## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
Members United Corporate Federal Credit Union,
Southwest Corporate Federal Credit Union, and
Constitution Corporate Federal Credit Union,
in its own right, and on behalf of NCUA
GUARANTEED NOTES TRUST 2010-R1, NCUA
GUARANTEED NOTES TRUST 2010-R2, NCUA
GUARANTEED NOTES TRUST 2010-R3, NCUA
GUARANTEED NOTES TRUST 2011-R1, NCUA
GUARANTEED NOTES TRUST 2011-R2, NCUA
GUARANTEED NOTES TRUST 2011-R3, NCUA
GUARANTEED NOTES TRUST 2011-R4, NCUA
GUARANTEED NOTES TRUST 2011-R5, NCUA
GUARANTEED NOTES TRUST 2011-R6, NCUA
GUARANTEED NOTES TRUST 2011-M1,

                Plaintiffs,

    -against-

HSBC BANK USA, NATIONAL ASSOCIATION

               Defendant.

---------------------------------------------------------------x



Case No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**



RECEIVED
MAR 2 0 2015
U.S.D.C. S.D. N.Y.
CASHIERS

TABLE OF CONTENTS

I.     NATURE OF THE ACTION.................................................................................1

II.    PARTIES..........................................................................................................6

III.   BNY MELLON AS INDENTURE TRUSTEE FOR THE NGN TRUSTS
       DECLINED TO TAKE ACTION ON BEHALF OF THE NGN TRUSTS
       AND, IN ANY EVENT, HAS DIRECT CONFLICTS IN PURSUING
       THESE CLAIMS ...........................................................................................17

IV.    JURISDICTION AND VENUE........................................................................19

V.     THE TRUSTS.................................................................................................20

VI.    BACKGROUND .............................................................................................21

       A.    RMBS Trusts ........................................................................................21

             Figure 1 ................................................................................................22

       B.    The Trustees' General Duties ...............................................................24

       C.    The Trustees' Duties Under the Pooling and Servicing
             Agreements ...........................................................................................25

       D.    Duty Properly to Take Title to the Mortgage Loans Conveyed
             to the Trust ............................................................................................26

       E.    Duty to Provide Notice of Incomplete or Defective Mortgage
             Files and Enforce Repurchase Rights with Respect to Mortgage
             Files that Cannot be Cured....................................................................28

       F.    Duty to Provide Notice of Breaches and to Enforce Repurchase
             Rights with Respect to Defective Loans................................................29

       G.    Duties under the Transfer Agreements .................................................31

       H.    Duties Regarding the Servicers.............................................................33

       I.    The Trustee's Duties upon Knowledge of an Event of Default.............34

       J.    The Trustee's Duties and Obligations under the TIA and the
             Streit Act, and the Common Law .........................................................35

i

VII. **DEFENDANT SHOULD HAVE CAREFULLY INVESTIGATED THE FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN APPROPRIATE ACTION** .......................................37

    A.    General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards .......................................................38

    B.    Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices .......................................44

        1.    American Home ..............................................................................44

        2.    Argent ..............................................................................................46

        3.    Bank of America .............................................................................51

        4.    Countrywide.....................................................................................55

        5.    Deutsche Bank .................................................................................61

        6.    First National Bank of Nevada .......................................................64

        7.    Fremont.............................................................................................67

        8.    GreenPoint .......................................................................................70

        9.    IndyMac ...........................................................................................75

        10.    MortgageIT ......................................................................................80

        11.    National City....................................................................................84

        12.    New Century ....................................................................................85

        13.    Nomura ............................................................................................95

        14.    Option One.......................................................................................96

        15.    Residential Funding .......................................................................100

        16.    Wells Fargo.....................................................................................102

    C.    A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust

Losses Are Further Evidence of the Originators' Systematic
Disregard of Underwriting Standards ..................................................................107

    1.    The Trusts Suffered from High Delinquency and
Default Rates.........................................................................................107

    2.    The Trusts Suffered Huge Losses ...........................................................109

D.    The Collapse of the Certificates' Credit Ratings Is Further
Evidence of Systematic Disregard of Underwriting Guidelines..........................109

    Table 2 ..................................................................................................110

**VIII. ADDITIONAL EVIDENCE SHOWS THAT DEFENDANT KNEW OF
DEFAULTS** ....................................................................................................112

A.    Defendant's Affiliates Have Been Sued on Claims of
Systematic, Widespread Shoddy Origination Practices......................................112

B.    Defendant Received Written Notice of Systematic, Widespread
Breaches of Representations and Warranties from Monoline
Insurers.........................................................................................................113

C.    Global RMBS Repurchase Investigations and Settlements
Alerted Defendant to Systematic, Widespread Breaches of
Representations and Warranties.........................................................................114

D.    Defendant Has Been Involved in Repurchase Litigation
Against Responsible Parties..............................................................................115

**IX. DEFENDANT FAILED TO PRUDENTLY ADDRESS MASTER
SERVICER AND/OR SERVICER DEFAULTS** ........................................................119

A.    Defendant Breached the Governing Agreements and Its
Common Law and Statutory Obligations By Failing to Fulfill
Its Duties After Defaults and Events of Default Triggered By
Master Servicer and Servicer Misconduct ............................................................119

B.    Specific Servicer Misconduct .............................................................................121

C.    The Master Servicers and Servicers Defaulted on their Duty to
Notify the Trustee of Breaches of the Mortgage Loan
Representations and Warranties.........................................................................131

D.    Defendant Knew That the Trusts Suffered from Widespread
Master Servicer and/or Servicer Defaults ...........................................................133

X.      DEFENDANT FAILED TO ENSURE LOAN FILES WERE
        PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO
        REMEDY ANY DEFECTS..........................................................................................135

        A.      Defendant Failed to Take Possession of Complete Mortgage
                Loan Files...........................................................................................................135

        B.      Defendant Knew That the Loan Files Were Incomplete ......................................138

        C.      The Document Delivery Failures Were Events of Default....................................139

XI.     DEFENDANT FAILED TO SATISFY ITS PRE-AND POST-DEFAULT
        DUTIES AND BREACHED THE GOVERNING AGREEMENTS ........................141

XII.    THE "NO ACTION" CLAUSES DO NOT APPLY.....................................................150

XIII.   CLAIMS FOR RELIEF .................................................................................................151

        COUNT ONE – BREACH OF CONTRACT....................................................................151

        COUNT TWO – BREACH OF FIDUCIARY DUTY .....................................................153

        COUNT THREE – NEGLIGENCE AND GROSS NEGLIGENCE................................155

        COUNT FOUR – NEGLIGENT MISREPRESENTATION ...........................................156

        COUNT FIVE – BREACH OF THE COVENANT OF GOOD FAITH ........................159

        COUNT SIX – VIOLATION OF THE STREIT ACT.....................................................160

        COUNT SEVEN – VIOLATION OF THE TRUST INDENTURE
        ACT OF 1939 ...................................................................................................................162

        PRAYER FOR RELIEF ...................................................................................................165

XIV.    JURY DEMAND...........................................................................................................165

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity

as liquidating agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western

Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union

("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and

Constitution Corporate Federal Credit Union ("Constitution"), (collectively, the "CCUs"), and as

the holder of the NGN Owner Trust Certificates (as defined below) brings this action against

HSBC Bank USA, National Association, ("HSBC" or "Defendant"), individually and on behalf

of and for the benefit of the NGN Trusts (as defined below, and collectively the "Plaintiffs") and

alleges as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this action against Defendant to recover the damages they have

suffered because of Defendant's violations of its statutory, contractual, and common law

obligations.

2.     This action arises out of Defendant's role as trustees for 37 trusts identified on

Exhibit A that issued residential mortgage-backed securities ("RMBS"). Each trust consists of

hundreds of individual residential mortgage loans that were pooled together and securitized for

sale to investors. Investors purchased certificates issued by the RMBS trust certificates that

entitled the investors (or "certificateholders") to fixed principal and interest payments from the

income stream generated as borrowers made monthly payments on the mortgage loans in the

trusts.

3.     The CCUs purchased the certificates in the trusts identified on Exhibit A at an

original face value of approximately $2.37 billion.

4.     The certificates' value was dependent on the quality and performance of the

1

mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustee to protect their interests.

5.     Defendant, as the trustee for the trusts, had contractual, common law, and statutory duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. The trustee for each trust has three primary duties. First, the trustee must oversee the process whereby the trusts take possession of the mortgage loans and acknowledge receipt of the mortgage files. This process includes review of the documents in the mortgage files, identification of any mortgage files that lack a complete chain of title or that have missing documents, and certification that the mortgage files are complete and accurate. If the trustee becomes aware of defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

6.     Second, if the trustee discovers a breach of the representations and warranties concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders will suffer losses properly borne by the party responsible for the defective loans.

7.     Third, the trustee must act to protect the interests of the trust and the

2

certificateholders when it becomes aware of defaults concerning the trust. Thus, when the trustee discovers a default, or is notified by other parties, such as servicers or custodians, of defaults like breaches of representations and warranties with respect to the underlying mortgage loans, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.     Here, Defendant failed to even ensure the trusts had full possession of the original notes and mortgages and the mortgage loan files had been properly reviewed for irregularities. If Defendant had fulfilled its obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased or substituted.

9.     Moreover, an overwhelming number of events alerted Defendant to the fact that the trusts suffered from numerous problems, yet it did nothing. First, the trusts suffered enormous losses due to the high number of mortgage defaults, delinquencies, and foreclosures caused by defective loan origination and underwriting. Second, highly publicized government investigations and enforcement actions, public and private litigation, and media reports highlighted the mortgage originators' systematic abandonment and disregard of underwriting guidelines and the deal sponsors' poor securitization standards in the years leading up to the financial crisis. As summarized below, these actions and reports detail the incredible volume of defective loans and notorious activities of the originators, sponsors, and other players in the RMBS industry. Yet Defendant failed to take steps to preserve its rights or hold the responsible parties accountable for the repurchase or substitution of defective mortgage loans in direct contravention of its obligations as trustee.

10.     Finally, Defendant failed to address servicer and/or master servicer defaults and events of default. Defendant knew that the master servicers and servicers were ignoring many of

3

their duties, including their duty to notify other parties, including Defendant as trustee, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendant's knowledge of these ongoing defaults and events of default, Defendant failed to act prudently to protect the interests of the trusts and the certificateholders.

11.     Defendant's failures resulted in the trusts and certificateholders suffering losses rightfully borne by other parties. Had Defendant adequately performed its contractual, common law, and statutory obligations, breaching loans would have been removed from the loan pools underlying the certificates and returned to the responsible party. Defendant's improper conduct directly caused losses to certificateholders like the Plaintiffs.

12.     Even after ample evidence came to light that the trusts were riddled with defective loans, Defendant shut its eyes to such problems and failed to take the steps necessary to protect the trusts and certificateholders. Defendant failed to act in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendant's interests. As a participant in many roles in the securitization process, Defendant was economically intertwined with the parties it was supposed to police.

13.     Because of the widespread misconduct in the securitization process, Defendant had incentives to ignore other parties' misconduct in order to avoid drawing attention to its own misconduct. Thus Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against responsible party breaches.

14.     Under the governing agreements and the common law, Defendant was required to exercise its rights and powers to protect the trusts. Once Defendant became aware of the various failures discussed in this complaint, Defendant was required to use the same degree of care and skill that a prudent person would. But Defendant did not do so. Instead of protecting the trusts

4

and the certificateholders, Defendant sat by as the trusts wasted away. Defendant failed to exercise due care, failed to provide Plaintiffs and certificateholders with its undivided loyalty, failed to act in good faith, and negligently and with gross negligence breached its duties and made misrepresentations to Plaintiffs.

