## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
Members United Corporate Federal Credit Union,
Southwest Corporate Federal Credit Union, and
Constitution Corporate Federal Credit Union,

and

GRAEME W. BUSH, as Separate Trustee of NCUA
GUARANTEED NOTES TRUST 2010-R2, NCUA
GUARANTEED NOTES TRUST 2010-R3, NCUA
GUARANTEED NOTES TRUST 2011-R1, NCUA
GUARANTEED NOTES TRUST 2011-R2, NCUA
GUARANTEED NOTES MASTER TRUST 2011-M1,

                                        Plaintiffs,

                    -against-

HSBC BANK USA, NATIONAL ASSOCIATION

                                        Defendant.

---------------------------------------------------------------x

Case No. 15-cv-2144 (LGS-SN)

**SUPPLEMENTAL
FIRST AMENDED
COMPLAINT**

**DEMAND FOR JURY TRIAL**

TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..............................................................................1

II.    PARTIES ......................................................................................................5

       A.    Plaintiff NCUA Board as Liquidating Agent ...........................................5

       B.    Plaintiff Separate Trustee ....................................................................7

       C.    Defendant ........................................................................................13

III.   JURISDICTION AND VENUE ...........................................................................13

IV.    THE TRUSTS ...............................................................................................14

V.     BACKGROUND ............................................................................................15

       A.    RMBS Trusts .....................................................................................15

       B.    The Trustee's General Duties .............................................................16

       C.    The Trustee's Duties Under the Pooling and Servicing
             Agreements ......................................................................................17

       D.    Duty Properly to Take Title to the Mortgage Loans Conveyed
             to the Trust ......................................................................................18

       E.    Duty to Provide Notice of Incomplete or Defective Mortgage
             Files and Enforce Repurchase Rights with Respect to Mortgage
             Files that Cannot Be Cured ................................................................20

       F.    Duty to Provide Notice of Breaches and to Enforce Repurchase
             Rights with Respect to Defective Loans ...............................................21

       G.    Duties under the Transfer Agreements ................................................23

       H.    Duties Regarding the Servicers ...........................................................25

       I.    The Trustee's Duties upon Knowledge of an Event of Default ...............26

       J.    The Trustee's Duties and Obligations under the TIA and the
             Streit Act, and the Common Law ........................................................27

VI.    **DEFENDANT SHOULD HAVE CAREFULLY INVESTIGATED THE FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN APPROPRIATE ACTION** ........................................29

A.    General Reports Concerning Originators' Systematic Abandonment of Their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards .......................................................29

B.    Specific Reports Concerning the Originators of Loans in the Trusts Abandoning Their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices .......................................35

    1.    American Home ................................................................................36

    2.    Argent ..............................................................................................37

    3.    Bank of America ..............................................................................43

    4.    Countrywide.....................................................................................46

    5.    Deutsche Bank .................................................................................53

    6.    First National Bank of Nevada .......................................................55

    7.    Fremont ............................................................................................59

    8.    GreenPoint .......................................................................................62

    9.    IndyMac ...........................................................................................66

    10.    MortgageIT ......................................................................................71

    11.    National City ....................................................................................75

    12.    New Century .....................................................................................77

    13.    Nomura ............................................................................................86

    14.    Option One.......................................................................................87

    15.    Residential Funding .........................................................................92

    16.    Wells Fargo......................................................................................94

C.    A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust

Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards ...................................................98

    1.    The Trusts Suffered from High Delinquency and Default Rates ...................................................99

    2.    The Trusts Suffered Huge Losses ...........................................100

D.    The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines.........................101

**VII.**    **ADDITIONAL EVIDENCE SHOWS THAT DEFENDANT KNEW OF DEFAULTS** ...................................................101

A.    In Its Capacity as an RMBS Servicer for Other Trusts, Defendant Discovered Extensive Responsible Party Breaches of Representations and Warranties ...................................................101

B.    Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers...................................................102

C.    Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties...................................................103

D.    Defendant Has Been Involved in Repurchase Litigation Against Responsible Parties...................................................105

**VIII.**    **DEFENDANT FAILED TO PRUDENTLY ADDRESS MASTER SERVICER AND/OR SERVICER DEFAULTS** ...................................................108

A.    Defendant Breached the Governing Agreements and Its Common Law and Statutory Obligations By Failing to Fulfill Its Duties After Defaults and Events of Default Triggered By Master Servicer and Servicer Misconduct ...................................................108

B.    Specific Servicer Misconduct ...................................................111

C.    The Master Servicers and Servicers Defaulted on their Duty to Notify the Trustee of Breaches of the Mortgage Loan Representations and Warranties...................................................121

D.    Defendant Knew That the Trusts Suffered from Widespread Master Servicer and/or Servicer Defaults...................................................123

E.    Defendant Knew That the Trusts Suffered from Widespread Issuer Defaults ...................................................125

IX.    **DEFENDANT FAILED TO ENSURE LOAN FILES WERE PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO REMEDY ANY DEFECTS**.............................................................126

    A.    Defendant Failed to Ensure Transfer of Complete Mortgage Loan Files.............................................................................126

    B.    Defendant Knew That the Loan Files Were Incomplete ...................................128

    C.    The Document Delivery Failures Were Events of Default................................129

X.    **DEFENDANT HAD CONFLICTS OF INTEREST**...................................................130

XI.    **DEFENDANT FAILED TO SATISFY ITS PRE-AND POST-DEFAULT DUTIES AND BREACHED THE GOVERNING AGREEMENTS** .......................134

XII.    **THE "NO ACTION" CLAUSES DO NOT APPLY**...................................................143

XIII.    **CLAIMS FOR RELIEF** .............................................................................................144

    COUNT ONE – BREACH OF CONTRACT....................................................144

    COUNT TWO – BREACH OF FIDUCIARY DUTY .....................................146

    COUNT THREE – BREACH OF THE COVENANT OF GOOD FAITH.............................................................................................................147

    COUNT FOUR – VIOLATION OF THE STREIT ACT................................148

    COUNT FIVE – VIOLATION OF THE TRUST INDENTURE ACT OF 1939 ...........................................................................................................150

    PRAYER FOR RELIEF ..................................................................................153

XIV.    **JURY DEMAND**.......................................................................................................154

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity as Liquidating Agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and Constitution Corporate Federal Credit Union ("Constitution"), (collectively, the "CCUs"), and Graeme W. Bush, as Separate Trustee of NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); and NCUA Guaranteed Notes Master Trust ("NCUA 2011-M1 Trust") (in such capacity, the "Separate Trustee," and together with the NCUA Board, "Plaintiffs"), bring this Supplemental First Amended Complaint (the "FAC"), against HSBC Bank USA, National Association, ("HSBC" or "Defendant"), and allege as follows:

## I.  NATURE OF THE ACTION

1.  This action arises out of Defendant's role as trustees for 35 trusts identified on Exhibit A that issued residential mortgage-backed securities ("RMBS"). Each trust consists of hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trusts that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

2.  The CCUs purchased the certificates in the trusts identified on Exhibit A at an original face value of approximately $1.7 billion.

3.  The certificates' value was dependent on the quality and performance of the mortgage loans in the trusts and swift correction of any problems with the loans. But, because of

the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustee to protect their interests.

4.     Defendant, as the trustee for the trusts, had contractual, common law, and statutory duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. The trustee for each trust has three primary duties. First, the trustee must oversee the process whereby the trusts take possession of the mortgage loans and acknowledge receipt of the mortgage files. This process includes review of the documents in the mortgage files, identification of any mortgage files that lack a complete chain of title or that have missing documents, and certification that the mortgage files are complete and accurate. If the trustee becomes aware of defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

5.     Second, if the trustee discovers a breach of the representations and warranties concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, or the assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders will suffer losses properly borne by the party responsible for the defective loans.

6.     Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of defaults concerning the trust. Thus, when the trustee

discovers a default, or is notified by other parties, such as servicers or custodians, of defaults like breaches of representations and warranties with respect to the underlying mortgage loans, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

7.      Here, Defendant failed to even ensure the trusts had full possession of the original notes and mortgages and the mortgage loan files had been properly reviewed for irregularities. If Defendant had fulfilled its obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased or substituted.

8.      Moreover, an overwhelming number of events alerted Defendant to the fact that the trusts suffered from numerous problems including, among other things: 1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices; 3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous lawsuits brought by and against Defendant and its affiliates alleging the systematic abandonment of originator underwriting guidelines. Yet Defendant failed to take steps to preserve its rights or hold the responsible parties accountable for the repurchase or substitution of defective mortgage loans in direct contravention of its obligations as trustee.

9.      Finally, Defendant failed to address servicer and/or master servicer defaults and events of default. Defendant knew that the master servicers and servicers were ignoring many of

their duties, including their duty to notify other parties, including Defendant as trustee, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendant's knowledge of these ongoing defaults and events of default, Defendant failed to act prudently to protect the interests of the trusts and the certificateholders.

10.     Defendant's failures resulted in the trusts and certificateholders suffering losses rightfully borne by other parties. Had Defendant adequately performed its contractual, common law, and statutory obligations, breaching loans would have been removed from the loan pools underlying the certificates and returned to the responsible party. Defendant's improper conduct directly caused losses to certificateholders like the Plaintiffs.

11.     Defendant failed to act in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendant's interests. As a participant in many roles in the securitization process, Defendant was economically intertwined with the parties it was supposed to police. Further, Defendant had incentive to ignore other parties' misconduct in order to avoid drawing attention to its own misconduct.

12.     Defendant was required to exercise its rights and powers to protect the trusts. Once Defendant became aware of the various failures discussed in this FAC, Defendant was required to use the same degree of care and skill that a prudent person would. But instead of protecting the trusts and the certificateholders, Defendant sat by as the trusts wasted away. As a result, Defendant breached the governing agreements, breached its fiduciary duties, and breached the duty of good faith.

13.     New York Real Property Law § 124 *et seq.* (the "Streit Act") was enacted to ensure that trustees act with due care, facilitate the orderly administration of the trust, and protect the trust beneficiaries' rights. Following an event of default, the Streit Act requires the trustee to

exercise the same degree of skill and care in performing its duties as would a prudent person in like circumstances. N.Y. Real Prop. Law § 126(1).

14.     Similarly, the Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa *et seq.*, was enacted to "meet the problems and eliminate the practices" that plagued Depression-era trustee arrangements and provide investors with a remedy for trustees that utterly neglect their obligations. *See, e.g.*, 15 U.S.C. § 77bbb(b) (explaining purposes of the TIA in light of problems identified in 15 U.S.C. § 77bbb(a)).[1]

15.     To that end, several sections of the TIA impose duties on trustees, including a duty to give holders of covered securities "notice of all defaults known to the trustee, within ninety days after the occurrence thereof " and to act prudently in the event of a default (as that term is defined in the governing documents). 15 U.S.C. § 77ooo(b), (c).

16.     Defendant's failure to perform its duties has damaged Plaintiffs. Accordingly, Plaintiffs now bring this action to recover damages against Defendant for breaching the governing agreements, for failing in its common law duties, for violating the TIA, and, for the New York Trusts, for violating the Streit Act.

## II.     PARTIES

### A.     Plaintiff NCUA Board as Liquidating Agent

17.     The National Credit Union Administration ("NCUA") is an independent agency

---

[1] In December 2014, the Second Circuit issued an order in *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. The Bank of New York Mellon*, No. 13-cv-1776 (2d Cir. Dec. 23, 2014).  In its order, the Second Circuit held that RMBS certificates issued pursuant to pooling and servicing agreements ("PSAs") are not covered by the TIA because they fall under TIA § 304(a)(2), which exempts "any certificate of interest or participation in two or more securities having substantially different rights and privileges." 15 U.S.C. § 77ddd(a)(2). This FAC contains two trusts, FMIC 2005-3 and PCHLT 2005-4, structured under indentures and thus not impacted by the Second Circuit ruling. Plaintiffs have also included TIA claims for trusts structured under PSAs to preserve their appellate rights.

of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the liquidating agent for such credit union. As the liquidating agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

18.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.

19.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.

20.     Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois. Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions.

21.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.

22.     Constitution was a federally chartered corporate credit union with its offices and principal place of business in Wallingford, Connecticut.

23.     As corporate credit unions, the CCUs provided investment and financial services to other credit unions.

24.     Pursuant to FCU Act, 12 U.S.C. § 1786(h) 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A), the NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, and into involuntary liquidation on October 1, 2010, appointing itself as the liquidating agent. The NCUA Board placed Members United, Southwest, and Constitution into conservatorship on September 24, 2010, and into involuntary liquidation on October 31, 2010, appointing itself as the liquidating agent.

25.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as the liquidating agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. The NCUA Board as liquidating agent may sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

26.     The NCUA Board as liquidating agent brings this action in its own right for the following CUSIPS: CUSIP 00441VAD0 in ACE 2006-FM1, CUSIPs 00442CAE9 and 00442CAD1 in ACE 2006-FM2, CUSIP 00442EAH8 in ACE 2006-NC3, CUSIP 00441YAF9 in ACE 2006-OP2, CUSIPs 251510LK7 and 251510LC5 in DBALT 2006-AR1, CUSIP 25150RAD7 in DBALT 2006-AR6, CUSIP 25151RAF1 in DBALT 2007-AR1, CUSIP 25151UAA5 in DBALT 2007-AR2, CUSIP 25151VAB1 in DBALT 2007-OA1, CUSIP

35729VAE7 in FHLT 2006-D, CUSIPs 55028CAE5 and 55028CAB1 in Trust LUM 2007-1,

CUSIP 61915YAB7 in MHL 2007-1, CUSIP 590214AD4 in Trust MLMI 2006-A4, CUSIPs

65538DAB1 and 65538DAA3 in Trust NAA 2006-AR4, CUSIP 655378AC1 in NAA 2007-2,

CUSIPs 65537KAY6, 65537KAC4, and 65537KAB6 in Trust NHELI 2007-1, CUSIP

68384CAD8 in Trust OPMAC 2006-2, CUSIP 71085PDD2 in PCHLT 2005-4, CUSIP

81744HAE3 in SEMT 2007-1, and CUSIP 9497EYAC3 in WFHET 2007-2 (collectively, the

"Non-Resecuritized Certificates"). The Non-Resecuritized Certificates are held by the NCUA

Board as liquidating agent.[2]

    **B.**    **Plaintiff Separate Trustee**

27.    In 2010, the NCUA and the NCUA as liquidating agent created the NCUA

Guaranteed Notes Program (the "NGN Program") as a means of liquidating the distressed

investment securities from the five failed CCUs (the "Legacy Assets") and thereby stabilize

funding for the credit union system. The Legacy Assets consist of over 2,000 investment

---

[2] Some certificates for which NCUA alleges direct claims were formerly held by four NGN trusts that have since unwound pursuant to the procedure described *infra* at ¶ 30, meaning that NCUA as liquidating agent now holds those certificates. Specifically the following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2010-R2 Series I-A (the "NCUA 2010-R2 I -A Trust"): CUSIPs 251510LK7 and 251510LC5 in DBALT 2006-AR1, and CUSIP 61915YAB7 in MHL 2007-1. The following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2011-R4 (the "NCUA 2011-R4 Trust"): CUSIP 00441VAD0 in ACE 2006-FM1, CUSIP 25151RAF1 in DBALT 2007-AR1, CUSIP 25151UAA5 in DBALT 2007-AR2, CUSIP 65538DAA3 in Trust NAA 2006-AR4, CUSIP 655378AC1 in NAA 2007-2, CUSIP 81744HAE3 in SEMT 2007-1, and CUSIP 9497EYAC3 in WFHET 2007-2. The following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2011-R5 (the "NCUA 2011-R5 Trust"): CUSIP 00442EAH8 in ACE 2006-NC3, CUSIP 25151VAB1 in DBALT 2007-OA1, CUSIP 55028CAB1 in Trust LUM 2007-1, CUSIPs 65537KAY6 and 65537KAB6 in Trust NHELI 2007-1, and CUSIP 71085PDD2 in PCHLT 2005-4. The following CUSIPs were formerly held by the NCUA Guaranteed Notes Trust 2011-R6 (the "NCUA 2011-R6 Trust"): CUSIP 00441QAD1 in ACE 2006-CW1, CUSIPs 00442CAE9 and 00442CAD1 in ACE 2006-FM2, CUSIP 00441YAF9 in ACE 2006-OP2, CUSIP 25150RAD7 in DBALT 2006-AR6, and CUSIP 35729VAE7 in FHLT 2006-D.

securities, secured by approximately 1.6 million residential mortgages, as well as commercial mortgages and other securitized assets. The NCUA as liquidating agent transferred certain Legacy Assets, including the CUSIPs on Exhibit A whose "Holder(s)" is an NGN Trust (the "Resecuritized Certificates"), to the NGN Trusts.[3] The NGN Trusts then issued approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets.

28.     Each NGN Trust created under the NGN Program issued Notes pursuant to an Offering Memorandum and three key agreements: (i) NGN Indentures by and between the NGN Trusts, as Issuers, and The Bank of New York Mellon ("BNYM"), as Indenture Trustee; (ii) Trust Agreements by and among the NCUA Board in its Capacity as Liquidating Agent, as Seller, Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"), in its capacity as Owner Trustee, and BNYM, as Certificate Registrar and the Certificate Paying Agent; and (iii) Guaranty Agreements by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NGN Trusts, as Issuer, and BNYM, as the Indenture Trustee. The NGN Indentures, NGN Trust Agreements, and NGN Guaranty Agreements are referred to collectively herein as the "NGN Agreements."[4]

29.     In short, the creation of the NGN Trusts involved the following: (i) the NCUA Board in its Capacity as Liquidating Agent (as Sellers) transferred the Resecuritized Certificates to the NGN Trusts (as Issuers) pursuant to the NGN Trust Agreements, and Wells Fargo (as Owner Trustee) caused the Owner Trust Certificates (defined below) to be issued to the NCUA

---

[3] The NGN Trusts are: NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); and NCUA Guaranteed Notes Master Trust ("NCUA 2011-M1 Trust").
[4] The NGN Agreements are substantially similar. Representative examples of an NGN Indenture, NGN Trust Agreement, and NGN Guaranty Agreement from the NCUA 2011-R1 Trusts are attached hereto as Exhibits B, C, and D.

Board as Liquidating Agent (as Sellers); (ii) the NGN Trusts (as Issuers) pledged the Certificates and the other assets of the trust estates to BNYM (as Indenture Trustee) and caused the NGN Notes to be issued pursuant to the NGN Indentures; (iii) BNYM (as Indenture Trustee) delivered the Notes, or NGNs, to the Initial Purchasers for further sale to investors.

30.     Under the NGN Trust Agreements, the NCUA Board transferred and assigned its rights, title, and interest to assert the claims at issue in this FAC related to the Resecuritized Certificates to the NGN Trusts. Ex. C, NGN Trust Agreement § 3.01.[5] In exchange, the NCUA Board received certain certificates that represent a beneficial ownership interest in the NGN Trusts (the "Owner Trust Certificates"). *Id*. As the holder of the Owner Trust Certificates, the NCUA Board as liquidating agent is entitled to payments from the NGN Trusts after the principal balance of the Notes issued by the various NGN Trusts has been reduced to zero; all accrued and unpaid interest on the Notes has been paid; all amounts owed to the Guarantor have been reimbursed; and the other parties to the NGN Agreements have been paid in full. *Id*.

31.     Under the NGN Guaranty Agreements, the NCUA in its capacity as an agency of

---

[5] The NCUA Board notified investors that it was actively investigating and pursuing certain legal claims against different defendants under federal and state securities laws in connection with the securities underlying the NGNs and that any recovery on those claims would benefit the NCUA Board as Liquidating Agent for the CCUs (referred to as the "Sellers" under the NGN securitization agreements) exclusively. *See*, *e.g.*, Ex. E, NGN Trust 2011-R4 Offering Memorandum at 31 ("Beginning in September 2010, in connection with these investigations, the NCUA requested that various potential defendants, including potentially these Initial Purchasers, enter into separate tolling agreements to suspend for a period of time the running of any statutes of limitations that apply to potential claims, including claims under federal and state securities laws, with respect to specified asset-backed securities sold to the Corporate Credit Unions. It is not known at this time whether specific legal claims will be asserted by the NCUA in respect of the Underlying Securities, or whether litigation will ensue. Any damages or other amounts recovered by the NCUA in connection with any such claims will not be part of the Trust Estate and will not be used to make payments on the Offered Notes. Any such recoveries will benefit the Sellers exclusively."). The NCUA Board did not transfer those claims against underwriters and originators under federal and state securities laws to the NGN Trusts. The claims at issue here were not subject to that reservation.

the Executive Branch of the United States Government (in such capacity, the "Guarantor")

provided a guarantee, backed by the full faith and credit of the United States, of the timely

repayment of all principal and interest to the investors in the NGN Trusts. Ex. D, NGN Guaranty

Agreement § 1.

32.    Under the NGN Indentures, BNYM was granted the right to take action against

Defendant with respect to the Resecuritized Certificates and the Trusts. Ex. B, NGN Indenture,

Granting Clause (granting BNYM all right, title, and interest to "all present and future claims,

demands, causes and choses in action in respect of the [Resecuritized Certificates]"); *see also id*.

§ 5.01(a)(i) ("The Indenture Trustee shall have the full power and authority to do all things not

inconsistent with the provisions of this Indenture that it may deem advisable in order to enforce

the provisions hereof or to take any action with respect to a default or an Event of Default

hereunder, or to institute, appear in or defend any suit or other proceeding with respect hereto, or

to protect the interests of the Noteholders and the Guarantor").[6]

33.    By letter dated January 30, 2015, NCUA as Guarantor requested that BNYM

pursue the claims alleged in this suit. Ex. F, NCUA Letter to BNYM.  On February 24, 2015,

BNYM declined to do so, stating that "BNY Mellon as Indenture Trustee on the various NCUA

re-securitization trusts does not intend to pursue the claims outlined in the Amended Complaints

you sent me. We take no position on the merits, but acknowledge and agree that the Guarantor

[NCUA] has the right to pursue claims based on the re-securitization Trust Indentures when the

Indenture Trustee fails to do so after receiving notice (which we have for the claims in the

---

[6] By contrast, Wells Fargo, as the Owner Trustee, has no such rights under the Trust Agreement, which is similar to an article of incorporation for the NGN Trusts. *See generally* Ex. C, NGN Trust Agreement.

