**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, *et al*.,<br><br>      Plaintiffs,<br><br>  v.<br><br>HSBC BANK USA, NATIONAL ASSOCIATION,<br><br>      Defendant. | **Case No. 15-cv-2144-LGS-SN** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT HSBC BANK USA, N.A.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ iv

GLOSSARY OF DEFINED TERMS AND ABBREVIATIONS……………………………vii

ARGUMENT ............................................................................................................... 3

I.      HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PRE-
        EOD R&W-BREACH CLAIMS. ........................................................................... 3

        A.      There Is No Evidence of Pre-EOD R&W Breaches or That HSBC Had
                Notice of/Discovered Any Pre-EOD R&W Breach in 20,787 of the At-
                Issue Loans ............................................................................................ 4

        B.      For Six of the Remaining Nine Loans, There Is No Evidence that HSBC
                Failed To Satisfy Its Contractual Duties. ................................................ 6

                1.      HSBC Satisfied Any Notice Duties. ............................................ 7

                2.      HSBC Satisfied Any "Enforcement" Duties. ................................ 7

II.     HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PRE-
        EOD DOCUMENT DEFECT CLAIMS. ............................................................. 14

        A.      The Document Acceptance Process Is Different and Distinct from the
                Document Repurchase Process. ............................................................. 15

        B.      There Is No Evidence of Material Document Defects or that HSBC
                Discovered or Received Notice of Material Document Defects ............... 17

III.    HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EOD
        CLAIMS. .......................................................................................................... 19

        A.      There Is No Evidence that an Event of Default Occurred. ..................... 20

        B.      There Is No Evidence that HSBC Knew of Any Event of Default. ......... 22

        C.      HSBC Satisfied Any Required Duties. ................................................... 22

IV.     THERE IS NO EVIDENCE HSBC ACTED IN BAD FAITH. ........................... 23

V.      HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        FIDUCIARY DUTY CLAIMS. ........................................................................... 23

VI.     HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TIA
        AND STREIT ACT CLAIMS. ............................................................................ 24

VII.  PLAINTIFFS WAIVED ALL CLAIMS REGARDING ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, AND MHL 2007-1.........................................25

VIII.  MANY OF PLAINTIFFS' CLAIMS, INCLUDING ALL DOCUMENT DEFECT CLAIMS, ARE BARRED BY THE STATUTE OF LIMITATIONS. ............................26

    A.    The Extender Statute Does Not Apply to Claims on Securities that Were Resecuritized, and Therefore All Document Defect Claims and Some of the R&W Breach Claims on Resecuritized Securities Are Time-Barred Under New York's Borrowing Statute. ................................................................26

        1.    The Extender Statute Does Not Apply to Assigned Claims. .....................26

        2.    The Claims on Securities Assigned to NGN Trusts Are Barred Under State Law. ........................................................................28

    B.    For Securities Purchased by Wescorp and U.S. Central, NCUA Did Not File Its Complaint Within Six Years of the Extender Statute's Accrual Date.................................................................................................................29

        1.    The Date of Conservation Was March 19, 2009.........................................29

        2.    Even If the Date of Conservation Was March 20, 2009, the Claims Were Filed Too Late. ........................................................................30

    C.    All Document Defect Claims and Some R&W Claims Are Time-Barred. ..........31

IX.  EVEN UNDER THE EXTENDER STATUTE, TORT CLAIMS ARISING FROM ACE 2005-AG1 ARE TIME-BARRED..............................................................32

X.  PLAINTIFF BUSH LACKS STANDING BECAUSE THE ASSIGNMENT OF CLAIMS TO HIM VIOLATES NEW YORK CHAMPERTY LAW. .............................33

XI.  PLAINTIFFS HAVE NO DAMAGES..............................................................................34

    A.    Damage Limitation Clauses Bar the Damages Plaintiffs Seek in Five of the Six Trusts at Issue. .............................................................................34

    B.    Plaintiffs Cannot Recover for "Make Whole" Amounts or Litigation Expenses Under the Governing Agreements. .........................................................35

    C.    Plaintiffs Have No Damages on Certificate M1 on Trust ACE 2005-AG1 or in Connection with Any Loan that Did Not Suffer a Loss. ...............................35

    D.    Plaintiffs Cannot Recover the Principal Balance of Liquidated Loans. ...............37

    E.    Any Judgment Must Be Reduced by the Amounts of NCUA's Prior Settlement Proceeds. ...............................................................................37

F.    The Deutsche Bank Settlement ███████████ ███████████████████████████...............................38

G.    Plaintiffs Are Not Entitled to Prejudgment Interest................................................39

CONCLUSION.........................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Mfr.'s & Traders Tr. Co. v. Reliance Ins. Co.*, 8 N.Y. 3d 583 (2007)............................................40

*Argonaut P'ship L.P. v Bankers Tr. Co.*, 2001 WL 585519 (S.D.N.Y. May 30, 2001)...............20

*Bailey v. Fish & Neave*, 8 N.Y.3d 523 (2007).............................................................................8

*Bakal v. U.S. Bank, NA*, 747 F. App'x 32 (2d Cir. 2019).........................................................21, 22

*Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y. 2008) .................................1

*Beckley Cap. Ltd. P'Ship v. DiGeronimo*, 184 F.3d 52 (1st Cir. 1999)........................................27

*Blackrock v. U.S. Bank Nat'l Ass'n*, 86 N.Y.S.3d 484,485-86 (App. Div. 2018) .................21, 22

*BlackRock v. Wells Fargo*, 2017 WL 953550 (S.D.N.Y. Mar. 10, 2017) ......................................5

*BNYM v. Walnut Place, LLC*, 11-cv-05988 (S.D.N.Y. Oct. 31, 2011), ECF 124 ........................11

*BNYM v. WMC Mortg., LLC*, 2015 WL 13867151 (S.D.N.Y. Aug. 18, 2015)............................37

*Brad H. v. City of New York*, 17 N.Y.3d 180 (2011) ........................................................................8

*Cadle Co. v. 1007 Joint Venture*, 82 F.3d 102 (5th Cir. 1996)...............................................27, 28

*Calgon Carbon Corp. v. WDF Inc.*, 700 F. Supp. 2d 408 (S.D.N.Y. 2010)...........................36, 40

*Com. Bank v. BNYM*, 35 N.Y.S.3d 63 (App. Div. 2016)...............................................................6

*Commerzbank AG v. HSBC Bank USA*, 2016 WL 3211978 (S.D.N.Y. June 8, 2016)......23, 24, 25

*Cornejo v. Bell*, 592 F.3d 121 (2d Cir. 2010) ..............................................................................22

*Deutsche Bank Nat'l Trust Co. v. Barclays Bank PLC*, 34 N.Y.3d 327 (2019) ...........................28

*Dormitory Auth. of N.Y. v. Samson Constr. Co.*, 30 N.Y.3d 704 (2018)......................................24

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) ...............................................................................................................................9

*FCCD Ltd. v. State St. Bank & Tr. Co.*, 2011 WL 519228 (S.D.N.Y. Feb. 15, 2011) ...................9

*FDIC v. Enventure V*, 77 F.3d 123 (5th Cir. 1996) .......................................................................31

*Fed. Fin. Corp. v. Hamilton*, 962 P.2d 1136 (Kan. Ct. App. 1998) .............................................31

*Fixed Income Shares: Series M v. Citibank N.A.*, 69 N.Y.S.3d 288 (App. Div. 2018) .....21, 22, 32

*Fixed Income Shares: Series M v. Citibank*, No. 14-cv-9373-JMF, ECF No. 176 (March 22, 2018) .................................................................................................................24

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002).............................................10

*Grobe v. Kramer*, 33 N.Y.S.2d 901 (Sup. Ct. 1942) .......................................................39

*Harris v. Seward Park Hous. Corp.*, 913 N.Y.S.2d 161 (App. Div. 2010) .....................36

*In re Gonzalez*, 241 B.R. 67 (S.D.N.Y. 1999) ...............................................................25

*In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 18 F.3d 126 (2d Cir. 1994) ...................38

*In re Part 60 Put-Back Litig.*, 36 N.Y.3d 342 (2020).....................................................35

*In re Refco, Inc. Sec. Litig.*, 2007 WL 57872 (S.D.N.Y. Jan. 9, 2007) ..........................38

*In re Trs. Est. Under PSAs Rel. to Wachovia Bank Comm. Mortg. Tr. Comm. Mortg. Pass-Through Certs., Series 2007-C30*, 2020 WL 1304400 (S.D.N.Y. Mar. 19, 2020) .........13

*In re Westchester Tank Fabricators, Ltd.*, 207 B.R. 391 (Bankr. E.D.N.Y.1997) .....................25

*Joslin v. Grossman*, 107 F. Supp. 2d 150 (D. Conn. 2000) ............................................31

*L-7 Designs, Inc. v. Old Navy, LLC,* 964 F. Supp. 2d 299 (S.D.N.Y. 2013)................................23

*Lesjac Realty Corp. v. Mulhauser*, 251 N.Y.S.2d 62 (Sup. Ct. 1964)............................39

*Ltd. v. BNYM*, 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018) ........................................24

*Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50 (E.D.N.Y. 2012)......................................21

*Md. Cas. Co. v. Emps. Mut. Liability Ins. Co. of Wis.*, 208 F.2d 731 (2d Cir. 1953) ...................39

*Meckel v. Cont'l Res. Co.*, 758 F.2d 811 (2d Cir. 1985).................................................1

*N. Indus. Holdings, LLC v. E. Envt'l Grp. Inc.*, 2016 WL 8541049 (N.D.N.Y. Feb. 23, 2016) ...................................................................................................................34

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010) .....................9

*NCUA v. U.S. Bank*, 439 F. Supp. 3d 275 (S.D.N.Y. 2020) ..........................................2

*NCUA v. Wells Fargo*, 14-cv-10067-KPF-SN (S.D.N.Y. Oct. 30, 2020), ECF 558 ...................30

*Nouveau Elevator Indus., Inc. v. Cont'l Cas. Ins. Co.*, 2006 WL 1720429 (E.D.N.Y. June 21, 2006) .................................................................................................................23

*Phoenix Light v. BNYM*, 2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017)................................. passim

*Phoenix Light v. U.S. Bank N.A.*, 14-CV-10116 (VSB), ECF 421 (Mar. 18, 2020)......................33

*Phoenix Light v. U.S. Bank N.A.*, 14-CV-10116 (VSB), ECF 421 (Mar. 18, 2020)......................33

*Phoenix Light v. U.S. Bank*, No. 14-cv-10104-VEC, Dkt. No 201 (Sept. 7, 2017)..................4, 33

*Putman High Yield Tr. v. Bank of N.Y.*, 776 N.Y.S.2d 796 (App. Div. 2004)..............................20

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. BNYM*, 775 F.3d 154 (2d Cir. 2014) ........................................................................................................................2, 4, 18, 24

*Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398 (2009) ..............10

*Royal Park v. Deutsche Bank*, 2018 WL 4682220 (S.D.N.Y. Sept. 28, 2018).....................4, 5, 17

*Royal Park v. HSBC*, 109 F. Supp. 3d 587 (S.D.N.Y. 2015)................................................... passim

*Royal Park v. HSBC*, 2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) ......................................4, 5, 6

*Royal Park v. HSBC*, 2018 WL 679495 (S.D.N.Y. Feb. 1, 2018)................................................28

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ................................................................34, 35

*Singer v. Olympia Brewing Co.*, 878 F.2d 596 (2d Cir. 1989) ......................................................38

*U.S. Bank v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386 (S.D.N.Y. 2016)..........................4

*W. & S. Life Ins. Co. v. BNYM*, 2017 WL 3392856 (Ohio Com. Pl. Aug. 4, 2017).....................19

*Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176 (App. Div. 2008) .....................................9

## OTHER AUTHORITIES

12 U.S.C. § 1786(h)(1)(A).............................................................................................................30

12 U.S.C. § 1787.................................................................................................................... passim

CPLR 202........................................................................................................................................28

CPLR 5001.................................................................................................................................36, 39

N.Y. Jud. Law § 488.......................................................................................................................33

## <u>GLOSSARY OF DEFINED TERMS AND ABBREVIATIONS</u>

**56.1**:  Defendant HSBC Bank USA, N.A.'s Statement of Material Facts Not in Dispute.

**Acebedo Decl.**:  Declaration of Fernando Acebedo.

**Acebedo Ex.**:  Exhibit to the Declaration of Fernando Acebedo.

**App'x**:  Exhibit A to the Declaration of Lauren H. Uhlig.

**BNYM**:  Bank of New York Mellon.

**CCUs**:  Corporate credit unions that originally purchased the certificates at issue in the Trusts. NCUA conserved and liquidated these CCUs.  The CCUs consist of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("Wescorp"), Members United Corporate Federal Credit Union ("Members United"), and Southwest Corporate Federal Credit Union ("Southwest").  There is another corporate credit union referenced in the Complaint, Constitution Corporate Federal Credit Union ("Constitution"), but it did not purchase any of the certificates at issue in the Trusts.