15.     Indeed, it is precisely this type of trustee complicity and inaction that led Congress to enact the Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa *et seq.*, to "meet the problems and eliminate the practices" that plagued Depression-era trustee arrangements and provide investors with a remedy for trustees that utterly neglect their obligations. *See, e.g.*, 15 U.S.C. § 77bbb(b) (explaining purposes of the TIA in light of problems identified in 15 U.S.C. § 77bbb(a)).[1]

16.     To that end, several sections of the TIA impose duties on trustees. First, TIA Section 315(a) provides that, prior to default (as that term is defined in the governing documents), the trustee is liable for any duties specifically set out in the governing documents. 15 U.S.C. § 77ooo(a)(1). Second, TIA Section 315(b) provides that the trustee must give holders of covered securities "notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b). Third, Section 315(c) requires a trustee to act prudently in the event of a default (as that term is defined in the governing documents). 15 U.S.C. § 77ooo(c). Finally, the TIA states that "[n]otwithstanding any other provision of the

---

[1] In December 2014, the Second Circuit issued an order in *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. The Bank of New York Mellon*, No. 13-cv-1776 (2d Cir. Dec. 23, 2014). In its order, the Second Circuit held that residential mortgage-backed securities ("RMBS") certificates issued pursuant to pooling and servicing agreements ("PSAs") are not covered by the TIA because they fall under TIA § 304(a)(2), which exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges." 15 U.S.C. § 77ddd(a)(2). This Complaint contains two trusts, FMIC 2005-3 and PCHLT 2005-4, structured under indentures and thus not impacted by the Second Circuit ruling. Plaintiffs have also included TIA claims for trusts structured under PSAs to preserve their appellate rights.

5

indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).

17.    In addition, New York Real Property Law § 124 *et seq.* (the "Streit Act") was enacted to ensure that trustees act with due care, facilitate the orderly administration of the trust, and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in the performance of its duties as would a prudent person under the same circumstances. N.Y. Real Prop. Law § 126(1).

18.    Defendant's failure to perform its duties has damaged Plaintiffs. Accordingly, Plaintiffs now bring this action against Defendant for breaching the governing agreements, for failing in its common law duties, for violating the TIA, and, for the New York Trusts, for violating the Streit Act.

## II.    PARTIES

19.    The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury

6

Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the Liquidating Agent for such credit union. As Liquidating Agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

20. U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided investment and financial services to other credit unions.

21. WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California. As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

22. Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois. Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions. As a corporate credit union, Members United provided investment and financial services to other credit unions.

23. Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas. As a corporate credit union, Southwest provided investment and financial services to other credit unions.

24. Constitution was a federally chartered corporate credit union with its offices and

7

principal place of business in Wallingford, Connecticut. As a corporate credit union, Constitution provided investment and financial services to other credit unions.

25.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A) and appointed itself Liquidating Agent. On September 24, 2010, the NCUA Board placed Members United, Southwest, and Constitution into conservatorship pursuant to the FCU Act. On October 31, 2010, the NCUA Board placed Members United, Southwest, and Constitution into involuntary liquidation, appointing itself Liquidating Agent.

26.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the CCUs, and succeeds to all rights, titles, powers, and privileges of the CCUs. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2). In addition, the NCUA Board as Liquidating Agent may "exercise all powers and authorities specifically granted to conservators or liquidating agents, respectively, under this chapter and such incidental powers as shall be necessary to carry out such powers; and (ii) take any action authorized by this chapter, which the Board determines is in the best interests of the credit union, its account holders, or the Board." *See* 12 U.S.C. §1787(b)(2)(J).

27.     In 2010, the NCUA created the NCUA Guaranteed Note ("NGN") Program as a

8

means of liquidating the distressed investment securities ("Legacy Assets") from the five failed corporate credit unions and thereby stabilizing funding for the credit union system. The Legacy Assets consist of over 2,000 investment securities, secured by approximately 1.6 million residential mortgages, as well as commercial mortgages and other securitized assets. The NCUA Board transferred the Legacy Assets, including the CCU's investment in the trusts at issue in this Complaint, to the NGN Trusts. The NGN Trusts then issued approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets. The timely repayment of principal and interest to the investors in the NGN Trusts is guaranteed by the NCUA and backed by the full faith and credit of the United States.

28.  As successor-in-interest to the CCUs, certain of the NCUA Board's interests in the majority of trusts at issue in this Complaint were resecuritized in the NGN Program as part of: NCUA Guaranteed Notes Trust 2010-R1 ("NCUA 2010-R1 Trust"); NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); NCUA Guaranteed Notes Trust 2011-R3 ("NCUA 2011-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R4 ("NCUA 2011-R4 Trust"); NCUA Guaranteed Notes Trust 2011-R5 ("NCUA 2011-R5 Trust"); NCUA Guaranteed Notes Trust 2011-R6 ("NCUA 2011-R6 Trust"), and NCUA Guaranteed Notes Master Trust ("NCUA 2011-MI Trust") (collectively the "NGN Trusts"). CUSIP 55028CAE5 in Trust LUM 2007-1, CUSIP 590214AD4 in Trust MLMI 2006-A4, CUSIP 65538DAB1 in Trust NAA 2006-AR4, CUSIP 65537KAC4 in Trust NHELI 2007-1, CUSIP 68384CAD8 in Trust OPMAC 2006-2 were never resecuritized and have been held, and continue to be held, by the NCUA Board since the liquidation of the CCUs.

9

29.     Plaintiff NCUA Board is the holder of certain certificates that represent a beneficial ownership interest in the NGN Trusts (the "Owner Trust Certificates"). As the holder of the Owner Trust Certificates, the NCUA Board is entitled to payments from the NGN Trusts after the principal balance of the senior notes issued by the various NGN Trusts has been reduced to zero; all accrued and unpaid interest on the senior notes has been paid; all amounts owed to the Guarantor have been reimbursed; and the Indenture Trustee, in all of its related capacities, the Administrator and the Owner Trustee have been paid in full.

30.     The NCUA Board notified investors that it was actively investigating and pursuing certain legal claims in connection with the securities underlying the NGNs and any recovery on those claims would benefit the NCUA Board as Liquidating Agent for the CCUs (referred to as the "Sellers" under the NGN securitization agreements) exclusively. *See, e.g.,* NGN Trust 2011-R4 Offering Memorandum at 31 ("Beginning in September 2010, in connection with these investigations, the NCUA requested that various potential defendants, including potentially these Initial Purchasers, enter into separate tolling agreements to suspend for a period of time the running of any statutes of limitations that apply to potential claims, including claims under federal and state securities laws, with respect to specified asset-backed securities sold to the Corporate Credit Unions. It is not known at this time whether specific legal claims will be asserted by the NCUA in respect of the Underlying Securities, or whether litigation will ensue. Any damages or other amounts recovered by the NCUA in connection with any such claims will not be part of the Trust Estate and will not be used to make payments on the Offered Notes. Any such recoveries will benefit the Sellers exclusively.").

31.     Plaintiff, the NCUA Board, brings this action in its own right as the duly-appointed liquidating agent for each of the CCUs with respect to CUSIPs that were not

resecuritized as part of the NGN Program, and in the right of, and on behalf of, and for the benefit of the NGN Trusts with respect to CUSIPs that were resecuritized as part of the NGN Program.[2]

32.     NCUA Guaranteed Notes Trust 2010-R1 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of October 27, 2010 (the "NGN 2010-R1 Indenture"), by and between the NCUA 2010-R1 Trust, as issuer, and The Bank of New York Mellon ("BNY Mellon"), as Indenture Trustee, (ii) Trust Agreement dated as of October 27, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"), in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of October 27, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R1 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R1 Indenture and of the Guarantor (collectively, the "NGN 2010-R1 Agreements").

33.     NCUA Guaranteed Notes Trust 2010-R2 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of November 17, 2010 (the "NGN 201-R2 Indenture"), by and between the NCUA 2010-R2 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of November 17, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii)

---

[2] The NCUA, as Guarantor, has assigned legal title and any rights it may have had to pursue the claims set forth in this Complaint to the NCUA Board, as Liquidating Agent for the CCUs.

11

Guaranty Agreement dated as of November 17, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R2 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R2 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R2 Indenture and of the Guarantor (collectively, the "NGN 2010-R2 Agreements").

34.     NCUA Guaranteed Notes Trust 2010-R3 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of December 9, 2010 (the "NGN 2010-R3 Indenture"), by and between the NCUA 2010-R3 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of December 9, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of December 9, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R3 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R3 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R3 Indenture and of the Guarantor (collectively, the "NGN 2010-R3 Agreements").

35.     NCUA Guaranteed Notes Trust 2011-R1 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of January 27, 2011 (the "NGN 2011-R1 Indenture"), by and between the NCUA 2011-R1 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of January 27, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and

12

BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of January 27, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R1 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R1 Indenture and of the Guarantor (collectively, the "NGN 2011-R1 Agreements").

36.     NCUA Guaranteed Notes Trust 2011-R2 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of February 11, 2011 (the "NGN 2011-R2 Indenture"), by and between the NCUA 2011-R2 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of February 11, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of February 11, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R2 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R2 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R2 Indenture and of the Guarantor (collectively, the "NGN 2011-R2 Agreements").

37.     NCUA Guaranteed Notes Trust 2011-R3 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of March 1, 2011 (the "NGN 2011-R3 Indenture"), by and between the NCUA 2011-R3 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of March 1, 2011, by and among the NCUA

13

Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of March 1, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R3 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R3 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R3 Indenture and of the Guarantor (collectively, the "NGN 2011-R3 Agreements").

38.    NCUA Guaranteed Notes Trust 2011-R4 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of March 31, 2011 (the "NGN 2011-R4 Indenture"), by and between the NCUA 2011-R4 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of March 31, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of March 31, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R4 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R4 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R4 Indenture and of the Guarantor (collectively, the "NGN 2011-R4 Agreements").

39.    NCUA Guaranteed Notes Trust 2011-R5 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of April 14, 2011 (the "NGN 2011-R5 Indenture"), by and between the NCUA 2011-R5 Trust, as issuer, and BNY Mellon, as

14

Indenture Trustee, (ii) Trust Agreement dated as of April 14, 2011, by and among the NCUA

Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and

BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty

Agreement dated as of April 14, 2011, by and among NCUA in its capacity as an Agency of the

Executive Branch of the United States, as Guarantor, the NCUA 2011-R5 Trust, as issuer, and

BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture

trustee under the NGN 2011-R5 Indenture for the benefit of the holders from time to time of the

senior notes issued by the issuer pursuant to the NGN 2011-R5 Indenture and of the Guarantor

(collectively, the "NGN 2011-R5 Agreements").

40.    NCUA Guaranteed Notes Trust 2011-R6 is a Delaware statutory trust formed

pursuant to, *inter alia*, the associated (i) Indenture dated as of May 5, 2011 (the "NGN 2011-R6

Indenture"), by and between the NCUA 2011-R6 Trust, as issuer, and BNY Mellon, as Indenture

Trustee, (ii) Trust Agreement dated as of May 5, 2011, by and among the NCUA Board in its

Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon,

as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as

of May 5, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of

the United States, as Guarantor, the NCUA 2011-R6 Trust, as issuer, and BNY Mellon, as the

Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN

2011-R6 Indenture for the benefit of the holders from time to time of the senior notes issued by

the issuer pursuant to the NGN 2011-R6 Indenture and of the Guarantor (collectively, the "NGN

2011-R6 Agreements").

41.    NCUA Guaranteed Notes Master Trust is a Delaware statutory trust formed

pursuant to, *inter alia*, the associated (i) Master Indenture dated as of June 16, 2011 (the "NGN

2011-M1 Indenture"), by and between the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, as

Indenture Trustee, (ii) Indenture Supplement dated as of June 16, 2011, by and between the

NCUA 2011-M1 Trust, as issuer, and BNY Mellon, (iii) Master Trust Agreement dated as of

June 16, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells

Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the

Certificate Paying Agent, and (iv) Guaranty Agreement dated as of June 16, 2011, by and among

NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor,

the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, (collectively,

the "NGN 2011-M1 Agreements").