Amended Complaints).” Ex. G, Email from BNYM's Head of Litigation.[7] More recently, on July 13, 2015, BNYM provided a sworn declaration providing as follows and confirming BNYM's previous email consenting to NCUA's derivative pursuit of this suit:

> 5.   BNYM, solely in its capacity as the Indenture Trustee of the NGN Trusts, does not object to NCUA's pursuit of the NCUA Suits on behalf of the NGN Trusts. BNYM, solely in its capacity as the Indenture Trustee of the NGN Trusts, takes a neutral position with respect to any challenge to NCUA's standing and leaves it to the decision of the courts presiding over the NCUA Suits. The statements made in this paragraph 5 are made in reliance on NCUA's statement in its letter to BNYM, dated July 7, 2015, that:
>
>> “In bringing the NCUA Suits on behalf of the NGN Trusts, the NCUA Board has fully committed to protecting the best interests of the NGN Trusts and the NGN Noteholders. Recoveries on claims brought on behalf of the NGN Trusts will be remitted to the NGN Indenture Trustee for deposit into the NGN Trust accounts.”

Ex. I, Declaration of Loretta Lundberg ¶ 5.

34.   On August 29, 2018, BNYM, in its capacity as the Indenture Trustee of the NGN Trusts, transferred all legal title, claims, powers, rights, authorities, and duties of BNYM, including the claims at issue in this FAC to the Separate Trustee and appointed the Separate Trustee for purposes of exercising any and all of the Indenture Trustee's powers, rights and authorities and/or fulfilling any and all of the Indenture Trustee's duties under each applicable Indenture with respect to the claims at issue in this FAC, with any recoveries going to the NGN Trusts Ex. P, Instrument of Appointment and Acceptance. The Separate Trustee is a citizen of Colorado and has standing to pursue these claims in his own name as duly appointed separate trustee of the NGN Trusts and holder of legal title, claims, powers, rights, authorities, and duties of BNYM, including the claims set forth herein.

---

[7] Additionally, on January 30, 2015, NCUA in its agency role as Guarantor consented to this action and assigned any rights or interests it may have had with respect to these claims to NCUA as liquidating agent.[6] Ex. H, NCUA Assignment Agreement.

35.     The Separate Trustee brings this action for the Resecuritized Certificates.

### C.     Defendant

36.     Defendant HSBC Bank USA, National Association, is a national banking association and is the principal subsidiary of HSBC USA Inc. HSBC's principal executive office is located at 2 Hanson Place, 14th Floor, Brooklyn, New York and its registered main office is located in McLean, Virginia. HSBC currently administers as corporate trustee for assets valued at several hundred billion USD, including RMBS.

37.     HSBC, together with its affiliates, is involved in many aspects of the private-label RMBS market. As of April 2011, HSBC, together with HSBC Finance Corporation and other subsidiaries ("HSBC Mortgage Servicing Companies") was the twelfth largest servicer of residential mortgages in the United States, servicing a portfolio of 892,200 residential mortgage loans.

38.     HSBC, through its affiliates HSBC Finance Corporation, Household Finance Corp., Beneficial, and Decision One has also acted as a mortgage loan originator or seller for numerous RMBS offerings. From 2005 through 2008, HSBC was also a leading sponsor of private-label RMBS, sponsoring RMBS offerings under the HASC, HALO and HFCHC shelves.

## III.   JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction pursuant to the following statutes: (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the

district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"; (c) 15 U.S.C. § 77v, providing for jurisdiction for claims under the TIA; (d) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; (e) 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy, without interest and costs, exceeds $75,000; and (f) 15 U.S.C. § 1367, providing for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This Court also has jurisdiction over the claims asserted under the Streit Act because this case involves New York common law trusts.

40.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), and/or 28 U.S.C. § 1391(b)(1), because Defendant is a resident of and/or conducts business in this District. This Court has personal jurisdiction over Defendant because it is a resident of and/or conducts business in this District and under N.Y. C.P.L.R. 301, New York's long arm statute. The claims relate to Defendant's role as trustee over trusts created under New York law and/or administered at least in part in New York. In addition, Defendant has filed foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation and warranty breaches.

## IV.     THE TRUSTS

41.     The trusts identified on Exhibit A are 35 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2004 and 2007.

42.     The trusts have a high concentration of loans originated by the following lenders and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment Corp.; Argent Mortgage Co. LLC; Residential Funding Co., LLC; Bank of America, N.A.; National City Mortgage Co.; Fremont Investment and Loan; National City Mortgage Co.; Bank of America, N.A.; J.P. Morgan Chase Bank, N.A.; Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP; First National Bank of Nevada; MortgageIT, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; New Century Mortgage Corporation; Option One Mortgage Corp.; and Wells Fargo Bank, N.A. (collectively, the "originators").

43.     A significant portion of the trusts were sponsored by the following sponsors and their affiliates: Merrill Lynch Mortgage Lending, Inc.; Wells Fargo Bank, N.A., Nomura Credit & Capital, Inc.; and DB Structured Products, Inc. (collectively, the "sponsors").

## V.     BACKGROUND

### A.     RMBS Trusts

44.     RMBS certificates are debt instruments issued to investors by an issuing trust that holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the income stream generated by the trust as borrowers make payments on their mortgage loans.

45.     The establishment and administration of each trust is governed by a series of contracts (the "governing agreements"). The vast majority of trusts are governed by an agreement called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA references and incorporates. The remaining trusts are governed by a document called an Indenture and certain related agreements that the Indenture references and incorporates,

including a document called the Sales and Servicing Agreement. All of the governing agreements are substantially similar, and impose the same duties on Defendant. *See* Ex. J §§ I – IX. Accordingly, this Amended Complaint refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

46.     Each trust is administered primarily by two entities – the trustee and the master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements, as well as those duties imposed by the common law, TIA and the Streit Act.

47.     The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing agreements, the common law, the TIA, and the Streit Act impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

48.     Defendant earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. Defendant also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. Defendant maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened Defendant's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

### B.     The Trustee's General Duties

49.     The terms of the governing agreements are substantially similar, if not identical,

and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Ex.

J §§ I – IX. Further, upon information and belief, Defendant employed the same general set of

policies and procedures to oversee and manage the trusts regardless of any individual variations

contained within the governing agreements.

50.     Most importantly, Defendant has an absolute duty under the governing

agreements, the common law, the TIA, and the Streit Act to acquire and protect the trust corpus

for the benefit of certificateholders. Trustee acknowledges receipt . . . and declares that it holds

(or the applicable Custodian on its behalf holds) and will hold such documents and the other

documents delivered to it constituting a Loan Document, and that it holds (or the applicable

Custodian on its behalf holds) or will hold all such assets and such other assets included in the

definition of 'REMIC I' in trust for the exclusive use and benefit of all present and future

Certificateholders." PSA Section 2.2;[8] *see also* Ex. J § II.

**C.     The Trustee's Duties Under the Pooling and Servicing Agreements**

51.     The PSAs are contracts between, in addition to others, the depositor, the master

servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs

for each of the trusts are substantially similar and memorialize the following events and

conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust;

(ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay

the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Ex. J §§ I – IX.[9]

---

[8] All cites to the PSA and its related agreements are to the PSA and related agreements specific
to the Deutsche Bank Alt-A Securities Mortgage Loan Trust 2006-AR6 ("DBALT 2006-AR6")
PSA, which, as alleged above, is substantially similar to the governing agreements for all of the
trusts. A copy of the DBALT 2006-AR6 PSA is attached as Exhibit K.

[9] Some of the trusts have a different structure—they issued notes pursuant to an indenture
(collectively, the "Indentures") on which the Defendant serves as indenture trustee. A separate
agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these

52.     The PSAs also set forth Defendant's contractual duties and obligations, which are identical or substantially identical for each trust. *See* Ex. J §§ I – IX. Specifically, each PSA requires Defendant to oversee and enforce the depositors', the custodians', and the servicers' obligations. In performing these contractual obligations, Defendant must act in the best interests of and for the protection of the trusts and the certificateholders. Certificateholders, unlike the trustee, have no direct contact with the depositors and servicers. Moreover, under the PSAs, certificateholders do not have the right to compel the trustee to enforce the responsible party's representations and warranties,[10] absent satisfaction of the collective action provisions. Certificateholders must rely on the Defendant to protect their interests.

### D.     Duty Properly to Take Title to the Mortgage Loans Conveyed to the Trust

53.      The trusts must take title to the mortgages conveyed to them for due consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance terms of the mortgage loans to the trust, and those terms are intended to ensure that the trustee, on behalf of the trusts, takes full title to the mortgage loans. *See* Ex. J § I – III.

54.     The first part of this conveyance involves the depositor assigning to the trustee, among other things, its rights, title, and interest in the mortgage loans and the depositor's rights

---

transactions. Although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and Defendant's duties and obligations are similar under the two structures.

[10] The governing agreements specify the party that is responsible for repurchasing any defective loan. Generally, they provide that, upon discovery and/or notice of a breach of a representation and warranty with respect to a mortgage loan that materially and adversely affects the interests of the certificateholders, the responsible party shall cure the breach or repurchase the affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due on the mortgage loan. The responsible party is generally either the originator of the loans, the seller of the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same or affiliated entities. For simplicity's sake, this complaint uses "responsible party" to refer to the entity responsible for the repurchase of any defective loans.

under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section

2.1 ("Conveyance of Trust Fund"), which provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, on behalf of the Trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Loans identified on the Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement, the Servicing Agreements, the Assignment Agreements, the Subsequent Mortgage Loan Purchase Agreement and such assets as shall from time to time be credited or required by the terms of this Agreement to be credited to the Pre-Funding Account, Capitalized Interest Account, Cap Account and Swap Account (including, without limitation the right to enforce the obligations of the other parties thereto thereunder), and all other assets included or to be included in REMIC I.

The other PSAs contain substantially similar provisions. *See* Ex. J § I.

     55.     Furthermore, the PSAs require Defendant, or its agents acting as custodians, to

acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all

mortgage pool assets—including the mortgage files and related documents and property—are

held by it as trustee. Significantly, Defendant, or its agents, must take physical possession of the

mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to

the trustee. As set forth in PSA Section 2.2:

> The Trustee acknowledges receipt, subject to the provisions of Section 2.1 hereof and Section 2 of the Custodial Agreements, of the Loan Documents and all other assets included in the definition of "REMIC I" under clauses (i), (ii) and (iii) (to the extent of amounts deposited into the Distribution Account), (iv) and (v) and declares that it holds (or the applicable Custodian on its behalf holds) and will hold such documents and the other documents delivered to it constituting a Loan Document, and that it holds (or the applicable Custodian on its behalf holds) or will hold all such assets and such other assets included in the definition of "REMIC I" in trust for the exclusive use and benefit of all present and future Certificateholders . . . .

The other PSAs contain substantially similar provisions. *See* Ex. J § II.

     56.     Once the mortgage files are in Defendant's or its custodians' possession,

Defendant, or the custodian on Defendant's behalf, is required to ensure that the underlying

mortgage loans were properly conveyed to the trusts, and that the trusts have perfected

enforceable title to the mortgage loans by reviewing the mortgage files for each mortgage loan.

Defendant, or the custodian on the Defendant's behalf, is required to review each mortgage file

within a certain period after the "closing date" of the securitization, identify any problems, and

deliver to the depositor a certification that all necessary documents have been executed and

received. This duty overlaps with and forms part of the requirements that the trustee must satisfy

to properly take title to the mortgage loans. As set forth in PSA Section 2.1:

> In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with the applicable Custodian pursuant to the related Custodial Agreement the documents with respect to each Loan as described under Section 2 of the related Custodial Agreement (the "Loan Documents"). In connection with such delivery and as further described in the related Custodial Agreement, the applicable Custodian will be required to review such Loan Documents and deliver to the Trustee, the Depositor, the Master Servicer and the Seller certifications (in the forms attached to the related Custodial Agreement) with respect to such review with exceptions noted thereon. In addition, the Depositor under the Custodial Agreements will have to cure certain defects with respect to the Loan Documents for the related Loans after the delivery thereof by the Depositor to the Custodians as more particularly set forth therein.

The other PSAs contain substantially similar provisions. *See* Ex. J § III.

57.    Defendant breached its contractual obligations by: 1) failing to take proper title to

the mortgage loans; 2) failing to adequately review the mortgage loan files and certify their

completeness; 3) failing to properly oversee the custodian or its agents. *See* Ex. J § II – IV.

**E.    Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot Be Cured**

58.    If Defendant or the custodian identifies any defect in a mortgage loan file for an

underlying mortgage loan contained in a trust, Defendant must identify such defect and promptly

provide notice to the relevant parties. As set forth in PSA Section 2.3(a):

> Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File . . . the Trustee shall promptly notify the Seller of such defect, missing document or breach.

59.    Once incomplete mortgage files or loans with defective transfer documentation are identified, the parties to the governing agreements must work to remedy these deficiencies. As set forth in PSA Section 2.3(a) (emphasis added):

> Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Loan that materially and adversely affects the value of such Loan or the interest therein of the Certificateholders . . . **the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Loan** from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

The other PSAs contain substantially similar provisions. *See* Ex. J § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements (including the custodial agreement) comply with their respective obligations.

60.    Defendant breached its contractual obligations by: 1) failing to provide notice of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect to mortgage files that could not be cured. *See* Ex. J § V.

**F.    Duty to Provide Notice of Breaches and to Enforce Repurchase Rights with Respect to Defective Loans**

61.    The quality of the mortgage loans to which the trusts purportedly receive title is also critical to an RMBS securitization. For that reason, the governing agreements contain "representations and warranties" by the responsible party attesting to the characteristics of the borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

21

62.     As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the responsible party to cure, substitute, or repurchase any mortgage loans that materially breach the responsible party's representations and warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the responsible party's repurchase obligations:

> Upon discovery or receipt of notice of . . . a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Loan that materially and adversely affects the value of such Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within 60 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the **Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Loan** from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement.

PSA Section 2.3(a) (emphasis added); *see also* Ex. J § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements comply with their respective obligations.

63.     To protect the trusts and all certificateholders, the governing agreements require Defendant to give prompt written notice to all parties to the governing agreements upon its knowledge of a breach of a representation or warranty made by the responsible party about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

64.     Defendant breached its contractual obligations by: 1) failing to provide notice of

defective mortgage loans; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by its contractual obligations.

### G.      Duties under the Transfer Agreements

65.      Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), Sale Agreements ("SAs"), and Assignment and Recognition Agreements (collectively, "transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These transfer agreements are generally between either the originator and the depositor, or the sponsor and the depositor.

66.      One of the parties to the transfer agreement—typically an originator or sponsor—makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans in either the PSA or the associated transfer agreement.[11] For simplicity's sake, this Complaint refers to that party as the "responsible party."

67.      The responsible party's typical representations and warranties in the transfer agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless

---

[11] The governing agreements frequently refer to the same entity by different titles depending upon the role being played. The role of seller or transferor generally overlaps with that of the sponsor.

specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. To the extent mortgages breach the responsible party's representations and warranties, the mortgage loans are worth less and are much riskier than represented. *See, e.g.*, Ex. J § IX.

68.    Under the transfer agreements, upon discovery or receipt of notice of any breach of the responsible party's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the responsible party is obligated to cure the breach in all material respects.

69.    If a breach is not cured within a specified period, the responsible party is obligated either to substitute the defective loan with a loan of adequate credit quality, or to repurchase the defective loan.

70.    The repurchase provisions ensure that the trust need not continue to hold mortgage loans for which the responsible party breached its representations and warranties. Thus, the repurchase provisions are designed to transfer the risk of any decline, or further decline, in the value of defective mortgage loans that results from a breach from the trusts to the responsible party.

71.    Under the transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or the certificateholders' interests in the loans. The responsible party's cure, substitute, and repurchase obligations do not require any showing that the responsible party's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or

require that the demanding party prove reliance on servicing and origination documents.

72.     Upon the sale of the mortgage loans to the trust, the rights under the transfer agreements, including the responsible party's representations and warranties concerning the mortgage loans, are generally assigned to the Defendant, as trustee, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

73.     Defendant breached its contractual obligations by: 1) failing to enforce its contractual rights under the transfer agreement; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by its contractual obligations.

### H.      Duties Regarding the Servicers

74.     Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

75.     Section 3.1 of the PSA states that:

> The Master Servicer shall supervise, monitor and oversee the obligation of the Servicers to service and administer their respective Loans in accordance with the terms of the applicable Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with each Servicer as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive, review and evaluate all reports, information and other data provided to the Master Servicer by each Servicer and shall cause each Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by such Servicer under the applicable Servicing Agreement.

The other PSAs contain substantially similar provisions. *See* Ex. J § VII.

76.     Similarly, Section 3.3(b) of the PSA states that:

> The Master Servicer, for the benefit of the Trustee and the Certificateholders, shall enforce the obligations of each Servicer under the related Servicing Agreement, and shall, in the event that a Servicer . . . fails to perform its obligations in accordance with the

25

related Servicing Agreement, subject to the preceding paragraph, terminate the rights and obligations of such Servicer thereunder and act as servicer of the related Loans or to cause the Trustee to enter in to a new Servicing Agreement with a successor servicer selected by the Master Servicer.

77.     Under the PSAs, Defendant, as trustee, has certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendant's obligations upon occurrence of an "event of default," which is defined as a specified failure of the master servicer or servicer to perform its servicing duties and cure this failure within a specified time. Section 7.1 of the PSAs identifies several types of failures by the master servicer or servicer that may give rise to an event of default. The other PSAs contain substantially similar provisions. *See* Ex. J § VIII. Such failures include a breach of master servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee.

78.     The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Ex. J § VIII.

79.     Defendant breached these contractual obligations by failing to properly monitor the servicers and master servicers.

**I.     The Trustee's Duties upon Knowledge of an Event of Default**

80.     The PSAs impose additional obligations upon Defendant once one of its responsible officers knows a default or a servicer event of termination has occurred. First, under Section 7.1 of the PSAs, Defendant must give written notice to the servicer of the occurrence of such an event within the specified period after Defendant obtains knowledge of the occurrence.

81.     Second, within sixty to ninety days after a default has occurred, Defendant must provide written notice to all certificateholders about that event, unless the default has been cured

or waived. *See* Ex. J § VIII.

82.     Third, and most importantly, Section 8.1 of the PSAs requires Defendant to "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The other PSAs contain substantially similar provisions. *See* Ex. J § VI.

83.     Defendant breached its contractual obligations by: 1) failing to provide notice of defaults and events of default; 2) failing to act as a prudent person following defaults and events of default; and 3) failing to act with due care and without negligence prior to an Event of Default.

**J.     The Trustee's Duties and Obligations under the TIA and the Streit Act, and the Common Law**

84.      The TIA applies to and is deemed to be incorporated into each of the PSAs (or indentures) and the related trusts. 15 U.S.C. § 77ddd(a)(1).

85.     The TIA imposes two sets of duties and obligations on Defendant as trustee of the trusts – one set "prior to default" and the other set "in case of default."

86.     Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust. 15 U.S.C. § 77ooo(a)(1). Under that provision, Defendant had to perform the duties specifically assigned to it under the governing agreements, including those duties described above.

87.     Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture] to determine whether or not such evidence conforms to the requirements of the indenture." 15 U.S.C. § 77ooo(a) (citing 15 U.S.C. § 77nnn). Thus, Defendant was required to examine the evidence the master servicer or custodian provided to the

trusts, certifying their compliance with the covenants it made under the governing agreements, and Defendant also had to determine whether that evidence conformed to the governing agreements' requirements.

88.     In addition, a trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Defendant consequently had to inform RMBS certificateholders of defaults and breaches of the governing agreements within ninety days after their occurrence.

89.     In case of a default (as defined in the PSA or indenture), a trustee must exercise "such of the rights and powers vested in it by such indenture, and [ ] use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).

90.     The Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the trust and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in performing its duties as a prudent person would under the same circumstances. N.Y. Real Prop. Law § 126(1).

91.     The duty to act as a prudent person is also implicated under the common law when the trustee substantially breaches its obligations under a contract or an indenture. Under such circumstances, the trustee cannot rely on provisions of the contract or indenture providing the trustee with the protections afforded to an indenture trustee.

92.     The common law also imposes fiduciary duties upon the trustee and requirements

28

to act with due care, with undivided loyalties and in good faith, and to refrain from negligent conduct. Defendant's negligence, willful misconduct, and failure to act resulted in breaches of the governing agreements.

93.     As set forth below, Defendant is liable to Plaintiffs under the TIA, the Streit Act, and the common law for failing to exercise the necessary degree of skill and in failing to enforce its rights and powers under the governing agreements.

## VI.     DEFENDANT KNEW THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND SHOULD HAVE TAKEN APPROPRIATE ACTION

94.     The trusts' loan pools contained large numbers of loans that materially breached the responsible parties' representations and warranties concerning the originators' compliance with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other associated standards. By 2009 at the latest, Defendant knew of problems in the trusts based on the public evidence and evidence otherwise only available to trustees, demonstrating the widespread breaches of representations and warranties in the trusts, including: 1) general reports concerning originators' systematic abandonment of their underwriting standards and reports concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific reports concerning the originators of loans in the trusts abandoning their underwriting standards and sponsors of the securitizations failing to follow prudent practices; 3) the high number of borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous lawsuits brought by and against Defendant and its affiliates alleging the systematic abandonment of originator underwriting guidelines.

A. **General Reports Concerning Originators' Systematic Abandonment of Their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards**

95.     By 2009, government reports, public and private investigations, and media reports

surfaced concerning the collapse of the RMBS market put Defendant on notice of the massive

problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the

duty to carefully investigate these issues and to take action as necessary. These reports and

investigations identified the originators' pervasive abandonment of underwriting standards and

sponsors' disregard of prudent securitization standards as the cause of the crisis.

96.     For example, the Office of the Comptroller of the Currency (the "OCC"),

published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest

rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in

those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized

the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

97.     Despite the importance of sticking to underwriting standards, it was clear that

originators were not following them. Chairman of the Federal Reserve Board, Benjamin

Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs

Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in

this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008, *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

98.    In November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report recounts widespread foreclosure abuses in connection with mortgages that have been securitized and the numerous federal and state investigations that have detailed this problem. The abuses identified in the report—including forged or back-dated mortgage assignments and "robo-signing" of false affidavits used in foreclosure actions—arise from failures in the documentation and transfer of mortgage loans from the originators to other entities in the securitization process, and ultimately into the trusts. As the report explains, irregularities in the chain of title between the originator and the trust can have significant legal consequences that damage the trusts and certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010)*, available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

99.    Other reports reached similar conclusions. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") issued a report detailing the causes of the

financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its

investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and
> mortgage backed securities that undermined U.S. financial markets. The Subcommittee
> investigation indicates that Washington Mutual was emblematic of a host of financial
> institutions that knowingly originated, sold, and securitized billions of dollars in high risk,
> poor quality home loans. These lenders were not the victims of the financial crisis; the high
> risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial

Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

100.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in

January 2011 that detailed, among other things, the collapse of mortgage underwriting standards

and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry

Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic

Crisis in the United States (2011) ("FCIC Report").