**Collateral**:  Residential mortgage loans placed into an RMBS trust.

**Custodian**:  Entity that receives, reviews, and accepts certain mortgage loan documents following the closing of the Trust ("document acceptance process").  Within a prescribed period of time following trust closing, the Custodian issues a mortgage file certification and exception report. The Custodian then maintains the mortgage file throughout the life of the loan and is responsible for giving notice to other trust parties of future defects.

**EOD**:  Event of default.  Events that are contractually defined in the PSA.

**Master Servicer**:  Entity that oversees the Servicers.

**MLPA**:  Mortgage Loan Purchase Agreement.  Governs the sale of the mortgage loans, and includes representations and warranties made by the Seller concerning the characteristics, quality, and risk profile of the mortgage loans.

**PSA**:  Pooling & Servicing Agreement.  Sets forth the contractual relationships, rights, and responsibilities of trust parties.

**Pro Supp**:  Prospectus Supplement.  A communication (the contents of which are regulated by the Securities Act) offering a security for sale.

**R&W**:  Representations and warranties.  Specified in the PSA.

**Repurchase**:  A remedy provided in the PSA in which the Responsible Party (typically the Seller or Sponsor) re-purchases a loan at a contractually-defined purchase price due to uncured material R&W breaches or uncured material document defects in mortgage files.

**RMBS**:  Residential mortgage-backed securities, in which an investment bank (the "sponsor" or "seller") acquires mortgage loans from loan "originators" and conveys them (through a "depositor") to an RMBS trust.

**RMBS Certificates**:  Represents certain rights to specified cash flows derived from the securitized mortgages.  Certificates are issued in various classes that establish a priority designed to increase the likelihood that senior certificate owners receive regular payments of principal and interest and junior certificate owners are first to experience losses when borrowers fail to pay, default, or foreclosure occurs.

**Servicer**:  Entity that administers the underlying loans in an RMBS trust, including interacting with borrowers, collecting payments, modifying loans, and foreclosing.

**Trusts**:  The trusts at issue in this motion that were chosen through a bellwether process.  ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, FHLT 2006-C, MHL 2007-1, NHELI 2007-1.

**Trustee**:  Entity that serves as an indenture trustee for RMBS and performs duties set out in the PSA.  HSBC was the Trustee for the Trusts.

**Uhlig Decl.**: Declaration of Lauren H. Uhlig.

**Uhlig Ex.**:  Exhibit to the Declaration of Lauren H. Uhlig.

**Warrantor**:  Generic reference to the entity responsible for making representations and warranties regarding the loans in RMBS trusts.

Plaintiffs allege that HSBC, as an RMBS indenture trustee for certain RMBS trusts, should have compelled the repurchase of allegedly defective loans and taken other steps to monitor, investigate, supervise and address the purported actions or omissions of third parties.  Contrary to Plaintiffs' allegations, however, pursuant to each Trust's PSA the Trustee does not undertake broad fiduciary obligations like a common-law trustee.  Instead, HSBC has only limited and largely ministerial duties specifically enumerated by contract.[1]  Reflecting this circumscribed role, HSBC was paid the nominal fee of $3,500 per year for each trust at issue.  Plaintiffs seek to hold HSBC liable for duties it did not have.  In light of the undisputed facts, Plaintiffs' claims are fatally deficient.  In the one similar case in this district to reach this stage, Judge Caproni granted summary judgment on most claims, for reasons equally applicable here.  *See Phoenix Light v. BNYM* ("*PL/BNYM*"), 2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017).  Judge Caproni held that the plaintiffs failed to adduce loan-by-loan evidence that the trustee discovered or received notice of alleged breaches by other parties, and failed to adduce trust-specific evidence of EODs.  Those same conclusions are mandated here as well.

The PSAs strictly limit the Trustee's duties.  First, the Agreements state that only "upon discovery" (or, for some Trusts, "upon discovery or receipt of notice") of a breach of an R&W that materially and adversely affects the loan's value or the Certificateholders' interests, HSBC shall promptly notify the warrantor of the breach, and, in some trusts, if the warrantor fails to cure the breach, HSBC shall "enforce" the warrantor's obligation to repurchase the loan.  The Agreements do not explicitly define the meaning of "enforce," but the context, other relevant provisions,

---

[1] "[U]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement."  *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 324 n.79 (S.D.N.Y. 2008) (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985)).

industry custom and practice, and the parties' undisputed pre-litigation conduct all refute Plaintiffs' assertion that "enforce" means that the Trustee was required to unilaterally initiate litigation. To the contrary, the PSAs provide that absent a contractually defined EOD, the Trustee "shall not be bound to make any investigation" or institute "any litigation" without direction and indemnification by a specified percentage of certificateholders—which never occurred here.

Second, the Agreements state that only "upon discovery" (or, for some Trusts, "upon discovery or receipt of notice") of a materially defective or missing document that materially and adversely affects the value of such loan or the interests of the Certificateholders, HSBC shall promptly notify the warrantor of the defect, and, in some trusts, if the warrantor fails to cure the defect, HSBC shall enforce the warrantor's obligation to repurchase the loan.

Finally, the Agreements state that only if HSBC has actual knowledge or written notice of a contractually defined EOD, then HSBC shall exercise the rights and powers granted to it under the indenture as would a prudent person.

These obligations are all loan- and Trust-specific. Thus, to survive summary judgment, Plaintiffs "must present evidence that proves a specific breach of a representation or warranty as to any loan . . . for which plaintiffs allege there was a breach." *PL/BNYM*, 2017 WL 3973951, at *8. Claims relating to alleged missing and defective documents also "require[] looking at individual loans and documents." *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. BNYM* ("*Ret. Bd.*"), 775 F.3d 154, 162 (2d Cir. 2014). And Plaintiffs' claims regarding EODs require evidence of HSBC's "actual knowledge or written notice of a particular EOD." *NCUA v. U.S. Bank* ("*NCUA/USB*"), 439 F. Supp. 3d 275, 282 (S.D.N.Y. 2020).

Plaintiffs' claim that HSBC was required to bring about repurchase of thousands of loans due to alleged breaches of R&Ws is invalid because, other than in a small handful of instances,

2

there is no evidence that HSBC ever "discovered" any breaches. "Discovery" means actual knowledge, as both Judge Scheindlin and Magistrate Judge Netburn have held in this case. And in *PL/BNYM*, without resolving whether actual knowledge was required, Judge Caproni nonetheless dismissed all claims for which the trustee did not receive written notice of the alleged defective loan. *PL/BNYM*, 2017 WL 3973951, *8-9. The same result is required here.

Plaintiffs' claims based on alleged document defects fare no better. Plaintiffs made no effort to even look at individual loan files (the "Mortgage File") to prove the existence of a materially defective or missing document. Instead, Plaintiffs attempt to rely on so-called exception reports—ministerial documents that were delivered at or near the time of trust closing—to argue that the trustee "discovered" material defects. The undisputed facts show that HSBC had no duty to take action based on these exception reports, which did not state that any document issue was material, and which were addressed in iterative fashion after trust closing by other transaction parties, typically resolving the alleged problem. Moreover, HSBC was not obligated to review or maintain the Mortgage File or obtain trailing documents after trust closing. Therefore, these claims fail for similar reasons discussed in *PL/BNYM*. They are also time-barred, because Plaintiffs cannot claim the benefit of the extender statute they invoke, for multiple reasons. And Plaintiffs' claims based on alleged EODs fail because there is no evidence of any such events or that HSBC ever learned of any such events.

Plaintiffs' claims also fail for many additional reasons, as discussed below.

## <u>ARGUMENT</u>

## I.   HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PRE-EOD R&W-BREACH CLAIMS.

Plaintiffs' claim that HSBC breached contractual duties that were triggered by notice or discovery of loan-specific R&W breaches fails for several reasons. First, for 20,787 of the 20,796

loans at issue (*i.e.*, all but nine), Plaintiffs adduce no evidence of loan-specific R&W breaches or that HSBC had notice of or discovered any loan-specific R&W breach.  Second, even if Plaintiffs could show notice or discovery for the remaining nine loans, Plaintiffs fail to demonstrate that HSBC did not satisfy its duties under the PSAs.

### A.       There Is No Evidence of Pre-EOD R&W Breaches or that HSBC Had Notice of/Discovered Any Pre-EOD R&W Breach in 20,787 of the At-Issue Loans.

"[B]y summary judgment . . . plaintiffs must present evidence that proves a specific breach of a representation or warranty . . . on an individualized loan-by-loan basis." *PL/BNYM*, 2017 WL 3973951, at *8; *see also Ret. Bd.*, 775 F.3d at 162 (the RMBS trustee's "alleged misconduct must be proved loan-by-loan and trust-by-trust").  "Loan-by-loan proof is required to establish the Trustee's liability to the Certificate-holders because, under . . . the PSAs, the Trustee has neither the obligation nor the ability to demand cure, substitution, or repurchase of a nonconforming loan *unless*—among other things—it can identify an R&W breach . . . that 'materially and adversely' affects the value of that particular loan." *Royal Park v. Deutsche Bank* ("*RP/DB*"), 2018 WL 4682220, at *5 (S.D.N.Y. Sept. 28, 2018) (emphasis added).  Accordingly, evidence of constructive knowledge or pervasive breach does not create a genuine issue of material fact.[2] Instead, Plaintiffs must present evidence that HSBC had "actual knowledge of specific breaches on the requisite loan-by-loan basis." *RP/HSBC II*, 2017 WL 945099, at *6, 8.

Plaintiffs did not re-underwrite any loans in FHLT 2006-C (7,806 loans) and NHELI 2007-

---

[2] *See Royal Park v. HSBC* ("*RP/HSBC II*"), 2017 WL 945099, at *4 (S.D.N.Y. Mar. 10, 2017) (collecting cases); *Phoenix Light v. U.S. Bank* ("*PL/USB*"), No. 14-cv-10104-VEC, Dkt. No 201 (Sept. 7, 2017) at 14 (collecting cases); *see also PL/BNYM*, 2017 WL 3973951, at *7 (granting summary judgment where plaintiffs relied on evidence of "pervasive breaches" but presented no evidence "relative to any particular loan"); *U.S. Bank v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386, 425 (S.D.N.Y. 2016) ("The parties could have, but did not, bargain for additional remedies or a notice provision that did not turn on loan-specific knowledge.  [Plaintiffs] therefore may not rely on evidence of 'constructive knowledge' or 'pervasive breach' to prove [the trustee]'s knowledge of breached warranties.").