      42.     NCUA, in its capacity as an agency in the Executive Branch of the U.S.

Government, has issued a guarantee in connection with the NGNs. Plaintiff NCUA Board, as

liquidating agent for each of the CCUs, is the holder of the Owner Trust Certificates in

connection with the NGNs. Any recovery the NGN Trusts receive as a result of the claims for

relief in this complaint directly increases the value of the Owner Trust Certificates. The value of

the Owner Trust Certificates will become available to pay claims against the liquidated CCUs,

including those of the NCUSIF and TCCUSF. Thus any recovery on behalf of the NGN Trusts in

this action will benefit the NGN Trusts and the NCUA Board and lessen the financial burden on

the government and federally insured credit unions resulting from the failure of the CCUs.

      43.     Plaintiff NCUA Board brings the claims on behalf of and for the benefit of the

NGN Trusts as the holder of the NGN Owner Trust Certificates, as an express third-party

beneficiary of the NGN Trust Indentures, and pursuant to its authority under 12 U.S.C. § 1787.

      44.     Defendant HSBC Bank USA, National Association, is a national banking

association and is the principal subsidiary of HSBC USA Inc. HSBC's principal executive office

is located at 2 Hanson Place, 14th Floor, Brooklyn, New York and its registered main office is located in McLean, Virginia. HSBC currently administers as corporate trustee for assets valued at several hundred billion USD, including RMBS.

45.    HSBC, together with its affiliates, is involved in many aspects of the private-label RMBS market. As of April 2011, HSBC, together with HSBC Finance Corporation and other subsidiaries ("HSBC Mortgage Servicing Companies") was the twelfth largest servicer of residential mortgages in the United States, servicing a portfolio of 892,200 residential mortgage loans.

46.    HSBC, through its affiliates HSBC Finance Corporation, Household Finance Corp., Beneficial, and Decision One has also acted as a mortgage loan originator or seller for numerous RMBS offerings. From 2005 through 2008, HSBC was also a leading sponsor of private-label RMBS, sponsoring RMBS offerings under the HASC, HALO and HFCHC shelves.

## III.    BNY MELLON AS INDENTURE TRUSTEE FOR THE NGN TRUSTS DECLINED TO TAKE ACTION ON BEHALF OF THE NGN TRUSTS AND, IN ANY EVENT, HAS DIRECT CONFLICTS IN PURSUING THESE CLAIMS

47.    BNY Mellon is the indenture trustee of the NGN Trusts.

48.    Pursuant to the indentures of each of the NGN Trusts, on February 24, 2015, NCUA, acting in its capacity as Guarantor with respect to the NCUA Guaranteed Notes, issued a written demand to BNY Mellon, not in its individual capacity, but solely as the indenture trustee of the NGN Trusts, to take action to assert the claims on behalf of the NGN Trusts. On February 25, 2015, BNY Mellon indicated that it does not intend to pursue claims on behalf of the NGN Trusts, and acknowledged and agreed that NCUA has the right to pursue claims on behalf of the NGN Trusts because BNY Mellon failed to do so after receiving notice.

49.    Additionally, BNY Mellon has irreconcilable direct and positional conflicts of

17

interest in pursuing Plaintiffs' claims against Defendant such that any demand for BNY Mellon would be futile.

50.    Most importantly, BNY Mellon is itself an RMBS trustee. While proceeding as plaintiff on behalf of the NGN Trusts, BNY Mellon would be in the untenable position of advocating against its own interests as an RMBS trustee and positions it has taken in separate litigation.

51.    In particular, BNY Mellon is already a defendant in several lawsuits asserting the very same claims against BNY Mellon as those asserted in this Complaint. *See, e.g., Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, Case No. 11-cv-5459 (S.D.N.Y. 2011); *Am. Fid Assur. Co. v. Bank of New York Mellon*, Case No. 11-1284 (W.D. Okla. 2011); *Blackrock Allocation Target Shares: Series S Portfolio, et al. v. Bank of New York Mellon, as Trustee, et al.*, Case No. 14-cv-9372 (S.D.N.Y. 2014); *Phoenix Light SF v. Bank of New York Mellon*, Case No. 14-cv-10104 (S.D.N.Y. 2014); *Royal Park Investments SA/NV v. The Bank of New York Mellon*, Case No. 14-cv-6502 (S.D.N.Y. 2014); *Western and Southern Life Ins. Co., et al. v. Bank of New York Mellon, as Trustee*, No. A1302490 (Ohio Ct. Comm. Pl. 2013).

52.    In those lawsuits, BNY Mellon has taken or will take positions directly at odds with Plaintiffs' claims against the Defendant. For example, BNY Mellon has asserted or almost certainly will assert that: (a) the Streit Act does not apply to RMBS trusts; (b) RMBS trustees have no duty of care prior to the occurrence of an Event of Default; (c) there is no independent cause of action against RMBS trustees for breach of fiduciary duty; and (d) that no Events of Default occurred with respect to certain RMBS trusts.

53.    BNY Mellon cannot fully and forcefully safeguard Plaintiffs' interests in light of

18

this irreconcilable conflict.

54. Because of the foregoing, the NCUA Board brings this action on behalf of itself, as Liquidating Agent for each of the CCUs, and pursuant to its authority under 12 U.S.C. § 1787, and on behalf of and for the benefit of the NGN Trusts, as holder of the NGN Trust Owner Trust Certificates and as an express third-party beneficiary of the NGN Indenture Agreements.

## IV. JURISDICTION AND VENUE

55. This Court has subject matter jurisdiction pursuant to the following statutes: (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"; (c) 15 U.S.C. § 77v, providing for jurisdiction for claims under the TIA; (d) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; (e) 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy, without interest and costs, exceeds $75,000; and (f) 15 U.S.C. § 1367, providing for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This Court also has jurisdiction over the claims asserted under the Streit Act because this case involves New York common law trusts.

56. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), and/or 28 U.S.C. § 1391(b)(1), because Defendant is a resident of and/or conducts

business in this District. This Court has personal jurisdiction over Defendant because it is a

resident of and/or conducts business in this District and under N.Y. C.P.L.R. 301, New York's

long arm statute. The claims relate to Defendant's role as trustee over trusts created under New

York law and/or administered at least in part in New York. In addition, Defendant has filed

foreclosure cases on behalf of the trusts in New York and in the course of such proceedings

either discovered or should have discovered multiple defaults and representation warranty

breaches.

## V.    THE TRUSTS

57.     The trusts identified on Exhibit A are 37 New York common law trusts or

Delaware statutory trusts created in connection with residential mortgage-backed securitizations

between 2004 and 2008.

58.     The trusts have a high concentration of loans originated by the following lenders

and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment

Corp.; Argent Mortgage Co. LLC; Residential Funding Co., LLC; Bank of America, N.A.;

National City Mortgage Co.; Fremont Investment and Loan; National City Mortgage Co.; Bank

of America, N.A.; J.P. Morgan Chase Bank, N.A.; Countrywide Home Loans, Inc. and

Countrywide Home Loans Servicing LP; First National Bank of Nevada; MortgageIT, Inc.;

GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; New Century Mortgage

Corporation; Option One Mortgage Corp.; and Wells Fargo Bank, N.A. (collectively, the

"originators").

59.     A significant portion of the trusts were sponsored by the following sponsors and

their affiliates: Merrill Lynch Mortgage Lending, Inc.; Wells Fargo Bank, N.A., Nomura Credit

& Capital, Inc.; and DB Structured Products, Inc. (collectively, the "sponsors").

## VI.    BACKGROUND

### A.    RMBS Trusts

60.    RMBS certificates are debt instruments issued to investors by an issuing trust that holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the income stream generated by the trust as borrowers make payments on their mortgage loans.

61.    Because residential mortgage loans are the assets underlying the RMBS, the origination of mortgages starts the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.

62.    The securitization process begins with a sponsor who purchases loans in bulk from one or more originators. The sponsor transfers title of the loans to an entity called a depositor.

63.    The depositor transfers the loans to a trust called the issuing entity.

64.    The issuing entity then issues notes and/or certificates, providing certificateholders scheduled principal and interest payments derived from the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

65.    The depositor files required documents (such as registration statements and

21

prospectuses) with the U.S. Securities and Exchange Commission ("SEC") so the certificates can be offered to the public.

66.    One or more underwriters then sell the notes or certificates to investors.

67.    Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
*Illustration of the Securitization Process*



68.    The establishment and administration of each trust is governed by a series of contracts (the "governing agreements"). The vast majority of trusts are governed by an agreement called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA references and incorporates. The remaining trusts are governed by a document called an Indenture and certain related agreements that the Indenture references and incorporates,

22

including a document called the Sales and Servicing Agreement. All of the governing agreements are substantially similar, and impose the same duties on Defendant. *See* Exhibit E §§ I – IX. Accordingly, this Complaint refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

69. Once the loans are deposited into a trust, borrowers begin making payments to the trust through a master servicer. The master servicer is ultimately responsible for servicing the loans, but may use a designee, typically called a servicer or sub-servicer, to perform some or all of the mortgage servicing functions. The master servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties, and overseeing any sub-servicers.

70. When the master servicer collects loan payments from borrowers, it then transfers those payments, less allowable deductions, to the trustee. The trustee uses the payments, less allowable fees and expenses, to make scheduled principal and interest payments to certificateholders.

71. Thus, each trust is administered primarily by two entities – the trustee and the master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements, as well as those duties imposed by the common law, TIA and the Streit Act.

72. The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing

agreements, the common law, the TIA, and the Streit Act impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

73.     Defendant earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. Defendant also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. Defendant maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened Defendant's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

**B.**     **The Trustee's General Duties**

74.     The terms of the governing agreements are substantially similar, if not identical, and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Ex. F §§ I – IX. Further, upon information and belief, Defendant employed the same general set of policies and procedures to oversee and manage the trusts regardless of any individual variations contained within the governing agreements.

75.     Most importantly, Defendant has an absolute duty under the governing agreements, the common law, the TIA, and the Streit Act to acquire and protect the trust corpus for the benefit of certificateholders. Trustee acknowledges receipt . . . and declares that it holds (or the applicable Custodian on its behalf holds) and will hold such documents and the other documents delivered to it constituting a Loan Document, and that it holds (or the applicable Custodian on its behalf holds) or will hold all such assets and such other assets included in the definition of 'REMIC I' in trust for the exclusive use and benefit of all present and future

24

Certificateholders." PSA Section 2.2;[3] *see also* Exhibit E § II.

## C. The Trustee's Duties Under the Pooling and Servicing Agreements

76.     The PSAs are contracts between, in addition to others, the depositor, the master

servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs

for each of the trusts are substantially similar and memorialize the following events and

conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust;

(ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay

the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Exhibit E §§ I –

IX.[4]

77.     The PSAs also set forth Defendant's contractual duties and obligations, which are

identical or substantially identical for each trust. *See* Exhibit E §§ I – IX. Specifically, each PSA

requires Defendant to oversee and enforce the depositors', the custodians', and the servicers'

obligations. In performing these contractual obligations, Defendant must act in the best interests

of and for the protection of the trusts and the certificateholders. Certificateholders, unlike the

trustee, have no direct contact with the depositors and servicers. Moreover, under the PSAs,

certificateholders do not have the right to compel the trustee to enforce the responsible party's

---

[3] All cites to the PSA and its related agreements are to the PSA and related agreements specific
to the Deutsche Bank Alt-A Securities Mortgage Loan Trust 2006-AR6 ("DBALT 2006-AR6")
PSA, which, as alleged above, is substantially similar to the governing agreements for all of the
trusts. A copy of the DBALT 2006-AR6 PSA is attached as Exhibit B.

[4] Some of the trusts have a different structure—they issued notes pursuant to an indenture
(collectively, the "Indentures") on which the Defendant serves as indenture trustee. A separate
agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these
transactions. Although there are some differences between the PSA and Indenture structures,
with regard to this Complaint, both the nature of the claims asserted and Defendant's duties and
obligations are similar under the two structures.

representations and warranties,[5] absent satisfaction of the collective action provisions.

Certificateholders must rely on the Defendant to protect their interests.