101.    The FCIC Report concluded that there was a "systemic breakdown in

accountability and ethics." "Unfortunately—as has been the case in past speculative booms and

busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the

financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available
> credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of
> events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky
> mortgages had become embedded throughout the financial system, as mortgage-related
> securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

102.    The FCIC Report also noted that during the housing boom, mortgage lenders

focused on quantity rather than quality, originating loans for borrowers who had no realistic

capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their

32

mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. A default in the first few months of a mortgage, known as an early payment default, is known in the mortgage industry as a significant indicator of pervasive disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards." *Id*.

103.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

104.    Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id*. at xxiii.

105.    The predominant RMBS securitization method involved an originate-to-distribute ("OTD") model where the originators of the loans do not hold the loans, but instead repackage and securitize them. The OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived. The Financial Stability Oversight Council ("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality

of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Report") at 11 (footnote omitted).

106.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans." *Id*. Similarly, the sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the represented quality and also failed to ensure that the purported mortgaged property's appraised value was accurate.

107.    As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

108.    Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as

defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

109.    In sum, reports regarding the disregard of underwriting standards and poor securitization practices became common by 2009. Even prior to 2009, Defendant had exclusive access to proprietary information and data demonstrating the systematic failure of underwriting standards that was not available to the public. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools underlying RMBS, resulting in steep losses. By at least 2009, it was apparent to trustees that the originators and sponsors involved in the securitization of the trusts had engaged in problematic practices and a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues and taken action in connection with the trusts entrusted to its care.

**B.    Specific Reports Concerning the Originators of Loans in the Trusts Abandoning Their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

110.    The governing agreements for each of the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

111.    However, Defendant knew that those representations and warranties were false and should have taken action to address the problems concerning the defective mortgage loans in the trusts. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines in the pursuit of profit  -- recklessly originating loans without regard for the borrowers' ability to repay. In addition,

investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards.

112.   The information below put Defendant on notice that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendant should have carefully investigated those issues in the context of the trusts entrusted to its care, provided notice to certificateholders, and taken appropriate action to protect the trusts.

### 1.   American Home

113.   American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated, aggregated, and serviced by its subsidiaries. It was the parent of American Home Mortgage Acceptance, Inc. and American Home Mortgage Holdings, Inc., which was the parent of American Home Mortgage Corp., a retail lender of mortgage loans. Collectively, these entities are referred to as "American Home." American Home originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

114.   American Home's lack of adherence to underwriting guidelines was detailed in a 165-page amended class action complaint filed in June 2008. *See* Am. Complaint, *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. June 4, 2008) ("American Home Am. Compl."). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from over 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky

loans, regardless of the borrowers' creditworthiness. *See generally* American Home Am. Compl.

115.    According to the American Home Am. Compl., former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied without compensating factors. *See id*. ¶¶ 120-21.

116.    Witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id*.

117.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for exceptions. It was commonplace to overrule mortgage underwriters' objections to facilitate loan approval. *See id*. ¶ 123.

118.    A former American Home auditor confirmed that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id*. ¶ 124.

119.    The parties settled the litigation on January 14, 2010, for $37.25 million.

120.    Like other originators from this period, American Home's poor lending practices resulted in numerous other civil lawsuits. Those lawsuits contain firsthand accounts from former employees and allegations that reunderwriting revealed that many loans originated by American Home were found to be breaching the associated representations and warranties. *See, e.g.*, Complaint, *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); First Consolidated and Am. Complaint, *New Jersey Carpenters Health Fund v. Structured Asset Mortgage Invs. II, et al.*, No. 08-cv-8093 (S.D.N.Y.

May 15, 2009).

### 2.    Argent

121.    ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the nation's largest privately-owned subprime lender. Ameriquest Mortgage Company ("Ameriquest") was ACC Capital's retail mortgage lending unit. Argent Mortgage Company, LLC ("Argent") was ACC Capital's wholly-owned wholesale lending unit that made loans through independent brokers. On September 1, 2007, Citigroup purchased Argent from ACC Capital, and Ameriquest announced that it was shutting down lending operations.

122.    Argent originated or contributed a substantial portion of the loans in the mortgage pools underlying the trusts.

123.    Argent appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report. Argent was ranked as the worst lender in Cleveland, Ohio, and Detroit, Michigan; the second worst in Las Vegas, Nevada, and Miami, Florida; the third worst in Denver, Colorado; the fourth worst in Stockton, California; the fifth worst in Bakersfield, California; the sixth worst in Riverside and Sacramento, California; and the eighth worst in Memphis, Tennessee.

124.    In the 2009 OCC Report, Argent was fourth in Las Vegas, Nevada; sixth in Fort Pierce-Port St. Lucie, Florida and Reno, Nevada; seventh in Bakersfield, California and Stockton-Lodi, California; eighth in Riverside-San Bernardino, California; ninth in Merced, California, Modesto, California and Fort Myers-Cape Coral, Florida; and tenth in Vallejo-Fairfield-Napa, California.

125.    According to a May 11, 2008, Cleveland Plain Dealer article titled *The Subprime House of Cards*, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, reported that "some

Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I didn't agree with." Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them." Mark Gillispie, *The Subprime House of Cards*, The Plain Dealer, May 11, 2008, *available at*

http://blog.cleveland.com/metro/2008/05/the_subprime_house_of_cards.html.

126.     According to a January 29, 2009, article in the Miami Herald, Orson Benn, a former vice president of Argent who was convicted and sentenced to prison for racketeering relating to mortgage fraud, spent three years during the height of the housing boom teaching brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved. Jack Dolan *et al.*, *Home Loan Racket Flourished In Florida*, Miami Herald, Jan. 29, 2009, *available at* http://www.miamiherald.com/2008/12/07/v-fullstory/878194/home-loan-racket-flourished-in.html.

127.     According to Mr. Benn himself, "the accuracy of loan applications was not a priority." *Id.* The article reports: "The simplest way for a bank to confirm someone's income is to call the employer. But in at least two dozen cases, the applications show bogus telephone numbers for work references." *Id.* The article notes that one Argent broker generated at least 100 loans worth $22 million in Miami and nearly all of them were based on false and misleading financial information. *See id.* For instance, "one borrower claimed to work for a company that didn't exist—and got a $170,000 loan. Another borrower claimed to work a job that didn't exist—and got enough money to buy four houses." *Id.* The Miami Herald obtained applications for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." *Id.*

128.    Richard Bowen, the former Business Chief Underwriter at Citibank, was involved in the due diligence process for Citibank's acquisition of Argent. In his April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent, and we found large numbers that did not—that were not underwritten according to the representations that were there." Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 239.

129.    In a video released by the American News Project on May 11, 2009, reporters Lagan Sebert and Mike Fritz interviewed several former employees of Argent and Ameriquest regarding their lending practices. American News Project, *Fraud by Mortgage Companies Key Cause of Foreclosures* (May 11, 2009), *available at* http://www.youtube.com/watch?v=MFPi6mcNubo.

130.    Tamara Loatman-Clark, a former loan closer for Argent, stated "I mean you did what you had to do and again if that meant manipulating documents so that you can get them out so that they could conform, that's what you did…. [T]here were incentives to get as many done as possible. So on a typical Thursday, I may have 15 or 20 files that I need to get funded somehow and you know you need to work very hard to get 20 files funded. Whatever hit your desk for the day is what you wanted to get out." *Id.*

131.    According to the video, "It was the Wall Street business that drove the frantic pace. Even before proper papers were signed, Ameriquest was bundling the loans and passing them on." Loatman-Clark said, "And so sometimes when they came back and you're talking about, you know, names not properly on mortgage documents… you're talking about missing documents, like internally the incentive was to do whatever you needed to do to get them out and

40

that sometimes meant that you manipulated documents to get them out." *Id*.

132.    The video report contained the following exchange:

Reporter: "So you are saying the goal was to make these loans and then get them off your books as quick as possible?"

Loatman-Clark: "Exactly. That was the pressure."

Reporter: "But who were the people who were buying, who were like the most hungry for these loans?"

Loatman-Clark: "Bear Stearns… Citigroup was another one. Basically the ones that were/are hardest hit were the people who invested. And these were the people we were shuffling these documents out to by any means necessary."

*Id*.

133.    On June 23, 2011, the Cleveland Plain-Dealer reported that a Cleveland grand jury indicted nine former Argent employees for their suspected roles in approving fraudulent home loans. Mark Gillespie, *Former Employees of Subprime Mortgage Lender Indicted by Cuyahoga County Grand Jury*, The Plain Dealer, June 23, 2011, *available at* http://blog.cleveland.com/metro/2011/06/former_employees_of_subprime_m.html.

134.    The indictment alleged that Argent employees "helped coach mortgage brokers about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's income and assets." *Id*. The article noted that "[e]mployees at an Argent loan processing center in Illinois ultimately approved the loans knowing that the company's own lending rules had not been satisfied." *Id*. A spokesman for the prosecutor's office said that "Argent employees bent the rules to get loans approved in order to inflate their wages and bonuses." *Id*.

135.    Later, the Plain Dealer reported that additional criminal charges had been brought against one of the former Argent employees indicted in June—a woman named Angela

41

Pasternak. Mark Gillespie, *Argent Mortgage Worker Gets Indicted Again in Suspected Mortgage Fraud Case*, The Plain Dealer, Nov. 15, 2011, *available at* http://blog.cleveland.com/metro/2011/11/argent_mortgage_worker_gets_in.html.

136.    According to the article, prosecutors said that Ms. Pasternak, "approved exceptions knowing that loan applications contained false income information and bogus credit scores." *Id*. The article also reported, "Plain Dealer investigations found numerous instances in which Argent approved mortgages that contained blatant misrepresentations of borrowers' income, assets and ability to pay." *Id*.

137.    According to another article, Steve Jernigan, a fraud investigator at Argent, said that when he sent an appraiser to check on a subdivision for which Argent had made loans, the address on the loans was clearly fictitious because the appraiser was standing in the middle of a cornfield. Michael W. Hudson, *Silencing the Whistle-blowers*, The Investigative Fund, May 10, 2010, *available at* http://www.theinvestigativefund.org/investigations/economiccrisis/1308/silencing_the_whistle-blowers/.

138.    When Jernigan reviewed the loan files, he determined that the houses did not exist and that each of the loan files contained the picture of the same house. *See id.* The article also reported that Argent had been ripped off by a con man named Robert Andrew Penn, who later admitted that he had appropriated victims' names and credit histories to obtain loans and buy properties for inflated prices around Indianapolis. *See id*. Although Argent was warned about the man in 2004, Jernigan said the company did not "conduct a serious investigation" into the fraud until mid-2006 when it learned the scheme was about to be made public by another duped lender. *Id*.

42

139.     In January 2010, Ameriquest and Argent agreed to pay $22 million to settle 29

class action lawsuits against them that had been consolidated in the Northern District of Illinois,

alleging that Argent and Ameriquest inflated appraisal values and borrower income or asset

statements and aggressively employed misleading marketing/sales techniques as part of a

business strategy to force potential borrowers to close loans. *See In re Ameriquest Mortgage Co.*

*Mortgage Lending Pracs. Litig.*, MDL No. 1715 (N.D. Ill).

### 3.     Bank of America

140.     Bank of America was a major sponsor of mortgage-backed securities during the

relevant time. Bank of America, including its acquired subsidiary Merrill Lynch Mortgage

Lending, Inc. ("Merrill Lynch"), originated, contributed, and sponsored a material portion of the

loans in the mortgage pools underlying the trusts.

141.     Bank of America-originated loans are the subject of multiple lawsuits around the

country, including lawsuits filed by the SEC, the Department of Justice, and the Federal Housing

Finance Agency ("FHFA"). In each of the lawsuits below, Bank of America and/or its affiliates

acted as the originator of the underlying loans and/or the sponsor, depositor and/or underwriter

of the RMBS at issue. The overwhelming evidence revealed that Bank of America and its

affiliates systematically failed to adhere to their obligations in any of their roles in the

securitization process.

- **DOJ:** Complaint, *United States v. Bank of America Corp.*, No. 13-cv-446 (W.D.N.C. Aug. 6, 2013).

- **SEC:** Complaint, *SEC v. Bank of America Corp.*, No. 13-cv-447 (W.D.N.C. Aug. 6, 2013).

- **FHFA:** Am. Complaint, *FHFA v. Bank of America Corp.*, No. 11-cv-06195 (S.D.N.Y. June 28, 2012); Mot. Dismiss denied in *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012), motion to certify appeal granted (June 19, 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).

142.    The Department of Justice explained its allegations in the following August 6,

2013, press release titled "Department of Justice Sues Bank of America for Defrauding Investors

in Connection with Sale of Over $850 Million of Residential Mortgage-Backed Securities":

> [T]he United States has filed a civil lawsuit against Bank of America Corporation and
> certain of its affiliates, including Merrill Lynch, Pierce, Fenner & Smith f/k/a/ Banc of
> America Securities, LLC, Bank of America, N.A., and Banc of America Mortgages
> Securities, Inc. (collectively "Bank of America"). The complaint alleges that Bank of
> America lied to investors about the relative riskiness of the mortgage loans backing the
> residential mortgage-backed securities (RMBS), made false statements after intentionally
> not performing proper due diligence and filled the securitization with a disproportionate
> amount of risky mortgages originated through third party mortgage brokers.
> ...
>
> "Bank of America's reckless and fraudulent origination and securitization practices in the
> lead-up to the financial crisis caused significant losses to investors," U.S. Attorney
> Tompkins said. "Now, Bank of America will have to face the consequences of its actions.
> We have made a commitment to the American people to hold financial institutions
> accountable for practices that violated the law and wreaked havoc on the financial system,
> and my office takes that commitment very seriously. Our investigation into Bank of
> America's mortgage and securitization practices continues."
> ...
>
> The civil complaint filed today in U.S. District Court in Charlotte alleges that Bank of
> America defrauded investors, including federally insured financial institutions, who
> purchased more than $850 million in RMBS from Bank of America Mortgage Securities
> 2008-A (BOAMS 2008-A) securitization. The government's civil complaint also seeks
> civil penalties from Bank of America under the Financial Institutions Reform, Recovery,
> and Enforcement Act of 1989 (FIRREA). According to the complaint, in or about January
> 2008, Bank of America sold BOAMS 2008-A RMBS certificates to investors by knowingly
> and willfully making materially false and misleading statements and by failing to disclose
> important facts about the mortgages collateralizing the RMBS, including Bank of
> America's failure to conduct loan level due diligence in the offering documents filed with
> the U.S. Securities and Exchange Commission (SEC). These misstatements and omissions
> concerned the quality and safety of the mortgages collateralizing the BOAMS 2008-A
> securitization, how it originated those mortgages and the likelihood that the "prime" loans
> would perform as expected.
>
> First, according to the filed complaint, a material number of the mortgages in the
> BOAMS 2008-A collateral pool failed to materially adhere to Bank of America's
> underwriting standards. Specifically, more than 40% of the 1,191 mortgages in the
> BOAMS 2008-A collateral pool did not substantially comply with Bank of America's
> underwriting standards in place at the time they were originated and did not have sufficient

documented compensating factors. As alleged in the complaint, Bank of America knew that specific loans in the BOAMS 2008-A collateral pool did not materially adhere or comply with Bank of America's underwriting standards.

Second, Bank of America did not conduct any loan-level due diligence at the time of securitization. According to the complaint, this was a violation of Bank of America's own policies, procedures and prior practice, and was contrary to industry standards and investor expectations. Moreover, this decision allowed Bank of America to keep bad loans in the deal. According to the complaint, these bad loans had a range of glaring origination problems, such as overstated income, fake employment, inflated appraisals, wrong loan-to-value ratios, undisclosed debt, occupancy misrepresentation, mortgage fraud and other red flags wholly inconsistent with a purportedly prime securitization. As a result of this lack of due diligence, Bank of America had no basis to make many of the representations it made in the offering documents regarding the credit quality of the underlying mortgages.

Finally, Bank of America concealed important risks associated with the mortgages backing the BOAMS 2008-A securitization. For example, Bank of America originated more than 70% of the loans through third party mortgage brokers. These loans, known as "wholesale mortgages," were riskier than similar mortgages originated directly by Bank of America. More significantly, at the same time Bank of America was finalizing this deal, it was receiving a series of internal reports that showed an alarming and significant decrease in the quality and performance of its wholesale mortgages. According to the complaint, Bank of America did not disclose that important information or the associated risks to investors.

Investors in the BOAMS 2008-A certificates have already suffered millions of dollars in losses and it is estimated that total losses sustained by investors will exceed $100 million.

*Available at* http://www.justice.gov/opa/pr/2013/August/13-ag-886.html.

143.    The SEC's lawsuit against Bank of America had similar allegations:

"In its own words, Bank of America 'shifted the risk' of loss from its own books to unsuspecting investors, and then ignored its responsibility to make a full and accurate disclosure to all investors equally," said George S. Canellos, Co-Director of the SEC's Division of Enforcement.
…

The SEC alleges that Bank of America deceived investors about the underlying risks as well as the underwriting quality of the mortgages, misrepresenting that the mortgage loans backing BOAMS 2008-A were underwritten in conformity with the bank's own guidelines. These mortgage loans, however, were riddled with ineligible appraisals, unsupported statements of income, misrepresentations regarding owner occupancy, and evidence of mortgage fraud. The key ratios of debt-to-income and original-combined-loan-to-value were routinely miscalculated, and then the materially inaccurate ratios were provided to the investing public.

> According to the SEC's complaint, a disproportionate concentration of high-risk wholesale loans and the inclusion of a material number of loans failing to comply with internal underwriting guidelines resulted in BOAMS 2008-A suffering an 8.05 percent cumulative net loss rate through June 2013 – the greatest loss rate of any comparable BOAMS securitization.

Press Release, *SEC Charges Bank of America with Fraud in RMBS Offering* (Aug. 6, 2013),

*available at*

http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370539751924#.UgzSb5LVAkQ.

144.   Other cases involving Bank of America and its affiliates acting as originator, sponsor, depositor and/or underwriter in RMBS have included allegations concerning investors' forensic analysis or re-underwriting of loan files that highlight the poor quality of mortgage loans securitized and sold by Bank of America to the trusts. *See, e.g.*, Complaint, *Western Southern Life Ins. v. Bank of America, N.A.*, No. 11-cv-00667 (Ohio Ct. Com. Pl. Aug. 18, 2011) (alleging misrepresentations regarding LTV and owner occupancy); Complaint, *CIFG Assurance N. Am. Inc. v. Bank of America, N.A.*, No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2011) (alleging that Bank of America's faulty securitization practices led to inclusion of a high percentage of defective loans); Complaint, *Prudential v. Bank of America et al.*, No. 13-cv-01586 (D.N.J. Mar. 14, 2013) ("Prudential's loan-level analysis has revealed systematic failures in Defendants' loan underwriting and assignment practices"); Complaint, *Texas County Dist. Ret. Sys. v. J.P. Morgan Secs. LLC et al.*, No. 1-GN-14-000998 (Tex. Civ. Dist. Ct. May 2, 2014) (forensic review demonstrated that "Bank of America included recklessly underwritten loans in its RMBS that failed to meet the applicable standards systematically disregarding its own and third-party due diligence, and then misrepresented the quality of those loans to investors").

### 4.   Countrywide

145.   Countrywide Financial, Countrywide Home Loans, Inc., Countrywide Mortgage

Funding, Inc. and Countrywide Home Loans Servicing LP ("Countrywide") was one of the largest originators of residential mortgages in the United States during the period leading up to the financial crisis. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

146.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

> He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

> But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."
> . . .
> During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

> But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

> He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

> In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan,* NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

147.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Complaint, *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

148.    Internal Countrywide e-mails released in connection with the SEC lawsuit and publicly available show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

149.    Indeed, in a September 1, 2004 email, Mozilo voiced his concern over the "clear

deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."

150.     In 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

151.     Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

152.     An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.

153.     Mozilo admitted in a September 26, 2006 email that Countrywide did not know how Pay Option ARM loans would perform and had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." Yet such loans were securitized and passed on to unsuspecting investors such as the CCUs.

154.     With growing concern over the performance of Pay Option ARM loans, Mozilo advised in a November 3, 2007 email that he "d[id]n't want any more Pay Options originated for the Bank." In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans expressed in the same email were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."

155.     In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

156.     Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."

Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry.

157.    Aguilera confirmed in a June 12, 2006 email that internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

158.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. In a February 21, 2007 email, Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."

159.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 7, 2007 e-mail that "the exception process has never worked properly."

160.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, Countrywide executive Russ Smith stated in an April 11, 2007 email that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."

161.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

162.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

163.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there." NBC Nightly News, *Countrywide Whistleblower Reports "Liar Loans,"* July 1, 2008. Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

164.    Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income to qualify for loans. *Id.*

165.    NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" *Id.*

166.     Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. Public disclosure of the staggering number of loans breaching the associated representations and warranties discovered in these cases should have alerted the trustee that Countrywide loans were highly likely to have breached the associated representations and warranties.

### 5.     Deutsche Bank

167.     Deutsche Bank AG, itself and through its affiliate DB Structured Products, Inc. (collectively "Deutsche Bank"), sponsored many of the trusts.

168.     Deutsche Bank was specifically criticized in the FCIC Report for failing to devote sufficient resources to its due diligence arm. *See* FCIC Report at 168.

169.     Clayton Holdings, Inc. ("Clayton") – a major provider of third-party due diligence services – provided trending reports to the FCIC. These reports show that from the first quarter of 2006 to the second quarter of 2007, Clayton rejected 34.9% of the mortgage loans Deutsche Bank submitted because the mortgage loans fell outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 50% were subsequently waived in by Deutsche Bank without proper consideration and analysis of compensating factors.

170.     Federal and state government investigations have also targeted Deutsche Bank's securitization practices. In particular, the Nevada Attorney General initiated an investigation into Deutsche Bank's residential mortgage acquisition and securitization business centering on whether mortgage lenders made misrepresentations to consumers who took out mortgage loans Deutsche Bank purchased and securitized. Deutsche Bank settled with Nevada for $11.5

million. *See In re DB Structured Products, Inc.*, No. A-13-690144-B, Assurance of

Discontinuance (D.C. Nev. Oct. 14, 2013), *available at*

http://ag.nv.gov/uploadedFiles/agnvgov/Content/News/PR/PR_Docs/2013/2013-10-

4_DB_AOD.pdf.