1 (3,496 loans), nor have Plaintiffs adduced any other evidence of loan-specific breaches in these trusts.  56.1 ¶¶ 4, 61.  Without evidence of loan-specific breaches, Plaintiffs cannot demonstrate liability related to these trusts.  Additionally, for ACE 2006-OP2 (4,472 loans), Plaintiffs provide no evidence that HSBC discovered or had notice of any loan-specific breach that Plaintiffs claim existed.  56.1 ¶¶ 4, 62.  For this reason, Plaintiffs' R&W claims regarding loans in ACE 2006-OP2 cannot survive summary judgment.  *See PL/BNYM*, 2017 WL 3973951, at *7 (granting summary judgment where plaintiffs presented no evidence "of [trustee's] knowledge of any specific breach of any representation or warranty").  Likewise, for the remaining three trusts, DBALT 2007-OA1 (1,164 loans), MHL 2007-1 (1,248 loans), and ACE 2005-AG1 (2,610 loans), Plaintiffs' claims for all but nine loans fail because there is no evidence that HSBC discovered or received notice of specific breaches in specific loans.  56.1 ¶¶ 4, 63.

Plaintiffs resort to arguing that HSBC *should have* discovered purported R&W breaches by investigating supposed "red flags."  But as both Judge Scheindlin and Magistrate Judge Netburn have held in this case, "discovery" requires actual knowledge.  *See Royal Park v. HSBC* ("*RP/HSBC I*"), 109 F. Supp. 3d 587, 603 (S.D.N.Y. 2015)[3] ("If, after discovery, plaintiffs cannot prove that HSBC had actual knowledge regarding the loans at issue here, HSBC may move for summary judgment."); *RP/HSBC II*, 2017 WL 945099, at *6 (the Court "reads 'discovery' as used in Section 2.03 to mean actual knowledge.  This interpretation is consistent with the contractual remedies available under the PSA and HSBC's limited duties"); *BlackRock v. Wells Fargo*, 2017 WL 953550, at *6-7 (S.D.N.Y. Mar. 10, 2017) (Netburn, M.J.) (same); *see also RP/DB*, 2018 WL 4682220, at *9 ("[I]t appears to be the uniform view of judges in this District that, in cases brought by RMBS investors against RMBS trustees, 'discovery' requires more than inquiry notice."

---

[3] Applied to this case in the Court's July 20, 2015 Opinion and Order.  ECF 56 at 1-2 & n.1.

(internal citation omitted)).  That requirement follows from the Agreements, because the PSAs specifically explain that, prior to an EOD, HSBC has no duty to investigate.  *See RP/HSBC II*, 2017 WL 945099, at \*7 ("[T]he PSAs did not obligate HSBC to investigate until it received notice or obtained actual knowledge of a Master Servicer EOD (rather than constructive notice of potential breaches).").  "Importing a 'should have known' standard is also inconsistent with cases that have emphasized the limited role of an indenture RMBS trustee."  *Id.*; *see also Com. Bank v. BNYM*, 35 N.Y.S.3d 63, 65 (App. Div. 2016) ("[T]he trustee of an RMBS . . . trust does not have a duty to 'nose to the source.'").[4]

Finally, Plaintiffs make a last-gasp argument that the Court should accept exception reports as evidence of notice of R&W breaches.  But exception reports do not include any allegations of R&W breaches, and therefore cannot constitute notice of the same.  56.1 ¶ 84.

Summary judgment should be entered for HSBC on the claims for these 20,787 loans.

## B.   For Six of the Remaining Nine Loans, There Is No Evidence that HSBC Failed To Satisfy Its Contractual Duties.

For six of the remaining nine loans,[5] even if HSBC received notice of breaches, summary judgment is warranted because there is no genuine dispute that HSBC satisfied its notice and "enforcement" duties.  The PSAs provide that, upon discovery or notice of a loan-specific R&W breach that materially and adversely affected the loan's value or the Certificateholders' interest, the Trustee (1) shall notify the warrantor of such breach, and (2) for certain trusts,[6] if the warrantor

---

[4] Even under a should-have-known standard, Plaintiffs' failure to point to any loan-by-loan evidence is fatal to their claims.  *See PL/BNYM*, 2017 WL 3973951, at \*8.

[5] One loan (0114262911) in DBALT 2007-OA1 and two loans (14675540 & 14671796) in ACE 2005-AG1 are not addressed by this argument.  Summary judgment should be entered on claims for these loans for the other reasons presented in this brief.

[6] FHLT 2006-C and NHELI 2007-1 do not include "enforcement" duties.  56.1 ¶ 66; App'x F.

does not cure, the Trustee "shall enforce the obligations of the [warrantor]."  56.1 ¶¶ 65-66; App'x F.  Here, HSBC fulfilled those duties.

### 1.    HSBC Satisfied Any Notice Duties.

Upon receiving loan-specific notice in these six loans, HSBC fulfilled its notice duties when it provided notice to the Responsible Parties.  56.1 ¶ 64; Acebedo Decl. ¶¶ 31-35.

### 2.    HSBC Satisfied Any "Enforcement" Duties.

HSBC also complied with any enforcement duties for these six loans by demanding repurchase.  56.1 ¶ 64; Acebedo Decl. ¶ 31-35.  Plaintiffs do not dispute that HSBC demanded repurchase, but instead strain to expand the obligation of enforcement duties.  Specifically, Plaintiffs claim that "shall enforce" means that the Trustee must unilaterally initiate repurchase litigation—in other words, litigate without direction and indemnification by the Trust's Certificateholders.  Plaintiffs' interpretation of "shall enforce" is flatly contradicted by the PSAs. Plaintiffs do not point to a single instance of an RMBS Trustee ever unilaterally initiating repurchase litigation, because PSAs do not contain any such requirement.  56.1 ¶¶ 75-77. Moreover, even if the PSA language were ambiguous, the parties' course of conduct conclusively demonstrates that "shall enforce" does not require unilateral initiation of repurchase litigation.

### a. The PSAs, as Well as Industry Custom and Practice, Unambiguously Establish that "Shall Enforce" Does Not Mean Unilaterally Initiate Litigation.

The Trustee has no obligation to litigate unless it is directed to do so by Certificateholders and indemnified for costs.  First, the PSAs expressly provide that the Trustee has no obligation to institute litigation without indemnification.  56.1 ¶¶ 70-71.  Second, the Trustee could not possibly initiate litigation without conducting some investigation into the underlying facts and potential claims, and the PSAs specifically exempt the Trustee from conducting any investigation without direction and indemnity from the Certificateholders.  56.1 ¶ 72.  Third, the Trustee cannot conduct

litigation without expending significant funds, and the PSAs expressly protect the Trustee from expending or risking its own funds and entitle the Trustee to satisfactory indemnity from the Certificateholders.  56.1 ¶ 73.  Fourth, the PSAs provide that the Trustee's duties and obligations are "determined solely by the express provisions" of the PSA and "no implied covenants or obligations shall be read into this Agreement against the Trustee."  56.1 ¶¶ 68-69.  Interpreting "shall enforce" to mean "unilaterally initiate litigation" would impermissibly create a duty that is not expressly spelled out in the PSA.  Fifth, bringing litigation of any kind, including repurchase litigation, is a discretionary act—for example, one must evaluate potential claims and the likelihood of success, select counsel, determine the proper forum, etc.—and, pursuant to the PSA, discretionary acts are not duties.  56.1 ¶ 74 ("Any permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty.").  Furthermore, even if bringing litigation was somehow considered a non-discretionary duty, the Trustee is not bound to exercise *any* of its duties or powers without direction and indemnity.  56.1 ¶¶ 70, 73.

Because Plaintiffs' interpretation of the PSAs directly contradicts the actual language of the PSAs, it must be rejected.  *See Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (2011) ("[C]ontract must be considered as a whole"); *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) ("[A]greements should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases.").  Moreover, Plaintiffs' interpretation flies in the face of common sense:  requiring the Trustee to automatically and unilaterally initiate repurchase litigation each and every time that a warrantor fails to repurchase a loan would inevitably result in instances of frivolous litigation concerning disputed claims of R&W breaches that are not viable, costly litigation that far outweighs the likelihood of recovery, and the depletion of trust resources, all without the consent of the Certificateholders.  *See* Acebedo Decl. ¶¶ 7-10.

8

Furthermore, Plaintiffs' interpretation contradicts RMBS industry custom and practice. Under New York law, evidence of custom and practice is admissible even if the contract would not otherwise be ambiguous.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 173, 178 (2d Cir. 2004) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."). Here, Plaintiffs do not point to a single instance in which an RMBS trustee has ever unilaterally initiated repurchase litigation.   56.1 ¶ 76; Acebedo Decl. ¶ 10.   This undisputed evidence contradicts Plaintiffs' arguments, and "may be appropriately considered by the court 'to show what the parties' specialized language is fairly presumed to have meant.'"  *FCCD Ltd. v. State St. Bank & Tr. Co.*, 2011 WL 519228, at *5 (S.D.N.Y. Feb. 15, 2011).

Here, HSBC properly executed its enforcement duties by demanding repurchase and had no duty to take further, extra-contractual actions.

### b. The Parties' Course of Conduct Establishes that "Shall Enforce" Does Not Mean Unilaterally Initiate Litigation.

Even if the Court were to find ambiguity in the PSAs, the Court still should grant summary judgment to HSBC on the basis of HSBC's understanding of the contracts and Plaintiffs' course of conduct and admissions that contradict their made-for-litigation arguments here.  After all, "[t]here is no surer way to find out [the intent of the parties to a contract] . . . than to see what they have done."  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010) (second and third alterations in original); *see also Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176, 179 (App. Div. 2008) (considering course of conduct evidence).

First, HSBC's policies, procedures, testimony, and pre-litigation conduct establish that it

9

did not interpret "shall enforce" to require unilateral litigation.  "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the *parties'* intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (emphasis added); *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (same).  HSBC is the only party to the PSAs whose intent is in the record, and that evidence is undisputed.  HSBC's policies and procedures make clear that HSBC did not understand "shall enforce" to mean unilaterally initiate repurchase litigation.  For example, Redacted

[Redacted].[7]  Likewise, testimony from HSBC's former corporate trust team leader, Fernando Acebedo, confirms that HSBC understood its pre-EOD duties to be "ministerial minimum, limited duties and obligations.  Generally, receive any notices, we disseminate those notices.  Act at the direction of certificateholders; have the loans put in our name.  And any other specific duties that may be in any trust."  Uhlig Ex. 5 (Acebedo Tr. 392:12-19).  HSBC's duties did not include initiating litigation without direction and indemnification from Certificateholders.[8]  Additionally, HSBC, like all other RMBS Trustees, has never unilaterally initiated repurchase litigation, Acebedo Decl. ¶ 10, which conclusively demonstrates that HSBC understood "shall enforce" to mean demanding repurchase, not unilaterally initiating repurchase litigation.

Second, NCUA's own conduct was consistent with HSBC's understanding and

---

[7] Uhlig Ex. 3 (HSBC Procedure at HSBCCTLA1179452-53); Acebedo Decl. ¶ 10; Uhlig Ex. 4 (HSBC Trust Indenture Information Sheet at HSBCCTLA1179401 Redacted

[8] *See, e.g.*, Uhlig Ex. 5 (Acebedo Tr. 486:18-487:4 ("Q. Did HSBC ever initiate litigation against a seller that refused to repurchase a loan? A. If directed by the requisite percentage of certificate holders, I believe we did. Q. What about if you were not directed? A. I don't recall HSBC initiating litigation without the direction of the certificate holders.")).

demonstrates that NCUA's new interpretation of "shall enforce" is simply made for litigation.  If NCUA's novel interpretation were recognized in the industry, no sophisticated investor would ever agree to indemnify the trustee for repurchase litigation.  But in the real world, NCUA, like other investors, recognized that in order to require a trustee to initiate repurchase action, investors would need to direct the trustee to act and "prove they have the financial wherewithal to indemnify the Trustee and the Trusts for the expenses associated with lengthy and arduous litigation of servicing and repurchase claims."[9]

**1. In direction and indemnification letters to HSBC, NCUA admitted that "shall enforce" does not require a Trustee to unilaterally initiate litigation.**  Beginning in 2013, NCUA issued a series of Direction and Indemnification letters to HSBC as Trustee requesting that HSBC take certain actions regarding certain RMBS trusts sponsored by Merrill Lynch.  56.1 ¶ 46; Acebedo Decl. ¶ 9.  Ultimately, NCUA directed and indemnified HSBC to commence repurchase litigation against Merrill Lynch in connection with only one of those trusts, MANA 2007-A3.  56.1 ¶ 47; Acebedo Decl. ¶ 9.  Although the PSA for MANA 2007-A3 includes the same "shall enforce" language at issue here, Uhlig Ex. 6 (MANA 2007-A3 PSA § 2.02), in *every* direction and indemnification letter and continuing through 2020, NCUA specifically acknowledged that HSBC as Trustee had no duty to initiate litigation but for the satisfactory indemnification offered by NCUA.[10]  56.1 ¶¶ 48, 50, 52, 55.  Further, the litigation that HSBC pursued at NCUA's direction

---

[9] Institutional Investors' Mem. of Law in Supp. of Settlement, *BNYM v. Walnut Place, LLC*, 11-cv-05988 (S.D.N.Y. Oct. 31, 2011), ECF 124 at 14.