### D.   Duty Properly to Take Title to the Mortgage Loans Conveyed to the Trust

78.     The trusts must take title to the mortgages conveyed to them for due

consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the

conveyance terms of the mortgage loans to the trust, and those terms are intended to ensure that

the trustee, on behalf of the trusts, takes full title to the mortgage loans. *See* Exhibit E § I – III.

79.     The first part of this conveyance involves the depositor assigning to the trustee,

among other things, its rights, title, and interest in the mortgage loans and the depositor's rights

under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section

2.1 ("Conveyance of Trust Fund"), which provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, on behalf of the Trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Loans identified on the Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement, the Servicing Agreements, the Assignment Agreements, the Subsequent Mortgage Loan Purchase Agreement and such assets as shall from time to time be credited or required by the terms of this Agreement to be credited to the Pre-Funding Account, Capitalized Interest Account, Cap Account and Swap Account (including, without limitation the right to enforce the obligations of the other parties thereto thereunder), and all other assets included or to be included in REMIC I.

The other PSAs contain substantially similar provisions. *See* Exhibit E § I.

---

[5] The governing agreements specify the party that is responsible for repurchasing any defective loan. Generally, they provide that, upon discovery and/or notice of a breach of a representation and warranty with respect to a mortgage loan that materially and adversely affects the interests of the certificateholders, the responsible party shall cure the breach or repurchase the affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due on the mortgage loan. The responsible party is generally either the originator of the loans, the seller of the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same or affiliated entities. For simplicity's sake, this complaint uses "responsible party" to refer to the entity responsible for the repurchase of any defective loans.

80.    Furthermore, the PSAs require Defendant, or its agents acting as custodians, to

acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all

mortgage pool assets—including the mortgage files and related documents and property—are

held by it as trustee. Significantly, Defendant, or its agents, must take physical possession of the

mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to

the trustee. As set forth in PSA Section 2.2:

> The Trustee acknowledges receipt, subject to the provisions of Section 2.1 hereof and
> Section 2 of the Custodial Agreements, of the Loan Documents and all other assets
> included in the definition of "REMIC I" under clauses (i), (ii) and (iii) (to the extent of
> amounts deposited into the Distribution Account), (iv) and (v) and declares that it holds
> (or the applicable Custodian on its behalf holds) and will hold such documents and the
> other documents delivered to it constituting a Loan Document, and that it holds (or the
> applicable Custodian on its behalf holds) or will hold all such assets and such other
> assets included in the definition of "REMIC I" in trust for the exclusive use and benefit
> of all present and future Certificateholders . . . .

The other PSAs contain substantially similar provisions. *See* Exhibit E § II.

81.    Once the mortgage files are in Defendant's or its custodians' possession,

Defendant, or the custodian on Defendant's behalf, is required to ensure that the underlying

mortgage loans were properly conveyed to the trusts, and that the trusts have perfected

enforceable title to the mortgage loans by reviewing the mortgage files for each mortgage loan.

Defendant, or the custodian on the Defendant's behalf, is required to review each mortgage file

within a certain period after the "closing date" of the securitization and deliver to the depositor a

certification that all documents required have been executed and received. This duty overlaps

with and forms part of the requirements that the trustee must satisfy to properly take title to the

mortgage loans. As set forth in PSA Section 2.1:

> In connection with such transfer and assignment, the Depositor does hereby deliver to,
> and deposit with the applicable Custodian pursuant to the related Custodial Agreement
> the documents with respect to each Loan as described under Section 2 of the related
> Custodial Agreement (the "Loan Documents"). In connection with such delivery and as

27

further described in the related Custodial Agreement, the applicable Custodian will be required to review such Loan Documents and deliver to the Trustee, the Depositor, the Master Servicer and the Seller certifications (in the forms attached to the related Custodial Agreement) with respect to such review with exceptions noted thereon. In addition, the Depositor under the Custodial Agreements will have to cure certain defects with respect to the Loan Documents for the related Loans after the delivery thereof by the Depositor to the Custodians as more particularly set forth therein.

The other PSAs contain substantially similar provisions. *See* Exhibit E § III.

82.     Defendant breached these contractual obligations by: 1) failing to take proper title to the mortgage loans; 2) failing to adequately review the mortgage loan files and certify their completeness; 3) failing to properly oversee the custodian or its agents. *See* Exhibit E § II – IV.

### E.     Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be Cured

83.     If Defendant or the custodian identifies any defect in a mortgage loan file for an underlying mortgage loan contained in a trust, Defendant must identify such defect and promptly provide notice to the relevant parties. As set forth in PSA Section 2.3(a):

Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File . . . the Trustee shall promptly notify the Seller of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within 60 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Loan from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

84.     Once incomplete mortgage files or loans with defective transfer documentation are identified, the parties to the governing agreements must work to remedy these deficiencies. As set forth in PSA Section 2.3(a) (emphasis added):

Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Seller of any

representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Loan that materially and adversely affects the value of such Loan or the interest therein or the Certificateholders, the Trustee shall promptly notify the Seller of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within 60 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, **the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Loan** from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

The other PSAs contain substantially similar provisions. *See* Exhibit E § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements (including the custodial agreement) comply with their respective obligations.

85.     Defendant breached these contractual obligations by: 1) failing to provide notice of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect to mortgage files that could not be cured. *See* Exhibit E § V.

### F.     Duty to Provide Notice of Breaches and to Enforce Repurchase Rights with Respect to Defective Loans

86.     The quality of the mortgage loans to which the trusts purportedly receive title is also critical to an RMBS securitization. For that reason, the governing agreements contain "representations and warranties" by the responsible party attesting to the characteristics of the borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

87.     As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the responsible party to cure, substitute, or repurchase any mortgage loans that materially breach the responsible party's representations and

29

warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the responsible party's repurchase obligations:

> Upon discovery or receipt of notice of . . . a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Loan that materially and adversely affects the value of such Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within 60 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the **Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Loan** from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

PSA Section 2.3(a) (emphasis added); *see also* Exhibit E § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements comply with their respective obligations.

88.     Consequently, under the governing agreements, Defendant is entrusted to ensure that the mortgage loans in the trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain quality as represented by the responsible party.

89.     To protect the trusts and all certificateholders, the governing agreements require Defendant to give prompt written notice to all parties to the governing agreements upon its knowledge of a breach of a representation or warranty made by the responsible party about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

90.     Defendant breached these contractual obligations by: 1) failing to provide notice

of defective mortgage loans; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by its contractual obligations. *See* Exhibit E § V.

### G.   Duties under the Transfer Agreements

91.     Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), Sale Agreements ("SAs"), and Assignment and Recognition Agreements (collectively, "transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These transfer agreements are generally between either the originator and the depositor, or the sponsor and the depositor.

92.     One of the parties to the transfer agreement—typically an originator or sponsor—makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans in either the PSA or the associated transfer agreement.[6] For simplicity's sake, this Complaint refers to that party as the "responsible party."

93.     The responsible party's typical representations and warranties in the transfer agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged

---

[6] The governing agreements frequently refer to the same entity by different titles depending upon the role being played. The role of seller or transferor generally overlaps with that of the sponsor.

31

property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. To the extent mortgages breach the responsible party's representations and warranties, the mortgage loans are worth less and are much riskier than represented. *See, e.g.*, Exhibit E § IX.

94.     Under the transfer agreements, upon discovery or receipt of notice of any breach of the responsible party's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the responsible party is obligated to cure the breach in all material respects.

95.     If a breach is not cured within a specified period, the responsible party is obligated either to substitute the defective loan with a loan of adequate credit quality, or to repurchase the defective loan.

96.     The repurchase provisions ensure that the trust need not continue to hold mortgage loans for which the responsible party breached its representations and warranties. Thus, the repurchase provisions are designed to transfer the risk of any decline, or further decline, in the value of defective mortgage loans that results from a breach from the trusts to the responsible party.

97.     Under the transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or the certificateholders' interests in the loans. The responsible party's cure, substitute, and repurchase obligations do not require any showing that the responsible party's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or require that the demanding party prove reliance on servicing and origination documents.

98.     Upon the sale of the mortgage loans to the trust, the rights under the transfer

agreements, including the responsible party's representations and warranties concerning the

mortgage loans, are generally assigned to the Defendant, as trustee, for the benefit of the trusts

and all certificateholders, in accordance with the governing agreements.

99.    Defendant breached these contractual obligations by: 1) failing to enforce its

contractual rights under the transfer agreement; 2) failing to enforce repurchase rights with

respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by its

contractual obligations.

### H.    Duties Regarding the Servicers

100.    Each PSA requires the master servicer or servicer to prudently service the loans

underlying the trusts.

101.    Section 3.1 of the PSA states that:

> The Master Servicer shall supervise, monitor and oversee the obligation of the Servicers
> to service and administer their respective Loans in accordance with the terms of the
> applicable Servicing Agreement and shall have full power and authority to do any and all
> things which it may deem necessary or desirable in connection with such master
> servicing and· administration. In performing its obligations hereunder, the Master Servicer
> shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore,
> the Master Servicer shall oversee and consult with each Servicer as necessary from time-
> to-time to carry out the Master Servicer's obligations hereunder, shall receive, review and
> evaluate all reports, information and other data provided to the Master Servicer by each
> Servicer and shall cause each Servicer to perform and observe the covenants, obligations
> and conditions to be performed or observed by such Servicer under the applicable
> Servicing Agreement.

The other PSAs contain substantially similar provisions. *See* Exhibit E § VII.

102.    Similarly, Section 3.3(b) of the PSA states that:

> The Master Servicer, for the benefit of the Trustee and the Certificateholders, shall
> enforce the obligations of each Servicer under the related Servicing Agreement, and shall,
> in the event that a Servicer . . . fails to perform its obligations in accordance with the
> related Servicing Agreement, subject to the preceding paragraph, terminate the rights and
> obligations of such Servicer thereunder and act as servicer of the related Loans or to
> cause the Trustee to enter in to a new Servicing Agreement with a successor servicer
> selected by the Master Servicer.

103.    Under the PSAs, Defendant, as trustee, has certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendant's obligations upon occurrence of an "event of default," which is defined as a specified failure of the master servicer or servicer to perform its servicing duties and cure this failure within a specified time. Section 7.1 of the PSAs identifies several types of failures by the master servicer or servicer that may give rise to an event of default. The other PSAs contain substantially similar provisions. *See* Exhibit E § VIII. Such failures include a breach of master servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee.

104.    The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Exhibit E § VIII.

105.    Defendant breached these contractual obligations by failing to properly monitor the servicers and master servicers.

### I.    The Trustee's Duties upon Knowledge of an Event of Default

106.    The PSAs impose additional obligations upon Defendant once one of its responsible officers knows a default or a servicer event of termination has occurred. First, under Section 7.1 of the PSAs, Defendant must give written notice to the servicer of the occurrence of such an event within the specified period after Defendant obtains knowledge of the occurrence.

107.    Second, within sixty to ninety days after a default has occurred, Defendant must provide written notice to all certificateholders about that event, unless the default has been cured or waived. As set forth in PSA Section 7.3(b):

34

> Not later than the later of 60 days after the occurrence of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Master Servicer Event of Default or five days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Holders of Certificates notice of each such occurrence, unless such default or Master Servicer Event of Default shall have been cured or waived.

The other PSAs contain substantially similar provisions. *See* Exhibit E § VIII.

108.    Third, and most importantly, Section 8.1 of the PSAs requires Defendant to "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The other PSAs contain substantially similar provisions. *See* Exhibit E § VI.

109.    Defendant breached these contractual obligations by: 1) failing to provide notice of defaults and events of default; 2) failing act as a prudent person following defaults and events of default; and 3) failing to act with due care and without negligence prior to an Event of Default. *See* Exhibit E §§ VI, VIII.

## J.    The Trustee's Duties and Obligations under the TIA and the Streit Act, and the Common Law

110.    Each of the PSAs (or indentures) is substantially similar and imposes substantially the same duties on Defendant as trustee. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs (or indentures) and the related trusts. 15 U.S.C. § 77ddd(a)(1).