171.    In July 2010, the Financial Industry Regulatory Authority ("FINRA") fined

Deutsche Bank $7.5 million for misrepresenting delinquency data in the issuance of subprime

securities. FINRA News Release, *FINRA Fines Deutsche Bank Securities $7.5 Million For*

*Negligent Misrepresentations Related To Subprime Securitizations* (July 21, 2010), *available at*

http://www.finra.org/newsroom/newsreleases/2010/p121747.

172.    RMBS lawsuits involving Deutsche Bank securitizations from the same period

that involve similar products highlight Deutsche Bank's securitization problems. In September

2011, the FHFA sued Deutsche Bank as sponsor of forty securitizations and ACE 2006-OP2.

The FHFA alleged that Deutsche Bank made untrue or misleading statements regarding the

mortgage loans' LTV ratios, owner occupancy status, and compliance with underwriting

guidelines. *See* Complaint, *FHFA v. Deutsche Bank AG, et al.*, No. 11-cv-06192 (S.D.N.Y.

Sept. 2, 2011).

173.    The FHFA's analysis of the quality of the loans in these offerings consistently

found that over 20% of the loans in these offerings had LTV ratios of over 100% and that non-

owner occupied properties had been repeatedly understated by over 10%. FHFA's complaint

highlighted government and private investigations into the originators' underwriting practices,

revealing widespread abandonment of the originators' reported underwriting guidelines during

the period, the collapse of the certificates' credit ratings, and the surge in delinquencies and

defaults in the mortgages in the Deutsche Bank securitizations as further support for alleging

Deutsche Bank's systematic misreporting of owner occupancy and LTV statistics.

174.     In *Federal Home Loan Bank v. Ally Financial, Inc.*, No. 11-cv-10952 (D. Mass. May 26, 2011), Federal Home Loan Bank of Boston analyzed Deutsche Bank securitizations. Federal Home Loan Bank of Boston found that Deutsche Bank underreported the percentage of loans with greater than 90% LTV ratios by between 24%-30% for the securitizations, and underreported the number of loans with greater than 100% LTV ratios by between 8% and 16%. Finally in the amended complaint in *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities, Inc. et al.*, No. 08-cv-03178 (E.D.N.Y. May 24, 2010), investors reviewed a loan sample from two Deutsche Bank securitizations, and found that Deutsche Bank understated the LTV ratio in 44% and 51% of the sampled loans for each trust.

### 6.     First National Bank of Nevada

175.     First National Bank of Nevada ("FNB Nevada") was a large subprime mortgage lender and originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

176.     First National Bank Arizona ("FNB Arizona"), FNB Nevada, and First Heritage Bank were controlled by First National Bank Holding Company ("FNB Holding"), collectively ("FNB Group"). All were under common management. *See* Department of the Treasury, Office of the Inspector General, *Audit Report: Safety and Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank, National Association* at 4 (Feb. 27, 2009) ("FNB Nevada OIG Report"), *available at* http://www.treasury.gov/about/organizational-structure/ig/Documents/oig09033.pdf.

177.     FNB Arizona ran the FNB Group's residential mortgage lending operation. *See* FNB Nevada OIG Report at 4.

178.    The dollar amount of mortgage loans originated by FNB Arizona increased substantially in the 2000s. David Enrich and Damian Paletta, *Failed Lender Played Regulatory Angles*, Wall Street Journal, Oct. 3, 2008, *available at* http://online.wsj.com/articles/SB122298993937000343.

179.    FNB Arizona was an OTD lender; in 2006, $6.9 billion of its loans were packaged into RMBS. *See* FNB Nevada OIG Report at 5.

180.    A series of investigations by the OCC detail how FNB Arizona achieved its rapid growth by pervasively disregarding its underwriting guidelines.

181.    In 2004, the OCC inspected FNB Arizona and determined that it needed better "[p]rocedures to reduce underwriting exceptions" and better "[p]olicies and internal controls over the use of appraisers." FNB Nevada OIG Report at 44.

182.    A 2005 OCC investigation found that "[c]redit underwriting and administration need improvement. The quickness of loan production has had priority over quality. Issues include loan appraisal violations (repeat issue) and inadequate practices over standby letters of credit." It recommended FNB Arizona "develop and implement procedures and accountability that are effective in reducing the high level of underwriting exceptions (repeat issue)" and reduce the number of employee and vendor errors in loan origination. It also cited FNB Arizona for two regulatory violations—failing to appraise properties prior to closing and failing to use independent appraisers. *Id.* at 44-46.

183.    A 2006 investigation found that FNB Arizona still had not implemented "effective procedures and processes to reduce the level and number of underwriting exceptions." The OCC also noted that appraisers' reports were often missing or incomplete. *Id.* at 47.

184.    In 2007, FNB Arizona's liquidity problems prompted the OCC to initiate an

informal enforcement action. It cited several matters requiring the direct attention of the bank's board, including internal loan review that lacked independence due to executive management influence, understaffed internal loan review, staffing levels and expertise that were not commensurate with the complexities of the bank's operations, and (yet again) the need to reduce underwriting exceptions. *See id.* at 48-50.

185.     FNB Arizona's underwriting practices became so poor that in 2007 it was unable to sell $683 million of residential mortgages to securitizers. It was also forced to repurchase a number of its poorly underwritten mortgages. This contributed to a liquidity crisis for the entire FNB Group. *See id.* at 2, 6.

186.     On June 30, 2008, FNB Arizona merged into FNB Nevada. Shortly thereafter, the OCC closed FNB Nevada and appointed the FDIC as its receiver. Press Release, *OCC Closes First National Bank of Nevada and Appoints FDIC Receiver* (July 25, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2008/nr-occ-2008-87.html.

187.     In its capacity as receiver for FNB Nevada, the FDIC sued former directors and officers of the FNB Group. Complaint, *FDIC v. Dorris et al.*, No. 11-cv-1652 (D. Ariz. Aug. 23, 2011). The FDIC alleged the same pervasive disregard of underwriting guidelines described above. *See id.* ¶¶ 38-42.

188.     The complaint also detailed how the bank's compensation structure was tied to the volume of loans originated, creating an incentive for bank employees to disregard the underwriting guidelines. *See id.* ¶ 30. FNB Arizona also used many mortgage brokers who had the same volume-based incentive to disregard underwriting guidelines and to inflate appraisals. *See id.* ¶¶ 33-34.

189.     The suit settled less than two months after it was filed and the court entered

judgments for $20 million against the two defendants.

190.   Evidence uncovered in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-cv-10446 (D. Mass.) further highlights FNB Arizona's disregard of its underwriting guidelines. There, the court allowed the plaintiff to engage in limited discovery, which uncovered four pertinent pieces of evidence:

- "[T]hree 'representative' no-document loans that [FNB Nevada] originated. In each of these 'No Doc' loans, the borrower's income was either unknown or unverified, or inadequate to make payments on the underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan."

- "[T]he declaration of Susan Wright, who underwrote loans at [FNB Nevada] in 2006 and 2007 and generally corroborates the Complaint's allegations about [FNB Nevada]'s underwriting practices." "Wright describes [FNB Nevada]'s business model as trying to 'make as many loans as possible and then sell them as quickly as possible' and explains that their underwriting practices instructed underwriters to remove income and asset information already in the possession of [FNB Nevada] from 'No Doc' loans. She states that [FNB Nevada] regularly made loans to borrowers whom '[FNB Nevada] knowingly qualified on the basis of what appeared to be obviously false information [and] [FNB Nevada] did not appear to reasonably expect that the borrowers would be able to repay these loans.'"

- "[S]everal emails generated by [FNB Nevada] employees, including Mortgage Division President Pat Lamb; Vice President of Risk Management Renea Aderhold; 'SVP Ops/Communication Manager' Beth Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk Officer Eric Meschen, which collectively paint a picture of a devil-may-care underwriting culture."

- "[T]he expert report of Ira Holt, an accountant who performed a forensic analysis of 408 of the Trusts' loans using the [FNB Nevada] guidelines that were in place when they were originated. Holt found that 108 (26.5%) had material defects that violated even [FNB Nevada]'s slack underwriting standards." "According to Holt, he was unable to 're-underwrite' some of the 408 loans because of the lack of documentation, as well as the 'scrubbing' of the applicant's disqualifying data by [FNB Nevada]. According to plaintiffs, the number of loans in the sample with material defects may be considerably higher than Holt's estimates."

*Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 894 F.Supp.2d 144, 148 & 148 n.6, 8 (D. Mass. Oct. 1, 2012). The court held allegations based on that evidence

were sufficient to survive a motion to dismiss. *Id.* at 150.

### 7.      Fremont

191.    Fremont Investment and Loan ("Fremont") originated or contributed a material

portion of the loans in the mortgage pools underlying the trusts and sponsored many trusts.

192.    Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a

lender "'known for poor quality loans.'" Opening Statement of Sen. Carl Levin, Chairman, *Wall*

*Street and the Financial Crisis: The Role of High Risk Home Loans*, Hearing Before S.

Permanent Subcomm. on Investigations (Apr. 23, 2010). Senator Levin recounted how an analyst

with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs

RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs
> using subprime loans from Fremont Investment and Loan, a subprime lender known for
> loans with high rates of delinquency. On January 24, 2007, an analyst wrote seeking advice
> from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. Since
> Fremont collateral has been performing not so good, is there anything special I should be
> aware of?" One analyst responded: "No, we don't treat their collateral any differently."
> The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are
> good to go." In other words, the analyst didn't have to factor in any greater credit risk for
> an issuer known for poor quality loans, even though three weeks earlier S&P analysts had
> circulated an article about how Fremont had severed ties with 8,000 brokers due to loans
> with some of the highest delinquency rates in the industry. In the spring of 2007, Moody's
> and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont
> mortgages. By October, both companies began downgrading the CDO. Today all five AAA
> tranches have been downgraded to junk status.

*Id.*

193.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc.,

which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court
> documents about the reckless lending practices that dominated the subprime market during
> the real estate boom.

> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*,

Myrtle Beach Sun-News, Aug. 15, 2010, at A, *available at*

http://www.myrtlebeachonline.com/2010/08/15/1637463/investors-paying-for-risky-loans.html.

On September 28, 2012, the court denied in principal part the defendants' Joint Motion to

Dismiss For Failure to State a Claim. *See Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley &*

*Co., Inc., et al.*, No. 10-2741 (Mass. Super. Ct.).

194.    On December 21, 2011, the FHFA filed an amended complaint against UBS

Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie

Mac and Fannie Mae. In the complaint, the FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See* Second Am. Complaint, *FHFA v. UBS Americas, Inc.*, No. 11-cv-05201 (S.D.N.Y.) (Dec.

21, 2011). The court denied a motion to dismiss the complaint in May 2012. *See FHFA v. UBS*

*Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). On July 25, 2013, the FHFA announced

that it had reached an agreement to settle the case for $885 million.

195.     Fremont's origination practices have also been addressed in numerous governmental investigations and reports. For example, the FCIC Report discusses that Moody's created an independent surveillance team in 2004 in order to monitor previously rated deals. The Moody's surveillance team saw a rise in early payment defaults in mortgages originated by Fremont in 2006, and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer stated that Moody's had never had to put on watch deals rated in the same calendar year. In 2007, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional 32 securities on watch. Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont. FCIC Report at 221-222.

196.     According to the FCIC Report, when sponsors kicked loans out of securitization pools, some originators simply put those loans into new pools. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times. FCIC Report at 168.

197.     Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont held the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th

in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 8. GreenPoint

198.    GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007. Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business. GreenPoint originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

199.    When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.
> . . .
> "To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance. "Once the door was opened, it was abused."
> . . .
> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*,

Bloomberg, Sept. 12, 2008, *available at*

http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

200.    Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as

successor to Bear Stearns & Co., Inc., in 2011 in connection with an RMBS underwritten by

Bear Stearns and exclusively collateralized by GreenPoint-originated loans. After sustaining

large losses due to the poor performance of GreenPoint loans, Syncora hired an independent

consultant to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected

without regard to payment status. Over 92% of the 1,431 loans contained misrepresentations, and

over 85% of the randomly selected 400 loans contained misrepresentations. The

misrepresentations uncovered included the following:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Complaint, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, No. 651566/2011 (N.Y. Sup. Ct.

June 6, 2011). Syncora's lawsuit survived a combined motion to dismiss and motion for

summary judgment. *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

201.    GreenPoint's own employees have corroborated the findings of Syncora. A confidential witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, stated that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007. *See* Complaint, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortgage Secs., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. Oct. 15, 2010) ("FHLB Indianapolis").

202.    According to that confidential witness, sales staff and managers at GreenPoint received bonuses based on the number of loans closed. As she said, "sales had tremendous authority" at GreenPoint, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id*. ¶ 266.

203.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment." When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions. *Id*. ¶ 267.

204.    More often than not, the confidential witness believed that her managers overrode

her denials due to the incentives they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers." She knew of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id*. ¶ 268.

205.   In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations in RMBS offering documents. Allstate's complaint relied on several confidential witnesses. One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans it originated for fraud. He thought this was a "mistake" because the fraud and misrepresentations uncovered in the 10% sample indicated that many more loans likely contained fraud. But the remaining 90% of the loans were not reviewed. Am. Complaint, *Allstate Bank v. J.P. Morgan Chase, N.A.*, No. 11-cv-1869, at ¶ 485 (S.D.N.Y. May 10, 2012).

206.   That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence. Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment. He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans. Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline. *Id*. ¶ 486.

207.   Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006. That confidential witness stated that GreenPoint employees understood that

if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan. The majority of the loan products originated in the confidential witness's office were stated income and asset loans and pay-option ARMs. Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their compensation was not tied to loan performance. *Id*. ¶ 487.

208.     Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 who supervised five Underwriters and three Conditions Specialists. That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines to approve applications, even when there were no compensating factors justifying the exceptions. The confidential witness knew that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was found. According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint. *Id*. ¶ 488.

209.     Allstate's complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers approved to transact with GreenPoint – a large enough number that GreenPoint could exercise no realistic degree of control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. *Id*. ¶ 490.

210.     GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; and 4th worst in Stockton, Merced,

and Vallejo-Fairfield-Napa, California.

### 9. IndyMac

211. By 2007, IndyMac Bank, F.S.B. ("IndyMac") was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. IndyMac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

212. On July 11, 2008, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

213. IndyMac has been the subject of numerous investigations and lawsuits alleging that IndyMac systematically abandoned its underwriting guidelines in pursuing profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by IndyMac breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits, investigations, and reports, in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendant with notice that large numbers of loans originated by IndyMac, including loans in the trusts, breached the associated representations and warranties.

214. For example, in June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-

analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of CRL's investigation into IndyMac's lending practices. CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac. The CRL Report summarized the results of its investigation:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

215.    CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

216.    The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id*.

217.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id*. at 3.

218.    Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id*. at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

219.     The CRL also found the following evidence: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."

The refrain from managers, Miller recalls, was simple: "Find a way to make this work." *Id*. at 9 (footnote omitted).

220.     Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin . . . . It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

221.     Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time. *See id*. at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

*Id*. at 10.

222.     Montilla and another IndyMac mortgage underwriter told the CRL that borrowers

did not know their stated incomes were being inflated as part of the application process. *See id.* at 14.

223.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying loan pool.

224.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id.*

225.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21. The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id.* at 11.

226.    IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id.* at 2-3.

227.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id*. at 31.

228.    Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id*. at 3. This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id*.

229.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division, alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral. *See FDIC v. Van Dellen*, No. 10-cv-04915 (C.D. Cal. July 2, 2010). The case was tried in late 2012, and the jury entered a verdict in favor of the FDIC.

230.    IndyMac currently faces or has faced additional litigation alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS. *See, e.g.*, *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y. May 14, 2009); *Federal Home Loan Bank of Boston v. Ally Financial, Inc., et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011); *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. July 27, 2012).

231.    IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.

### 10.   MortgageIT

232.   MortgageIT, Inc. ("MortgageIT") is a residential mortgage banking company headquartered in New York, New York. On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products. MortgageIT originated or contributed a material portion of the loans in the trusts.

233.   MortgageIT has been the subject of numerous investigations and lawsuits alleging that MortgageIT systematically abandoned its underwriting guidelines in the pursuit of profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by MortgageIT breached the associated representations and warranties.

234.   MortgageIT faced a civil mortgage fraud lawsuit brought in May 2011 by the United States Department of Justice ("DOJ") alleging that MortgageIT made repeated false certifications to the U.S. Department of Housing and Urban Development ("HUD") in connection with its residential mortgage origination and sponsorship practices. *See United States v. Deutsche Bank AG and MortgageIT, Inc.*, No. 11-cv-02976 (S.D.N.Y.). An amended complaint was filed on August 22, 2011 ("DOJ Complaint").

235.   The United States alleges that "MortgageIT repeatedly lied to be included in a Government program to select mortgages for insurance by Government. Once in that program, they [sic] recklessly selected mortgages that violated program rules in blatant disregard of whether the borrowers could make mortgage payments." DOJ Complaint ¶ 1.

236.   According to the DOJ Complaint, "As of June 2011, HUD has paid more than $368 million in FHA insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance. Many of those claims arose out of FHA mortgage insurance provided by HUD based on MortgageIT's false certifications of due diligence." *Id*. ¶ 233.

237.    The complaint also alleges that MortgageIT chronically understaffed quality

control: "Between 2006 and 2009, the sole employee at Deutsche Bank or MortgageIT

conducting quality control reviews of closed FHA-insured mortgages was the Government Loan

Auditor. His review of closed FHA-insured mortgages continually declined during that period,

and declined most significantly after Deutsche Bank acquired MortgageIT. By the end of 2007,

the Government Loan Auditor was no longer spending any time conducting quality control

reviews of closed mortgage files. To increase sales, Deutsche Bank and MortgageIT shifted his

work from quality control reviews of closed mortgages (i.e., quality control audits) to assistance

with production. By the end of 2007, not a single person at Deutsche Bank or MortgageIT was

conducting quality control reviews of closed FHA-insured mortgages, as required by HUD

rules." *Id.* ¶ 143-144.

238.    MortgageIT allegedly also ignored quality control measures. For example,

MortgageIT contracted with an outside vendor to conduct quality control reviews of FHA-

insured loans. The vendor provided the reviews in letters detailing underwriting violations found

in FHA-insured mortgages to MortgageIT. The findings included identification of serious

underwriting violations. Instead of reading the letters, MortgageIT employees "stuffed the letters,

unopened and unread, in a closet at MortgageIT's Manhattan headquarters." It was not until

MortgageIT hired its first quality control manager that these letters were taken out of the closet

and read. Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor

prevented MortgageIT from taking appropriate actions to address patterns of ongoing

underwriting violations." *Id.* ¶ 111-124.

239.    The Amended DOJ Complaint further alleged that "Deutsche Bank's and

MortgageIT's failure to implement the required quality control systems rendered them unable to

prevent patterns of mortgage underwriting violations and mortgage fraud." *Id*. ¶ 145.

240.    Additionally, the complaint alleged that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles." *Id*. ¶ 162.

241.    The complaint cites many examples of MortgageIT's failure to perform due diligence. These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162-230.

242.     On May 9, 2012, the parties settled the case for $202.3 million.

Several private investigations and lawsuits also illustrated the fact that MortgageIT failed to

comply with its stated underwriting guidelines. The complaint in *Landesbank Baden-*

*Wurttemberg v. Deutsche Bank AG*, No. 654543/2012 (N.Y. Sup. Ct. Dec. 27, 2012), quotes

confidential witnesses demonstrating that there was virtually no effort at compliance at

MortgageIT. Through the confidential witnesses, the complaint alleges that loan officers stated

that it did not matter what happened with loans as long as MortgageIT received the commission;

that the sales team rejected any attempt to stop using brokers because of likely fraudulent

activity; that the due diligence was far from adequate; and that compensation was tied to loan

volume and there was no disincentive to originate and sell loans that would later default.

### 11.     National City

243.     National City Mortgage Co. was a division of National City Bank which was a

wholly owned subsidiary of National City Corporation. Collectively these entities are referred to

as "National City." National City originated or contributed a material number of loans the

mortgage pools underlying the trusts.

244.     In 2008, investors brought a securities fraud class action lawsuit against National

City alleging that National City misrepresented the quality of its mortgage loans. *See* Am. Class

Action Complaint, *In Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-nc-70004

(N.D. Ohio June 13, 2008). On August 8, 2011, it was announced that the case had settled for

$168 million.

245.     National City faced another class action lawsuit in 2010 alleging, among other

things, that National City did not adhere to its underwriting standards. *See* Second Am. Class

Action Complaint, *Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. and Argent*

*Classic Convertible Arbitrage Fund L.P. v. National City Corp.*, No. 08-nc-70016 (N.D. Ohio Feb. 19, 2010). On November 30, 2010, the case settled for $22.5 million.

246.    Evidence of misconduct on the part of National City employees can also be found in the complaint filed in *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012). For example, in October 2011, in Providence, Rhode Island, National City Loan Officer Juan Hernandez pled guilty to participating in a fraudulent lending scheme. Hernandez pled guilty to fraudulently obtaining loans from National City and other lenders by using "straw purchasers" and providing false information to qualify borrowers for loans they would not have otherwise qualified for. From October 2006 through August 2007, Hernandez prepared false loan applications for phony borrowers containing falsified borrower incomes and debts, and misrepresenting that the properties would be owner occupied when they were not. *Id.* ¶ 361.

247.    Hernandez was joined in the fraud by Miguel Valerio, a National City Loan Processor. Valerio also pled guilty to the fraudulent scheme in December 2011. *Id.* ¶ 362.

248.    Similarly, in the Cleveland, Ohio area, in February 2011, at least two National City employees were indicted for lending fraud, along with 15 other co-conspirators. Loren Segal and Krystal Hill, both National City employees, were indicted for assisting in a fraudulent lending scheme that spanned from March 2005 through November 2007. The scheme included using straw purchasers, inflated appraisals, falsified borrower incomes, fake bank statements, and false verifications of borrowers' funds. Both Segal and Hill pled guilty to participating in the scheme. *Id*. ¶ 363.

249.    National City's systemic failure to follow its underwriting guidelines and evaluate its borrowers' true repayment abilities, and the fraudulent loans that followed, required the

parent company, National City Corporation, to take a charge of $4.2 billion in the first quarter of 2008 for its defective loans. Moreover, National City's abject failure to follow its underwriting guidelines led to the SEC investigating National City's underwriting standards in 2008. In addition, in mid-2008, National City Corporation entered into a confidential agreement with the OCC, "effectively putting the bank on probation," according to a Wall Street Journal article published on June 6, 2008. Damian Paletta *et al.*, *National City is Under Scrutiny*, Wall Street Journal, June 6, 2008, *available at* http://online.wsj.com/articles/SB121271764588650947.