[10] *See, e.g.*, 56.1 ¶¶ 50, 52, 55; Uhlig Ex. 7 (Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification ("D&I") Letter at 3 (NCUA "*acknowledge[d] and agree[d] that . . . the Trustee is under no obligation* 'to exercise any of the trusts or powers vested in it by [the PSA] . . . or *to institute, conduct or defend any litigation* [t]hereunder or in relation [t]hereto at the request, order or direction of any of the Certificateholders . . . pursuant to the provisions of [the PSA], *unless such Certificateholders . . . shall have offered to the Trustee reasonable security or indemnity*

was resolved last year pursuant to an NCUA-negotiated settlement that it directed HSBC to accept. 56.1 ¶ 54; Acebedo Decl. ¶ 9.   Ultimately, the settlement agreement that NCUA reached was insufficient to cover the litigation costs, resulting in a net loss.   56.1 ¶ 56; Acebedo Decl. ¶ 9. NCUA's interpretation of Section 2.03 would require trustees to mechanically initiate this type of discretionary, expensive, and risky litigation.   NCUA's actions and representations, however, demonstrate that NCUA understood that Trustees are not obligated to initiate litigation without proper indemnification and direction from Certificateholders.

**2. In internal communications, NCUA acknowledged that Trustees needed direction and indemnification to pursue litigation after a warrantor rejected a repurchase request.** NCUA routinely deliberated and voted on whether to direct a Trustee when warrantors refused to repurchase loans in response to alleged R&W breaches.   56.1 ¶ 40; Uhlig Ex. 11 (Dep. Ex. 200). In other words, NCUA understood the Trustee *had to be directed and indemnified* in order to bring litigation.   For example, in 2013, after receiving a notice from the Trustee for a Nomura trust stating that the warrantor denied repurchase, NCUA voted against pursuing the claims of breach. 56.1 ¶ 41; Uhlig Ex. 12 (Dep. Ex. 643).   Its rationale is revealed in its internal communications: "There would be some time and expense related to *entering into an indemnity and providing a direction* and we have no idea whether the breach claims have merit (at least one of the three has apparently been resolved) or what the delta between the liquidation value and the repurchase amount is."  Uhlig Ex. 12 (Dep. Ex. 643 at NCUA_A_5063985.0002) (emphasis added).   NCUA therefore understood that when a warrantor rejects a repurchase request, the Trustee requires direction and indemnity from Certificateholders to initiate litigation.

---

against the costs, expenses, and liability which may be incurred therein or thereby.") (emphasis added)); Ex. 8 (Aug. 26, 2014 MANA 2007-A3 D & I Letter at Ex. B (same))

**3. In a settlement agreement with an RMBS sponsor, NCUA acknowledged that Trustees did not litigate absent direction and indemnification.**  As part of that settlement, which covered some of the Trusts at issue here, [Redacted]



Uhlig Ex. 13 (DB/NCUA Agreement § 5.1 (emphasis added)).  This provision was included precisely because the plain meaning of the PSAs, the intent of the parties to the PSAs, and industry custom and practice was that Trustees were not required to act unilaterally to pursue repurchase litigation, but rather acted only if directed and indemnified by Certificateholders.  As shown by this provision, NCUA shared this understanding.

NCUA's admissions both before and after it brought suit show that it has always understood that Trustees do not initiate litigation unilaterally.  Instead, Trustees (as well as Certificateholders) rely on the direction-and-indemnification process required by the PSAs.  There is no evidence showing otherwise.  *See In re Trs. Est. Under PSAs Rel. to Wachovia Bank Comm. Mortg. Tr. Comm. Mortg. Pass-Through Certs., Series 2007-C30*, 2020 WL 1304400, at *17 (S.D.N.Y. Mar. 19, 2020) (no genuine dispute of material fact where party "fails to point to any relevant extrinsic evidence supporting [its] interpretation of the language").

---

[11] [Redacted]  *See* Uhlig Ex. 13 (DB/NCUA Agreement at DBUSH_000001).

## II.    HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' PRE-EOD DOCUMENT DEFECT CLAIMS.

By attempting to conflate distinct loan-level issues and processes, which are addressed by different PSA provisions and handled by different trust parties, Plaintiffs baselessly claim that HSBC was required to seek repurchase of loans that appeared on the Custodians' exception reports close in time to trust closing.  The purpose of an exception report is to inform the Responsible Party (*e.g.*, the Depositor or Sponsor/Seller) of loan files with potentially missing or defective documents and to commence a cure period for the Responsible Party to correct any such issues that are material.  56.1 ¶ 92.  The Custodian, not the Trustee, was responsible for preparing the exception report and working with the Depositor/Sponsor/Seller to cure outstanding document exceptions even after delivering the "final" certification and attached exception report.  56.1 ¶ 90; *see also* Acebedo Decl. ¶¶ 36-38.  Yet, Plaintiffs' "document defect" claims are based on the theory that the Trustee's receipt of a Custodian's exception report (PSA § 2.01) provided "notice" to the Trustee of loans with material missing or defective documents that have a "material[] and adverse[]" effect on Certificateholders (PSA § 2.03), thereby triggering the Trustee's duty to demand that the Seller cure, substitute, or repurchase such loans.  Because there were thousands of trailing documents that needed to be recorded and delivered to Custodians after trust closing, NCUA's novel litigation theory would have resulted in nearly all the loans making up an RMBS trust being repurchased within months of trust establishment.  This theory fails for the reasons discussed below.  And for two of the Trusts, HSBC had no enforcement duties in any event.[12] Finally, even if Plaintiffs' theory were valid, these claims would be time-barred, as explained in Section VIII, *infra*.

---

[12] FHLT 2006-C and NHELI 2007-1 PSAs do not provide for enforcement duties.  *Supra* n. 6.

A.      **The Document Acceptance Process Is Different and Distinct from the Document Repurchase Process.**

The Trustee is not responsible for the document acceptance process, which is assigned to the Custodian, and the PSAs identify no Trustee duties upon receipt of the Custodian's exception report.  56.1 ¶¶ 88, 94, 95; Acebedo Decl. ¶¶ 36, 40.  Because the Trustee agrees to perform "only such duties as are specifically set forth in the [PSAs]" and no duties can be implied, App'x A, Plaintiffs' theory necessarily fails.

Section 2.01 of the PSAs addresses the *Custodian's* process for receipt and acceptance of mortgage file documents following the Closing of the Trust.  App'x H.  As part of that process, the Custodian conducts a review of the mortgage files, and within a prescribed period of time, issues a Mortgage File Certification and exception report.  *Id.*  The purpose of the exception report is to identify mortgage files with documents that, for any number of reasons, are missing or incomplete at the time the report is prepared so that the party responsible for conveying the mortgage files to the trust (the Seller or Depositor) can work with the Custodian and Servicer to complete the mortgage file transfer process and/or cure documentation issues.  56.1 ¶ 92; Acebedo Decl. ¶ 38.  The PSAs acknowledge that "trailing" mortgage file documents will continue to be delivered to the trust after Closing and potentially after issuance of the Custodian's exception report.  56.1 ¶ 93.  The exception report, moreover, is not a static document, but rather is frequently updated by the Custodian during the life of the trust to reflect receipt of trailing documents as well as the movement of documents in and out of the mortgage file when in use by other trust participants (*e.g.*, Servicers, foreclosure attorneys, etc.).  Acebedo Decl. ¶¶ 37-38; Uhlig Ex. 35 (Corcoran Decl. ¶ 6) (exceptions show "the current status of the file, including exceptions that may exist because of the use of custodial documents by the servicer, foreclosure counsel, or others while in their possession").  In third party discovery in this litigation, the Custodians for the Trusts

15

produced certain "cured" exception reports, reflecting the status of mortgage files at the time those reports were generated, which show that many so-called document exceptions were later cured. 56.1 ¶ 97; Acebedo Decl. ¶ 39.  During the life of the trust, the Custodian does not provide the Trustee with such reports or any updates about documentation issues, Acebedo Decl. ¶ 39, demonstrating that the Trustee had no duties related to exception reports.  The PSAs expressly provide that the Trustee was not responsible for the mortgage file acceptance process, that all such functions would be performed by the Custodian, and the PSAs identify no duties for the Trustee upon receipt of the Custodian's certification and exception report.  *See* App'x G & H; 56.1 ¶ 94.

Section 2.03 of the PSA, by contrast, addresses the process by which the Trustee, after receipt of loan-specific notice or discovery, requests that the Seller cure, substitute, or repurchase specific mortgage loans with material R&W breaches and/or material missing or defective documents to the extent that they "materially and adversely affect[] the value of such Mortgage Loan or the interest therein of the Certificateholders."  App'x F.  The purpose of the repurchase process is to remove from the trust loans that are not of the character and quality represented to investors as the result of material deficiencies in the loan origination process.  Section 2.03 *does not mention* the Custodian's exception report.  *Id.*; 56.1 ¶ 87.  That omission cannot be squared with Plaintiffs' litigation theory.  Had the sophisticated parties that drafted the PSAs intended for the result Plaintiffs now advocate, Section 2.03 would not only have mentioned the exception report explicitly, but would have provided specific directions to the Trustee following receipt of that document.  The absence of any such language is fatal to Plaintiffs' claims.  As Plaintiffs acknowledge, Custodian exception reports routinely list hundreds if not thousands of mortgage loans, constituting a significant portion of each trust's collateral.  56.1 ¶ 91.  It is inconceivable that the PSAs would not have provided specific and express instructions to the Trustee if the PSA

drafters had intended the Trustee to take the actions Plaintiffs now contend were required.  Uhlig Ex. 17 (Musarra Tr. 471:24-472:5 ("In all my experience in the business, I have worked at other shops back at Wachovia, no trustee treated an Exception Report like a notice of a defect that has not been cured.  It is just not done in the industry"); *see also id.* 175:11-176:4; 465:13-18).

### B.       There Is No Evidence of Material Document Defects or that HSBC Discovered or Received Notice of Material Document Defects.

HSBC's mere receipt of exception reports did not trigger any duty.  To the contrary, under the PSAs, receipt of exception reports required no action on HSBC's part, other than to confirm that the exception reports conformed on their face to PSA requirements, which is not disputed in this case.  App'x G & H; 56.1 ¶ 94.  Only if HSBC received notice of or discovered a material document defect, and only if the warrantor failed to cure the problem, might any enforcement duty by HSBC come into play.  *See, e.g., RP/DB*, 2018 WL 4682220, at *5.