111.    The TIA imposes two sets of duties and obligations on Defendant as trustee of the trusts – one set "prior to default" and the other set "in case of default."

112.    Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust. 15 U.S.C. § 77ooo(a)(1). Under that

provision, Defendant had to perform the duties specifically assigned to it under the governing agreements, including those duties described above.

113.    Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture] to determine whether or not such evidence conforms to the requirements of the indenture." 15 U.S.C. § 77ooo(a) (citing 15 U.S.C. § 77nnn). Thus, Defendant was required to examine the evidence the master servicer or custodian provided to the trusts, certifying their compliance with the covenants it made under the governing agreements, and Defendant also had to determine whether that evidence conformed to the governing agreements' requirements.

114.    In addition, a trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Defendant consequently had to inform RMBS certificateholders of defaults and breaches of the governing agreements within ninety days after their occurrence.

115.    In case of a default (as defined in the PSA or indenture), a trustee must exercise "such of the rights and powers vested in it by such indenture, and [ ] use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).

116.    The Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the trust and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in performing its duties as a prudent person would under the same circumstances. N.Y. Real Prop.

Law § 126(1).

117.    The duty to act as a prudent person is also implicated under the common law when the trustee substantially breaches its obligations under a contract or an indenture. Under such circumstances, the trustee cannot rely on provisions of the contract or indenture providing the trustee with the protections afforded to an indenture trustee.

118.    The common law also imposes fiduciary duties upon the trustee and requirements to act with due care, with undivided loyalties and in good faith, and to refrain from negligent conduct and negligent misrepresentations. Defendant's negligence, willful misconduct, and failure to act resulted in breaches of the governing agreements.

119.    As set forth below, Defendant is liable to Plaintiffs under the TIA, the Streit Act, and the common law for failing to exercise the necessary degree of skill and in failing to enforce its rights and powers under the governing agreements.

## VII.   DEFENDANT SHOULD HAVE CAREFULLY INVESTIGATED THE FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN APPROPRIATE ACTION

120.    The trusts' loan pools contained large numbers of loans that materially breached the responsible parties' representations and warranties concerning the originators' compliance with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other associated standards. By 2009 at the latest, Defendant had a duty to carefully investigate the evidence, public evidence or evidence otherwise available to trustees, demonstrating the widespread breaches of representations and warranties in the trusts, including: 1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific reports concerning the originators of loans in the trusts abandoning their underwriting standards

and sponsors of the securitizations failing to follow prudent practices; 3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous lawsuits brought against Defendant and its affiliates alleging the systematic abandonment of originator underwriting guidelines.

A.    **General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards**

121.    By 2009, government reports, public and private investigations, and media reports had surfaced concerning the collapse of the RMBS market and revealed the potential for massive problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues and to take action as necessary. These reports and investigations identified the originators' pervasive abandonment of underwriting standards and sponsors' disregard of prudent securitization standards as the cause of the crisis.

122.    For example, the Office of the Comptroller of the Currency (the "OCC"), published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

123.    Despite the importance of sticking to underwriting standards, it was clear that

originators were not following them. Chairman of the Federal Reserve Board, Benjamin

Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs

Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of

Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the*

*President's Working Group on Financial Markets*, Apr. 10, 2008, *available at*

http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

124.    In November 2010, the Congressional Oversight Panel, which was established as

part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining

the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation."

The report recounts widespread foreclosure abuses in connection with mortgages that have been

securitized and the numerous federal and state investigations that have detailed this problem. The

abuses identified in the report—including forged or back-dated mortgage assignments and "robo-

signing" of false affidavits used in foreclosure actions—arise from failures in the documentation

and transfer of mortgage loans from the originators to other entities in the securitization process,

and ultimately into the trusts. As the report explains, irregularities in the chain of title between

the originator and the trust can have significant legal consequences that damage the trusts and

certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010), *available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

125.    Other reports reached similar conclusions. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") issued a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

126.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

127.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id.* at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

128.    The FCIC Report also noted that during the housing boom, mortgage lenders

focused on quantity rather than quality, originating loans for borrowers who had no realistic

capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their

mortgages within just a matter of months after taking a loan nearly doubled from the summer of

2006 to late 2007." *Id.* at xxii. A default in the first few months of a mortgage, known as an early

payment default, is known in the mortgage industry as a significant indicator of pervasive

disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage

fraud "flourished in an environment of collapsing lending standards." *Id.*

129.    In this lax lending environment, mortgage lenders went unchecked, originating

mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

130.    Lenders and borrowers took advantage of this climate, with borrowers willing to

take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened

underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low

that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard

for a borrower's ability to pay." *Id.* at xxiii.

41

131.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the

Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had

heard about mortgage lenders "running wild, taking applications over the Internet, not verifying

people's income or their ability to have a job." *Id*. at 12-13 (internal quotation marks omitted).

132.    The predominant RMBS securitization method involved an originate-to-distribute

("OTD") model where the originators of the loans do not hold the loans, but instead repackage

and securitize them. The OTD model created a situation where the origination of low quality

mortgages through poor underwriting thrived. The Financial Stability Oversight Council

("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront
> without retaining a material ongoing economic interest in the performance of the loan.
> This reduces the economic incentive of originators and securitizers to evaluate the credit
> quality of the underlying loans carefully. Some research indicates that securitization was
> associated with lower quality loans in the financial crisis. For instance, one study found
> that subprime borrowers with credit scores just above a threshold commonly used by
> securitizers to determine which loans to purchase defaulted at significantly higher rates
> than those with credit scores below the threshold. By lower underwriting standards,
> securitization may have increased the amount of credit extended, resulting in riskier and
> unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011)

("FSOC Report") at 11 (footnote omitted).

133.    The FSOC reported that as the OTD model became more pervasive in the

mortgage industry, underwriting practices weakened across the industry. The FSOC Report

found "[t]his deterioration was particularly prevalent with respect to the verification of the

borrower's income, assets, and employment for residential real estate loans." *Id*. Similarly, the

sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed

to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans

were of the represented quality and also failed to ensure that the purported mortgaged property's

42

appraised value was accurate.

134.    As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

135.    Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

136.    In sum, reports regarding the disregard of underwriting standards and poor securitization practices became common by 2009. Even prior to 2009, Defendant had exclusive access to proprietary information and data demonstrating the systematic failure of underwriting standards that was not available to the public. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools underlying RMBS, resulting in steep losses. By at least 2009, it was apparent to trustees that the originators and sponsors involved in the securitization of the trusts had engaged in problematic practices such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues fully in connection with the trusts entrusted to its care.

**B.**     **Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

137.    The governing agreements for each of the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

138.    However, as discussed below, Defendant had reason to suspect that those representations and warranties were false and carefully investigate whether the mortgage files for the underlying mortgage loans in their trusts were defective. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines while pursuing profit by recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards.

139.    The information below provided ample reason for Defendant to suspect, as trustee for the trusts, that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendant should have carefully investigated those issues in the context of the trusts entrusted to its care, provided notice to certificateholders, and taken appropriate action to protect the trusts.

**1.     American Home**

140.    American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated, aggregated, and serviced by its subsidiaries. It was the parent of American Home Mortgage Acceptance, Inc. and American

Home Mortgage Holdings, Inc., which was the parent of American Home Mortgage Corp., a retail lender of mortgage loans. Collectively, these entities are referred to as "American Home." American Home originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

141.   American Home's lack of adherence to underwriting guidelines was detailed in a 165-page amended class action complaint filed in June 2008. *See* Am. Complaint, *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. June 4, 2008) ("American Home Am. Compl."). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from over 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See generally* American Home Am. Compl.

142.   According to the American Home Am. Compl., former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied without compensating factors. *See id.* ¶¶ 120-21.

143.   Witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id.*

144.   Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American

45

Home headquarters to get approval for exceptions. It was commonplace to overrule mortgage underwriters' objections to facilitate loan approval. *See id.* ¶ 123.

145.    A former American Home auditor confirmed that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.* ¶ 124.

146.    The parties settled the litigation on January 14, 2010, for $37.25 million.

147.    Like other originators from this period, American Home's poor lending practices resulted in numerous other civil lawsuits. Those lawsuits contain firsthand accounts from former employees and allegations that reunderwriting revealed that many loans originated by American Home were found to be breaching the associated representations and warranties. *See, e.g.,* Complaint, *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.,* No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); First Consolidated and Am. Complaint, *New Jersey Carpenters Health Fund v. Structured Asset Mortgage Invs. II, et al.,* No. 08-cv-8093 (S.D.N.Y. May 15, 2009).

### 2.    Argent

148.    ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the nation's largest privately-owned subprime lender. Ameriquest Mortgage Company ("Ameriquest") was ACC Capital's retail mortgage lending unit. Argent Mortgage Company, LLC ("Argent") was ACC Capital's wholly-owned wholesale lending unit that made loans through independent brokers. On September 1, 2007, Citigroup purchased Argent from ACC Capital, and Ameriquest announced that it was shutting down lending operations.

149.    Argent originated or contributed a substantial portion of the loans in the mortgage pools underlying the trusts.

150.    Argent appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report.

46

Argent was ranked as the worst lender in Cleveland, Ohio, and Detroit, Michigan; the second worst in Las Vegas, Nevada, and Miami, Florida; the third worst in Denver, Colorado; the fourth worst in Stockton, California; the fifth worst in Bakersfield, California; the sixth worst in Riverside and Sacramento, California; and the eighth worst in Memphis, Tennessee.

151.    In the 2009 OCC Report, Argent was fourth in Las Vegas, Nevada; sixth in Fort Pierce-Port St. Lucie, Florida and Reno, Nevada; seventh in Bakersfield, California and Stockton-Lodi, California; eighth in Riverside-San Bernardino, California; ninth in Merced, California, Modesto, California and Fort Myers-Cape Coral, Florida; and tenth in Vallejo-Fairfield-Napa, California.

152.    According to a May 11, 2008, Cleveland Plain Dealer article titled *The Subprime House of Cards*, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, reported that "some Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I didn't agree with." Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them." Mark Gillispie, *The Subprime House of Cards*, The Plain Dealer, May 11, 2008, *available at* http://blog.cleveland.com/metro/2008/05/the_subprime_house_of_cards.html.

153.    According to a January 29, 2009, article in the Miami Herald, Orson Benn, a former vice president of Argent who was convicted and sentenced to prison for racketeering relating to mortgage fraud, spent three years during the height of the housing boom teaching brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved. Jack Dolan *et al.*, *Home Loan Racket Flourished In Florida*, Miami Herald, Jan. 29,

47

2009, *available at* http://www.miamiherald.com/2008/12/07/v-fullstory/878194/home-loan-racket-flourished-in.html.

154.    According to Mr. Benn himself, "the accuracy of loan applications was not a priority." *Id.* The article reports: "The simplest way for a bank to confirm someone's income is to call the employer. But in at least two dozen cases, the applications show bogus telephone numbers for work references." *Id.* The article notes that one Argent broker generated at least 100 loans worth $22 million in Miami and nearly all of them were based on false and misleading financial information. *See id.* For instance, "one borrower claimed to work for a company that didn't exist—and got a $170,000 loan. Another borrower claimed to work a job that didn't exist—and got enough money to buy four houses." *Id.* The Miami Herald obtained applications for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." *Id.*

155.    Richard Bowen, the former Business Chief Underwriter at Citibank, was involved in the due diligence process for Citibank's acquisition of Argent. In his April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent, and we found large numbers that did not—that were not underwritten according to the representations that were there." Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 239.

156.    In a video released by the American News Project on May 11, 2009, reporters Lagan Sebert and Mike Fritz interviewed several former employees of Argent and Ameriquest regarding their lending practices. American News Project, *Fraud by Mortgage Companies Key Cause of Foreclosures* (May 11, 2009), *available at*

http://www.youtube.com/watch?v=MFPi6mcNubo.