### 12.   New Century

250.    New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively "New Century"). New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone. New Century originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

251.    New Century failed amid revelations that its books contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding. The circumstances leading to its collapse tell the story of a company that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

252.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

> The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500. Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan. They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus Dispatch, June 2, 2008, at 1A.

253.    The article continued:

Lending experts and consumer advocates say New Century was the poster child for the subprime tsunami – a company that relaxed lending standards so much that even borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id*.

254.    New Century's foreclosure rates reflected its inattention to underwriting standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted. Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

255.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada; Bakersfield, California; Riverside-San Bernardino, California; and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California; Las Vegas, Nevada; Merced, California; Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida; and Vallejo-Fairfield-Napa, California.

256.    The U.S. Bankruptcy Court for the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and

all accounting and financial statement irregularities, errors and misstatements" in connection

with New Century's practices and procedures. The Examiner engaged a law firm, forensic

accountants, and financial advisors to assist in his investigation and reporting. Final Report of

Michael J. Missal, *In re: New Century TRS Holdings, Inc.*, No. 07-bk-10416 (D. Del. Feb. 29,

2008) (the "Examiner's Report") *available at*

http://www.klgates.com/files/upload/Final_Report_New_Century.PDF.

257.    The Examiner concluded that New Century "engaged in a number of significant

improper and imprudent practices related to its loan originations, operations, accounting and

financial reporting processes." Examiner's Report at 2. The Examiner summarized the findings:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." *Id*. at 3.

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id*.

- "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id*.

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id*. at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id*. at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses." *Id*.

258.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id*. at 61-62.

259.    From 2003 to 2006, New Century peddled riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated with such products. For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%. And from 2004 to 2005, the percentage of interest-only adjustable-rate loans rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases. New Century qualified borrowers based on their ability to pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years. *Id*. at 57, 125-26.

260.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans—with such loans representing at least 42% of New Century's total loan volume.

"Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income. Stated income loans are often referred to in the industry as "liars' loans," because of the ease with which unscrupulous borrowers or mortgage brokers can overstate income. *Id.* at 58. New Century actively discouraged its employees from even seeking to verify whether a prospective borrower's stated income was reasonable. *Id*. at 127 n.314.

261.    The Examiner identified several "red flags" that indicated the poor quality of New Century's loans and that New Century was not adhering to its underwriting guidelines. Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id*. at 109.

262.    The Examiner found:

New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004. For example, in April 2004, New Century's Chief Credit Officer reported that 'the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels' and that 'Investor Rejects [kickouts] are at an incline as well.' Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that 'we have so many issues pertaining to quality and process!'"

*Id*. at 110.

263.    In 2005, New Century began internal audits of its loan origination and production processes. An audit of the Sacramento wholesale fulfillment center revealed several "high risk" problems, including that 45% of the loans reviewed had improper RESPA disclosures, 42% did not have approval stipulations fully satisfied, 39% had noted exceptions regarding the calculation or verification of income, and 23% had appraisal exceptions or problems. *See id*. at 152.

264.    Further adding to the problem was that exceptions were frequently granted to

underwriting guidelines, but "New Century had no formal exceptions policy." *Id*. at 174.

265.    With no policy in place, granting exceptions was arbitrary. Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id*. at 111.

266.    The Examiner reported:

New Century's loan originations grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005. The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume. While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kick-out and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality.

*Id*. at 113.

267.    New Century consistently prioritized the origination of new loans over virtually all other concerns, including loan quality. Despite after-the-fact assertions by some company spokespeople that such disregard was anomalous, New Century leaders articulated priorities demonstrating that the disregard was systematic. For example, Patrick Flanagan, who until 2006 was New Century's Head of Loan Production and Secondary Marketing, "emphasized maintaining New Century's loan production even when field audits revealed loan quality problems." *Id*. at 89. Even after Flanagan left the company, New Century's prioritization of volume, rather than quality, continued.

268.    The Examiner noted that New Century's Quality Assurance Department would run audit reports after loans were funded to determine if the loan file evidenced compliance with

82

New Century's underwriting guidelines. "The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files." Despite this, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance." *Id*. at 137.

269.    The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of loans. For instance, the Examiner reported that management had determined a way to identify underwriters whose actions led to a high number of defective loans in October 2005, but failed to implement the effort until much later. *See id*. at 169 n.337.

270.    The Examiner's Report found that loan quality trends "worsened dramatically" at New Century in 2006 and early 2007. Although New Century belatedly tried to improve loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the same sorts of problems, including defective appraisals and missing documentation continued to be the main reasons for investors kicking out increasing quantities of New Century loans." *Id*. at 157-58.

271.    The Examiner concluded, "New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004. Yet . . . the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends." *Id*. at 175.

272.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC. She testified that at New Century, risk

managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers [sic] had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the

Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice

President of Corporate Risk, New Century).

273.    She also testified to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id*.

274.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked

"common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less." *Id*.

275.    The FCIC found that New Century "ignored early warnings that its own loan

quality was deteriorating and stripped power from two risk-control departments that had noted

the evidence." FCIC Report at 157. The FCIC reported that New Century's Quality Assurance

staff "had found severe underwriting errors," while New Century's Internal Audit department

"identified numerous deficiencies in loan files," with seven out of nine reviews of the company's

loan production department resulting in "'unsatisfactory'" ratings. *Id.* Instead of making efforts

designed to bring the company into compliance with its underwriting guidelines, New Century's management directed that the negative results be removed from the company's loan performance tracking system, that the Quality Assurance department be dissolved, and that the Internal Audit department's budget be cut. *Id.*

276.    In December 2009, the SEC filed a complaint charging three former New Century executives with securities fraud. *See SEC v. Morrice, et al.*, No. 09-cv-01426 (C.D. Cal. Dec. 7, 2009). The SEC's complaint alleges that the New Century executives misled investors as to the deterioration of New Century's loan portfolio, including dramatic increases in early default rates and loan repurchases/repurchase requests. On July 30, 2010, the SEC announced it had accepted offers to settle the case, subject to court approval, with defendants agreeing to (1) pay over $1.5 million in disgorgement and civil penalties; (2) be permanently enjoined from further securities law violations; and (3) a five-year ban on serving as an officer or director of a public company.

277.    The Attorney General for the Commonwealth of Massachusetts also investigated New Century's faulty origination practices with the following findings:

- New Century unlawfully qualified borrowers for adjustable rate mortgages by using "teaser" rates instead of using the "fully indexed rates" as required by law. Assurance of Discontinuance at 13, *In re: Morgan Stanley & Co. Incorporated*, No. 10-2538 (Mass. Super. Ct. June 24, 2010), *available at* http://www.mass.gov/ago/docs/press/2010/2010-06-24-ms-settlement-attachment3.pdf.

- New Century engaged in "sloppy underwriting for many loans and stretching of underwriting guidelines to encompass or approve loans not written in accordance with the guidelines." *Id*. at 9.

- New Century successfully pressured Morgan Stanley into buying loans which both parties knew did not comply with the underwriting guidelines. *Id*. at 10.

- "31% of the New Century loans on properties checked via BPOs . . . and securitized by Morgan Stanley in 2006 and 2007 had []LTV ratios . . . that were greater than 100%." *Id*. at 13.

- "As early as October 2005, Morgan Stanley's diligence team determined . . . that the stated income on a number of New Century loans was unreasonable. In early 2006, a Morgan Stanley employee commented that stated income credit was not adequately evaluated by New Century. . . . On average, the stated income of these borrowers was approximately 42% higher than the income of fully documented borrowers." *Id*. at 13-14.

278.     Private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines. In *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc.*, No. 10-2741 (Mass. Super. Ct. July 9, 2010), confidential witnesses stated that: the company abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

### 13.     Nomura

279.     Nomura Group, through its affiliate Nomura Credit & Capital, Inc. (collectively "Nomura"), sponsored a significant number of the trusts.

280.     Nomura's deficient due diligence practices are well known. Clayton's trending reports revealed that from the first quarter of 2006 to the first quarter of 2007, Clayton rejected 37.85% of the mortgage loans Nomura submitted for review because they fell outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 58% of the loans were later waived in by Nomura without proper consideration and analysis of compensating factors and included in securitizations.

281.     Over the past three years, Nomura has also been a defendant in at least six significant RMBS lawsuits. The plaintiffs in those actions have performed forensic investigations and loan level reviews confirming the high number of breaches of representations and warranties in Nomura securitizations. On September 2, 2011, the FHFA sued Nomura alleging Nomura made untrue or misleading statements regarding the mortgage loans' LTV ratios, owner

occupancy status, and compliance with underwriting guidelines for seven Nomura sponsored securitizations. The FHFA's review of at least 1,000 randomly selected mortgage loans from each trust revealed that for each securitization, Nomura understated the percentage of non-owner occupied properties by 5%, and for some securitizations by 10%. In addition, the percentage of mortgage loans with an LTV ratio over 100% was over 10% in all but one of the securitizations, and over 19% in two of the securitizations. *See* Complaint, *FHFA v. Nomura Holding Am., Inc. et al.*, No. 11-cv-6201 (S.D.N.Y. Sept. 2, 2011).

282.    In *Prudential v. Nomura*, No. L571012 (Sup. Ct. N.J. Aug. 1, 2012), Prudential's forensic analysis revealed that, for the NHELI 2006-FM1 Securitization, Nomura had overstated the percentage of owner occupied properties by over 12%. Prudential's forensic analysis revealed that 77.96% of the mortgage loans had a CLTV greater than 80%, over 10% more than the amount represented.

283.    In *CMFG Life Insurance v. Nomura Securities International, Inc.*, No. 13-cv-578 (W.D. Wis. Aug. 15, 2013), CMFG conducted a forensic review of a Nomura securitizations. In its analysis of 893 of the 1,656 loans backing its certificate, CMFG found that 62.3% of the loan had an LTV ratio greater than 100%, contrary to the represented 0%, and that the percentage of owner occupied properties was overstated by 11.83%.

284.    Finally, in *Federal Home Loan Bank of Boston v. Ally Financial, Inc. et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011), Federal Home Loan Bank of Boston conducted a forensic analysis of a Nomura securitization and found that Nomura underreported the percentage of loans with LTV ratios greater than 90% by 37.5%, and underreported the number of loans with greater than 100% LTV ratios by 18.44%.

### 14.    Option One

285.    Option One Mortgage Corp. ("Option One") was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc. in April 2008. Option One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

286.    In November 2008, the OCC issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. Option One was ranked as the sixth-worst mortgage originator by number of foreclosures in the worst-affected metropolitan areas.

287.    Reflecting the terrible quality of its loans, Option One has since been named as a defendant in a wave of lawsuits alleging that it engaged in a pattern of fraudulent and otherwise improper lending practices. Cambridge Place, a RMBS investor, sued Morgan Stanley and other Wall Street banks alleging violations of the Massachusetts Securities Act arising from the Wall Street banks' offers and sales of RMBS. Cambridge Place's complaint relied on several confidential witnesses. These former employees with first-hand knowledge confirmed that Option One violated its stated standards for underwriting and appraisals. *See* Am. Complaint, *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. Oct. 14, 2011).

288.    For example, a former underwriter at Option One in Atlanta, Georgia from 2005 to 2006, referred to as CW 52, said that if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. With account executives, "the biggest screamer and shaker of trees gets the most fruit." For a "top-producing" account executive, any red flags that may have been present in the

loan file being considered would be "overlooked" and the loan file would invariably be pushed through successfully. CW 52 estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner. CW 52 also stated that a loan applicant could tell "a straight up lie" about his or her income, but the false information would be overlooked and the loan would be approved, despite CW 52's initial rejection of the application. *Id*. ¶ 242.

289.    Similarly, CW 53, an underwriter at Option One's Marietta, Georgia office in 2005, reported that Option One approved stated income loans "knowing good and well that those people did not make that much money in the position they were in." Likewise, CW 54, an underwriter for Option One in Hawaii from November 2004 to January 2006, stated that "the overwhelming majority of stated income loans were crafted," meaning that the borrowers were not making "anywhere near" what they claimed. However, CW 54 stated that he felt pressured to push loans through because every loan generated income and because, "[i]f you applied any level of rational thought, you were frowned upon." *Id*. ¶ 243.

290.    Former employees also revealed that falsified mortgage appraisals were another ubiquitous facet of Option One's questionable origination practices. With respect to artificially inflated appraisals, CW 52 stated that "[o]f course [loan appraisers] inflated values" and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file. Similarly, CW 55 stated that the appraisals "were all bad." He considered the appraisals borderline fraudulent, not merely incompetent, but was unable to prevent loans based on the flawed appraisals. He explained, "Our job is supposed to be stopping bad loans, but no one stopped them." When CW 55 objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine,

California, and on up the chain until someone high enough in the Underwriting and Sales Department would ultimately approve the loan. *Id*. ¶ 244.

291.    Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street banks to be securitized. CW 56, an Assistant Vice President of Option One from 2005 to 2007, worked in the Correspondent Lending department, which purchased loans from small mortgage companies. CW 56 stated that Option One purchased loans that raised concerns under the stated guidelines and that when he raised such concerns he was essentially told, "Shut up. Wall Street will buy it: don't worry about it." *Id*. ¶ 245.

292.    Similarly, CW 57, who was an underwriter at Option One in Pleasanton, California from October 2005 to October 2007, stated that "[i]f [a borrower] had a FICO and a pulse, they could get a loan" from Option One. CW 57 also stated the following:

> I caught blatant fraud, and the [account executive] would still fight for it. [The account executives and managers] would fight me because they didn't care. They knew they were going to sell it on the secondary market, and they didn't care because it wasn't their money. They were going to get paid regardless.... At Option One they didn't have a portfolio; they sold everything, so they didn't care.... [Option One] didn't have to worry about it, because once they're done with these crappy loans, they'd sell them off. They were the investors' problem.

*Id.* ¶ 246.

293.    The *Cambridge Place* suit survived a motion to dismiss, with the court holding that the allegations paint a "particularized and compelling portrait of a dramatic loosening of underwriting standards on the part of the originators." *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, 10-2741, 2012 WL 5351233, *13 (Mass. Super. Ct. Sept. 28, 2012).

294.    Option One has also been the subject of state and federal investigations. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and

present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

295.    According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id*. ¶ 4.

296.    The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home." *Id*. ¶ 8. Option One also "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id*. Option One's "origination policies employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id*. ¶ 1.

297.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).

298.    On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

299.    On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125

91

million. Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions*, Massachusetts Attorney General (Aug. 9, 2011), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2011/option-one-settlement.html.

### 15. Residential Funding

300.    Residential Funding Co., LLC ("RFC") originated or contributed a material number of loans to the trusts.

301.    RFC's underwriting practices are implicated in two lawsuits filed by MBIA. MBIA provided monoline insurance, a form of credit enhancement that insured RMBS certificates in the event of default, for RMBS containing RFC-originated loans. In its suits, MBIA alleged misrepresentations regarding the loans underlying the RMBS that it insured. The RMBS in these suits were issued in 2006 and 2007. *See* Complaint, *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (Minn. Dist. Ct. Sept. 17, 2012) ("MBIA v. Ally Compl."); First Am. Complaint, *MBIA Ins. Corp. v. Residential Funding Co.*, No. 603552/2008 (N.Y. Sup. Ct. Mar. 19, 2010) ("MBIA v. RFC Compl.").

302.    RFC sponsored RMBS at issue in those suits and originated or acquired many of the loans underlying RMBS at issue in those suits. *See* MBIA v. Ally Compl. ¶¶ 5, 22; MBIA v. RFC Compl. ¶ 2.

303.    After sustaining large losses due to loan defaults, MBIA conducted forensic analyses of several thousand loans underlying the RMBS sponsored by RFC. In *MBIA v. RFC*, MBIA reviewed 7,913 loans and found that 7,019 (88%) contained material misrepresentations. *Id.* ¶ 50; *see also* MBIA v. Ally Compl. ¶ 80. The material misrepresentations included, among other things, routine disregard of underwriting guidelines, debt-to-income ("DTI") and combined loan-to-value ratios ("CLTV") that exceeded the amounts allowed in the underwriting guidelines,

and failure to verify employment as required by underwriting guidelines. *See* MBIA v. Ally Compl. ¶¶ 76-83; MBIA v. RFC Compl. ¶¶ 47-72.

304.   Representative examples of the misrepresentations MBIA uncovered include:

- On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the borrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to conform to the legal standards and the loan file lacked any letter form the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned.

- On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000. The borrower was retired and received a fixed income that was stated as $6,450 per month. The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%. Because the borrower received a fixed income, the borrower did not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines. Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines.

- On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676. The borrower stated income of $3,700 per month and had a FICO score of 650. The CLTV for the mortgage loan was 94.2%. Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%. Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines.

- On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value

of \$540,000.00 and a senior loan balance of \$405,000.00. The borrower stated income of \$11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of \$11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in connection with which the borrower claimed to have actually earned \$43,523 for 2006 and \$20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan.

MBIA v. RFC Compl. ¶ 52.

### 16.    Wells Fargo

305.    Wells Fargo Bank, N.A., ("Wells Fargo") originated or contributed a material number of loans to the loan pools underlying the trusts and sponsored some trusts.

306.    The City of Memphis sued Wells Fargo in 2010 over its mortgage practices, claiming violations of the Fair Housing Act. *See* Am. Complaint, *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857 (W.D. Tenn. Apr. 7, 2010) ("Memphis Compl."). The complaint includes sworn declarations from former Wells Fargo employees describing Wells Fargo's abandonment of underwriting guidelines.

307.    Camille Thomas was a loan processor at Wells Fargo from January 2004 to January 2008. She handled the paperwork involved in the loan, including processing the file for review and approval by the underwriters. To do her job, she had to be familiar with Wells Fargo's underwriting guidelines. Ms. Thomas recounted how the bonus structure placed pressure on credit managers to make loans that should not have been made. She stated that managers manipulated LTV ratios by using inflated appraisals they knew were not accurate. She also knew that documents were falsified to inflate borrowers' incomes. When she complained, a branch manager told her, "we gotta do what we gotta do." Finally, she stated that borrowers were not informed that their loans were adjustable-rate mortgages with low "teaser rates," or about

prepayment penalties, potential violations of lending laws, which would also be violations of the underwriting guidelines. Memphis Compl. Exh. 4.

308.    Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008 in the Memphis area. She stated that the district manager put pressure on credit managers to convince people to apply for loans even if the person could not afford the loan or did not qualify for it. To her shock, many people with bad credit scores and high debt-to-income ratios were approved for subprime loans. Ms. Dancy would shake her head in disbelief and ask herself, "how could that happen?" She knew that Wells Fargo violated its underwriting guidelines to make those loans. Although she never witnessed it herself, she heard also from other employees that some branch managers falsified information to get customers to qualify for subprime loans. She stated that a bonus system was used to pressure her to make loans she thought should not be made. Memphis Compl. Exh. 1.

309.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to 2008 in the Memphis area. According to Mr. Simpson, Wells Fargo managers falsified the mileage on car loan applications so the loan would be approved. He also stated that Wells Fargo was "very aggressive" in mortgage lending. The culture was "completely results driven." According to Mr. Simpson, Wells Fargo employees did not tell customers about the fees and costs associated with closing a loan – again, potential violations of lending laws, and also violations of the underwriting guidelines. He also knew managers who falsified information in loan files, such as income documentation, to get loans approved. Mr. Simpson further confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the loans. Memphis Compl. Exh. 2.

310.    Mario Taylor was a Wells Fargo credit manager from June 2006 to February 2008

in the Memphis area. His job was to find potential borrowers and to get them to apply for loans. His manager pressured him to push loans on borrowers whether they were qualified for the loan or could pay back the loan. He was also told to mislead borrowers by only telling them the "teaser rate" without disclosing the rate was adjustable and by not telling them about the "fine print." One of his branch managers changed pay stubs and used white-out on documents to alter the borrower's income. Finally, Mr. Taylor confirmed that Wells Fargo employees were heavily incentivized by the bonus structure to generate large volumes of loans. Memphis Compl. Exh. 3.

311.    Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from 1998 to December 2007 in the Maryland area. She described the financial incentives to sign borrowers up for loans. In two years, she made more than $1.2 million in sales commissions. She knew loan officers who would lie to potential borrowers about whether they could refinance their loan once the "teaser rate" period expired. Ms. Jacobson also knew loan officers who falsified loan applications to qualify them for loans they should not have been given. One loan officer would "cut and paste" the credit report of an approved borrower into other borrowers' applications. She reported this conduct to management but was not aware of any action taken to correct the problems. Memphis Compl. Exh. 7.

312.    The district court denied a motion to dismiss. *City of Memphis v. Wells Fargo Bank, N.A.*, 2011 WL 1706756 (W.D. Tenn. May 4, 2011). The case subsequently settled.

313.    The FCIC's investigation supports the affidavits of these former Wells Fargo employees. The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007. According to Ms. Parmer, at least half the loans she flagged as fraudulent were approved. She also told the FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never

referred to the Treasury Department's Financial Crimes Enforcement Network. FCIC Report at 162.

314.    In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. (parent company of Wells Fargo Bank, N.A.) and Wells Fargo Financial, Inc. At the time, this was the largest penalty assessed by the Board in a consumer-protection enforcement action. The order addressed allegations that Wells Fargo had falsified income information in mortgage applications. These practices were allegedly fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of adequate controls to manage the risks resulting from these programs. Press Release, Federal Reserve Board (July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

315.    There is widespread evidence of pervasive breaches of seller representations and warranties in Wells Fargo sponsored RMBS, including detailed allegations in securities cases against Wells Fargo, such as *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, No. 09-cv-1376 (N.D. Cal.), which Wells Fargo agreed to settle for $125 million. This action and others have demonstrated systemic and pervasive deficiencies in Wells Fargo's underwriting practices, which led to inaccurate representations and warranties regarding LTV ratios and owner occupancy.

316.    Other RMBS lawsuits involving Wells Fargo sponsored trusts have revealed Wells Fargo's systemic securitization abuses. For example, in August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of residential mortgage-backed securities to Colonial. The complaint alleged that Wells Fargo made material

misrepresentations in the offering documents regarding loan-to-value ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices. *See Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortgage Fin. Corp., et al.*, No. 12-cv- 6166 (S.D.N.Y. Aug. 10, 2012).