Plaintiffs failed to adduce any evidence that HSBC received any notice of (or otherwise discovered) a document defect that "materially and adversely affect[ed] the value [of a specific loan] or the interest therein of the Certificateholders" through the exception reports or otherwise. Acebedo Decl. ¶ 40; Uhlig Decl. ¶ 16.  The exception report cannot provide the Trustee with notice of "material" missing or defective mortgage file documents because the Report itself provides no indicia of materiality.  56.1 ¶ 96; Acebedo Decl. ¶ 38.  On its face, the Report does nothing to identify which of the thousands of document "exceptions" are considered material defects and which are not.  Whereas the provisions of PSA § 2.03 require that a document defect "materially and adversely affect[] the value of such Mortgage Loan or the interest therein of the Certificateholders" before repurchase is required, no similar standard governs the Custodian's identification of purported document "exceptions."  *Compare* App'x F, *with* App'x H.  Plaintiffs' proposed expert concedes that many of the purported document exceptions identified by the

Custodian were not material and would not have given rise to any repurchase claim under Section 2.03.[13]   Thus, Plaintiffs' theory would impose an *implied* obligation on the Trustee to conduct an independent and painstaking review of the Custodian's exception report to determine for itself which exceptions are material before requesting cure, substitution, or repurchase.   Plaintiffs' theory makes no sense given the independent role of the Custodian and is flatly inconsistent with at least two PSA provisions.   *See* App'x G (Custodian solely responsible for Certification and exception report); App'x A (Trustee has no implied duties prior to a Master Servicer Event of Default)).

Furthermore, in defiance of the Second Circuit's instructions that repurchase issues must be analyzed on a loan-by-loan basis, *see Ret. Bd.*, 775 F.3d at 162, Plaintiffs' proposed expert, Leonard Blum, simply decrees that entire categories of document issues listed on exception reports are *per se* material.   For example, Blum advances the blanket proposition that copies of required documents, rather than the originals, "are potential indicators of fraud or otherwise flawed origination processes and increase the risk in any foreclosure proceeding," and therefore constitute "material" defects.   Uhlig Ex. 14 (Blum Rep. at Materiality App'x & Ex. 6).   But in no instance did Blum investigate whether the particular document issue ever posed an actual problem for the specific loan in question or whether the purported document is even missing.   Uhlig Ex. 15 (Blum Tr. 242:18-252:22).   Blum did not examine the Mortgage File of a single loan.   *Id.*; 56.1 ¶ 99.

There are many reasons that entries on an exception report may be immaterial.   An HSBC

_____

[13] *See* Uhlig Ex. 14 (Blum Rep. at 113 ("The MHL Trust contained 3,259 loans.   HSBC's final exceptions report [sic] in December 2007 showed 1,861 loans with 2,227 exceptions.   I conclude that *511* of the loans listed in the final exceptions report – 16% of the loans in the Trust – contained a total of *550* material exceptions, as set out in Exhibit 4.") (emphasis added and citations omitted)).   Put another way, for the MHL trust, Blum opines that only about 25% (550 of 2,227) of the exceptions identified by the Custodian were material.

expert witness examined a sample of the loans Blum claimed had material document defects and concluded that all of them either could be easily cured or would have no impact on the ability to foreclose.  Uhlig Ex. 16 (Ex. 1A to Ross Rep.).  For 90% of the loans, the purportedly missing document or its functional equivalent was present in the loan file—which Blum did not examine— and easily could have been obtained if needed.  *Id*.  But the Court need not credit one expert over the other to grant this motion: The point is simply that an entry on an exception report does not equate to a real problem that would adversely affect Certificateholders.

Indeed, in this litigation Plaintiffs insist that even fully performing loans should have been put back based on document issues.  56.1 ¶ 98.  That would never have occurred in the real world. The only court to have conducted a trial on these issues concluded that "[t]here is no evidence that the plaintiffs in any of their RMBS investments, including the trusts at issue in this case, insisted that a performing loan be taken out of a trust due to document . . . issues."  *W. & S. Life Ins. Co. v. BNYM*, 2017 WL 3392856, at *2 (Ohio Com. Pl. Aug. 4, 2017).  Because there is no evidence that any document issues "materially and adversely affect[ed] the value [of a specific loan] or the interest therein of the Certificateholders," Plaintiffs fail to show any purported enforcement duty was triggered.

## III.   HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EOD CLAIMS.

Under the PSAs for the Trusts, HSBC assumed a "prudent person" standard of care only upon (1) the occurrence of an EOD, as defined in the PSAs, and (2) HSBC's actual knowledge thereof.  *See* Feb 23, 2018 Order (ECF 314) (Schofield, J.) at 8 ("Section 8.01 imposes a heightened, prudent person standard of care on the trustee, but only if the trustee has 'actual knowledge' or 'written notice' of an Event of Default.").  Because there is no evidence to establish an EOD or HSBC's knowledge, Plaintiffs' post-EOD claims fail.

### A.    There Is No Evidence that an Event of Default Occurred.

The PSAs for 5 of the 6 Trusts provide that HSBC assumed a prudent-person standard of care only upon a *Master Servicer* EOD.[14]   EODs (both Servicer and Master Servicer) are contractually-defined events that may not arise by implication.   EODs were intended to be significant events with identifiable beginnings and ends.   *See Argonaut P'ship L.P. v Bankers Tr. Co.*, 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001).   The PSAs therefore set forth in detail what conduct by the Servicer or Master Servicer could constitute an EOD.   App'x K & L.

An EOD also requires (1) written notice of the purported EOD to the breaching party (either the Servicer or Master Servicer), and (2) expiration of a cure period (typically 30 days) without the breaching party curing the purported EOD.   *See, e.g.*, 56.1 ¶ 110; App'x K& L; *accord Putman High Yield Tr. v. Bank of N.Y.*, 776 N.Y.S.2d 796, 796 (App. Div. 2004) ("With regard to defendant's alleged failure to act prudently upon occurrence of a default, no such duty was ever triggered in the absence of written notification of default."); *see also* Feb 23, 2018 Order (ECF 314) (Schofield, J.) at 8 ("An EoD under the PSAs generally occurs upon the master servicer's breach of its obligations, receipt of notice of the breach, and failure to cure during the requisite period.").   Unless all procedural requirements are met, there is no EOD.

Plaintiffs have failed to establish any of the above EOD elements.   First, Plaintiffs cannot

---

[14] *See* App'x M (ACE 2005-AG1 PSA § 9.01 ("During the continuance of a Master Servicer Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."); *accord* ACE 2006-OP2 PSA § 9.01; FHLT 2006-C PSA § 8.01; DBALT 2007-OA1 PSA § 8.1; MHL 2007-1 PSA § 9.01). Only the NHELI 2007-1 PSA, § 9.01, includes a "Servicer Default with respect to Wells Fargo" along with a Master Servicer EOD as giving rise to prudent person duties.  56.1 ¶ 105.  Because Wells Fargo was both the Master Servicer and Servicer for NHELI 2007-1, there is no functional difference between a Master Servicer and Servicer EOD for that trust.  56.1 ¶ 106.

establish that there was a breach by the Master Servicer[15] that would constitute an EOD.  Notably, Plaintiffs failed to provide any evidence (or to respond at all) in response to HSBC's interrogatory requesting that Plaintiffs "state and describe each alleged 'Event of Default.'"  Uhlig Ex. 27 (Pls' Agreement); 56.1 ¶ 111.[16]  And Plaintiffs proffered no expert testimony—from a servicing expert or otherwise—that the Master Servicer's conduct gave rise to an EOD.  56.1 ¶ 112.  Likewise, HSBC was unaware of any Master Servicer failure to perform that would give rise to an EOD.  Acebedo Decl. ¶¶ 14-17.  Plaintiffs' EOD claims must be dismissed for lack of evidence.

Second, there was no written notice to the Servicer or Master Servicer.  56.1 ¶ 113; Acebedo Decl. ¶ 15 (HSBC has no knowledge of any written notice to the Master Servicer of any failure to perform).  Without that notice, no EOD occurred.  *See Bakal v. U.S. Bank, NA*, 747 F. App'x 32, 35-36 (2d Cir. 2019) (dismissing EOD claim against RMBS trustee for lack of written notice to master servicer of alleged EOD).  Plaintiffs may not rely on the prevention doctrine to excuse their failure of proof.  Application of that doctrine—"which precludes a party from arguing that its performance under a contract has not been triggered by a conditional precedent" that the party itself prevents from being triggered—would require that HSBC took "active" steps to cause the lack of written notice to the Master Servicer.  That doctrine does not apply to trustees in the EOD context.  *Blackrock v. U.S. Bank Nat'l Ass'n*, 86 N.Y.S.3d 484,485-86 (App. Div. 2018) (rejecting application of doctrine against trustee on a similar record); *accord Fixed Income Shares: Series M v. Citibank N.A.*, 69 N.Y.S.3d 288, 289-90 (App. Div. 2018).  There is no evidence that

---

[15] Or, for NHELI 2007-1, of Wells Fargo as Servicer (the same entity as the Master Servicer).  *See supra* n. 14.

[16] Plaintiffs are stuck with this record and may not, in opposition to this Motion or at trial, use evidence that they failed to disclose in discovery.  *See, e.g.*, *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012).

HSBC took any such action; Plaintiffs' prevention arguments rely exclusively on what they allege HSBC *should have* done. *See RP/HSBC I*, 109 F. Supp. 3d at 605.[17]

**B.      There Is No Evidence that HSBC Knew of Any Event of Default.**

Even if Plaintiffs could show that an EOD occurred, they still "must produce proof of actual knowledge with regard to [alleged Events of Default in] these trusts on the part of HSBC's responsible officers." *RP/HSBC I*, 109 F. Supp. 3d at 606.  The Trustee's prudent-person standard is triggered only when "a Responsible Officer of the Trustee . . . has actual knowledge [of a Master Servicer EOD] or unless written notice of any event which is in fact [a Master Servicer EOD] is received by the Trustee at its Corporate Trustee Office."  App'x J; 56.1 ¶ 107.  Moreover, that notice and knowledge must be trust-specific.  *See* App'x J (requiring that "such notice reference[] the Certificates, the Trust or this Agreement").  There is no evidence that HSBC received a trust-specific notice of a Master Servicer EOD.  56.1 ¶ 114; Acebedo Decl. ¶¶ 14-15, 17.  Nor is there evidence of HSBC's trust-specific knowledge of such EODs from other sources.  *Id.*

**C.      HSBC Satisfied Any Required Duties.**

Finally, even if Plaintiffs could establish that a contractually-defined EOD occurred, and that HSBC had actual knowledge of it, HSBC still would be entitled to summary judgment on the post-EOD claims.  That is because the "prudent person" standard does not require HSBC to take the actions Plaintiffs allege HSBC should have taken.  "Even after the Event of Default, '[t]he scope of the trustee's obligation . . . is still circumscribed by the indenture . . . . The trustee is not required to act beyond his contractually conferred rights and powers.'"  *RP/HSBC I*, 109 F. Supp.

---

[17] The First Department's decisions in *Blackrock* and *Fixed Income Shares* postdate Judge Scheindlin's motion-to-dismiss-stage holding in this case, *see RP/HSBC I*, 109 F. Supp. 3d at 605. These later First Department rulings constitute binding precedent on this question of New York law.  *See, e.g.*, *Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010).  Likewise, the Second Circuit's decision in *Bakal*, 747 F. App'x at 35-36, did not apply the prevention doctrine.

3d at 597 (alterations in original).  Even during an EOD, a Trustee thus is still not required to expend, advance, or risk its own funds, or incur financial liability without an indemnity satisfactory to it.  56.1 ¶ 115.