157.    Tamara Loatman-Clark, a former loan closer for Argent, stated "I mean you did what you had to do and again if that meant manipulating documents so that you can get them out so that they could conform, that's what you did.... [T]here were incentives to get as many done as possible. So on a typical Thursday, I may have 15 or 20 files that I need to get funded somehow and you know you need to work very hard to get 20 files funded. Whatever hit your desk for the day is what you wanted to get out." *Id.*

158.    According to the video, "It was the Wall Street business that drove the frantic pace. Even before proper papers were signed, Ameriquest was bundling the loans and passing them on." Loatman-Clark said, "And so sometimes when they came back and you're talking about, you know, names not properly on mortgage documents... you're talking about missing documents, like internally the incentive was to do whatever you needed to do to get them out and that sometimes meant that you manipulated documents to get them out." *Id.*

159.    The video report contained the following exchange:

Reporter: "So you are saying the goal was to make these loans and then get them off your books as quick as possible?"

Loatman-Clark: "Exactly. That was the pressure."

Reporter: "But who were the people who were buying, who were like the most hungry for these loans?"

Loatman-Clark: "Bear Stearns... Citigroup was another one. Basically the ones that were/are hardest hit were the people who invested. And these were the people we were shuffling these documents out to by any means necessary."

*Id.*

160.    On June 23, 2011, the Cleveland Plain-Dealer reported that a Cleveland grand jury indicted nine former Argent employees for their suspected roles in approving fraudulent

49

home loans. Mark Gillespie, *Former Employees of Subprime Mortgage Lender Indicted by Cuyahoga County Grand Jury*, The Plain Dealer, June 23, 2011, *available at* http://blog.cleveland.com/metro/2011/06/former_employees_of_subprime_m.html.

161.    The indictment alleged that Argent employees "helped coach mortgage brokers about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's income and assets." *Id.* The article noted that "[e]mployees at an Argent loan processing center in Illinois ultimately approved the loans knowing that the company's own lending rules had not been satisfied." *Id.* A spokesman for the prosecutor's office said that "Argent employees bent the rules to get loans approved in order to inflate their wages and bonuses." *Id.*

162.    Later, the Plain Dealer reported that additional criminal charges had been brought against one of the former Argent employees indicted in June—a woman named Angela Pasternak. Mark Gillespie, *Argent Mortgage Worker Gets Indicted Again in Suspected Mortgage Fraud Case*, The Plain Dealer, Nov. 15, 2011, *available at* http://blog.cleveland.com/metro/2011/11/argent_mortgage_worker_gets_in.html.

163.    According to the article, prosecutors said that Ms. Pasternak, "approved exceptions knowing that loan applications contained false income information and bogus credit scores." *Id.* The article also reported, "Plain Dealer investigations found numerous instances in which Argent approved mortgages that contained blatant misrepresentations of borrowers' income, assets and ability to pay." *Id.*

164.    According to another article, Steve Jernigan, a fraud investigator at Argent, said that when he sent an appraiser to check on a subdivision for which Argent had made loans, the address on the loans was clearly fictitious because the appraiser was standing in the middle of a

cornfield. Michael W. Hudson, *Silencing the Whistle-blowers*, The Investigative Fund, May 10, 2010, *available at*

http://www.theinvestigativefund.org/investigations/economiccrisis/1308/silencing_the_whistle-blowers/.

165.    When Jernigan reviewed the loan files, he determined that the houses did not exist and that each of the loan files contained the picture of the same house. *See id.* The article also reported that Argent had been ripped off by a con man named Robert Andrew Penn, who later admitted that he had appropriated victims' names and credit histories to obtain loans and buy properties for inflated prices around Indianapolis. *See id.* Although Argent was warned about the man in 2004, Jernigan said the company did not "conduct a serious investigation" into the fraud until mid-2006 when it learned the scheme was about to be made public by another duped lender. *Id.*

166.    In January 2010, Ameriquest and Argent agreed to pay $22 million to settle 29 class action lawsuits against them that had been consolidated in the Northern District of Illinois, alleging that Argent and Ameriquest inflated appraisal values and borrower income or asset statements and aggressively employed misleading marketing/sales techniques as part of a business strategy to force potential borrowers to close loans. *See In re Ameriquest Mortgage Co. Mortgage Lending Pracs. Litig.*, MDL No. 1715 (N.D. Ill).

### 3.    Bank of America

167.    Bank of America was a major sponsor of mortgage-backed securities during the relevant time. Bank of America, including its acquired subsidiary Merrill Lynch Mortgage Lending, Inc. ("Merrill Lynch"), originated, contributed, and sponsored a material portion of the loans in the mortgage pools underlying the trusts.

168.    Bank of America-originated loans are the subject of multiple lawsuits around the

country, including lawsuits filed by the SEC, the Department of Justice, and the Federal Housing

Finance Agency ("FHFA"). In each of the lawsuits below, Bank of America and/or its affiliates

acted as the originator of the underlying loans and/or the sponsor, depositor and/or underwriter

of the RMBS at issue. The overwhelming evidence revealed that Bank of America and its

affiliates systematically failed to adhere to their obligations in any of their roles in the

securitization process.

- **DOJ:** Complaint, *United States v. Bank of America Corp.*, No. 13-cv-446 (W.D.N.C. Aug. 6, 2013).

- **SEC:** Complaint, *SEC v. Bank of America Corp.*, No. 13-cv-447 (W.D.N.C. Aug. 6, 2013).

- **FHFA:** Am. Complaint, *FHFA v. Bank of America Corp.*, No. 11-cv-06195 (S.D.N.Y. June 28, 2012); Mot. Dismiss denied in *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012), motion to certify appeal granted (June 19, 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).

169.    The Department of Justice explained its allegations in the following August 6,

2013, press release titled "Department of Justice Sues Bank of America for Defrauding Investors

in Connection with Sale of Over $850 Million of Residential Mortgage-Backed Securities":

> [T]he United States has filed a civil lawsuit against Bank of America Corporation and certain of its affiliates, including Merrill Lynch, Pierce, Fenner & Smith f/k/a/ Banc of America Securities, LLC, Bank of America, N.A., and Banc of America Mortgages Securities, Inc. (collectively "Bank of America"). The complaint alleges that Bank of America lied to investors about the relative riskiness of the mortgage loans backing the residential mortgage-backed securities (RMBS), made false statements after intentionally not performing proper due diligence and filled the securitization with a disproportionate amount of risky mortgages originated through third party mortgage brokers.
>
> ...
>
> "Bank of America's reckless and fraudulent origination and securitization practices in the lead-up to the financial crisis caused significant losses to investors," U.S. Attorney Tompkins said. "Now, Bank of America will have to face the consequences of its actions. We have made a commitment to the American people to hold financial institutions accountable for practices that violated the law and wreaked havoc on the financial

system, and my office takes that commitment very seriously. Our investigation into Bank of America's mortgage and securitization practices continues."

...

The civil complaint filed today in U.S. District Court in Charlotte alleges that Bank of America defrauded investors, including federally insured financial institutions, who purchased more than $850 million in RMBS from Bank of America Mortgage Securities 2008-A (BOAMS 2008-A) securitization. The government's civil complaint also seeks civil penalties from Bank of America under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). According to the complaint, in or about January 2008, Bank of America sold BOAMS 2008-A RMBS certificates to investors by knowingly and willfully making materially false and misleading statements and by failing to disclose important facts about the mortgages collateralizing the RMBS, including Bank of America's failure to conduct loan level due diligence in the offering documents filed with the U.S. Securities and Exchange Commission (SEC). These misstatements and omissions concerned the quality and safety of the mortgages collateralizing the BOAMS 2008-A securitization, how it originated those mortgages and the likelihood that the "prime" loans would perform as expected.

First, according to the filed complaint, a material number of the mortgages in the BOAMS 2008-A collateral pool failed to materially adhere to Bank of America's underwriting standards. Specifically, more than 40% of the 1,191 mortgages in the BOAMS 2008-A collateral pool did not substantially comply with Bank of America's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors. As alleged in the complaint, Bank of America knew that specific loans in the BOAMS 2008-A collateral pool did not materially adhere or comply with Bank of America's underwriting standards.

Second, Bank of America did not conduct any loan-level due diligence at the time of securitization. According to the complaint, this was a violation of Bank of America's own policies, procedures and prior practice, and was contrary to industry standards and investor expectations. Moreover, this decision allowed Bank of America to keep bad loans in the deal. According to the complaint, these bad loans had a range of glaring origination problems, such as overstated income, fake employment, inflated appraisals, wrong loan-to-value ratios, undisclosed debt, occupancy misrepresentation, mortgage fraud and other red flags wholly inconsistent with a purportedly prime securitization. As a result of this lack of due diligence, Bank of America had no basis to make many of the representations it made in the offering documents regarding the credit quality of the underlying mortgages.

Finally, Bank of America concealed important risks associated with the mortgages backing the BOAMS 2008-A securitization. For example, Bank of America originated more than 70% of the loans through third party mortgage brokers. These loans, known as "wholesale mortgages," were riskier than similar mortgages originated directly    by Bank of America. More significantly, at the same time Bank of America was finalizing this deal, it was receiving a series of internal reports that showed an alarming and

53

significant decrease in the quality and performance of its wholesale mortgages. According to the complaint, Bank of America did not disclose that important information or the associated risks to investors.

Investors in the BOAMS 2008-A certificates have already suffered millions of dollars in losses and it is estimated that total losses sustained by investors will exceed $100 million.

*Available at* http://www.justice.gov/opa/pr/2013/August/13-ag-886.html.

170.    The SEC's lawsuit against Bank of America had similar allegations:

"In its own words, Bank of America 'shifted the risk' of loss from its own books to unsuspecting investors, and then ignored its responsibility to make a full and accurate disclosure to all investors equally," said George S. Canellos, Co-Director of the SEC's Division of Enforcement.

...

The SEC alleges that Bank of America deceived investors about the underlying risks as well as the underwriting quality of the mortgages, misrepresenting that the mortgage loans backing BOAMS 2008-A were underwritten in conformity with the bank's own guidelines. These mortgage loans, however, were riddled with ineligible appraisals, unsupported statements of income, misrepresentations regarding owner occupancy, and evidence of mortgage fraud. The key ratios of debt-to-income and original-combined-loan-to-value were routinely miscalculated, and then the materially inaccurate ratios were provided to the investing public.

According to the SEC's complaint, a disproportionate concentration of high-risk wholesale loans and the inclusion of a material number of loans failing to comply with internal underwriting guidelines resulted in BOAMS 2008-A suffering an 8.05 percent cumulative net loss rate through June 2013 – the greatest loss rate of any comparable BOAMS securitization.

Press Release, *SEC Charges Bank of America with Fraud in RMBS Offering* (Aug. 6, 2013),

*available at*

http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370539751924#.UgzSb5LVAkQ.

171.    Other cases involving Bank of America and its affiliates acting as originator,

sponsor, depositor and/or underwriter in RMBS have included allegations concerning investors'

forensic analysis or re-underwriting of loan files that highlight the poor quality of mortgage loans

securitized and sold by Bank of America to the trusts. *See, e.g.*, Complaint, *Western Southern*

*Life Ins. v. Bank of America, N.A.*, No. 11-cv-00667 (Ohio Ct. Com. Pl. Aug. 18, 2011) (alleging misrepresentations regarding LTV and owner occupancy); Complaint, *CIFG Assurance N. Am. Inc. v. Bank of America, N.A.*, No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2011) (alleging that Bank of America's faulty securitization practices led to inclusion of a high percentage of defective loans); Complaint, *Prudential v. Bank of America et al.*, No. 13-cv-01586 (D.N.J. Mar. 14, 2013) ("Prudential's loan-level analysis has revealed systematic failures in Defendants' loan underwriting and assignment practices"); Complaint, *Texas County Dist. Ret. Sys. v. J.P. Morgan Secs. LLC et al.*, No. 1-GN-14-000998 (Tex. Civ. Dist. Ct. May 2, 2014) (forensic review demonstrated that "Bank of America included recklessly underwritten loans in its RMBS that failed to meet the applicable standards systematically disregarding its own and third-party due diligence, and then misrepresented the quality of those loans to investors").