317.     In *Federal Home Loan Bank of Atlanta v. Countrywide Fin. Corp, et al.*, No. 11-cv-00489 (N.D. Georgia Feb. 17, 2011), the plaintiff performed a forensic review of 30 offerings, including at least one trust sponsored by Wells Fargo. The Federal Home Loan Bank of Atlanta found that in its sample of more than 21,000 loans "over 58% of the appraised property values in this sample were overstated by 5% or more." Moreover, the analysis revealed that although the offering documents for all 30 offerings represented that no loans had an LTV at origination over 100%, of the "more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (*i.e.*, an LTV over 100%)."

318.     In a similar action brought by the Federal Home Loan Bank of Indianapolis, *Federal Home Loan Bank Indianpolis v. Banc of America Mort. Sec., Inc., et al.*, No. 10-cv-01463 (S.D. Ind. Nov. 15, 2010), the bank conducted a forensic review of 32 offerings, including some Wells Fargo sponsored trusts. For four of those trusts, Wells Fargo represented that no loan in the pool had an LTV ratio over 100%, but the review revealed that 9.02%, 14.29%, 17.39%, and 8.33% of the loans respectively, had an LTV greater than 100%. The review also revealed that the owner occupancy percentages were understated.

**C.      A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards**

319.     There were various other indications that the trust's loan pools included large

numbers of mortgage loans that materially breached the responsible party's representations and warranties, including the following: 1) the trusts' high default and delinquency rates; and 2) the trusts' enormous cumulative losses. A summary of the trusts' default and delinquency rates and the trusts' cumulative losses is attached as Exhibit L.

### 1.      The Trusts Suffered from High Delinquency and Default Rates

320.     Residential mortgages are considered delinquent if no payment has been received for over 30 days after payment is due. Residential mortgages where no payment has been received for over 90 days (or three payment cycles) are considered to be in default.

321.     By January 2009 at the latest, Defendant and its responsible officers witnessed a significant rise in reported default and delinquencies in the loan pools backing the trusts with many defaults and delinquencies occurring within months of the loans' origination. As many commentators have noted, such rapid and numerous defaults indicate loans that should not have been made. For example, a November 2008 Federal Reserve Board study attributed the general rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher J. Mayer et al., *The Rise in Mortgage Defaults*, at 15-16 Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59.

322.     By 2009, these massive numbers of defaults and delinquencies, including early payment defaults which automatically breach representations and warranties, put Defendant on notice that the loans sold into the trusts did not comply with the responsible parties' representations and warranties and Defendant should have taken action to address any issues. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially

lower percentages of defaults, foreclosures, and delinquency.

323.    These default and delinquency rates were communicated to Defendant monthly through the service reports and trustee remittance reports. By January 2009, 31 out of the 35 trusts were reporting default and delinquency rates of over 10%, with nearly half of all the trusts reporting delinquency rates of over 40%. The average default and delinquency rate of the trusts by January 2009 was over 39%. By January 2010, this average was over 48%.

324.    Properly underwritten loans would have experienced far fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies even during an economic downturn.

## 2.    The Trusts Suffered Huge Losses

325.    Realized losses are the losses incurred regarding any liquidated mortgage loan or any mortgage loan charged off by the servicer. The realized losses equal the portion of the stated principal balance remaining unpaid after applying all net liquidation proceeds to the mortgage loan.

326.    By January 2009 at the latest, the trusts' extraordinary losses should have raised a red flag to Defendant that the mortgage loans sold to the trusts did not comply with the responsible parties' representations and warranties. In particular, large realized losses are indicative of severe deficiencies in the appraisal and valuation process. As an example, the FMIC 2005-3 trust was reporting cumulative losses in January 2009 of over $119 million, which equates to more than 10% of the trust's total original par value.

327.    By January 2009, the total combined cumulative losses for the trusts (with reported figures) exceeded $1.7 billion, with the trusts reporting an average loss of over $50 million. By January 2011, the total reported cumulative losses for the trusts were over $5.8

billion.

328.    The immense losses are strong evidence that the originators systematically disregarded the underwriting standards and that many mortgages in the pool were not written in adherence to the underwriting guidelines in breach of the representations and warranties.

**D.    The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines**

329.    The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.

330.    The vast majority of the certificates owned by the CCUs were initially rated triple-A at issuance. A triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14. By the end of 2008, 30 of the 68 certificates—a staggering 44%— had been downgraded to junk status by at least one credit rating agency. By the end of 2009, this figure had increased to over 97%. A complete list of the downgrades for the certificates is set forth in Exhibit M.

331.    The high initial credit ratings reflected the risk associated with properly originated and underwritten mortgage loans and were based on the credit risk characteristics the responsible parties represented and warranted to the credit rating agencies. Consequently, the total collapse in the credit ratings of the RMBS certificates the CCUs purchased, typically from triple-A to non-investment speculative grade, put Defendant on notice that it was required to notify certificateholders of any defaults and take appropriate action.

**VII.    ADDITIONAL EVIDENCE SHOWS THAT DEFENDANT KNEW OF DEFAULTS**

A.      **In Its Capacity as an RMBS Servicer for Other Trusts, Defendant Discovered Extensive Responsible Party Breaches of Representations and Warranties**

332.    HSBC and its affiliated entities also served as servicers and/or master servicers for numerous other RMBS trusts. In its capacity as servicer and/or master servicer, Defendant learned that many of the loans originated and sponsored by the same parties involved in the trusts at issue in this Amended Complaint were performing poorly. For example, in its capacity as servicer and/or master servicer for those trusts, one of Defendant's duties was to prepare monthly reports for the trustees detailing the poor performance of the loans. Also, as servicer and/or master servicer, Defendant knew that the credit rating agencies had downgraded trusts as a result of the poor quality of the originators' and sponsors' loan pools because it was responsible for communicating with the ratings agencies. As servicer and/or master servicer, Defendant reviewed the loan files of the mortgage loans, discovering systematic, widespread breaches of representations and warranties in the loan pools.

333.    As a servicer for various trusts, Defendant was also responsible for modifying loans and enforcing mortgages in foreclosure proceedings. Such tasks would have invariably led to the discovery that title to a substantial number of mortgages was not perfected.

334.    Because of its experience as servicer to other RMBS trusts, Defendant knew that these same defective underwriting and securitization practices affected the trusts committed to its care, and had an obligation to investigate the issue carefully.

B.      **Defendant Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers**

335.    Monoline insurers have filed many complaints against responsible parties for representations and warranty breaches in connection with other RMBS trusts to which Defendant serves either as master servicer, servicer, or trustee. Prior to filing suit against the responsible

parties, the monoline insurers often obtained and carried out forensic loan level reviews of the loans at issue. *See, e.g.*, *CIFG Assurance N. Am., Inc. v. Goldman Sachs & Co., et al.*, No. 652286/2011 (N.Y. Sup. Ct. Aug. 16, 2011); *CIFG Assurance N. Am., Inc. v. GreenPoint Mortg. Funding, Inc.*, No. 653449/2012 (N.Y. Sup. Ct. Mar. 3, 2013); *Ambac Assurance Corp. v. Nomura Credit & Capital, Inc. et al.*, No. 651359/2013 (N.Y. Sup. Ct. May 15, 2013); *CIFG Assurance N. Am., Inc. v. Bank of Am., N.A., et al.*, No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2012); *Assured Guaranty Corp. v. EMC Mortg. LLC*, No. 12-cv-01945 (S.D.N.Y. Mar. 15, 2012); *Assured Guaranty Mun. Corp. v. DLJ Mortg. Capital*, No. 652837/2011 (N.Y. Sup Ct. Oct. 17, 2011); *Assured Guaranty Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12-cv-01579 (S.D.N.Y. Mar. 05, 2012); *Ambac Assurance Corp. v. EMC Mortg. LLC*, No. 651013/2012 (N.Y. Sup. Ct. Aug. 14, 2012); *Assured Guaranty Mun. Corp. v. GMAC Mortg., LLC, et al.*, No. 12-cv-03776 (S.D.N.Y. May 11, 2012).

336.    For example, in *Assured Guaranty Corp. v. DB Structured Products, Inc. and ACE Securities Corp.*, No. 651824/2010 (N.Y. Sup. Ct. Oct. 25, 2010), Assured, a monoline insurer, wrote insurance on two Deutsche Bank RMBS securitizations for which Defendant was the trustee. Because of the high default rates in the two trusts, Assured retained third-party consultants that reviewed over 3,000 of the mortgage loans from the two trusts and found that one or more of Deutsche Bank's mortgage loan representations was false when made for over 80% of the loans. In light of these discoveries, Assured provided detailed notice of the breaches to both HSBC, as trustee, and the responsible party.

337.    Because of the monoline insurers' breach notices and lawsuits, Defendant knew that these same defective underwriting and securitization practices affected other trusts containing loans originated and securitized by these same originators and sponsors. Furthermore,

discovery will likely demonstrate that monoline insurers and private mortgage insurers provided loan-by-loan breach notices for certain trusts in this action.

### C.   Global RMBS Repurchase Investigations and Settlements Alerted Defendant to Systematic, Widespread Breaches of Representations and Warranties

338.   RMBS certificateholders have initiated numerous mortgage repurchase directions, compelling trustees to demand that responsible parties repurchase the mortgage loans due to breaches of representations and warranties. Defendant was trustee for many of the RMBS subject to these directions.

339.   For example, on December 16, 2011, several institutional mortgage investors in hundreds of RMBS trusts sponsored by J.P. Morgan or its affiliates issued written instructions to Defendant along with U.S. Bank, Deutsche Bank, and BNYM, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools backing the trusts and deficient loan servicing practices. The notices covered over $95 billion of RMBS sponsored by J.P. Morgan from 2005 to 2007.

340.   The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts. J.P. Morgan offered to settle the claims for $4.5 billion less than two years later. HSBC approved the settlement and an Article 77 proceeding is pending.

341.   In January 2012, institutional RMBS investors in trusts sponsored by Wells Fargo or its affiliates issued written instructions to U.S. Bank and HSBC, as trustees, to open investigations into potential breaches of certain representations and warranties and servicing breaches in the trusts in pools securing over $19 billion of RMBS issued by various affiliates of Wells Fargo.

342.     The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts.

343.     As trustee, Defendant has received many breach notices from institutional investors, indicating widespread and systemic violations of representations and warranties by the responsible parties. Defendant knew similar issues likely affected the other RMBS trusts committed to its care, and had an obligation to investigate that issue carefully.

### D.     Defendant Has Been Involved in Repurchase Litigation Against Responsible Parties

344.     Defendant was also involved in repurchase claims for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the trusts. In many instances, these actions were initiated by certificateholders who provided notices of breaching loans to the Defendant on a loan-by-loan basis and then directed the Defendant to bring suit.  Based on its involvement in these repurchase actions, which alleged widespread, systematic breaches of representations and warranties, Defendant had an obligation protect all trusts committed to its care and take action as appropriate.

345.     Defendant, as trustee, filed at least sixteen complaints against Deutsche Bank Structured Products, Inc. ("DBSP") in its capacity as sponsor of sixteen different trusts from the ACE and DBALT shelves. In each action, Defendant alleged that "forensic reviews" of the loan files held by the trusts had been conducted prior to initiating suit. In each case, the forensic review revealed a massive number of defective loans – loans that blatantly breached DBSP's representations and warranties. Defendant also alleged that DBSP's inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident. Defendant further

referenced government investigations and reports and private litigation establishing widespread

abandonment of stated underwriting and securitization standards by common originators and

Deutsche Bank.

346.    In *ACE Securities Corp., Series 2006-SL2 v. DB Structured Products, Inc.*, No.

650980/2012 (N.Y. Sup. Ct. Mar. 28, 2012), Defendant brought an action to enforce DBSP's

repurchase obligations in connection with ACE 2006-SL2, a securitization that Deutsche Bank

sponsored containing a large percentage of Fremont loans. Defendant alleged that its

investigations of over 1,600 of the trust's loans revealed that a stunningly high percentage of

those analyzed – 99 percent – were in fact defective Loans. Defendant explained that its findings

were consistent with "[r]ecent government investigations, [which] revealed that Deutsche Bank,

via its wholly-owned subsidiaries DBSP and ACE, disregarded underwriting guidelines, and as a

result made representations and warranties for mortgages that did not meet stated criteria in the

governing documents." *Id*. ¶ 31. Defendant also acknowledged that "Fremont's originating

practices were so poor, they were separately sued by both Morgan Stanley and Lehman Brothers

for breach of contract arising out of Fremont's failure to repurchase loans that Fremont sold

between 2004 and 2006." *Id*. ¶ 37.

347.    In *Deutsche Alt-A Securities Mortgage Loan Trust v. DB Structured Products

Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012), Defendant brought an action to enforce

Deutsche Bank's breaches of representations and warranties in connection with DBALT 2006-

OA1, a securitization containing 88.49% loans originated by Countrywide. The forensic review

revealed breaches in 93% of the loan files reviewed. Defendant alleged:

> The breaches uncovered by the Forensic Review involve a high degree of borrower
> fraud and dishonesty concerning such core matters as borrower income, employment,
> occupancy of the subject property and other indebtedness. Put simply, the Forensic
> Review established that borrowers lied, with or without the knowledge of [Countrywide

and other loan originators], concerning how much money they owed, how much money they made, whether and where they worked, and where they lived. A handful of instances of such inaccuracies is perhaps to be expected. Hundreds of instances of borrower dishonesty is not.

Id. ¶ 11

348.    In *Deutsche Alt-A Securities Mortgage Loan Trust v. DB Structured Products Inc.*, No. 13-cv-3685 (S.D.N.Y. May 31, 2013), Defendant brought action to enforce Deutsche Bank's breaches of representations and warranties in connection with DBALT 2007-OA4. The forensic review revealed that 91.33% of the loan files reviewed showed breaches, finding that "[i]n Loan File after Loan file, core information about Mortgage Loan characteristics, the borrower, or the property was simply wrong, misrepresented, or otherwise in breach of DBSP's representations and warranties." *Id.* ¶ 49.

349.    Between May 2012 and April 2013, Defendant, as trustee, filed at least eight complaints against Nomura as sponsor of eight different trusts from the NEHLI and NAA shelves for breaches of representations and warranties. Defendant relied on forensic reviews of the loans associated with the mortgage loans held by the trusts conducted prior to initiating suit, revealing that Nomura systemically failed to provide accurate loan level information. Specifically, analysis showed breach rates in the trusts involved of over 80% and sometimes as high as 91.8%. Defendant asserted that with respect to Nomura's securitizations, underwriting guidelines were brushed aside, with loan originators abandoning minimum verification procedures and therefore leaving open the possibility of even greater risks being concealed.

350.    In *Nomura Asset Acceptance Corp. Alternative Loan Trust Series 2006-3 v. Nomura Credit & Capital, Inc.*, No. 652619/2012 (N.Y. Sup. Ct. Jan. 15, 2013), for example, a forensic review of 944 mortgage loan files found 2205 separate breaches of representations and warranties in 818 of the loans reviewed, amounting to a breach rate of over 86%. *Id.* ¶ 60. The

forensic review further revealed that the mortgage loan originators had abandoned their stated underwriting guidelines, identifying at least 311 defective loans in which borrower income, employment, outstanding mortgage obligations, and occupancy information had been grossly misrepresented. Defendant alleged that "these breaches are systemic in nature and adversely affect the vast majority of the . . . Mortgage Loans in the Trust." *Id*. ¶ 62.

351.    In 2009, an affiliate of Defendant filed a suit against Nationstar (formerly known as Centex Credit Corp.) in connection with the purchase of residential mortgage loans from Nationstar. *HSBC Mortgage Services, Inc. v. Nationstar Mortgage LLC*, No. 2009-L-005647 (Ill. Cir. Ct. 2009). In the complaint, Defendant's affiliate alleged that Nationstar violated its representations and warranties by providing, among other things, fraudulent loans. *Id*. ¶ 23. The complaint details numerous misrepresentations concerning the occupancy status, income misrepresentations, and undisclosed borrower liability. *Id*.

352.    Defendant's affiliate also filed a suit against EquiSouth (formerly known as Principal Equity Mortgage, Inc.) regarding its purchase of residential mortgage loans that EquiSouth originated. *HSBC Mortgage Services, Inc. v. EquiSouth Mortgage Inc. and Morris A. Capouano*, No. 10-cv-4747 (N.D. Il. Jul. 29, 2010). Defendant's affiliate alleged that EquiSouth breached its representations and warranties, misrepresenting borrower employment and occupancy status information with respect to several loans.

353.    Defendant's involvement in repurchase litigation, particularly the forensic reviews conducted in connection with that litigation, shows that Defendant knew that such widespread, systemic breaches of representations and warranties likely affected all of the trusts committed to its care. Furthermore, discovery will likely demonstrate that individual investors provided loan-by-loan breach notices on certain trusts in this action.

## VIII.   DEFENDANT FAILED TO PRUDENTLY ADDRESS MASTER SERVICER AND/OR SERVICER DEFAULTS

### A.   Defendant Breached the Governing Agreements and Its Common Law and Statutory Obligations By Failing to Fulfill Its Duties After Defaults and Events of Default Triggered By Master Servicer and Servicer Misconduct

354.   The master servicers and/or servicers failed to prudently service the mortgage loans underlying the trusts. The governing agreements require that the master servicers and/or servicers administer the mortgage loans for and on behalf of the certificateholders, and do so (consistent with the terms of the governing agreements): (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) to maximize the recoveries regarding such mortgage loans on a net present value basis; and (iii) without regard to the right of the master servicers and/or servicers to receive compensation or other fees for their services under the governing agreements, the obligation of the master servicers and/or servicers to make servicing advances under the governing agreements, and the master servicers' and/or servicers' ownership, servicing or management for others of any other mortgage loans. The master servicers and servicers did not adhere to these requirements.

355.   The master servicers and/or servicers failed to meet their obligations by: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) providing false or misleading information to borrowers; (v) failing to properly deliver loan documentation; and (vi) failing to maintain appropriate staffing, training and quality control systems.

356.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. In that process, because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers were put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the applicable parties or take action based on these breaches as required by the governing agreements.

357.    In addition, in the course of fulfilling their duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

358.    The master servicers and/or servicers failed to notify parties to the governing agreements upon the discovery of mortgages in violation of the representations and warranties; failed to enforce repurchase obligations; failed to properly respond to denial of mortgage insurance claims based on originator misrepresentations; failed to foreclose upon properties when appropriate under applicable law; and failed to conduct foreclosures in a lawful fashion.

359.    Much of this conduct constituted Events of Default under the governing agreements. These failures have been confirmed by governmental investigations, published reports, and public and private litigation that have described the master servicers' and/or servicers' pervasive deviation from customary and lawful servicing practices.

360.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any of the covenants or agreements under the governing agreements, after notice and lapse of time, constitutes a default.

361.    These defaults ripened into Events of Default under the governing agreements for the trusts. Defendant had an obligation to provide notice of such defaults, which would have resulted in additional Events of Default, but it failed to do so.

362.    Defendant breached the governing agreements, its duties, and violated the law after becoming aware of such breaches, defaults and/or Events of Default by failing to: provide notice of such breaches, defaults and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

363.    Defendant failed to exercise the same skill and care as a prudent person in the same circumstances in enforcing its rights and powers under the governing agreements upon learning of the above breaches, defaults and/or Events of Default.

**B.    Specific Servicer Misconduct**

364.    Most of the trusts' loans are or were serviced by the following servicers and their affiliates: Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc.; Wells Fargo Bank, N.A.; Washington Mutual Bank; Fremont Investment and Loan; GMAC Mortgage Corporation or Mortgage LLC; PHH Mortgage Corp.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; National City Mortgage Co. and Home Loan Services; Bank of America, N.A.; Ocwen Loan Servicing, LLC; Option One Mortgage Corp.; and Litton Loan Servicing LP.

365.    After Countrywide was acquired by Bank of America in 2008, Countrywide Home Loans Servicing L.P. ("CHLS") was renamed BAC Home Loans Servicing LP ("BAC Servicing"). In July 2011, BAC Servicing was merged into Bank of America.

366.    In March 2008, prior to being acquired by Bank of America, Countrywide was

ranked as the most common mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4 trillion. In September 2009, after its acquisition of Countrywide, Bank of America was the nation's most common mortgage servicer with a servicing portfolio of over $2.1 trillion.

367.    On October 6, 2008, the attorneys general in multiple states reached an $8.68 billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending. The settlement allowed certain borrowers whose loans were serviced by Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for certain borrowers, reduction of their principal balances.

368.    On June 7, 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide Home Loans, Inc. and BAC Servicing for "unlawful acts and practices in servicing mortgage loans." Complaint, *Federal Trade Commission v. Countrywide Home Loans, Inc. and BAC Home Loan Servicing, LP*, No. 10-cv-4193 (C.D. Cal. June 7, 2010). Countrywide Home Loans and BAC Servicing paid $108 million to settle.

369.    According to the FTC, when borrowers fell behind on their payments, Countrywide and BAC imposed several default-related services "by funneling the work through panoply of Countrywide subsidiaries." In its mortgage servicing operation, Countrywide/BAC followed a so-called "vertical integration strategy" to generate default-related fee income. Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen in the default services process. According to the FTC, these subsidiaries existed solely to generate revenues for Countrywide/BAC and did not operate at arms'-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added a substantial mark-

up to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were both contrary to prudent servicing standards and violated the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

370.    Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through a Chapter 13 bankruptcy. According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and deficiencies accrued on their loan. According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts." After the bankruptcy cases closed and borrowers no longer had the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

371.    Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of 49 State Attorneys General, the Departments of Justice, Treasury and HUD (collectively, the "Coalition") reached a settlement with, among others, Bank of America. In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to

properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

372.   Wells Fargo also serviced many of the trusts. The Office of the Comptroller of the Currency ("OCC") issued a consent order dated April 13, 2011 finding, in part, that Wells Fargo as servicer filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re Wells Fargo Bank, N.A.*, Consent Order, No. AA-EC-11-19 (Apr. 13, 2011).

373.   Wells Fargo stipulated to the consent order. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

374.   The consent order required Wells Fargo to undertake a sweeping review of its foreclosure practices, including (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

375.   Additionally, the Coalition reached a settlement with Wells Fargo. The Coalition Complaint alleged that Wells Fargo committed unfair and deceptive practices including: (a) failing to timely and accurately apply payments made by borrowers and failing to maintain

accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

376.    Following a two week trial, on December 19, 2014, a jury verdict was rendered against Wells Fargo in the amount of $54.8 million resolving claims brought in the class action *Mazzei v. The Money Store*, No. 01-cv-05694 (S.D.N.Y. Jun. 22, 2001). The jury determined that Wells Fargo, and its subsidiaries charged improper and excessive fees for default-related services.  *See* Kurt Orzeck, *Wells Fargo Owes $55M in Mortgage Late Fee Suit, Jury Says*, Law360 (Dec. 19, 2014), *available at* http://www.law360.com/articles/606660/wells-fargo-owes-55m-in-mortgage-late-fee-suit-jury-says.