## IV.   THERE IS NO EVIDENCE HSBC ACTED IN BAD FAITH.

Even if Plaintiffs could show that HSBC did not act in accordance with the governing agreements (they cannot), the claims would still fail because HSBC cannot be "liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized."  56.1 ¶ 117. Plaintiffs must present evidence not just that HSBC breached its duties, but that its interpretation of the agreements was so unreasonable and dishonest as to constitute bad faith.  *See L-7 Designs, Inc. v. Old Navy, LLC,* 964 F. Supp. 2d 299, 307-08 (S.D.N.Y. 2013) ("good faith requires 'honesty in fact'").  There is no such evidence here.  At the very least, HSBC's conduct reflected a reasonable reading of the agreements, even if the Court ultimately concludes it was not the best one.  If the meaning of terms like "discovery" is ambiguous, then HSBC's conduct was reasonable as a matter of law.  *See, e.g., Nouveau Elevator Indus., Inc. v. Cont'l Cas. Ins. Co.*, 2006 WL 1720429, at *6, *8 (E.D.N.Y. June 21, 2006) (summary judgment on bad-faith claim because defendant's reading of "ambiguous" term was "reasonable").  The same conclusion is fatal to Plaintiffs' claim for breach of the covenant of good faith and fair dealing, which also should be dismissed as duplicative of Plaintiffs' breach of contract claims.  *See Commerzbank AG v. HSBC Bank USA* ("*Commerzbank/HSBC*"), 2016 WL 3211978, at *3 (S.D.N.Y. June 8, 2016) (dismissing same).

## V.   HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIDUCIARY DUTY CLAIMS.

The Court already held that HSBC was not in a fiduciary relationship with Plaintiffs before an event of default and thus dismissed the Plaintiffs' pre-EOD fiduciary duty claims.  *RP/HSBC I,*

109 F. Supp. 3d at 608-09.  HSBC is also entitled to summary judgment on Plaintiffs' post-EOD fiduciary duty claims because they are improperly duplicative of Plaintiffs' breach-of-contract claims: Plaintiffs allege the same injury, the same predicate conduct, and the same damages for both claims.  *See Dormitory Auth. of N.Y. v. Samson Constr. Co.*, 30 N.Y.3d 704, 711-12 (2018).  In addition, these claims fail because there is no evidence of events of default, nor is there any evidence of a breach of the duty of loyalty or a conflict of interest.  56.1 ¶¶ 119-120; Acebedo Decl. ¶¶ 41-42; *see also Fixed Income Shares: Series M v. Citibank*, No. 14-cv-9373-JMF, ECF No. 176 (March 22, 2018) (dismissing conflict of interest claims at the summary judgment stage after finding that "Plaintiffs do not provide any concrete evidence that the Trustee's actions were influenced in any way by a conflict of interest.  That is, conclusory assertions aside, Plaintiffs fail to prove that, by virtue of any conflict of interest, [the Trustee] caused them concrete harm.").  This Court made clear that "[b]ald assertions of conflict" are insufficient, and the existence of a conflict of interest cannot be inferred solely from, for example, "a relationship between an issuer and an indenture trustee that is mutually beneficial and increasingly lucrative," or "[a] fee arrangement expressly authorized by the trust's governing agreements."  *RP/HSBC I*, 109 F. Supp. 3d at 598.  Finally, the claims are barred by the economic loss doctrine.  *See Triaxx Prime CDO 2006-1, Ltd. v. BNYM*, 2018 WL 1417850, at *7 (S.D.N.Y. Mar. 8, 2018) (dismissing same at the motion to dismiss stage), *aff'd*, 741 F. App'x 857 (2d Cir. 2018).

## VI.    HSBC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TIA AND STREIT ACT CLAIMS.

The Trust Indenture Act does not apply to any of the Trusts, all of which are governed by PSAs.  *See Ret. Bd.*, 775 F.3d at 169.  The Streit Act claims also fail either because they have already been dismissed, *RP/HSBC I*, 109 F. Supp. 3d at 610-11, or for the reasons the Court cited in a companion case, *Commerzbank/HSBC Bank USA*, 2016 WL 3211978, at *2.

## VII. PLAINTIFFS WAIVED ALL CLAIMS REGARDING ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, AND MHL 2007-1.

As explained above, in a settlement agreement with Deutsche Bank, NCUA agreed ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1.  56.1 ¶¶ 25-30.  Redacted

████████████████████████████████████████████████████████████████

█████████████████████████████████████████  *Id.*  Notwithstanding these circumstances, Redacted

████████████████████████████████  NCUA's  Redacted

████████████████████████████.

Waiver is "an intentional relinquishment or abandonment of a known right or privilege." *In re Westchester Tank Fabricators, Ltd.*, 207 B.R. 391, 399 (Bankr. E.D.N.Y.1997).  It "'requires (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit.'"  *In re Gonzalez*, 241 B.R. 67, 75 (S.D.N.Y. 1999) (citation omitted).  Waiver may be express or implied.  *Id.*

Here, NCUA was well aware of its right to seek or support repurchase claims.  Indeed, it directed HSBC to take such action in some circumstances, none of which produced a meaningful recovery.  56.1 ¶¶ 46-56.  NCUA also understood that putbacks were a difficult and uncertain process, and it chose instead to pursue securities claims like those it threatened to bring against Deutsche Bank.  56.1 ¶¶ 22, 28, 41.  Redacted ████████████████████, NCUA had substantial information concerning possible problems in the trusts.  By the time of the DB settlement, NCUA already had sued underwriters with respect to the Trusts.  56.1 ¶¶ 22-24.  The

Complaint in this case verbatim repeats many of the allegations in NCUA's 2011 complaints. *Compare, e.g.*, Uhlig Ex. 18 (RBS Compl. ¶ 126) with 1st Am. Compl. (ECF 64) ¶ 152.

If at the time it was making these allegations, NCUA had marshalled the support of other investors and directed that HSBC seek the repurchase of specific loans in the Trusts, HSBC could have made timely attempts to cause repurchase.  Instead, Redacted

Redacted

Redacted  Under these undisputed facts, Redacted

Redacted

## VIII.   MANY OF PLAINTIFFS' CLAIMS, INCLUDING ALL DOCUMENT DEFECT CLAIMS, ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiffs assert that their claims are governed by the statute of limitations set forth in 12 U.S.C. § 1787 (the "Extender Statute").   That statute, however, does not apply to two large categories of Plaintiffs' claims.  First, the statute does not apply to claims brought by parties other than NCUA, so it does not apply to claims brought by Bush.  Second, the statute does not save claims on securities originally purchased by Wescorp or U.S. Central, because NCUA missed the six-year filing deadline under the statute for those claims.  As a result, all claims relating to document defects in the Trusts are time-barred, because those claims all accrued at or near the time of trust closing (*i.e.*, no later than 2007).  Similarly, certain R&W breach claim are time-barred.[18]

### A.   The Extender Statute Does Not Apply to Claims on Securities that Were Resecuritized, and Therefore All Document Defect Claims and Some of the R&W Breach Claims on Resecuritized Securities Are Time-Barred Under New York's Borrowing Statute.

#### 1.   The Extender Statute Does Not Apply to Assigned Claims.

The extender statute provides that it applies only to "any action ***brought by the*** [NCUA]

---

[18] Additional claims also may be time-barred, but final resolution of that issue turns on the date of accrual of the claims, which is not presented by this motion.

***Board*** as conservator or liquidating agent" of a credit union.  12 U.S.C. § 1787(b)(14) (emphasis

added).  The claims being asserted by Bush are not "brought by the Board."  Moreover, to the

extent claims expired while owned by Bush, they cannot be revived by reconveyance to NCUA.

    In addition, public policy would not support the application of the Extender Statute to the

claims conveyed to Bush.  Courts have relied on federal common law and policy to decide whether

such statutes apply in particular cases, and the primary policy in favor of extending that benefit to

an assignee is that the "marketability" of the agency-held assets "may be enhanced if the private

purchaser can use the longer statute of limitations." *Beckley Cap. Ltd. P'Ship v. DiGeronimo*, 184

F.3d 52, 56 (1st Cir. 1999).  But where "there is no reason why a special statute of limitations is

needed . . . to make the obligation marketable to a purchaser," the state statute of limitations

controls.  *Id.* at 58.

    No policy supports extending the limitations period on claims that were conveyed to the

NGN Trusts.  First, the nature of the transfer to the NGN Trusts shows that the prevailing policy

rationale for extending the limitations period has no application here.  It is undisputed that the

NGN Trusts were not purchasers on the open market.  56.1 ¶¶ 31-32.  It is also undisputed that the

Trustees of the NGNs were not inclined to bring claims arising from the certificate ownership on

their own.  56.1 ¶ 36.  Accordingly, the potential for a longer time period in which to bring those

claims did not influence the NGN Trusts' acquisition of the certificates.  Because "[a] market thus

exist[ed] for such a [certificate] without an extension of [the] limitations period to an assignee of

the [NCUA]," *Cadle Co. v. 1007 Joint Venture*, 82 F.3d 102, 106 (5th Cir. 1996), the Extender

Statute was unnecessary to make otherwise worthless assets marketable.

    Second, public policy does not support application to many of the claims conveyed to the

NGN Trusts because they were timely when conveyed, between October 2010 and June 2011.

56.1 ¶ 32.  For those claims, too, the Extender Statute was not necessary to make them marketable, and thus public policy does not favor its application.  *See Cadle*, 82 F.3d at 106.

### 2. The Claims on Securities Assigned to NGN Trusts Are Barred Under State Law.

Because the Extender Statute does not apply, either New York law applies if the claims accrued in New York or, if the claims accrued outside New York, the New York borrowing statute applies.  CPLR 202.  Under the borrowing statute, the claims take the statute of limitations of the place where the claim accrued or New York, whichever is shorter.  *Id.*  Claims for economic harm generally accrue where the plaintiff resides.  *Deutsche Bank Nat'l Trust Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 335 (2019).  And if the original owner of the claim transfers it, the limitations period applicable to the original owner continues to apply.  *Royal Park v. HSBC*, 2018 WL 679495, at *6 (S.D.N.Y. Feb. 1, 2018).

For claims on securities purchased by U.S. Central (based in Kansas, 56.1 ¶ 2) the relevant statute is Kansas's five-year limitations period for contract actions, which means that claims that accrued before March 20, 2010 are time-barred.  For claims that accrued to Wescorp (based in California, 56.1 ¶ 2) and Southwest (based in Texas, 56.1 ¶ 2) before March 20, 2011 are time-barred under California and Texas's four-year statutes.  As described *infra,* Section VIII, this includes all document-defect claims, which accrued at or around trust closing (*i.e.*, no later than 2007), and any R&W claims that accrued before these dates.[19]

---

[19] This would include R&W breach claims on all loans in ACE 2005-AG1 (Wescorp purchase) that accrued before March 20, 2011; all loans in ACE 2006-OP2 (U.S. Central purchase) that accrued before March 20, 2010; all loans in DBALT 2007-OA1 (to the extent purchased by Wescorp) that accrued before March 20, 2011; all loans in FHLT 2006-C (Southwest purchase) that accrued before March 20, 2011; all loans in MHL 2007-1 (U.S. Central purchase) that accrued before March 20, 2010; all loans in NHELI 2007-1 (to the extent purchased by Wescorp) that accrued before March 20, 2011 (or to the extent purchased by U.S. Central, March 20, 2010).  *See also* 56.1 ¶¶ 78-83.

**B.    For Securities Purchased by Wescorp and U.S. Central, NCUA Did Not File Its Complaint Within Six Years of the Extender Statute's Accrual Date.**

The extender statute provides that for breach of contract claims brought by NCUA, the limitations period is six years or "the period applicable under State law," whichever is longer.  12 U.S.C. § 1787(b)(14).  This period begins to run on the "later of . . . the date of the appointment of the Board as conservator or liquidating agent[] or . . . the date on which the cause of action accrues" under state law.  *Id.*  In ruling on HSBC's motion to dismiss, Judge Scheindlin ruled that the relevant accrual date is the date of conservation, not the later date of liquidation.  July 20, 2015 Opinion & Order, ECF 56 at 20.  For all document-defect claims, the cause of action accrued at or near the time of trust closing (*i.e.*, all before 2007), and therefore the Court would apply the date of conservation, which is later.  Likewise, for the R&W breach claims for which Plaintiffs identified an accrual date before the date of conservation, the Court would apply the date of conservation, which is later.  The date of conservation for Wescorp and U.S. Central was March 19, 2009, yet NCUA did not file its claims against HSBC until over six years later, March 20, 2015.  Therefore, even under the Extender Statute, Plaintiffs' claims fail as untimely.  Indeed, even if the date of accrual was March 20, 2009, the claim is still too late, under the specific accrual language of the extender statute.