### 4.   Countrywide

172.   Countrywide Financial, Countrywide Home Loans, Inc., Countrywide Mortgage Funding, Inc. and Countrywide Home Loans Servicing LP ("Countrywide") was one of the largest originators of residential mortgages in the United States during the period leading up to the financial crisis. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

173.   In a television special titled, *"If You Had a Pulse, We Gave You a Loan,"* Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."
>
> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."

. . .

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan,* NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

174.   On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Complaint, *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

175.    Internal Countrywide e-mails released in connection with the SEC lawsuit and publicly available show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

176.    Indeed, in a September 1, 2004 email, Mozilo voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."

177.    In 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the

57

creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

178. Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

179. An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.

180. Mozilo admitted in a September 26, 2006 email that Countrywide did not know how Pay Option ARM loans would perform and had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." Yet such loans were securitized and passed on to unsuspecting investors such as the CCUs.

181. With growing concern over the performance of Pay Option ARM loans, Mozilo advised in a November 3, 2007 email that he "d[id]n't want any more Pay Options originated for the Bank." In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans expressed in the same email were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans]

combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."

182.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

183.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry.

184.    Aguilera confirmed in a June 12, 2006 email that internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the

use of exceptions remained excessive.

185.    In February 2007, nearly a year after pressing for a reduction in the overuse of
exceptions and as Countrywide claimed to be tightening lending standards, Countrywide
executives found that exceptions continued to be used at an unacceptably high rate. In a February
21, 2007 email, Aguilera stated that any "[g]uideline tightening should be considered purely
optics with little change in overall execution unless these exceptions can be contained."

186.    John McMurray, a former Countrywide managing director, expressed his opinion
in a September 7, 2007 e-mail that "the exception process has never worked properly."

187.    Countrywide conceded that the poor performance of loans it originated was, in
many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV
ratio stated income loans were performing worse than those of its competitors. After reviewing
many of the loans that went bad, Countrywide executive Russ Smith stated in an April 11, 2007
email that "in most cases [poor performance was] due to poor underwriting related to reserves
and verification of assets to support reasonable income."

188.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8
billion in relief to homeowners nationwide to settle lawsuits and investigations regarding
Countrywide's deceptive lending practices.

189.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide
regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning
his supervisors about Countrywide's poor underwriting practices.

190.    According to Zachary, Countrywide pressured employees to approve unqualified
borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It
doesn't matter how you get there." NBC Nightly News, *Countrywide Whistleblower Reports*

*"Liar Loans,"* July 1, 2008. Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

191.    Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income to qualify for loans. *Id.*

192.    NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" *Id.*

193.    Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. Public disclosure of the staggering number of loans breaching the associated representations and warranties discovered in these cases should have alerted the trustee that Countrywide loans were highly likely to have breached the associated representations and warranties.

### 5.    Deutsche Bank

194.    Deutsche Bank AG, itself and through its affiliate DB Structured Products, Inc. (collectively "Deutsche Bank"), sponsored many of the trusts.

61

195.    Deutsche Bank was specifically criticized in the FCIC Report for failing to devote sufficient resources to its due diligence arm. *See* FCIC Report at 168.

196.    Clayton Holdings, Inc. ("Clayton") – a major provider of third-party due diligence services – provided trending reports to the FCIC. These reports show that from the first quarter of 2006 to the second quarter of 2007, Clayton rejected 34.9% of the mortgage loans Deutsche Bank submitted because the mortgage loans fell outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 50% were subsequently waived in by Deutsche Bank without proper consideration and analysis of compensating factors.

197.    Federal and state government investigations have also targeted Deutsche Bank's securitization practices. In particular, the Nevada Attorney General initiated an investigation into Deutsche Bank's residential mortgage acquisition and securitization business centering on whether mortgage lenders made misrepresentations to consumers who took out mortgage loans Deutsche Bank purchased and securitized. Deutsche Bank settled with Nevada for $11.5 million. *See In re DB Structured Products, Inc.*, No. A-13-690144-B, Assurance of Discontinuance (D.C. Nev. Oct. 14, 2013), *available at* http://ag.nv.gov/uploadedFiles/agnvgov/Content/News/PR/PR_Docs/2013/2013-10-4_DB_AOD.pdf.

198.    In July 2010, the Financial Industry Regulatory Authority ("FINRA") fined Deutsche Bank $7.5 million for misrepresenting delinquency data in the issuance of subprime securities. FINRA News Release, *FINRA Fines Deutsche Bank Securities $7.5 Million For Negligent Misrepresentations Related To Subprime Securitizations* (July 21, 2010), *available at* http://www.finra.org/newsroom/newsreleases/2010/p121747.

199.    RMBS lawsuits involving Deutsche Bank securitizations from the same period that involve similar products highlight Deutsche Bank's securitization problems. In September 2011, the FHFA sued Deutsche Bank as sponsor of forty securitizations and ACE 2006-OP2. The FHFA alleged that Deutsche Bank made untrue or misleading statements regarding the mortgage loans' LTV ratios, owner occupancy status, and compliance with underwriting guidelines. *See* Complaint, *FHFA v. Deutsche Bank AG, et al.*, No. 11-cv-06192 (S.D.N.Y. Sept. 2, 2011).

200.    The FHFA's analysis of the quality of the loans in these offerings consistently found that over 20% of the loans in these offerings had LTV ratios of over 100% and that non-owner occupied properties had been repeatedly understated by over 10%. FHFA's complaint highlighted government and private investigations into the originators' underwriting practices, revealing widespread abandonment of the originators' reported underwriting guidelines during the period, the collapse of the certificates' credit ratings, and the surge in delinquencies and defaults in the mortgages in the Deutsche Bank securitizations as further support for alleging Deutsche Bank's systematic misreporting of owner occupancy and LTV statistics.

201.    In *Federal Home Loan Bank v. Ally Financial, Inc.*, No. 11-cv-10952 (D. Mass. May 26, 2011), Federal Home Loan Bank of Boston analyzed Deutsche Bank securitizations. Federal Home Loan Bank of Boston found that Deutsche Bank underreported the percentage of loans with greater than 90% LTV ratios by between 24%-30% for the securitizations, and underreported the number of loans with greater than 100% LTV ratios by between 8% and 16%. Finally in the amended complaint in *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities, Inc. et al.*, No. 08-cv-03178 (E.D.N.Y. May 24, 2010), investors reviewed a loan sample from two Deutsche Bank securitizations, and found that Deutsche Bank

63

understated the LTV ratio in 44% and 51% of the sampled loans for each trust.

### 6.   First National Bank of Nevada

202.    First National Bank of Nevada ("FNB Nevada") was a large subprime mortgage lender and originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

203.    First National Bank Arizona ("FNB Arizona"), FNB Nevada, and First Heritage Bank were controlled by First National Bank Holding Company ("FNB Holding"), collectively ("FNB Group"). All were under common management. *See* Department of the Treasury, Office of the Inspector General, *Audit Report: Safety and Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank, National Association* at 4 (Feb. 27, 2009) ("FNB Nevada OIG Report"), *available at* http://www.treasury.gov/about/organizational-structure/ig/Documents/oig09033.pdf.

204.    FNB Arizona ran the FNB Group's residential mortgage lending operation. *See* FNB Nevada OIG Report at 4.

205.    The dollar amount of mortgage loans originated by FNB Arizona increased substantially in the 2000s. David Enrich and Damian Paletta, *Failed Lender Played Regulatory Angles*, Wall Street Journal, Oct. 3, 2008, *available at* http://online.wsj.com/articles/SB122298993937000343.

206.    FNB Arizona was an OTD lender; in 2006, $6.9 billion of its loans were packaged into RMBS. *See* FNB Nevada OIG Report at 5.

207.    A series of investigations by the OCC detail how FNB Arizona achieved its rapid growth by pervasively disregarding its underwriting guidelines.

208.    In 2004, the OCC inspected FNB Arizona and determined that it needed better

"[p]rocedures to reduce underwriting exceptions" and better "[p]olicies and internal controls over the use of appraisers." FNB Nevada OIG Report at 44.

209.    A 2005 OCC investigation found that "[c]redit underwriting and administration need improvement. The quickness of loan production has had priority over quality. Issues include loan appraisal violations (repeat issue) and inadequate practices over standby letters of credit." It recommended FNB Arizona "develop and implement procedures and accountability that are effective in reducing the high level of underwriting exceptions (repeat issue)" and reduce the number of employee and vendor errors in loan origination. It also cited FNB Arizona for two regulatory violations—failing to appraise properties prior to closing and failing to use independent appraisers. *Id.* at 44-46.

210.    A 2006 investigation found that FNB Arizona still had not implemented "effective procedures and processes to reduce the level and number of underwriting exceptions." The OCC also noted that appraisers' reports were often missing or incomplete. *Id.* at 47.

211.    In 2007, FNB Arizona's liquidity problems prompted the OCC to initiate an informal enforcement action. It cited several matters requiring the direct attention of the bank's board, including internal loan review that lacked independence due to executive management influence, understaffed internal loan review, staffing levels and expertise that were not commensurate with the complexities of the bank's operations, and (yet again) the need to reduce underwriting exceptions. *See id.* at 48-50.

212.    FNB Arizona's underwriting practices became so poor that in 2007 it was unable to sell $683 million of residential mortgages to securitizers. It was also forced to repurchase a number of its poorly underwritten mortgages. This contributed to a liquidity crisis for the entire FNB Group. *See id.* at 2, 6.

213.    On June 30, 2008, FNB Arizona merged into FNB Nevada. Shortly thereafter, the

OCC closed FNB Nevada and appointed the FDIC as its receiver. Press Release, *OCC Closes*

*First National Bank of Nevada and Appoints FDIC Receiver* (July 25, 2008), *available at*

http://www.occ.gov/news-issuances/news-releases/2008/nr-occ-2008-87.html.

214.    In its capacity as receiver for FNB Nevada, the FDIC sued former directors and

officers of the FNB Group. Complaint, *FDIC v. Dorris et al.*, No. 11-cv-1652 (D. Ariz. Aug. 23,

2011). The FDIC alleged the same pervasive disregard of underwriting guidelines described

above. *See id.* ¶¶ 38-42.

215.    The complaint also detailed how the bank's compensation structure was tied to

the volume of loans originated, creating an incentive for bank employees to disregard the

underwriting guidelines. *See id.* ¶ 30. FNB Arizona also used many mortgage brokers who had

the same volume-based incentive to disregard underwriting guidelines and to inflate appraisals.

*See id.* ¶¶ 33-34.

216.    The suit settled less than two months after it was filed and the court entered

judgments for $20 million against the two defendants.

217.    Evidence uncovered in *Plumbers' Union Local No. 12 Pension Fund v. Nomura*

*Asset Acceptance Corp.*, No. 08-cv-10446 (D. Mass.) further highlights FNB Arizona's disregard

of its underwriting guidelines. There, the court allowed the plaintiff to engage in limited

discovery, which uncovered four pertinent pieces of evidence:

- "[T]hree 'representative' no-document loans that [FNB Nevada] originated. In each of these 'No Doc' loans, the borrower's income was either unknown or unverified, or inadequate to make payments on the underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan."

- "[T]he declaration of Susan Wright, who underwrote loans at [FNB Nevada] in 2006 and 2007 and generally corroborates the Complaint's allegations about [FNB

Nevada]'s underwriting practices." "Wright describes [FNB Nevada]'s business model as trying to 'make as many loans as possible and then sell them as quickly as possible' and explains that their underwriting practices instructed underwriters to remove income and asset information already in the possession of [FNB Nevada] from 'No Doc' loans. She states that [FNB Nevada] regularly made loans to borrowers whom '[FNB Nevada] knowingly qualified on the basis of what appeared to be obviously false information [and] [FNB Nevada] did not appear to reasonably expect that the borrowers would be able to repay these loans.'"

- "[S]everal emails generated by [FNB Nevada] employees, including Mortgage Division President Pat Lamb; Vice President of Risk Management Renea Aderhold; 'SVP Ops/Communication Manager' Beth Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk Officer Eric Meschen, which collectively paint a picture of a devil-may-care underwriting culture."