377.    JPMorgan Chase Bank, N.A. acquired another common servicer of the trusts, Washington Mutual, in or about September 2008.

378.    The OCC issued a consent order dated April 13, 2011 finding that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, J.P. Morgan, including Washington Mutual, filed with state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records.  *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

379.    JPMorgan stipulated to the consent order.  *Id.*

380.    The OCC ordered JPMorgan, including Washington Mutual, to undertake a sweeping review of its foreclosure practices, including: (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the

terms of the underlying mortgage and in compliance with all applicable legal requirements and

OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account

was only charged fees and/or penalties that were permissible under the terms of the borrower's

loan documents, applicable state and federal law, and were reasonable and customary; and (b)

whether the frequency that fees were assessed to any delinquent borrower's account was

excessive under the terms of the borrower's loan documents, and applicable state and federal

law.

381.    Further, private litigation has brought to light that J.P. Morgan charged marked-up

and unnecessary servicing fees (including through the use of default-related service vendors) and

assessed them against borrowers' accounts for profits. *See, e.g.*, *Ellis v. J.P. Morgan Chase &*

*Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013).

382.    Additionally, JPMorgan entered into a settlement of claims brought by the

Coalition that it committed unfair and deceptive practices including overcharging borrowers for

default related services. *See United States, et al., v. Bank of Am., et al.*, No. 12-cv-00361 (D.D.C.

Mar. 14, 2012).

383.    In 2010, the Federal Reserve, the OCC, the Federal Deposit Insurance

Corporation, and the Office of Thrift Supervision conducted on-site reviews of foreclosure

processing at fourteen federally regulated mortgage servicers. The servicers included Ally

Bank/GMAC, Bank of America, HSBC, JPMorgan Chase, OneWest (which had acquired

IndyMac, a common servicer for the trusts, in or about March 2009), PNC (which had acquired

National City, another servicer for the trusts), and Wells Fargo. These entities together served as

servicer or master servicer on a huge percentage of the trusts.

384.    In April 2011, the investigating agencies issued a report titled "Interagency

Review of Foreclosure Policies and Practices." *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

385.    The report found "critical weaknesses in each of the servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions against each of the servicers subject to the report.

386.    Specifically, the report found that the foreclosure governance processes were underdeveloped and insufficient and that weaknesses included: (i) lack of sufficient audit trails to show how information set out in servicer affidavits (including the amount of fees and penalties charged) was linked to servicers' internal records; (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed; and (iii) lack of sufficient oversight of default management service providers.

387.    Additionally, the OTS issued a consent order dated April 13, 2011 finding that OneWest failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

388.    OneWest stipulated to the OTS's findings. *In re OneWest Bank, FSB*, Consent Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf.

389.    In addition, the consent order detailed OneWest's practice of charging excessive fees. The consent order required OneWest to enact a compliance program to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage. The order also required OneWest to review whether a delinquent

borrower's account was only charged fees and/or penalties that were permissible under the terms of the loan documents and were otherwise reasonable and customary. Further, OneWest is required to review whether the frequency that fees were assessed to borrowers' accounts was excessive. Finally, OneWest was required to remediate all injury to borrowers by reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses.

390.    As mentioned above, in February 2012, forty-nine state attorneys general and the federal government announced a historic joint $25 billion state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of residential mortgages: (i) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A. The complaint alleged these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, preparing, executing, notarizing or presenting false and misleading documents, engaging in robo signing, and "charging excessive or improper fees for default-related services." *See United States, et al. v. Bank of America, et al.*, No. 12-cv-0361 (D.D.C. April 4, 2012). These entities served as master servicer and servicer for many of the trusts.

391.    On December 20, 2010, New Jersey Administrative Director of the Courts issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications

demonstrating there were no irregularities in handling their foreclosure proceedings. The order

was directed at, among others, PHH, PNC (and its servicer National City), and Wachovia, all

master servicers or servicers to the trusts. *Available at*

http://www.judiciary.state.nj.us/notices/2010/n101220b.pdf.

    392.    Also on December 20, 2010, the New Jersey Superior Court Chancery Division

issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document*

*Irregularities*, Docket No. F-59553-10 (N.J. Sup. Ct.), directing six mortgage loan lenders and

servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the

processing of their uncontested residential foreclosure filings should not be suspended. Wells

Fargo, JPMorgan Chase, Bank of America/BAC, OneWest FSB (f/k/a IndyMac), and GMAC

were recipients of this show cause order. *Available at*

https://www.judiciary.state.nj.us/notices/2010/n101220c.pdf.

    393.    PHH also entered into a consent order with the state of New Jersey pursuant to

allegations regarding its loan modification and foreclosure processes. *In re PHH Mortgage Corp.*

(Dec. 4, 2013), *available at* http://nj.gov/oag/newsreleases13/PHH-Mortgage-Corporation.pdf.

    394.    In December 2013, the Consumer Financial Protection Bureau, authorities in 49

states, and the District of Columbia filed a proposed court order requiring the country's largest

nonbank mortgage-loan servicer, Ocwen, and its subsidiary, Ocwen Loan Servicing, to provide

$2 billion in first-lien principal reduction to underwater borrowers to compensate for years of

systemic misconduct at every stage of the mortgage-servicing process. The consent order also

covered two companies previously purchased by Ocwen, Litton and Homeward Residential

Holdings LLC (previously known as American Home Mortgage Servicing, Inc.). These entities

served as master servicer or servicer to some of the trusts. *See*

http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/.

395.    According to the complaint, Ocwen violated state law in several ways, including failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; charging borrowers unauthorized fees for default-related services; and providing false or misleading information in response to consumer complaints.

396.    On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork, erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms [such as Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers." Jessica Silver-Greenberg & Michael Corkery, *Loan Complaints by Homeowners Rise Once More*, N.Y. Times (Feb. 18, 2014), *available at* http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/.

397.    In October 2012, Ocwen and Green Tree Servicing LLC ("Green Tree") won a joint bid in the United States Bankruptcy Court of the Southern District of New York for GMAC's mortgage servicing platform. GMAC was a common master servicer and servicer to the trusts.

398.    A May 2014 report on servicer mortgage practices found that Green Tree's servicing practices were inadequate in light of the 2012 National Mortgage Settlement's improved servicing standards requirements. Evan Weinberger, *$25B Mortgage Deal Monitor Says Banks Improved Practices*, Law360.com, May 14, 2014, *available at* http://www.law360.com/articles/537724/25b-mortgage-deal-monitor-says-banks-improved-practices.

399.    The report used twenty-nine metrics, including errors in foreclosure sales, adherence to late fee guidelines and pre-foreclosure initiation notifications, to determine whether national servicing standards have improved. Office of Mortgage Settlement Oversight, Compliance in Progress: A Report from the Monitor of the National Mortgage Settlement (May 14, 2014), *available at* https://www.jasmithmonitoring.com/omso/wp-content/uploads/sites/4/2014/05/compliance-report-interactive-.pdf.

400.    Green Tree's servicing of the GMAC servicing platform fell short of the requirements for eight of these metrics.  *Id.* at 9. The report ultimately concluded that Green Tree "has much implementation work to do."  *Id.* at 2.

401.    Option One has also been the subject of state and federal investigations. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for unfair and deceptive origination and servicing of mortgage loans. Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

402.    On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).

403.    On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

404.    Another original servicer, Greenpoint Mortgage Funding, Inc., was shuttered by Capital One in 2007 amid escalating problems with its origination and servicing activities.

**C.    The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustee of Breaches of the Mortgage Loan Representations and Warranties**

405.     Under the governing agreements, master servicers and servicers typically are required to notify the trustee, among others, upon discovery of a breach of representations and warranties with respect to a mortgage loan that materially and adversely affects the loan or the interests of the certificateholders in the loans.

406.     In the course of their duties, the master servicer and servicers to the trusts became aware of the overwhelming and widespread problems with the underlying mortgage loans due to the shoddy origination and underwriting practices detailed above.

407.     Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. Because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers must have been put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the trustee or take action based on these breaches.

408.     In addition, in the course of fulfilling its duties to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

409.     These breaches materially affected the mortgage loans and the interests of the certificateholders as the breaches made it far more likely that the loans would underperform.

410.     Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, including the duty to notify the trustee of breaches of representations and warranties, after notice and lapse of time, constitutes an event of default.

411.     PSA Section 7.1 states:

"Master Servicer Event of Default," wherever used herein, means any one of the following events:

. . .

(ii) any failure on the part of the Master Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement, or the breach by the Master Servicer of any representation and warranty contained in Section 2.5, wh ich continues unremedied for a period of 30 days after the date on which written notice of such failure, or as otherwise set forth in this Agreement, requiring the same to be remedied, shall have been given to the Master Servicer by the Depositor or the Trustee. . . .

412.     As alleged above, in the course of their duties, the master servicer and servicers to the trusts became aware of widespread problems with the underlying mortgage loans and failed to abide by their covenants to prudently service the loans.

### D. Defendant Knew That the Trusts Suffered from Widespread Master Servicer and/or Servicer Defaults

413.     Defendant, as trustee, knew of the servicing misconduct (and Events of Default) alleged, which has been the subject of high profile government investigations and private and public lawsuits. In the aftermath of the financial crisis, servicing abuse has also received widespread attention in the media. Thus, Defendant knew of the breaches, defaults, and events of default alleged herein.

414.     Defendant, as a prolific servicer, also knew that the master servicers and servicers were discovering breaches of representations and warranties and failing to notify the applicable parties.

415.     In 2010, the Federal Reserve, the OCC, the FDIC, and the Office of Thrift Supervision conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, including HSBC.

416.     In April 2011, the investigating agencies issued a report titled "Interagency Review of Foreclosure Policies and Practices." The report found, among other things, that the

123

servicers failed to evaluate "compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions against each of the servicers subject to the report. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

417.    Ally/GMAC, Bank of America, JPMorgan Chase, OneWest, PNC, and Wells Fargo were all subjects of the investigation. These entities and their affiliates and acquired companies (including Countrywide, IndyMac, Washington Mutual and National City) acted as master servicer and servicer to many of the trusts.

418.    Thus, Defendant knew – based on an investigation that it was subject to – that servicers failed to implement proper quality control, audit and compliance standards and thus failed to adhere to the notification requirements in the governing agreements.

419.    This failure by the master servicer and servicers to prudently service the loans, notify Defendant of defective loans, and other associated problems constituted Events of Default, yet rather than adhere to its statutory and contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

420.    Defendant and its responsible officers also received servicing reports and monthly remittance reports that revealed widespread modifications, large losses and write-downs, and poor loan quality. Through these reports, Defendant, based on its roles in the RMBS, knew that there were widespread breaches of representations and warranties that the master servicers and servicers had discovered but failed to give the required notification.

421.    This failure by the master servicer and servicers to notify the Defendant of defective loans and other associated problems constituted an event of default, yet rather than

adhere to its statutory and contractual obligations upon such a default, Defendant ignored the master servicer and servicer misconduct.

422.    Defendant breached the governing agreements, its duties, and applicable law after becoming aware of all of the foregoing breaches, defaults, and/or Events of Default by failing to do the following: provide notice of such breaches, defaults, and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

**E.    Defendant Knew That the Trusts Suffered from Widespread Issuer Defaults**

423.    Defendant knew of Events of Default in regards to the two Indenture Trusts at issue – FMIC 2005-3 and PCHLT 2005-4. Under the Indentures, an Event of Default occurs when the Issuer (*i.e.*, the Trust) fails to abide by the covenants contained in the Indenture and protect the trust estate.

424.    In PCHLT 2005-4, for example, an Event of Default occurs upon "a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture, or any representation or warranty of the Issuer made in the Indenture. . . ." Ex. N, PCHLT 2005-4 Appendix A (Definitions).

425.    Among the many covenants and duties of the Issuer is an obligation to:

a)    "not take any action or permit any action to be taken by others that would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans or under any instrument included in the Trust Estate. . . ." Ex. O, PCHLT 2005-4 Indenture  § 3.08(c);

b)    "[not] waive or impair, or fail to assert rights under, the Mortgage Loans,

or impair or cause to be impaired the Issuer's interest in the Mortgage Loans, the

Mortgage Loan Purchase Agreement or in any Basic Document, if any such

action would materially and adversely affect the interests of the Noteholders. . . ."

*Id*. § 3.09(d); and

c)    "[not] permit any Person to be released from any covenants or obligations

with respect to the Notes under this Indenture. . . ." *Id*. § 3.09(c)(ii).

426.    Consequently, the same allegations underpinning Plaintiffs' PSA claims relating

to known and unremedied responsible party and Servicer defaults constitute violations of the

Issuer/Trust's duties under the Indenture. For the same reasons as discussed above, Defendant

was aware of these failures on behalf of the Issuers and the resulting Events of Default.

## IX.    DEFENDANT FAILED TO ENSURE LOAN FILES WERE PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO REMEDY ANY DEFECTS

### A.    Defendant Failed to Ensure Transfer of Complete Mortgage Loan Files

427.    To ensure that the rights, title and interest in the mortgage loans were perfected

and properly conveyed to the trusts, the governing agreements imposed upon Defendant, or its

agents, a duty to take physical possession of the mortgage files, ensure that the note and

mortgage were endorsed and assigned, ensure that key documents for the loans were included in

the mortgage files and to create an exception report identifying those mortgage loans for which

the mortgage files were incomplete. *See* Ex. J §§ III, IV. The sponsors or depositors were

required to substitute compliant loans for the loans with incomplete files or repurchase the loans.

*See* Ex. J § V. Defendant, however, failed to act prudently and with due care and systematically

disregarded its contractual and fiduciary duties to enforce its rights on behalf of

certificateholders to ensure that mortgage loans lacking complete mortgage files were removed

from the mortgage pools underlying the Certificates. If Defendant had met its contractual,

fiduciary, common law, and statutory duties with respect to the non-compliant loans, Plaintiffs would not have incurred their very significant losses attributable to the default of many of the defective loans. And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

428.    The governing agreements require that Defendant, or its agent, take physical possession of the mortgage files. *See* Ex. J §§ I, II. Under the governing agreements, Defendant, or the custodian on its behalf, was required to review each of the loan files and to certify that the documentation for each loan was accurate and complete. *See* Ex. J § III, IV.

429.    Defendant had a duty, under the governing agreements, to review the mortgage file exception reports identifying mortgage loans with incomplete mortgage files. Those loans had to be cured, repurchased, or substituted by the responsible parties. *Id.*

430.    Upon information and belief, Defendant accepted incomplete files without requiring the responsible parties to cure document defects or substitute or repurchase loans.

431.    Certificateholders did not receive or have access to any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon Defendant to police the deal and protect their contractual and other legal rights including under any custodial agreements.

432.    Failure to take physical possession of the key mortgage loan documents and ensure that identified irregularities were corrected, was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010. Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).

Professor Levitin described the implications of the failure by a securitization trustee to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever. The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law. If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
> . . .
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

### B.      Defendant Knew That the Loan Files Were Incomplete

433.      That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to the trust, or there was no duly executed assignment of the mortgage to the trust, or the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing its duties with due care.

434.      Numerous reports, litigation, and investigations have revealed the widespread misconduct of servicers to the trusts at issue here to cover-up the systemic failure of depositors and sponsors to properly assign the underlying mortgage loans to issuing trusts, including through the use of robo-signers. *See, e.g.*, Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm; Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2; *In re Ally Fin. Inc., Ally Bank & GMAC Mortgage, LLC*, Consent Order, No. 11-20-B-HC, No. 11-020-B-DEO (Apr. 13, 2011), *available at*

http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a3.pdf; *In re HSBC Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47d.pdf; *In re OneWest Bank, FSB*, Consent Order, No. WN-11-011 (Apr. 13 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf; *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf; *In re PNC Bank, N.A.*, Consent Order, No. AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf; *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

### C.    The Document Delivery Failures Were Events of Default

435.    Events of Default occurred shortly after the final exception reports were delivered for each of the trusts under multiple provisions of the governing agreements.

436.    First, many of the governing agreements provide that that an Event of Default occurs if the depositor fails to perform its obligations under the governing agreements and such breach is not remedied within a specified number of days of notice of the breach. *See* Ex. J §§ VII. The depositor had an obligation to deliver complete mortgage loan files but failed to do so. For each trust, notice of the depositor's breach was provided by the trustee, or custodian acting on the trustee's behalf, when it delivered the final certification and exception report. Within a period of time after such notice, the breaches ripened into Events of Default and the Defendant had a duty to exercise due care to protect certificateholders' interests. *See* Ex. J §§ V, VI. Defendant should have caused the responsible parties to repurchase the affected loans and

reviewed defaulted loans to determine whether they should be put-back to the responsible party.

437.    Second, all of the governing agreements require that the servicer's or master servicer's failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period of notice by Defendant of such breach. *See* Ex. J § VIII. When borrowers defaulted and the servicers or master servicers were required to commence foreclosures they allegedly fabricated the documents necessary to foreclose rather than cause the sponsor, depositor, or originator to repurchase or substitute the affected loan. Defendant was aware of this fact as they were aware of the contents of the document exception reports and that properties with exceptions had defaulted and not repurchased or substitute. However, Defendant did not provide notice as it was required to do. Having failed to provide the required notice, Defendant had an obligation to act prudently to address all defaults.

438.    Despite the existence of uncured Events of Default, Defendant did not adequately address the defaults and Events of Default. If Defendant had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the responsible parties and caused them to repurchase or substitute the affected loans. Defendant's failure to do so damaged Plaintiffs.

## X.    DEFENDANT HAD CONFLICTS OF INTEREST

439.    Defendant failed and unreasonably refused to take action to protect the trusts and certificateholders against originator breaches and servicer violations because it would have revealed that Defendant was engaged in the same misconduct in its role as servicer and originator for other mortgages and RMBS trusts.

440.    As mentioned above, during the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over Defendant's foreclosure processes.

The reviews uncovered significant problems in Defendant's foreclosure processing, including "critical weaknesses in HSBC's foreclosure document preparation process, and oversight and monitoring of third-party vendors, including foreclosure attorneys." In addition, the foreclosure governance process of HSBC was "underdeveloped and insufficient to manage and control operational, compliance, legal and reputational risk." Interagency Review of Foreclosure Policies and Practices, *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

441.   On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated formal enforcement actions requiring HSBC America Holdings, Inc. and HSBC Finance Corporation, the corporate parent and affiliate of Defendant, to "address a pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing." Press Release, Bd. of Governors of the Fed. Reserve Sys. (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110413a.htm. The enforcement action required HSBC to improve its residential mortgage loan servicing and foreclosure practices. According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [HSBC]."

442.   As part of the enforcement action, HSBC North America Holdings, Inc. and HSBC Finance Corporation entered into a consent order with the Federal Reserve Board, which found that HSBC had engaged in "unsafe or unsound practices with respect to the manner in which the Bank handled various foreclosure and related activities." *In re HSBC Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47d.pdf.

443.     On April 18, 2013, Defendant settled with the Federal Reserve and OCC in

relation to its deficient practices in mortgage loan servicing and foreclosure processing and

agreed to pay $249 million in cash payments and other assistance to help mortgage borrowers.

Press Release, Bd. of Governors of the Fed. Reserve & OCC, OCC and Federal Reserve Reach

Agreement with HSBC to Provide $249 Million in Payments and Assistance (Jan. 18, 2013),

*available at* http://www.occ.gov/news-issuances/news-releases/2013/nr-ia-2013-13.html.

444.     In April 2015, HSBC and Assurant Inc. ("Assurant") agreed to pay $1.8 million to

end a class action lawsuit alleging that HSBC chose excessive coverage levels for force-place

flood insurance contracts and took a bonus from Assurant. Kat Greene, *HSBC, Assurant To Pay

$1.8M To End Insurance Kickback Row*, Law360 (Apr. 10, 2015), *available at*

http://www.law360.com/articles/642100/hsbc-assurant-to-pay-1-8m-to-end-insurance-kickback-

row. If the agreement is approved, HSBC will be barred from ordering insurance for customers

at a higher level than what they had when their policy lapsed, and HSBC would have to return

90% of its alleged commissions to the class of customers. HSBC chose higher, more expensive

levels of insurance coverage when homeowners let policies lapse. In exchange for the

underwriting business, an Assurant affiliate would kick back a portion of the premiums to

HSBC.

445.     Despite pledging to reform its servicing misconduct and foreclosure abuses four

years ago, Defendant has still failed to comply with applicable federal regulatory standards. On

June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage

servicing operations of Defendant and five other banks for failing to meet the requirements of the

prior consent orders and "continu[ing] to engage in unsafe and unsound practices" in violation of

the prior consent orders. *See* Press Release, Office of Comptroller of Currency, OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others (June 17, 2015), *available at* http://www.occ.gov/news-issuances/news-releases/2015/nr-occ-2015-85.html. Among other penalties imposed under the amended consent orders, Defendant is prohibited from:  (i) acquiring new servicing rights on existing securitizations; (ii) entering into new contracts to perform residential mortgage servicing for other parties; (iii) outsourcing or sub-servicing new residential mortgage servicing activities to other parties; (iv) off-shoring new residential mortgage servicing activities; and (v) making any new appointments of senior officers responsible for residential mortgage servicing or residential mortgage servicing risk management and compliance.

446.    Defendant was also a leading sponsor of private-label mortgage-backed securities and securitized hundreds of millions of dollars of loans. In this role, Defendant engaged in misconduct and breached applicable representations and warranties. For example, in an action brought by the Federal Housing Finance Agency ("FHFA"), the FHFA conducted a comprehensive loan-level analysis of HSBC sponsored trusts and found that up to 13.26% of mortgage loans breached owner occupancy representations and warranties, and that up to 39.51% of mortgage loans breached loan-to-value representations and warranties. Compl. ¶¶ 96, 100, *FHFA v. HSBC N. Am. Holdings, Inc*., No. 11-cv-06189 (S.D.N.Y. Sept. 2, 2011).

447.    Because Defendant and/or its affiliates was engaging in the same illicit and improper acts as the servicers for the trusts, Defendant had a conflict of interest that caused it to fail to take action in response to the servicer violations, or even alert the certificateholders to the servicers' misconduct.

448.    Further, many of the same banks or their affiliate entities that act as sponsors

to the trusts were the parties that sponsored the trusts that included loans originated by Defendant. Accordingly, because Defendant itself faced enormous repurchase liability for loans sold in breach of representations and warranties, including loans in RMBS trusts sponsored by the same sponsors of the trusts, Defendant was disincentivized to take any action to protect the trusts.