**1.    The Date of Conservation Was March 19, 2009.**

The Complaint pleads that NCUA placed Wescorp and U.S. Central into conservatorship on March 20, 2009, but discovery has proved that incorrect.  The orders of conservatorship were entered on March 19, 2009.  Uhlig Ex. 19 (NCUA_A_5046436_0001 (Wescorp)); Ex. 20 (NCUA_HSBC_0007133 (U.S. Central)); Uhlig Ex. 21 (NCUA 30(b)(6) Tr. I 63:11-13).  Those orders expressly state that the NCUA Board "*has* appointed itself as Conservator," pursuant to its statutory authority to "*without notice, immediately* take possession and control of the business,

29

assets and records" of each credit union.  Uhlig Exs. 19 & 20 (citing 12 U.S.C. § 1786(h)(1)(A)).

The NCUA Board minutes confirm that it took this action on March 19.  Uhlig Ex. 22 (Minutes at

90-91, 118-119).  Indeed, the conservatorship was public knowledge by 8 P.M. on March 19, when

Credit Union Times published an article reporting that "NCUA *today* placed U.S. Central Federal

Corporate Credit Union and Western Federal Corporate Credit Union into conservatorship."  Uhlig

Ex. 24 (*NCUA Places U.S. Central and Wescorp Into Conservatorship*, CU Times (Mar. 19, 2009,

8:00 pm)).

Consistent with these facts, when NCUA sued the directors and officers of Wescorp, it

pleaded that "[o]n March 19, 2009, WesCorp was placed into conservatorship by the National

Credit Union Administration Board."  Uhlig Ex. 24 (*NCUA v. Siravo*, CV10-01597, ECF 116, 2d

Am. Compl., C.D. Cal., Feb. 22, 2011) ¶ 1).  In answering that complaint, the officers and directors

of Wescorp admitted the truth of that allegation.  *Id.*, Uhlig Ex. 25 (*NCUA v. Siravo*, CV10-01597,

ECF 190, Am. Ans., C.D. Cal. Oct. 31, 2011) ¶ 1).  Similarly, in its parallel case against Wells

Fargo, NCUA admitted that "NCUA placed WesCorp into conservatorship on March 19, 2009"

and "NCUA placed U.S. Central into conservatorship on March 19, 2009."  Uhlig Ex. 26 (*NCUA

v. Wells Fargo*, 14-cv-10067-KPF-SN (S.D.N.Y. Oct. 30, 2020), ECF 558 at Statement 22 & 24).

NCUA will likely point to a statement in each of the conservation orders that the order is

"effective upon service," and to the certificates showing that formal service was accomplished on

March 20, 2009.  But these facts do not alter the legal conclusion that for accrual purposes under

§ 1787, "the date of the appointment of the Board as conservator" was March 19, 2009.

### 2.    Even If the Date of Conservation Was March 20, 2009, the Claims Were Filed Too Late.

Even if the date of conservation for Wescorp and U.S. Central was March 20, 2009, the

filing of the Complaint on March 20, 2015, was still too late.  The specific text of the Extender

Statute mandates the conclusion that the six-year limitations period expired on March 19, 2015.

The Extender Statute provides that the six-year limitations period begins "*on the date* the claim accrues."  12 U.S.C. § 1787(b)(14) (emphasis added).  Thus, unlike some other statutes that provide that limitations periods run "after" an event or "within" a specified period of time, this provision requires that the day on which the claim accrues must be counted as the first day of the limitations period.  *See, e.g.*, *FDIC v. Enventure V*, 77 F.3d 123 (5th Cir. 1996) (interpreting identical FDIC extender); *Joslin v. Grossman*, 107 F. Supp. 2d 150, 156 (D. Conn. 2000) (same; "The FDIC was appointed receiver on October 17, 1991, giving the plaintiff until October 16, 1994 to commence this action".); *Fed. Fin. Corp. v. Hamilton*, 962 P.2d 1136 (Kan. Ct. App. 1998) (same as to identical RTC extender).  As a result, even if the claim accrued on March 20, 2009, the filing of the Complaint on March 20, 2015 was one day too late.

### C.     All Document Defect Claims and Some R&W Claims Are Time-Barred.

All of NCUA's document defect claims in the Trusts implicate one of the two conclusions discussed above (all either were assigned to an NGN trust or were originally purchased by Wescorp or U.S. Central, or both), and are therefore time-barred.  For those claims on securities purchased by Wescorp or U.S. Central, even under the extender statute, Plaintiffs filed too late.  For the claims on securities that were assigned to an NGN Trust, the extender statute does not apply and, as already held by Judge Scheindlin, these claims accrued at or near the time of trust closing—no later than 2007.  July 20, 2015 Op. & Order (ECF 56) at 21.

The Court addressed document-defect claims in ruling on HSBC's motions to dismiss the Phoenix Light case.  Like Plaintiffs here, Phoenix Light alleged that "[i]f HSBC discovers a material defect (*e.g.*, a missing or irregular document), HSBC must promptly . . . require the Seller

to cure or repurchase the loan."[20]  The Court ruled that these claims based on document obligations that arose at or near the time of closing were time-barred and dismissed them.  *RP/HSBC I*, 109 F. Supp. 3d at 608.  That ruling is law of the case here.  And even if there were any ambiguity in Judge Scheindlin's ruling, the law is now clear that *all* Plaintiffs' document-related claims are time-barred.  The court in *IKB International, S.A. v. LaSalle Bank, N.A.* held that "[t]he alleged breaches occurred on the dates on which the Trustees were first required, in connection with the closing of the Trusts, to perform the mortgage loan file obligations, *including not only the review and certification of the mortgage loan files but also any obligation to seek repurchase based on loan file defects*.  The limitations period began at the time of those breaches …."[21]  The *IKB* court held the claims time-barred, and the same result is required here.  As for R&W breach claims, the extender statute does not apply to claims on securities that were assigned to NGN trusts; therefore those claims must be dismissed when the accrual date is earlier than the end date of the applicable state statute of limitations.  *See supra* 28 & n.19.  And, even under the extender statute, all R&W breach claims for loans in the Trusts purchased by Wescorp and U.S. Central that accrued before March 20, 2009 are time barred.  *See supra* Section VIII.B.

## IX.    EVEN UNDER THE EXTENDER STATUTE, TORT CLAIMS ARISING FROM ACE 2005-AG1 ARE TIME-BARRED.

Judge Scheindlin held that any tort claims for securitizations that closed on or after March 20, 2006 are timely.  July 20, 2015 Op. & Order, ECF 56 at 21-22.  Because the ACE 2005-AG1 trust closed on October 28, 2005, any tort claims related to that trust are time-barred.

---

[20] *PL/HSBC*, 14-cv-1010, Feb. 13, 2015 Memo. in Opp'n to Mot. to Dismiss (ECF 22), at 6-7.

[21] Decision/Order, No. 654436/2015, at 17 (Jan. 27, 2021).

**X.     PLAINTIFF BUSH LACKS STANDING BECAUSE THE ASSIGNMENT OF CLAIMS TO HIM VIOLATES NEW YORK CHAMPERTY LAW.**

Under New York champerty law, an attorney "shall not . . . [d]irectly or indirectly, buy, take an assignment of or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose of bringing an action thereon."  N.Y. Jud. Law § 488.  Here, Bush, a private-practice attorney, was "assigned 'all legal title, claims, powers, rights, authorities, and duties of the Indenture Trustee . . . in connection with' the at-issue claims," Jan. 8, 2020 Order (ECF 397) at 1, with the intent and for the purpose of bringing the at-issue claims in this litigation, which violates New York's prohibition on champerty.  *See, e.g.*, NCUA's Mem. ISO Mot. for Leave To File Suppl. Compl. (ECF 352) at 8 (Bush's appointment was "to bring the claims held by BNYM against HSBC"); Uhlig Ex. 28 (NCUA's Resp. to Suppl. Interrog., ¶ 2 ("In order to facilitate the enforcement of the claims against HSBC asserted in this action, NCUA directed BNYM to transfer: 'all legal title, claims, powers, rights, authorities, and duties of BNYM' as they pertain specifically to this action [to Graeme Bush] . . . Those rights and authorities are limited entirely to the prosecution of this action.")).  The assignment of claims to Bush is therefore void and those claims must be dismissed.  *See Phoenix Light v. U.S. Bank N.A.*, 14-CV-10116 (VSB), ECF 421 (Mar. 18, 2020) (dismissing similar claims under New York champerty law).[22]

---

[22] The situation here is virtually identical.  Like the *Phoenix Light* plaintiffs, NCUA resecuritized certain RMBS (into the NGN Trusts), and assigned the securities and related claims to an indenture trustee (BNYM).  *See* Indenture (ECF 65-2) at 5.  Because of the assignment, NCUA, like the *Phoenix Light* plaintiffs, did not have standing to bring claims on these RMBS.  As a result, similar to the *Phoenix Light* plaintiffs, NCUA caused the indenture trustee to "assign[] 'all legal title, claims, powers, rights, authorities, and duties of the Indenture Trustee . . . in connection with' the at-issue claims" to Bush.  Jan 8, 2020 Order (ECF 397) at 1.  And, like the agreements at issue in *Phoenix Light v. U.S. Bank*, the agreement transferring claims to Bush "specifically referenced the instant litigation . . . by caption" and assigned Mr. Bush the "rights to pursue the claims raised in the case[] identified by caption."  *Phoenix Light v. U.S. Bank N.A.*, 14-CV-10116 (VSB), ECF 421 (Mar. 18, 2020), at 10.  Indeed, that agreement specifically states that the RMBS at issue "are part

## XI.    PLAINTIFFS HAVE NO DAMAGES.

Even if Plaintiffs' theories of liability could survive summary judgment, HSBC would still be entitled to summary judgment based on Plaintiffs' inability to prove cognizable damages.

### A.    Damage Limitation Clauses Bar the Damages Plaintiffs Seek in Five of the Six Trusts at Issue.

The PSAs for five Trusts contain damages limitation clauses that bar consequential damages.  App'x Q.  Because *all* of the damages Plaintiffs seek—namely, investment losses—are consequential damages, these clauses require summary judgment.

Consequential damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000).  When a service contract is at issue, payments to the service provider are general damages, the losses from the defendant's failure to perform are consequential.  *N. Indus. Holdings, LLC v. E. Envt'l Grp. Inc.*, 2016 WL 8541049, at *5, *7 (N.D.N.Y. Feb. 23, 2016).

The same rule applies here.  Plaintiffs and their proposed damages expert define the damages Plaintiffs seeks as "the additional monies that Plaintiffs would have received, and would reasonably expect to receive in the future, from their investment in the Certificates, if the Trustee had acted to enforce the warrantors' obligations to repurchase defective loans."  Uhlig Ex. 29 (Milner Rep. ¶ 61).  In other words, Plaintiffs contend that *if* HSBC had performed its contractual obligations, the Responsible Parties *would have* repurchased loans, which *would have* resulted in Plaintiffs receiving more investment income.  All the damages calculations are based on multiple

---

of a lawsuit styled as *NCUA Board, et al. v. HSBC Bank USA, National Association¸* Case No. 15-cv-02144 (S.D.N.Y.)," and explains that NCUA "desires to supplement and/or amend the operative complaint to . . . add [Bush] as a substituted or additional plaintiff . . . to assert any claims on behalf of the Indenture Trustee or the NGN Trusts."  *See* Instrument of App't & Acceptance (ECF 353-1) at § 1.1.

hypothetical, speculative steps and actions taken not only by HSBC, but also by Responsible Parties, and even courts (since Plaintiffs posit that litigation was required).  These alleged losses are several "step[s] removed from the naked performance promised by [HSBC]."  *Schonfeld*, 218 F.3d at 177.  They do not constitute "damages based upon the value of performance," but rather "the value of the consequences of that performance."  *MMS USA Holdings*, 2013 WL 1154932, at *5.  They are therefore barred by damages limitation provisions.