- "[T]he expert report of Ira Holt, an accountant who performed a forensic analysis of 408 of the Trusts' loans using the [FNB Nevada] guidelines that were in place when they were originated. Holt found that 108 (26.5%) had material defects that violated even [FNB Nevada]'s slack underwriting standards." "According to Holt, he was unable to 're-underwrite' some of the 408 loans because of the lack of documentation, as well as the 'scrubbing' of the applicant's disqualifying data by [FNB Nevada]. According to plaintiffs, the number of loans in the sample with material defects may be considerably higher than Holt's estimates."

*Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 894 F.Supp.2d

144, 148 & 148 n.6, 8 (D. Mass. Oct. 1, 2012). The court held allegations based on that evidence

were sufficient to survive a motion to dismiss. *Id.* at 150.

### 7.   Fremont

218.   Fremont Investment and Loan ("Fremont") originated or contributed a material

portion of the loans in the mortgage pools underlying the trusts and sponsored many trusts.

219.   Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a

lender "'known for poor quality loans.'" Opening Statement of Sen. Carl Levin, Chairman, *Wall*

*Street and the Financial Crisis: The Role of High Risk Home Loans*, Hearing Before S.

Permanent Subcomm. on Investigations (Apr. 23, 2010). Senator Levin recounted how an analyst

with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs

RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, a subprime lender known for loans with high rates of delinquency. On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. Since Fremont collateral has been performing not so good, is there anything special I should be aware of?" One analyst responded: "No, we don't treat their collateral any differently." The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry. In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id.*

220.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc.,

which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.

> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*,

Myrtle Beach Sun-News, Aug. 15, 2010, at A, *available at*

http://www.myrtlebeachonline.com/2010/08/15/1637463/investors-paying-for-risky-loans.html.

On September 28, 2012, the court denied in principal part the defendants' Joint Motion to

Dismiss For Failure to State a Claim. *See Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley &*

*Co., Inc., et al.*, No. 10-2741 (Mass. Super. Ct.).

221.    On December 21, 2011, the FHFA filed an amended complaint against UBS

Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie

Mac and Fannie Mae. In the complaint, the FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See* Second Am. Complaint, *FHFA v. UBS Americas, Inc.*, No. 11-cv-05201 (S.D.N.Y.) (Dec.

21, 2011). The court denied a motion to dismiss the complaint in May 2012. *See FHFA v. UBS*

*Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). On July 25, 2013, the FHFA announced

that it had reached an agreement to settle the case for $885 million.

222.    Fremont's origination practices have also been addressed in numerous

governmental investigations and reports. For example, the FCIC Report discusses that Moody's

created an independent surveillance team in 2004 in order to monitor previously rated deals. The

Moody's surveillance team saw a rise in early payment defaults in mortgages originated by

Fremont in 2006, and downgraded several securities with underlying Fremont loans or put them

on watch for future downgrades. Moody's chief credit officer stated that Moody's had never had

to put on watch deals rated in the same calendar year. In 2007, Moody's downgraded 399

subprime mortgage-backed securities that had been issued in 2006 and put an additional 32

69

securities on watch. Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont. FCIC Report at 221-222.

223.    According to the FCIC Report, when sponsors kicked loans out of securitization pools, some originators simply put those loans into new pools. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times. FCIC Report at 168.

224.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont held the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 8.    GreenPoint

225.    GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007. Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's

70

origination business. GreenPoint originated or contributed a material portion of the loans in the

mortgage pools underlying the trusts.

226. When originating stated income loans, GreenPoint often inflated the borrowers'

income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's

underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower
> than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay
> stubs or tax returns to document their earnings, were offered by lenders such as
> GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found
> it difficult to verify their salaries.
> . . .
> "To grow, the market had to embrace more borrowers, and the obvious way to do that
> was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage
> Finance. "Once the door was opened, it was abused."
> . . .
> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or
> more, and more than half increased the amount by more than 50 percent, according to a
> study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-
> based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge,*

Bloomberg, Sept. 12, 2008, *available at*

http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

227. Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as

successor to Bear Stearns & Co., Inc., in 2011 in connection with an RMBS underwritten by

Bear Stearns and exclusively collateralized by GreenPoint-originated loans. After sustaining

large losses due to the poor performance of GreenPoint loans, Syncora hired an independent

consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected

without regard to payment status. Over 92% of the 1,431 loans contained misrepresentations, and

over 85% of the randomly selected 400 loans contained misrepresentations. The

misrepresentations uncovered included the following:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Complaint, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, No. 651566/2011 (N.Y. Sup. Ct. June 6, 2011). Syncora's lawsuit survived a combined motion to dismiss and motion for summary judgment. *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

228.    GreenPoint's own employees have corroborated the findings of Syncora. A confidential witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, stated that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007. *See* Complaint, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortgage Secs., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. Oct. 15, 2010)

72

("FHLB Indianapolis").

229.    According to that confidential witness, sales staff and managers at GreenPoint received bonuses based on the number of loans closed. As she said, "sales had tremendous authority" at GreenPoint, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id.* ¶ 266.

230.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment." When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions. *Id.* ¶ 267.

231.    More often than not, the confidential witness believed that her managers overrode her denials due to the incentives they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers." She knew of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id.* ¶ 268.

232.    In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations in RMBS offering documents. Allstate's complaint relied on several confidential witnesses. One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans it originated for fraud. He thought this was a "mistake" because the fraud and misrepresentations uncovered in the 10% sample indicated that many more loans likely contained fraud. But the remaining 90% of the loans were not reviewed. Am. Complaint, *Allstate*

73

*Bank v. J.P. Morgan Chase, N.A.*, No. 11-cv-1869, at ¶ 485 (S.D.N.Y. May 10, 2012).

233.    That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence. Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment. He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans. Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline. *Id.* ¶ 486.

234.    Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006. That confidential witness stated that GreenPoint employees understood that if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan. The majority of the loan products originated in the confidential witness's office were stated income and asset loans and pay-option ARMs. Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their compensation was not tied to loan performance. *Id.* ¶ 487.

235.    Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 who supervised five Underwriters and three Conditions Specialists. That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines to approve applications, even when there were no compensating factors justifying the exceptions. The confidential witness knew that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud

was found. According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint. *Id.* ¶ 488.

236.    Allstate's complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers approved to transact with GreenPoint – a large enough number that GreenPoint could exercise no realistic degree of control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. *Id.* ¶ 490.

237.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; and 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California.

### 9.    IndyMac

238.    By 2007, IndyMac Bank, F.S.B. ("IndyMac") was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. IndyMac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

239.    On July 11, 2008, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

240.    IndyMac has been the subject of numerous investigations and lawsuits alleging that IndyMac systematically abandoned its underwriting guidelines in pursuing profits. These

investigations and lawsuits contain ample evidence that mortgage loans originated by IndyMac breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits, investigations, and reports, in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendant with notice that large numbers of loans originated by IndyMac, including loans in the trusts, breached the associated representations and warranties.

241.    For example, in June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of CRL's investigation into IndyMac's lending practices. CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac. The CRL Report summarized the results of its investigation:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

242.    CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id.* at 2.

243.    The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.*

244.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id.* at 3.

245.    Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

246.    The CRL also found the following evidence: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."

The refrain from managers, Miller recalls, was simple: "Find a way to make this work." *Id.* at 9 (footnote omitted).

247.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin . . . . It would go to upper

77

management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

248.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time. *See id.* at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

*Id.* at 10.

249.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process. *See id.* at 14.

250.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying loan pool.

251.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made

loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id.*

252.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21. The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id.* at 11.

253.    IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id.* at 2-3.

254.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id.* at 31.

255.    Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3. This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id.*

256.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division, alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral. *See FDIC v. Van Dellen*, No. 10-cv-04915 (C.D. Cal. July 2, 2010). The case was tried in late 2012, and the jury entered a verdict in favor of the FDIC.

257.    IndyMac currently faces or has faced additional litigation alleging disregard of

underwriting standards that adversely affected the value of the purchased RMBS. *See, e.g.*, *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y. May 14, 2009); *Federal Home Loan Bank of Boston v. Ally Financial, Inc., et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011); *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. July 27, 2012).

258. IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.

### 10. MortgageIT

259. MortgageIT, Inc. ("MortgageIT") is a residential mortgage banking company headquartered in New York, New York. On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products. MortgageIT originated or contributed a material portion of the loans in the trusts.

260. MortgageIT has been the subject of numerous investigations and lawsuits alleging that MortgageIT systematically abandoned its underwriting guidelines in the pursuit of profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by MortgageIT breached the associated representations and warranties.

261. MortgageIT faced a civil mortgage fraud lawsuit brought in May 2011 by the United States Department of Justice ("DOJ") alleging that MortgageIT made repeated false certifications to the U.S. Department of Housing and Urban Development ("HUD") in

connection with its residential mortgage origination and sponsorship practices. *See United States v. Deutsche Bank AG and MortgageIT, Inc.*, No. 11-cv-02976 (S.D.N.Y.). An amended complaint was filed on August 22, 2011 ("DOJ Complaint").

262.   The United States alleges that "MortgageIT repeatedly lied to be included in a Government program to select mortgages for insurance by Government. Once in that program, they [sic] recklessly selected mortgages that violated program rules in blatant disregard of whether the borrowers could make mortgage payments." DOJ Complaint ¶ 1.

263.   According to the DOJ Complaint, "As of June 2011, HUD has paid more than \$368 million in FHA insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance. Many of those claims arose out of FHA mortgage insurance provided by HUD based on MortgageIT's false certifications of due diligence." *Id.* ¶ 233.

264.   The complaint also alleges that MortgageIT chronically understaffed quality control: "Between 2006 and 2009, the sole employee at Deutsche Bank or MortgageIT conducting quality control reviews of closed FHA-insured mortgages was the Government Loan Auditor. His review of closed FHA-insured mortgages continually declined during that period, and declined most significantly after Deutsche Bank acquired MortgageIT. By the end of 2007, the Government Loan Auditor was no longer spending any time conducting quality control reviews of closed mortgage files. To increase sales, Deutsche Bank and MortgageIT shifted his work from quality control reviews of closed mortgages (i.e., quality control audits) to assistance with production. By the end of 2007, not a single person at Deutsche Bank or MortgageIT was conducting quality control reviews of closed FHA-insured mortgages, as required by HUD rules." *Id.* ¶ 143-144.

265.   MortgageIT allegedly also ignored quality control measures. For example,

MortgageIT contracted with an outside vendor to conduct quality control reviews of FHA-insured loans. The vendor provided the reviews in letters detailing underwriting violations found in FHA-insured mortgages to MortgageIT. The findings included identification of serious underwriting violations. Instead of reading the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a closet at MortgageIT's Manhattan headquarters." It was not until MortgageIT hired its first quality control manager that these letters were taken out of the closet and read. Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations." *Id.* ¶ 111-124.

266.    The Amended DOJ Complaint further alleged that "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud." *Id.* ¶ 145.

267.    Additionally, the complaint alleged that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles." *Id.* ¶ 162.

268.    The complaint cites many examples of MortgageIT's failure to perform due diligence. These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting

bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162-230.

269.    On May 9, 2012, the parties settled the case for $202.3 million.

Several private investigations and lawsuits also illustrated the fact that MortgageIT failed to comply with its stated underwriting guidelines. The complaint in *Landesbank Baden-Wurttemberg v. Deutsche Bank AG*, No. 654543/2012 (N.Y. Sup. Ct. Dec. 27, 2012), quotes confidential witnesses demonstrating that there was virtually no effort at compliance at MortgageIT. Through the confidential witnesses, the complaint alleges that loan officers stated that it did not matter what happened with loans as long as MortgageIT received the commission; that the sales team rejected any attempt to stop using brokers because of likely fraudulent activity; that the due diligence was far from adequate; and that compensation was tied to loan volume and there was no disincentive to originate and sell loans that would later default.