449.    Finally, Defendant also failed to take appropriate action due it, and its affiliates, economic intertwinement with the parties it was supposed to police. HSBC's highly profitable securitization business was dependent upon the good graces of originators, servicers, and sponsors. Strictly enforcing repurchase obligations would have harmed important business relationships and cut off the supply of mortgage loans to HSBC's securitization arm.

## XI.    DEFENDANT FAILED TO SATISFY ITS PRE-AND POST-DEFAULT DUTIES AND BREACHED THE GOVERNING AGREEMENTS

450.    As the trustee for the trusts, Defendant owes Plaintiffs and the other certificateholders certain contractual and fiduciary duties, and other common law obligations, as well as duties under the TIA and the Streit Act. Among these duties are those set forth in governing agreements, which were incorporated by reference into the certificates Defendant signed, and under applicable state and federal laws.

451.    Defendant breached its contractual, fiduciary, common law, and statutory duties in at least four different ways.

452.    First, the governing agreements purported to transfer title to the mortgage loans to the trusts for the benefit of certificateholders. To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed, the governing agreements imposed on Defendant a duty to ensure that key documents for the loans were included in the mortgage files. Defendant created or had access to an exception report identifying those mortgage loans for

which the mortgage files were incomplete. The responsible party was required to substitute the loans with incomplete files with compliant loans or repurchase the loans. Defendant, however, systematically disregarded its contractual and fiduciary duties to enforce its rights on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates.

453.    Defendant breached its contractual and fiduciary duties under the governing agreements, its common law duties, and its obligation under the TIA and the Streit Act by failing to ensure the trusts had physical possession of many of the operative documents for the mortgage loans. If Defendant had met its contractual, fiduciary, and statutory duties with respect to the non-compliant loans, which now constitute the overwhelming majority of the defaulted loans, Plaintiffs would not have incurred their very significant losses.

454.    These breaches constituted defaults and Events of Default under the governing agreements, and all parties to the governing agreements (but not certificateholders) received notice of the defaults in the form of the document exception reports. Defendant was required to provide notice of these defaults to certificateholders, among others. It did not. If it had, the responsible parties would have been forced to repurchase or replace many of the loans that ultimately caused Plaintiffs' losses. And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

455.    Defendant did not exercise due care or act in good faith when it learned of defaults and Events of Default. When Defendant reviewed the final exception reports indicating that mortgage files were missing required documents, it should have acted to require the responsible party to repurchase or replace the non-compliant loans. At a minimum, Defendant should have notified certificateholders that the mortgage files were incomplete and the

responsible party did not repurchase or substitute the loans.

456. Defendant acted with gross negligence and negligence when it failed to ensure the proper documentation of the mortgage loans. Further, by not notifying certificateholders, Defendant negligently misrepresented the circumstances surrounding the trusts in a situation where it had unique and special knowledge that the Plaintiffs did not have.

457. Second, Defendant is obligated to provide notice of defaults under the governing agreements. Defendant violated this requirement by failing to give notice of repeated breaches by the master servicers or servicers designated under the governing agreements or of systemic breaches by the sponsors, originators, or affiliates that served as the depositors. For example, the master servicers or servicers routinely failed to provide notice of the sponsors' or originators' numerous breaches of representation and warranty provisions in the governing agreements and loan purchase agreements that the mortgage loans had been underwritten in accordance with applicable underwriting guidelines. If adequate notice of such breaches had been provided, the responsible party would have been required to repurchase the mortgage loans that did not comply with the applicable underwriting guidelines and which ultimately caused Plaintiffs' losses.

458. Defendant was aware of these Events of Default but failed to provide notice, and to act with due care and good faith. Defendant also knowingly and negligently failed to act upon these Events of Default and negligently misrepresented these circumstances to Plaintiffs even though it had special and unique knowledge that Plaintiffs did not have.

459. Third, when the Defendant performed servicing related functions with respect to the trusts, it had a duty to provide accurate certifications and remittance reports as required under the governing agreements and applicable federal law. Defendant negligently failed to do so. If it had accurately reported the facts regarding its knowledge of defective mortgage loans, the

responsible party would have been forced to repurchase the non-compliant loans that have caused Plaintiffs losses. Accurate certifications also could have prevented subsequent mortgage loan securitizations from including large numbers of defective and non-compliant loans.

460.    Fourth, having notice of the master servicers' and servicers' numerous defaults and Events of Default under the governing agreements and breaches of representations and warranties by the responsible party, Defendant failed to exercise due care to ensure that certificateholders' interests were adequately protected. If Defendant had exercised due care and acted in good faith, it would have issued repurchase demands years ago and, if necessary, commenced repurchase litigation forcing the responsible party to repurchase defective loans.

461.    When Defendant learned that the master servicers or servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the governing agreements and that master servicers and servicers engaged in widespread misconduct constituting events of default under the governing agreements, Defendant should have (i) taken steps to require the responsible party to repurchase the loans; and (ii) notified certificateholders of the master servicers' or servicers' defaults and the breaches of representation and warranty provisions.

462.    Yet Defendant failed to give notice of defaults that occurred when the responsible party breached representation and warranty provisions providing that all loans met applicable loan origination guidelines. In reality, during the 2004–2007 period, the responsible parties regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

463.    Defendant knew that the responsible parties regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long

before certificateholders.

464.    Many facts should have caused Defendant to conduct careful investigations into the trusts and take appropriate action, including the following: 1) the trusts' high default rates and poor performance; 2) breaches of representations and warranties made by the responsible parties; 3) servicer defaults and events of default; 4) incomplete transfer of the mortgage loans; and 5) the failure by sponsors, sellers, originators, issuers, and itself to fulfill the duties and obligations set forth in the governing agreements. Unlike certificateholders, Defendant had the ability under the governing agreements to carefully investigate these issues. Nonetheless, Defendant failed to perform its duties as trustee to provide notice of such failures and to protect the trusts and certificateholders.

465.    By at least 2009, Defendant, based on its access to public information as well as information unavailable to the public, know of the breaches of representations and warranties and had a duty to carefully investigate circumstances suggesting that the trusts routinely contained loans that materially breached the responsible parties' representations and warranties, which adversely affected the value of those mortgage loans and the trusts' and certificateholders' interests in those mortgage loans and take appropriate action to address those defaults

466.    Defendant also knew of failures on the part of the servicers to observe or perform in material respects its covenants or agreements in the governing agreements, including the servicers' and/or master servicers' failure to do the following: (i) give notice to the other parties of responsible party breaches of representations and warranties upon discovery thereof and enforce the responsible parties' repurchase obligations; and (ii) observe or perform the covenants or agreements contained in the governing documents. These breaches by the servicers constituted Events of Default as defined by the governing agreements. Defendant knew these servicers'

breaches were material.

467.    Defendant breached its contractual, fiduciary and legal duties under governing agreements, the common law, and the TIA and the Streit Act by failing to do the following: (i) carefully and prudently investigate breaches involving the loans in the trusts committed to its care; (ii) notify certificateholders of breaches; and (iii) take appropriate action to enforce the responsible parties' repurchase of the defective mortgage loans.

468.    Defendant also was aware of Events of Default but failed to provide notice, and to act prudently and with due care and good faith. These defaults and/or Events of Default occurred and remained uncured for the requisite period. Thus, under the governing agreements, Defendant was obligated to exercise the rights and powers vested in it by the governing agreements, and to use the same care and skill as prudent persons would exercise or use under the circumstances in the conduct of their own affairs. A prudent person would have taken action to protect the trusts and certificateholders from the known responsible party breaches of representations and warranties by exercising all of its rights under the governing agreements to enforce the responsible parties' repurchase obligations, including conducting a timely, careful and prudent investigation to determine all of the materially breaching mortgage loans and suing the responsible parties for specific performance to compel their repurchase of those loans.

469.    A prudent person also would have ensured that Defendant was receiving notification of breaches of representations and warranties from servicers and master servicers and enforced the responsible parties' obligations with respect to breaching mortgage loans.

470.    In addition to its statutory duty to exercise due care upon learning of a default, Defendant had a similar duty under the governing agreements to exercise due care upon an Event of Default. Events of Default occurred under each of the governing agreements, but Defendant

failed to take the required actions to protect the rights of the trusts. Although certain Events of Default require formal notice and an opportunity to cure, the trustee cannot escape their duty of care by failing to provide the required notice. Defendant was aware that the master servicers, servicers, depositors, and sponsors failed to provide notice of representation and warranty violations that occurred in the trusts and engaged in other misconduct in contravention of the governing agreements. Defendant, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, Defendant had the duty to act prudently to enforce repurchase provisions once it learned of such defaults.

471.    Events of Default occurred under each of the governing agreements, but Defendant failed to take the required actions to protect the trusts. Although certain Events of Default require formal notice and an opportunity to cure, the trustee cannot escape its duty of care by failing to provide the required notice. Defendant was aware that the master servicers, servicers, depositors, sponsors, and the trustees themselves, failed to provide notice of the responsible parties' representation and warranty violations. Defendant, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, the Defendant had the duty to act prudently to enforce repurchase provisions once it learned of such defaults.

472.    Despite the existence of uncured Events of Default, Defendant did not adequately address the defaults and Events of Default. If Defendant had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the responsible parties and caused them to repurchase or substitute the affected loans. Defendant's failure to do so damaged Plaintiffs.

473.     If Defendant had performed its duties as trustee, it would have enforced the obligations of the responsible parties and caused them to buy back, or replace with non-defective loans, the loans that ultimately defaulted and caused Plaintiffs' losses. And if Defendant had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have been more valuable.

474.     If Defendant had met its contractual, statutory, and fiduciary duties to ensure delivery of notes and mortgage loans files, inspection of them, and issuance of accurate certifications, it would have caused the responsible party to substitute or repurchase all loans where the servicers, sponsors, depositors, and originators failed to deliver required documentation to the trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default.

475.     Defendant's failure to meet its contractual and fiduciary duties and duties under the TIA, the Streit Act, and the common law once it became aware of defaults relating to the numerous representation and warranty breaches by the responsible parties further caused harm. If Defendant had provided notice of defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the responsible parties to repurchase loans as they were required to do and would have taken action against master servicers and servicers for misconduct.

476.     Defendant and its responsible officers knew of the responsible parties breaches of representations and warranties and also knew of the numerous defaults and Events of Default. Defendant was aware (or would have been aware if it had carried out its duties) of these problems.

477.     Defendant had an obligation under the law and the governing agreements to provide notice regarding defaults and Events of Default.

478.     Defendant further had a duty to impart correct and accurate information to certificateholders. Because of its status as trustee, Defendant had special knowledge about the accuracy of the certifications, the breaches of representations and warranties, and the servicer misconduct. Defendant negligently breached its duties to Plaintiffs in its conduct and negligently misrepresented information to Plaintiffs.

479.     Plaintiffs did not have the knowledge that the Defendant had and could not obtain that information. Plaintiffs were thus dependent on Defendant to accurately impart information and conduct itself in accordance with its fiduciary and contractual duties and other common law and statutory duties.

480.     Defendant further had a duty to act with due care, in good faith, and with undivided loyalty, all of which it breached by failing to protect the trusts and certificateholders and failing to take action against the responsible parties. Every trustee—including Defendant— has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors. This duty is non-waivable and arises independently of the governing agreements. Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust. Under the common law, Defendant cannot contract around all responsibility for its negligence and failure to act.

481.     Further, in contravention of its statutory, contractual, and common law duties, Defendant failed to adequately protect the trusts before and after certain trust sponsors and originators filed for bankruptcy or otherwise became insolvent. Defendant failed to adequately and comprehensively pursue relief against relevant parties and failed to provide adequate notice

of relevant defaults and "events of default."

482.    Defendant also breached its contractual, statutory, and common law duties by failing to properly oversee repurchase litigation initiated by monoline insurers. In particular, Defendant failed to ensure that the interests of the trusts and certificateholders were adequately protected and failed to ensure that recoveries adequately benefited the trusts as a whole. Defendant also failed to utilize those suits and the associated reunderwriting results, tolling agreements, and repurchase demands to protect the trusts and certificateholders.

483.    Defendant was guilty of acting with negligence, gross negligence, and willful misconduct in failing to adhere to its contractual, fiduciary, common law, and statutory obligations. Defendant negligently, and with willful misconduct, disregarded its duties to protect the trusts and the certificateholders and its duty to provide accurate information to Plaintiffs.

484.    Defendant's breaches of its contractual, statutory, and fiduciary duties has caused Plaintiffs immense damages.

485.    Many, if not all of, the repurchase or substitution claims described above may have lapsed due to Defendant's inaction.

## XII.    THE "NO ACTION" CLAUSES DO NOT APPLY

486.    The "no action" clauses in the governing agreements do not apply to this lawsuit because the claims are brought against Defendant as trustee, not against a third party. The PSAs expressly permit suits against the trustee, stating that no provision of the agreements "shall be construed to relieve the trustee . . . from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."

487.    Additionally, under the TIA and New York law, "no action" clauses do not apply to an action against the trustee, as here, for its own wrongdoing. Defendant is not being asked to

sue as trustee to enforce rights and obligations under the governing agreements. Rather, this

action asserts claims against Defendant for breaching its statutory and contractual obligations.

488.    Compliance with the "no action" clauses' pre-suit requirements also would have

been futile. The no action clauses (if they applied) would require Plaintiffs to demand that

Defendant initiate proceedings against itself and to indemnify Defendant for its own liability to

the trusts, an absurd result that the parties did not intend. *See Cruden v. Bank of New York*, 957

F. 2d 961, 968 (2d Cir. 1992).

## XII.    CLAIMS FOR RELIEF

<u>**COUNT ONE – BREACH OF CONTRACT**</u>

489.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs above as if fully set forth herein.

490.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to the Non-Resecuritized Certificates.

491.    The Separate Trustee brings this count to recover damages relating to the

Resecuritized Certificates.

492.    The PSAs are valid and binding contracts entered into between Defendant, each

trust, the sponsors, the master servicers, the servicers, and depositors.

493.    The PSAs provide, among other things, the terms under which Defendant acts as

trustee for the trusts.

494.    As current holders of certificates issued by each trust, Plaintiffs are express,

intended third party beneficiaries under the PSAs entitled to enforce the performance of the

Trustee.

495.    Defendant breached several obligations that it undertook on behalf of Plaintiffs as

certificateholder including, without limitation, to:

    (a)    take physical possession of the operative documents for the mortgage loans in the trusts or ensure possession by the custodian;

    (b)    ensure all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports are identified;

    (c)    make accurate representations in final certifications and exception reports;

    (d)    protect the interests of the beneficiaries of the trusts;

    (e)    take steps to cause the responsible party to repurchase loans lacking adequate documentation;

    (f)    investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the responsible parties' widespread practice of including in securitization trusts loans which breached such representations and warranties;

    (g)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.1 of the PSAs, or similar sections, relating to repeated failures by the master servicer or servicer to require the repurchase or substitution of mortgage loans by the responsible party (1) under Section 2.3, or similar sections, where such loans breached representations and warranties, and (2) under Sections 2.1 and 2.2, or similar sections, where such loans were lacking proper documentation;

    (h)    enforce the repurchase obligations of the responsible party.

496.    The specific provisions breached by Defendant are further detailed herein and in the Exhibits hereto.[12]

497.    Defendant's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their certificates and diminished their value.

498.    Plaintiffs have performed their obligations under the PSAs.

---

[12] Full copies of each of the governing agreements are publically available on the SEC EDGAR website. Due to the amount and length of the agreements, only the relevant portions have been attached hereto. Plaintiffs incorporate the full PSAs and governing agreement herein by reference.

499.    Defendant is liable to Plaintiffs for the losses they suffered as a direct result of Defendant's failure to perform its contractual obligations under the PSAs.

## COUNT TWO – BREACH OF FIDUCIARY DUTY

500.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

501.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the Non-Resecuritized Certificates.

502.    The Separate Trustee brings this count to recover damages relating to the Resecuritized Certificates.

503.    As set forth in detail above, Defendant owed certificateholders, including Plaintiffs, a fiduciary duty to act in good faith, and with due care and undivided loyalty when performing the obligations set forth in the PSAs, and, in addition, to exercise all powers under the PSAs prudently once an Event of Default occurred or payments to Certificateholders became impaired. These obligations included, without limitation, duties to:

> (a)    take physical possession of the operative documents for the mortgage loans in the trusts or ensure possession by the custodian;
>
> (b)    ensure all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports are identified;
>
> (c)    make accurate representations in final certifications and exception reports;
>
> (d)    protect the interests of the beneficiaries of the trusts;
>
> (e)    take steps to cause the responsible party to repurchase loans lacking adequate documentation;
>
> (f)    investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the responsible parties' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(g)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.1 of the PSAs, or similar sections, relating to repeated failures by the master servicer or servicer to require the repurchase or substitution of mortgage loans by the responsible party (1) under Section 2.3, or similar sections, where such loans breached representations and warranties, and (2) under Sections 2.1 and 2.2, or similar sections, where such loans were lacking proper documentation;

(h)     enforce the repurchase obligations of the responsible party.

504.     As set forth in detail above, Defendant breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

505.     The violations by Defendant of its fiduciary obligations impaired certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## **COUNT THREE –BREACH OF THE COVENANT OF GOOD FAITH**

506.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

507.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the Non-Resecuritized Certificates.

508.     The Separate Trustee brings this count to recover damages relating to the Resecuritized Certificates.

509.     As all relevant times, Defendant owed Plaintiffs, as express, intended third party beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required Defendant to ensure that it did not, by act or omission, injure the rights of the Plaintiffs to receive the benefits and protections provided for under the PSAs.

510.     By the conduct described above, Defendant breached its duty of good faith and

fair dealing under the PSAs.

511.    Defendant's breaches are material.

512.    As a result of these breaches, Plaintiffs have suffered damages and will continue
to suffer damages in an amount to be proven at trial.

## COUNT FOUR – VIOLATION OF THE STREIT ACT

513.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding
paragraphs as if fully set forth herein.

514.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to
recover damages arising at any time related to the Non-Resecuritized Certificates.

515.    The Separate Trustee brings this count to recover damages relating to the
Resecuritized Certificates.

516.    The Streit Act was enacted to provide for the proper administration of mortgage
trusts and requires that the trustee exercise due care in performing its obligations. N.Y. Real
Prop. Law § 124.

517.    Plaintiffs, as certificateholders and beneficiaries of the trusts were entitled to the
protections afforded under the Streit Act.

518.    The certificates are "mortgage investments" subject to the Streit Act. N.Y. Real
Prop. Law § 125(1).

519.    The PSAs that established the trusts are "indentures," and Defendant is a "trustee"
under the Streit Act. N.Y. Real Prop. Law § 125(3).

520.    As described above, Defendant violated the Streit Act by failing to discharge its
pre-default duties.

521.    Following an event of default, the Streit Act provides that the trustee must

exercise the same degree of skill and care in the performance of its duties as a prudent man would under the same circumstances. N.Y. Real Prop. Law § 126(1).

522.    In addition, Section 124 of the Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124.

523.    As set forth above, Defendant failed to exercise its rights under the PSAs after becoming aware of numerous defaults, failed to carefully review the mortgage files, failed to identify and rectify defaults by other parties, failed to notify certificateholders and other parties of deficiencies, failed to take steps to address those deficiencies, and, most importantly, failed to protect the best interests of certificateholders particularly through the enforcement of the repurchase, cure, or substitution of defective loans.

524.    Defendant is liable to Plaintiffs for damages incurred as a result of its violations of the Streit Act in an amount to be determined at trial.

## COUNT FIVE – VIOLATION OF THE TRUST INDENTURE ACT OF 1939

525.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

526.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the Non-Resecuritized Certificates.

527.    The Separate Trustee brings this count to recover damages relating to the Resecuritized Certificates.

528.    Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

529.    Each of the PSAs is an "indenture," and Defendant is an "indenture trustee," within the meaning of the TIA. 15 U.S.C. § 77ccc(7), (10). Two trusts at issue, FMIC 2005-3 and PCHLT 2005-4, were formed using indentures and not PSAs. As noted above, each of the PSAs and indentures are substantially similar and imposes substantially the same duties on Defendant in its capacity as trustee. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs and the related trusts. 15 U.S.C. § 77ddd(a)(1).

530.    Defendant violated the TIA in at least four ways. First, TIA Section 315(a) provides that, prior to default (as that term is defined in the indenture), the trustee is liable for any duties specifically set out in the indenture. 15 U.S.C. § 77ooo(a)(1). As set forth above, Defendant failed to comply with a number of duties set out in the indentures, including its duty to carefully review the mortgage files, to notify certificateholders and other parties of deficiencies, to take steps to address those deficiencies, and, most importantly, to enforce the substitution or repurchase of defective loans.

531.    Second, TIA Section 315(b) provides that the indenture trustee notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). As set forth above, Defendant failed to carefully investigate serious known issues with the loans in the trust, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

532.    Third, in case of default (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15

U.S.C. § 77ooo(c). Here, as set forth above, Defendant did nothing after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and events of default. A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans. In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

533.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b). Defendant has impaired the ability of the trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which Defendant failed to take action to correct. In addition, Defendant has impaired the ability of the trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

534.    These breaches materially and adversely affected the interests of the certificateholders because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties and originators.

535.    Defendant is liable to Plaintiffs for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      An award of all appropriate damages and/or equitable relief in favor of Plaintiffs

against Defendant for breaches of its contractual, common law, and statutory duties in an amount

to be determined at trial, including any applicable pre- or post-judgment interest thereon;

       B.      Awarding Plaintiffs all reasonable costs and expenses incurred in this action,

including attorney's fees, expert fees, and any other properly taxable costs and expenses;

       C.      Any other relief that the Court deems just and proper.

## XIV.  JURY DEMAND

       Plaintiffs hereby demand a trial by jury of all issues properly triable.


Dated: May 28, 2019

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal
Credit Union, Members United Corporate
Federal Credit Union, Southwest Corporate
Federal Credit Union, and Constitution
Corporate Federal Credit
Union,

and

GRAEME W. BUSH, as Separate Trustee of
the NGN Trusts (as defined above)

By: _/s/_ _George A. Zelcs_
George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com

mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

David C. Frederick
Scott K. Attaway
Matthew M. Duffy
Frederick G. Hall
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@kelloghansen.com
sattaway@kellogghansen.com
mduffy@kellogghansen.com
fhall@kellogghansen.com

David H. Wollmuth
William A. Maher
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com

*Attorneys for the National Credit Union Administration Board as liquidating agent and Graeme W. Bush as Separate Trustee*

<u>Of Counsel</u>:
Michael J. McKenna, General Counsel

Alan R. Burch, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
mmckenna@ncua.gov
aburch@ncua.gov