### B.    Plaintiffs Cannot Recover for "Make Whole" Amounts or Litigation Expenses Under the Governing Agreements.

In calculating the amounts that Plaintiffs say HSBC should have recovered as repurchase proceeds, Plaintiffs include "make whole" amounts, *i.e.*, losses incurred on the loan prior to the hypothetical repurchase.  But each of the PSAs defines the primary element of the defined Purchase Price as the principal balance of the loan at the time of repurchase.  56.1 ¶ 125.  When a loan incurs a loss, its principal balance is reduced by the amount of the loss.  Therefore, if the loan is repurchased after the loss is incurred, the Purchase Price is at the reduced amount (with certain adjustments not relevant here).  Uhlig Decl. ¶ 17.  Thus, all such amounts must be excluded from any damages.

Plaintiffs' damages calculations also include litigation costs that would have been incurred in hypothetical repurchase litigation.  *Id.* ¶ 18.  But the New York Court of Appeals has held that attorneys' fees are not recoverable under substantively identical PSA definitions in *In re Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 362 (2020).  Therefore, Plaintiffs cannot recover these amounts.

### C.    Plaintiffs Have No Damages on Certificate M1 on Trust ACE 2005-AG1 or in Connection with Any Loan that Did Not Suffer a Loss.

In the opinion of Plaintiffs' own expert, Mr. Milner, Plaintiffs have negative damages on their investment in tranche M1 of trust ACE 2005-AG 1.  Uhlig Ex. 29 (Ex. J to Milner Rep.).  In other words, HSBC's allegedly wrongful conduct ***benefitted*** Plaintiffs' investment by $1.7 million,

compared to the course Plaintiffs argue HSBC should have followed.  If HSBC had caused repurchase of the allegedly breaching loans supporting this security, those loans would no longer be in the trust.  In this "but-for" world, Plaintiffs would have lost out on the millions of dollars of interest payments that they received in the real world, and they would not have the valuable security that they now hold.  Because damages are a required element of a claim for breach of contract, *see, e.g.*, *Harris v. Seward Park Hous. Corp.*, 913 N.Y.S.2d 161, 162-63 (App. Div. 2010), they have no viable claim on this security.

Plaintiffs nonetheless says that HSBC owes them more than $14 million on tranche M1 because of prejudgment interest of $17.4 million.  Uhlig Ex. 29 (Ex. J to Milner Rep.).  But even if Plaintiffs are entitled to prejudgment interest generally (they are not, *see* Section XI.G, *infra*), they would not be capable of creating damages where there are none otherwise, as here.  It is axiomatic that prejudgment interest is available only on actual damages.  New York CPLR 5001 expressly provides that prejudgment interest only "shall be recovered *upon a sum awarded* because of a breach of performance of a contract."  *Id.*  Here, there is no "sum awarded" on which interest can be applied.  Because there can be no prejudgment interest if there are no damages, the "damages" Plaintiffs seek on this security must be excluded from any award in this case.  *See Calgon Carbon Corp. v. WDF Inc.*, 700 F. Supp. 2d 408, 418 (S.D.N.Y. 2010) (New York law does not authorize interest "absent an underlying award of a sum of money"; "an award of bare 'statutory interest'" is not authorized by New York law or equity).

For the same reasons, Plaintiffs cannot recover in connection with any loan, in any trust, that has not suffered a loss of principal.  Whether or not it was a breach of contract for HSBC to fail to cause repurchase of a loan that did not have a loss and has never incurred one (either because it remains current or because it was paid off), there are no damages.  The "damages" as to all such

36

loans are negative: Plaintiffs' investments did better in the real world than they would have done in the but-for world in which HSBC forced a repurchase.  That is because repurchase would have denied Plaintiffs the benefit of the principal and interest payments that have flowed into the trust in the real world.  And because interest cannot create damages where they do not otherwise exist, as discussed above, claims with respect to such loans fail as a matter of law.

> **D.     Plaintiffs Cannot Recover the Principal Balance of Liquidated Loans.**

Under the PSAs for the trusts at issue, when a warranting party repurchases a loan, it does so at a defined Purchase Price.  The definition of that price varies between trusts.  In four of the Trusts (ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1), the PSAs define the Stated Principal Balance (the main component of the repurchase price) for liquidated loans as zero.  56.1 ¶¶ 128-130.  Therefore, Plaintiffs cannot recover these amounts.  *See BNYM v. WMC Mortg., LLC*, 2015 WL 13867151, at * (S.D.N.Y. Aug. 18, 2015).

Judge Cote analyzed this scenario in *BNYM v. WMC Mortgage, LLC*.  She began with the fact that, as here, "[t]he parties are sophisticated commercial entities who negotiated a complex agreement and formalized that agreement as one of a series of contracts whose language was drafted with precision," and therefore "[l]ooking for an appropriate measure of damages outside those contracts should be a last resort."  *Id.* at *5.  She then reasoned that "[b]ecause the PSA's Purchase Price formula may be applied in the situation here – where loans have been liquidated – that formula, to which the parties explicitly agreed, guides any calculation of damages."  *Id*. at *6.  The same reasoning applies here and requires summary judgment as to any claim for the principal balance of loans that had been liquidated as of the date that any repurchase would have occurred.

> **E.     Any Judgment Must Be Reduced by the Amounts of NCUA's Prior Settlement Proceeds.**

NCUA has previously litigated claims relating to the Trusts against other parties and

recovered $107.7 million in settlements.  56.1 ¶ 24.  Under the one-satisfaction rule, this amount (plus interest on it) must be deducted from any damages in this case.

The one-satisfaction rule is the fundamental principle that "a plaintiff is entitled to only one satisfaction for each injury."  *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989).  Under this rule, "a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages."  *Id*.  The one-satisfaction rule "deals with underlying damages, not legal claims."  *In re Refco, Inc. Sec. Litig.*, 2007 WL 57872, at *4 (S.D.N.Y. Jan. 9, 2007).  Thus, the rule focuses on "the underlying injury, not the pleadings that categorize it or the statutes under which liability is found."  *Id*.  That is because "[e]ven if a single injury is deemed a violation of two entirely separate laws, as many injuries are, it would be fundamentally unfair for plaintiffs to recover twice for it."  *Id.*

Here, there can be no doubt that the injury addressed in the prior settlements is the same injury at issue in this case: investment losses on the securities purchased by the credit unions. Therefore, NCUA's receipt of $107.7 million from its securities-law suits relating to the Trusts must reduce any damages in this case.  *See In re Joint E. Dist. & S. Dist. Asbestos Litig*., 18 F.3d 126, 132-33 (2d Cir. 1994).[23]

**F.      The Deutsche Bank Settlement** Redacted .

Redacted

---

[23] NCUA's damages expert (Milner) proposed a different theory under which the settlements would reduce the damages in this case by only $3.2 million.  Uhlig Decl. ¶ 19.  That theory has been rejected by the Second Circuit as "border[ing] on the frivolous."  *Singer*, 878 F.2d at 600.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ 56.1 ¶ 131.  Thus, even if HSBC had done as NCUA urges and pursued

repurchases in these Trusts, and even if it had recovered the amounts that NCUA posits it could

have recovered, ████████████████████████████████████

████████████████████████████████████████████████—*i.e.*, it would have resulted in

no change from the status quo prior to litigation—████████████████████

███████████████████████.  *See, e.g., Md. Cas. Co. v. Emps. Mut. Liability Ins. Co. of Wis.*,

208 F.2d 731 (2d Cir. 1953) (L. Hand, J.) (dismissing complaint based on circuity of action).

## G.   Plaintiffs Are Not Entitled to Prejudgment Interest.

Although CPLR 5001 provides that prejudgment interest "shall be recovered upon a sum

awarded because of a breach of performance of a contract," courts have not applied this provision

inflexibly.  In particular, they have not awarded prejudgment interest where (1) the parties were

not in a straightforward debtor-creditor relationship or (2) the defendant did not have the use and

benefit of the allegedly withheld funds.  For both reasons, prejudgment interest is unavailable here.

First, New York courts have limited prejudgment interest to situations that are "in the

nature of a debtor and creditor relationship whereby the amount involved is known or reasonably

ascertainable by the parties affected."  *Lesjac Realty Corp. v. Mulhauser*, 251 N.Y.S.2d 62, 64

(Sup. Ct. 1964).  Merely because damages are sufficiently determinable to be awarded does not

mean that the standard for recovering prejudgment interest is satisfied.  "The principle which

upholds a method of computation of value for the purpose of determining damages is not identical

with the principle which requires the award of interest."  *Grobe v. Kramer*, 33 N.Y.S.2d 901, 903

(Sup. Ct. 1942), *aff'd*, 42 N.Y.S.2d 424 (App. Div. 1943).  Here, the situation is a far cry from the

level of certainty required for interest.

The parties here are not in a simple debtor-creditor relationship.  HSBC had no obligation to make any payments to Plaintiffs.  Plaintiffs' claims for damages result only from the indirect effects of HSBC's alleged failures to cause repurchases of loans, which in turn allegedly caused shortfalls of funds into the trusts (although not in all cases, since Plaintiffs claim damages even on performing loans), and those shortfalls subsequently resulted in diminished cash flows to certificates owned by Plaintiffs (although in some cases these diminished cash flows were more than offset in the real world by the continued principal and interest payments flowing from the loans).  Even if these damages are not technically consequential (they are, *see* Section XI.A, *supra*), they do not meet the level of certainty that is required for an award of prejudgment interest.

Second, "[i]nterest is designed, not to be a penalty, but rather "*to require a person who owes money to pay compensation for the advantage received from the use of that money over a period of time.*  The party against whom a judgment is awarded is presumed to have used the money to its benefit, and consequently, to have realized some profit, tangible or otherwise.  Otherwise, making Party B pay interest on Party A's debt would be in the nature of a penalty." *Calgon*, 700 F. Supp. 2d at 416-17 (internal quotation marks and citations omitted).  *See also Mfr.'s & Traders Tr. Co. v. Reliance Ins. Co.*, 8 N.Y. 3d 583, 589 (2007) ("The purpose of interest is to require a person who owes money to pay compensation for the advantage received from the use of that money over a period of time."; "it is simply the cost of having the use of another person's money for a specified period").  Thus, in cases where the defendant did not have use of the money allegedly due the plaintiff, interest is not available.  That is the situation here.  HSBC did not gain any advantage from use of the hypothetical proceeds of repurchases.  Those funds were in the possession of the warranting parties, not HSBC.

## **CONCLUSION**

For the reasons stated above, summary judgment should be granted in HSBC's favor.

Dated: June 15, 2021                          Respectfully submitted,

                                              By:   /s/ *George A. Borden*
                                                    George A. Borden
                                                    Kevin M. Hodges (*pro hac vice*)
                                                    Andrew W. Rudge (*pro hac vice*)
                                                    Edward C. Reddington (*pro hac vice*)
                                                    Noah M. Weiss (*pro hac vice*)
                                                    Lauren H. Uhlig (*pro hac vice*)
                                                    Matthew B. Underwood (*pro hac vice*)
                                                    WILLIAMS & CONNOLLY LLP
                                                    725 Twelfth Street, N.W.
                                                    Washington, DC 20005
                                                    Telephone: (202) 434-5000
                                                    Facsimile: (202) 434-5029
                                                    gborden@wc.com
                                                    khodges@wc.com
                                                    arudge@wc.com
                                                    ereddington@wc.com
                                                    nweiss@wc.com
                                                    luhlig@wc.com
                                                    munderwood@wc.com


                                                    *Counsel for HSBC Bank USA, N.A.*