## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL  CREDIT UNION ADMINISTRATION
BOARD, as Liquidating  Agent, and

GRAEME W. BUSH, as Separate Trustee of
NCUA GUARANTEED NOTES TRUST 2010-R2,
NCUA GUARANTEED NOTES TRUST 2010-R3,
NCUA GUARANTEED NOTES TRUST 2011-R1,
NCUA GUARANTEED NOTES TRUST 2011-R2,
NCUA GUARANTEED NOTES MASTER TRUST
2011-M1,

      Plaintiffs,

-against-

HSBC BANK USA, NATIONAL
ASSOCIATION,

       Defendant.

Case No. 1:15-cv-02144-LGS

Hon. Lorna G. Schofield
Hon. Sarah Netburn

## NCUA PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

## REDACTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... iii

BACKGROUND ............................................................................................................................. 2

    A.    Factual Background Relevant to Plaintiffs' Motion for Summary Judgment ............. 2

        1.    PSA § 2.03:  Trustee Duties First To "Notify" and Then To "Enforce" ............... 2

        2.    HSBC Failed to Enforce Repurchase of Materially Breaching Loans .................. 3

    B.    Plaintiffs' Affirmative Case for Trial .......................................................................... 3

LEGAL STANDARD ..................................................................................................................... 4

ARGUMENT ................................................................................................................................... 4

I.     THE § 2.03 PHRASE "TRUSTEE SHALL ENFORCE" REQUIRES LITIGATION ...... 4

    A.    The Plain Meaning of "Enforce" Includes Litigation To Compel Compliance ............ 4

    B.    Reading "Shall Enforce" to Require Anything Less Than Effectual Litigation Would
        Ignore Established Canons of Construction ................................................................. 7

    C.    HSBC's Manufactured Industry Custom Cannot Change the Plain Meaning of the
        Contractual Phrase "Trustee Shall Enforce" ............................................................. 8

II.    HSBC WAS REQUIRED TO ENFORCE UNDER PSA § 2.03 WITHOUT DIRECTION
     AND INDEMNITY FROM CERTIFICATEHOLDERS ................................................. 11

    A.    The Text of the PSAs Demonstrates Trustee Enforcement Is Not Contingent on
        Certificateholder Direction ....................................................................................... 11

    B.    The Structure of the PSAs Demonstrates Trustee Enforcement in § 2.03 Cannot Be
        Made Contingent on Certificateholder Direction ...................................................... 15

    C.    HSBC Misrepresents and Misconstrues NCUA Statements on Indemnity ................ 16

III.   HSBC'S AFFIRMATIVE DEFENSE OF FAILURE TO MITIGATE, FOR WHICH IT
     BEARS THE BURDEN OF PROOF, SHOULD BE DISMISSED ................................ 18

IV.   PLAINTIFFS' MORTGAGE FILE CLAIMS SHOULD PROCEED TO TRIAL .......... 19

    A.    The Exceptions Reports Provided Discovery or Notice of Material Exceptions ........ 19

    B.    "Discovery" Requires Nosing to the Source ............................................................. 22

V.      PLAINTIFFS' R&W CLAIMS SHOULD PROCEED TO TRIAL ................................. 25

    A.      HSBC Discovered Pre-EOD R&W Breaches Through Its 16 DBSP Lawsuits .......... 25

    B.      HSBC Failed to Pick Up the Scent and Nose to the Source ........................................ 27

    C.      HSBC Is Not Entitled to Summary Judgment on its Good Faith Defense ................. 29

VI.     PLAINTIFFS' CLAIMS ARE TIMELY ....................................................................... 30

    A.      The Extender Statute Applies to All Claims By the Separate NGN Trustee ............. 30

    B.      NCUA's Complaint Was Timely Filed ....................................................................... 31

VII.    THE SEPARATE NGN TRUSTEE HAS STANDING .................................................. 33

VIII.   PLAINTIFFS' DAMAGES EVIDENCE SHOULD PROCEED TO TRIAL .................. 34

    A.      Plaintiffs Seek To Recover General Damages, Not Consequential Damages ........... 34

    B.      Plaintiffs are Entitled to "Make Whole" Amounts, Including With Respect to Liquidated Loans and Litigation Expenses .................................................................. 36

    C.      Warrantors Were Liable to Pay the Trustee's Litigation Expenses ........................... 38

    D.      A Third-Party Settlement Raised by HSBC Is Inapplicable Here .............................. 38

IX.     HSBC'S POST-TRIAL ISSUES ARE PREMATURE AND LACK MERIT ................. 39

    A.      There Is No Double Recovery, an Issue That Will Be Ripe Only After Trial ........... 39

    B.      Plaintiffs Are Entitled to Prejudgment Interest .......................................................... 42

    C.      Plaintiffs are Entitled to Damages on the M1 Certificate for ACE 2005-AG1 .......... 43

CONCLUSION .................................................................................................................................. 43

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*10 Ellicott Square v. Mountain Valley*, 634 F.3d 112 (2d Cir. 2011).............................................. 4

*ACE Secs. v. DBSP*, 981 N.Y.S. 2d 633 n.3 (N.Y. Sup. Ct. 2013)............................................... 25

*ADM Inv. Servs. v. Collins*, 515 F.3d 753 (7th Cir. 2008)........................................................... 40

*Air Et Chaleur v. Janeway*, 757 F.2d 489 (2d Cir. 1985) .......................................................... 18

*Am. List Corp. v. U.S. News & World, Rep.*, 75 N.Y.2d 38 (1989).............................................. 35

*Ambac Assurance v. Countrywide*, 31 N.Y.3d 569 (2018).......................................................... 14

*Ambac Assurance v. Countrywide*, 179 A.D.3d 518 (1st Dep't 2020) ........................................ 25

*Aramony v. United Way*, 254 F.3d 403 (2d Cir. 2001) ............................................................... 14

*Assured Guar. v. DBSP*, 44 Misc. 3d 1206(A) (N.Y. Sup. Ct. July 3, 2014)............................... 25

*Assured Guar. v. Flagstar Bank*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013) ...................................... 3

*Barkley v. United Homes*, 848 F. Supp. 2d 248 (E.D.N.Y. 2012) ............................................... 42

*Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318 (2007)....................................................................... 13

*Beckley Cap. v. DiGeronimo*, 184 F.3d 52 (1st Cir. 1999)......................................................... 30

*Biotronik v. Conor Medsystems*, 22 N.Y.3d 799 (2014)....................................................... 34, 35

*BNYM v. Morgan Stanley*, 2013 WL 3146824 (S.D.N.Y.)......................................................... 22

*BNYM v. Morgan Stanley*, 2017 WL 698607 (S.D.N.Y.)........................................................... 18

*Brooke Grp. v. JCH Syndicate 488*, 87 N.Y.2d 530 (1996) ......................................................... 4

*Capital Ventures v. Republic of Argentina*, 652 F.3d 266 (2d Cir. 2011) .................................... 14

*Charlery v. Dep't of Educ.*, 2017 WL 2124447 (S.D.N.Y.),
    *aff'd*, 737 F. App'x 54 (2d Cir.2018).................................................................................... 18

*Chesapeake Energy v. BNYM*, 773 F.3d 110 (2d Cir. 2014) .............................................. 7, 8, 15

*Commerzbank v. U.S. Bank*, 277 F. Supp. 3d 483 (S.D.N.Y. 2017)............................................. 22

*Commerzbank v. U.S. Bank*, 457 F. Supp. 3d 233 (S.D.N.Y. 2020)................................. 20, 21, 22

*Deutsche Alt-A Secs. v. DBSP*, 958 F. Supp. 2d 488 ....................................... 25, 36, 38

*Deutsche Bank v. Morgan Stanley*, 97 F. Supp. 3d 548 (S.D.N.Y. 2015) ................................... 25

*Eskenazi v. Mackoul*, 72 A.D.3d 1012 (2d Dep't 2010) ................................. 18

*FDIC v. Bledsoe*, 989 F.2d 805 (5th Cir. 1993)................................................. 30, 33

*FDIC v. Enventure V*, 77 F.3d 123 (5th Cir. 1996) ....................................... 32, 33

*FHFA v. Nomura Holding Am.*, 873 F.3d 85 (2d Cir. 2017)........................................... 11, 25, 34

*Fixed Income Shares v. Citibank*, 157 A.D.3d 541 (1st Dep't 2018)........................................... 23

*Flanagan v. Johnson*, 154 F.3d 196 (5th Cir. 1998)................................................. 33

*Fleisher v. Phoenix Life Ins.*, 997 F. Supp. 2d 230 (S.D.N.Y. 2014) ................................. 42

*Fulton Cogeneration v. Niagara Mohawk Power*, 84 F.3d 91 (2d Cir. 1996)............................. 4

*Gerber v. MTC*, 329 F.3d 297 (2d Cir. 2003) .............................................. 42

*Greenfield v. Philles Records*, 98 N.Y.2d 562 (2002) .......................................... 8

*Home Equity 2006-5 v DLJ Mortg.*, 2014 WL 317838, *5-6 (N.Y. Sup. Ct.)........................... 25

*IKB v. Lasalle Bank.*, 2021 N.Y. Misc. Lexis 347, at 27-28 (N.Y. Sup. Ct.) ................................. 6

*Indesco, In re*, 451 B.R. 274 (Bankr. S.D.N.Y. 2011)................................................. 36

*Int'l Cards v. MasterCard*, 2016 WL 7009016 (S.D.N.Y.).......................................... 18

*Isaacs v. Jefferson Tenants*, 270 A.D.2d 95 (1st Dep't 2000) ....................................... 40

*J. D'Addario & Co. v. Embassy Indus.*, 20 N.Y.3d 113 (2012) ...................................... 42

*Jacobson v. Sassower*, 66 N.Y.2d 991 (1985) ............................................. 9

*Joint E. Dist. & S. Dist. Asbestos Litig., In re*, 18 F.3d 126 (2d Cir. 1994) ................................ 41

*Kassis v. Teachers' Ins. & Annuity Ass'n*, 13 A.D.3d 165 (1st Dep't 2004)........................... 43

*Kelly v. Honeywell Int'l*, 933 F.3d 173 (2d Cir. 2019) ................................. 7

*Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312 (1989).......................................... 34

*LaSalle Bank v. Capco Am., Sec'n*, 2005 WL 3046292 (S.D.N.Y.).............................. 22

*Law Debenture Tr. v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010)................................ 7, 9

*Levy v. Young Adult Inst.*, 2015 WL 13745763 (S.D.N.Y.),
    *aff'd*, 744 F. App'x 12 (2d Cir. 2018) ................................................................ 17

*MARM 2006-OA2 v. UBS Real Estate*, 2015 WL 764665 (S.D.N.Y) .................................. 37, 38

*Maryland Cas. v. Emps. Mut.*, 208 F.2d 731 (2d Cir. 1953) ................................................. 39

*MBIA v. Countrywide*, 30 Misc. 3d 1201(A) (N.Y. Sup. Ct. 2010) ...................................... 25

*McCoy v. Goldberg*, 810 F. Supp. 539 (S.D.N.Y. 1993) ....................................................... 43

*Mickens v. United States*, 148 F.3d 145 (2d Cir. 1998) ....................................................... 32

*MMS USA v PricewaterhouseCoopers*, 2013 WL 1154932 (N.Y. Sup. Ct.) ......................... 35

*Morgan Guar. v. Bay View Franchise*, 2002 WL 818082 (S.D.N.Y.) ................................... 22

*Morgan Stanley 2006-14SL v. Morgan Stanley*, 2013 WL 4488367 (N.Y. Sup. Ct.) ............ 25

*MSST 2007-1 v. Morgan Stanley*, 289 F. Supp. 3d 484 (S.D.N.Y. 2018) ............................. 25

*N. Indus. Holdings v. E. Env't Grp.*, 2016 WL 8541049 (N.D.N.Y.) ................................... 35

*NCUA v. Barclay*, 785 F.3d 387 (10th Cir. 2015) ................................................................ 32

*NCUA v. Deutsche Bank*, 410 F. Supp. 3d 662 (S.D.N.Y. 2019) ............................... 30, 32, 33

*NCUA v. HSBC*, 117 F. Supp. 3d 392 (S.D.N.Y. 2015) .......................................... 3, 30, 31, 32

*NCUA v. HSBC*, 2020 WL 91390 (S.D.N.Y.) ............................................................ 3, 30, 33

*NCUA v. RBS*, 833 F.3d 1125 (9th Cir. 2016) ..................................................................... 32

*NCUA v. U.S. Bank*, 898 F.3d 243 (2d Cir. 2018) ................................................................ 30

*NCUA v. Wells Fargo*, 247 F. Supp. 3d 377 (S.D.N.Y. 2017) ............................... 13, 22, 27, 29

*NCUA v. Wells Fargo*, 2017 WL 3610511 (S.D.N.Y.) ............................................. 23, 27, 29

*Neenan v. Kamalian*, 292 A.D.2d 433 (2d Dep't 2002) ...................................................... 40

*Nicholas Labs. v. Almay, Inc.*, 900 F.2d 19 (2d Cir. 1990) ............................................ 13, 14

*Nielsen Co. v. Success Sys.*, 112 F. Supp. 3d 83 (S.D.N.Y. 2015) ........................................ 36

*Nomura Asset v. Nomura Credit*, 2014 WL 2890341 (N.Y. Sup. Ct.) ................................. 25

*NXIVM Corp. v. Sutton*, 2019 WL 4010859 (D.N.J.) .......................................................... 18

*NXXI Inc., In re*, 216 F. Supp. 3d 381 (S.D.N.Y. 2016) ....................................................... 36

*O'Neill v. 225 E. 73rd Owners*, 298 A.D.2d 239 (1st Dep't 2002) ............................................... 40

*Orester v. Dayton Rubber Mfg.*, 228 N.Y. 134 (1920) ................................................................ 35

*Part 60 Put-Back Litig., In re*, 36 N.Y.3d 342 (2020) .................................................................. 38

*Perreca v. Gluck*, 295 F.3d 215 (2d Cir. 2002) ............................................................................. 8

*Phoenix Light v. U.S. Bank*, 2020 WL 1285783 (S.D.N.Y.) ........................................................ 33

*Policemen's Annuity v. Bank of Am.*, 907 F. Supp. 2d 536 (S.D.N.Y. 2012) .............................. 22

*Policemen's Annuity v. Bank of Am.*, 943 F. Supp. 2d 428 (S.D.N.Y. 2013) .............................. 23

*Portugues-Santana v. Rekomdiv*, 657 F.3d 56 (1st Cir. 2011) .................................................... 40

*Premium Mortg. v. Equifax*, 583 F.3d 103 (2d Cir. 2009) ........................................................... 38

*Reda v. Eastman Kodak*, 233 A.D.2d 914 (4th Dep't 1996) ......................................................... 15

*Refco, Inc. Secs. Litig., In re*, 2007 WL 57872 (S.D.N.Y.) .......................................................... 41

*Reichert v. N. MacFarland Builders*, 85 A.D.2d 767 (3d Dep't 1981) ........................................ 36

*Royal Park v. Deutsche Bank*, 2016 WL 439020 (S.D.N.Y.) .......................................................... 6

*Royal Park v. HSBC*, 109 F. Supp. 3d 587 (S.D.N.Y. 2015) ........................................................ 23

*SACO I Trust v. EMC Mortg.*, 2014 N.Y. Misc. LEXIS 2494 (N.Y. Sup. Ct.) ............................ 25

*Sch. Dist. of Niagara Falls v. CrossPointe*, 2012 WL 1144618 (W.D.N.Y.) .............................. 40

*Shonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ...................................................................... 35

*Singer v. Olympia Brewing*, 878 F.2d 596 (2d Cir. 1989) ..................................................... 41, 42

*Singleton Mgmt.v. Compere*, 243 A.D.2d 213 (1st Dep't 1998) .................................................. 41

*Sogem-Afrimet, Inc. v. M/V Ikan Selayang*, 951 F. Supp. 429 (S.D.N.Y. 1996),
   *aff'd*, 122 F.3d 1057 (2d Cir. 1997) ....................................................................................... 18

*Starr v. Firstmark Corp.*, 2013 WL 4811371 (E.D.N.Y.) ............................................................ 17

*Swartwout v. Johnson*, 5 Cow. 74 (N.Y. Sup. Ct. 1825) ............................................................. 33

*Taboola, Inc. v. Ezoic Inc.*, 2019 WL 465003 (S.D.N.Y.) ........................................................... 35

*Tart v. Elementis Pigments*, 191 F. Supp. 2d 1019 (S.D. Ill. 2001) ............................................ 40

*The T.J. Hooper*, 60 F.2d 737 (2d Cir. 1932) .............................................................................. 11

*Tractebel Energy v. AEP Power*, 487 F.3d 89 (2d Cir. 2007) ...................................... 35

*Travelers Indem. v. Maho Mach.*, 952 F.2d 26 (2d Cir. 1991) .................................... 18

*Trust for the Certificate Holders v. Love Funding Corp.*, 13 N.Y.3d 190 (2009) ........................ 33

*Turnbull v. USAir*, 133 F.3d 184 (2d Cir. 1998) ............................................. 40

*U.S. Bank v. Ables & Hall*, 696 F. Supp. 2d 428 (S.D.N.Y. 2010)............................... 18

*U.S. Bank v. Dexia*, 2016 WL 6996176 (S.D.N.Y.) ......................................... 40

*U.S. Naval Inst. v. Charter Commc'ns*, 936 F.2d 692 (2d Cir.1991)............................ 42

*UMLIC VP v. Matthias*, 364 F.3d 125 (3d Cir. 2004) ...................................... 30

*UMLIC-Nine Corp. v. Lipan Springs*, 168 F.3d 1173 (10th Cir. 1999) ......................... 30

*United States. v. Russell Elec.*, 250 F. Supp. 2 (S.D.N.Y. 1965)................................. 18

*United States v. Inn Foods*, 383 F.3d 1319 (Fed. Cir. 2004) .................................. 32, 33

*United States v. Thornburg*, 82 F.3d 886 (9th Cir. 1996) ..................................... 30

*W&S Life v. U.S. Bank*, 69 Misc.3d 1213(A) (N.Y. Sup. Ct. 2020) .............................. 6

*Wells Fargo v. Bank of Am.*, 2014 WL 476299 (S.D.N.Y.) ................................... 36

**Statutes**

12 U.S.C. § 1787(14)(A)(i)(I)................................................................ 32

12 U.S.C. § 1787(b)(14)(B)(i) .............................................................. 31

N.Y. Est. Powers & Trusts Law § 5-4.3(a)..................................................... 41

N.Y. Gen. Oblig. Law § 15-108(a) .......................................................... 41

**Rules**

CPLR § 4533-b ............................................................................. 40

CPLR § 4547 .............................................................................. 40

CPLR § 5001............................................................................. 42, 43

CPLR § 5004.............................................................................. 42

Fed. R. Civ. P. 6(a) ...................................................................... 32

Fed. R. Civ. P. 6(a)(1)(A) ..................................................................................... 32

Fed. R. Evid. 408 .................................................................................................. 40

Fed. R. Evid. 408(a) .............................................................................................. 40

Fed. R. Evid. 803(6) .............................................................................................. 21

**Regulations**

Asset-Backed Securities, 70 Fed. Reg. 1506 (Jan. 7, 2005) ................................... 9, 10

**Other Authorities**

*Black's Law Dictionary* (9th ed. 2009) ..................................................................... 8

*Black's Law Dictionary* (11th ed. 2019) .............................................................. 5, 32

Restatement (Second) of Contracts (1981) ............................................................. 29

*The Financial Crisis Inquiry Report*, Financial Crisis Inquiry Commission (Jan. 2011),
    http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf ........ 10

## GLOSSARY OF DEFINED TERMS AND ABBREVIATIONS

56.1 – Plaintiffs' Responses and Counter-Statement to Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1 (July 13, 2021)

*ACE Sec. v. DBSP – ACE Sec. Corp. Home Equity Loan Tr. v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543 (S.D.N.Y. 2014)

Blum – Report of Leonard A. Blum (Sept. 9, 2019)

Blum Reply – Reply Report of Leonard A. Blum (Dec. 7, 2020)

BNYM – The Bank of New York Mellon

*BNYM Tr. v. Morgan Stanley Capital* ("*BNYM*") *– Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 11 Civ. 505 (CM) (GWG), 2017 WL 698607 (S.D.N.Y. Feb. 10, 2017)

Burnaman Tr. - Deposition of Phillip R. Burnaman, II (Mar. 18, 2021)

Burnaman WF Tr. - Deposition of Phillip R. Burnaman, II (Oct. 22, 2019), provided as NCUA Plaintiffs' Summary Judgment Exhibit 9 to the Declaration of Matthew M. Duffy in Support of Plaintiffs' Motion of Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment (May 12, 2020) in *Nat'l Credit Union Admin. Bd., et al. v. Wells Fargo Bank, N.A.*, Case No. 14-cv-10067-KPF-SN (S.D.N.Y. Oct. 30, 2020), ECF No. 544-9.

EODs – Events of Default

Hillcoat – Report of Christopher S. Hillcoat (Sept. 8, 2019)

Hillcoat Tr. - Deposition of Christopher Hillcoat (Apr. 2, 2021)

Hillcoat WF Tr. - Deposition of Christopher S. Hillcoat (Aug. 15, 2019), provided as NCUA Plaintiffs' Summary Judgment Exhibit 4 to the Declaration of Matthew M. Duffy in Support of Plaintiffs' Motion of Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment (May 12, 2020) in *Nat'l Credit Union Admin. Bd., et al. v. Wells Fargo Bank, N.A.*, Case No. 14-cv-10067-KPF-SN (S.D.N.Y. Oct. 30, 2020), ECF No. 544-4.

*MARM – MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015)

Milner Aff. – Affidavit of Christopher J. Milner in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (July 12, 2021)

Milner Reply – Reply Report of Christopher J. Milner (Dec. 21, 2020)

Mortgage Files – defined set of documents important to the value of the loans, including ownership, title, and security

NCUA – National Credit Union Administration Board

NGN trusts – NCUA Guaranteed Notes Trusts

PSA – Pooling and Servicing Agreement

R&Ws – Representations and warranties

Richard Tr. - Deposition of John J. Richard (Apr. 28, 2021)

RMBS – Residential mortgage-backed securities or security

Shev – Opening Report of Gary Shev (Sept. 9, 2019)

Transferor – For the FFML 2006-FF15 and FFML 2006-FF17 Trusts, First Franklin Financial Corporation

Trustee – HSBC Bank USA, National Association or "HSBC"

Warrantor – Refers generically to entities responsible for repurchasing breaching loans, whether labeled in the relevant contracts as an Originator, Seller, Sponsor, Depositor, etc.

Wells Fargo 30(b)(6) Tr. - 30(b)(6) Deposition of Wells Fargo Bank (Aug. 17, 2017), provided as Exhibit 19 to the Declaration of Jeremy M. Amar-Dolan in Support of Defendant Wells Fargo Bank, N.A.'s Motions to Exclude the Opinions of Plaintiffs' Proffered Experts (Mar. 13, 2020) in *Nat'l Credit Union Admin. Bd., et al. v. Wells Fargo Bank, N.A.*, Case No. 14-cv-10067-KPF-SN (S.D.N.Y.), ECF No. 529-21.

HSBC Br. – Memorandum of Law in Support of Defendant HSBC's Motion for Summary Judgment (June 15, 2021)

Plaintiffs National Credit Union Administration Board, as liquidating agent, and Graeme W. Bush, as separate NGN trustee (collectively, "Plaintiffs" or "NCUA"), respectfully seek partial summary judgment against HSBC Bank USA, National Association, as Trustee ("HSBC" or the "Trustee") for six bellwether residential mortgage-backed securities ("RMBS").

Plaintiffs' cross-motion presents three discrete questions of law the Court should resolve for Plaintiffs at summary judgment and thus instruct the jury at trial.  Each RMBS contains thousands of mortgage loans that were backed by warranties from third-party warrantors that promised to repurchase any materially breaching loans.  Each Pooling and Servicing Agreement ("PSA") (typically in § 2.03) requires in words or effect that "the Trustee shall enforce" such warrantor repurchases, which were crucial to backstop the represented quality of the loans.

*First*, the phrase "Trustee shall enforce" in § 2.03 plainly required HSBC to *compel* warrantors to repurchase materially breaching loans, including through litigation if necessary.  "Enforce" on its face entails use of "force."  But HSBC used no force at all.

*Second*, the command "Trustee shall enforce" is plainly not contingent on investor direction.  The provisions cited by HSBC permit — but do not require — a quorum of certificateholders to direct Trustee action; and § 2.03 on its face is self-executing.  Structurally, the PSAs confirm this by *not* requiring the Trustee to inform certificateholders of the breach evidence in the Trustee's files, which would be necessary to evaluate whether to enforce.

*Third*, the Court should preclude as a matter of law HSBC's affirmative defense of failure to mitigate damages because it offers no damages calculation or any mitigation trigger event.

The Court should further reject HSBC's own motion for summary judgment.  HSBC's challenges to the voluminous evidence that it discovered yet failed to enforce Mortgage File breaches (as defined below) for 4,422 loans and R&W breaches (as defined below) for at least

1,973 loans are unpersuasive, and raises only disputes of fact.  Further, Plaintiffs' claims are timely; appointment of the Separate NGN Trustee was in no way champertous; and the damages sought are general (not consequential) damages that flow *directly* from Trustee non-enforcement.

**BACKGROUND**[1]

### A.    Factual Background Relevant to Plaintiffs' Motion for Summary Judgment

Plaintiffs are certificateholders in six bellwether RMBS trusts for which HSBC is Trustee.  56.1 ¶¶ 4-6.  RMBS trusts contain thousands of mortgage loans backed by warranties from third-party warrantors to deliver a defined set of documents important to the value and security of the loans ("Mortgage Files"), and that the loans complied with other representations and warranties ("R&Ws") concerning, *inter alia*, borrower creditworthiness.  56.1 ¶ 173.

### 1.    PSA § 2.03:  Trustee Duties First To "Notify" And Then To "Enforce"

PSA § 2.03 requires notice and then enforcement by the Trustee, as follows:

> ***Upon discovery or receipt of notice*** of any materially defective document in, or that a document is missing from, a ***Mortgage File*** or of a breach by the Seller of any ***representation, warranty or covenant*** under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, ***the Trustee shall promptly notify*** the Seller and the Servicer of such defect, missing document or breach ***and request*** that the Seller deliver such missing document, cure such defect or breach within sixty (60) days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, ***the Trustee shall enforce*** the obligations of the Seller under the Mortgage Loan Purchase Agreement ***to repurchase*** such Mortgage Loan from REMIC I at the Purchase Price . . . .[2]

HSBC's obligations in § 2.03 are thus triggered by "discovery or receipt of notice"; it

---

[1] The Glossary above provides the full citation for short forms used in this brief.  Unless otherwise indicated herein, all emphasis is added; and all alterations, quotation marks, and citations are omitted.  The current motions concern six bellwether trusts, and there are 28 other trusts at issue in NCUA's complaint.  Paragraphs ¶¶ 1-131 of the 56.1 statement are by HSBC, and ¶¶ 132-215 are by NCUA.

[2] Uhlig Ex. B.  The PSAs for four trusts (Uhlig Exs. B, C, D, F) contain a similar ¶ 2.03, and PSA language for the two remaining trusts (Uhlig Exs. E, G) should be interpreted similarly, *see infra* Part I.A.

2

then must "promptly notify" the warrantor and "request" cure; if the warrantor does not cure, then "the Trustee shall enforce" the warrantor's obligation "to repurchase."  PSA § 2.03.

### 2.   HSBC Failed to Enforce Repurchase of Materially Breaching Loans

*Mortgage File breaches.*  Mortgage File breaches concern the original documentation necessary to secure the Trustee's security, interest, and possession of the loans.  Under the PSAs, HSBC was required to receive final exceptions reports for each trust, and the reports it received listed *thousands* of Mortgage File breaches or "exceptions" to complete Mortgage Files.  56.1 ¶¶ 138, 160-168.  HSBC did not attempt to enforce repurchase of these breaching loans or even take the first step towards doing so; in fact, HSBC trust administrators typically just filed exceptions reports away in metal filing cabinets.  56.1 Response ¶ 90.

*R&W breaches.*  Typical (non-Mortgage File) R&Ws warrant compliance with lender underwriting guidelines and that no misrepresentation was made by the borrower.  *See Assured Guar. v. Flagstar Bank*, 920 F. Supp. 2d 475, 509 (S.D.N.Y. 2013) ("(1) 'Each Mortgage Loan was originated in good faith and in accordance with [the originating lender's] underwriting guidelines'; and (2) 'No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place'").

*HSBC's ineffective enforcement policy.*  HSBC enforcement policy was limited to ineffective letter-writing campaigns.  *See*, *e.g.*, Duffy Ex. 14 ¶ 198 (Hillcoat) ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

### B.   Plaintiffs' Affirmative Case for Trial

This Court allowed contract and other claims to proceed, *NCUA v. HSBC*, 117 F. Supp. 3d 392 (S.D.N.Y. 2015), and held Plaintiffs have contractual standing, *NCUA v. HSBC*, 2020

3

WL 91390 (S.D.N.Y.).  Plaintiffs' case for trial includes three experts and detailed evidence.[3]

Leonard Blum concludes that at least **4,422 loans** in six trusts have material Mortgage File breaches based on the exceptions reports created by the Trustee's custodian.

Blum also analyzes facts HSBC learned by suing loan seller Deutsche Bank, warrantor for four trusts, *16 times* as warrantor for other trusts, in which HSBC alleged a fundamentally broken assembly line that regularly and repeatedly supplied defective loans.  Gary Shev confirmed **1,973 loans** in four trusts have material R&W breaches — 21,344 breaches in all.

Christopher Milner calculates damages based on HSBC's failure to enforce repurchase of those loans of $93.1 million, plus prejudgment interest of $89 million, a total of $182.1 million.

## LEGAL STANDARD

Summary judgment is appropriate "where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning."  *Fulton Cogeneration v. Niagara Mohawk Power*, 84 F.3d 91, 98 (2d Cir. 1996).

## ARGUMENT

I.    **THE § 2.03 PHRASE "TRUSTEE SHALL ENFORCE" REQUIRES LITIGATION**

A.    **The Plain Meaning of "Enforce" Includes Litigation To Compel Compliance**

**1.**  PSA § 2.03 for four trusts provides unambiguously that "*the Trustee shall enforce*" warrantor repurchase obligations for materially breaching loans.  *Supra* p. 3.  "The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning."  *Brooke Grp. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (1996).  And "[i]t is common practice for the courts . . . to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  *10 Ellicott Square v. Mountain Valley*, 634 F.3d 112,

---

[3] Duffy Ex. 4 (Blum); Duffy Ex. 33 (Milner Reply); Uhlig Ex. 34 (Shev).  Full reports are on the CD.

120 (2d Cir. 2011) (New York law); *see* 56.1 ¶ 7 (New York law applies to the PSAs).

English dictionaries, legal dictionaries, and finance dictionaries all define "enforce" to require compulsion, thus *effectively* bringing about compliance with an obligation.[4]  And litigation is the way to "compel" an unwilling warrantor to repurchase breaching loans, yet HSBC never sued to enforce repurchase.  The PSA term "enforce" contains the word "force," and the PSAs must be read to require litigation in order to force *effective* compliance.

2.   The fifth PSA contains language that three courts have held also requires a Trustee to enforce repurchase, providing "[i]n the event that the Trustee . . . receives notice of a breach by the Originator of any of the representations and warranties set forth in clauses I(tt), I(uu) or I(lll) of Schedule IV, the Trustee . . . *shall request the Originator to repurchase the Mortgage Loan*" and "[t]he Originator *shall* repurchase each such Deleted Mortgage Loan."  Uhlig Ex. E (FHLT 2006-C § 2.03(c)).  The PSA then provides "the Originator shall indemnify . . . the Trustee and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, *reasonable and necessary legal fees and related costs*, judgments, and other costs and expenses resulting from any *claim, demand, defense or assertion* based on . . . a breach by the Originator of any of its representations and warranties contained in this Agreement."  *Id.* § 2.03(g).  The PSA further provides "[t]he Trustee agrees to hold the Trust Fund and *exercise the rights referred to above* for the benefit of all present and future Holders of the Certificates."  *Id.* § 2.05 (emphasis added).

---

[4] *See*, *e.g.*, *Black's Law Dictionary* (11th ed. 2019) ("1. To give force or effect to (a law, etc.); to *compel* obedience to.  2. Loosely, to *compel* a person to *pay damages* for not complying with (a contract)."); Duffy Ex. 34 (*Dictionary of Banking and Finance* 105 (2d ed. 2000)) ("to *make sure* something is done or that a rule is obeyed; to enforce the terms of a contract"); Duffy Ex. 35 (*Merriam-Webster's Ninth New Collegiate Dictionary* 412 (indexed ed. 1987)) ("to give force to; . . . constrain[,] *compel* . . . ; to carry out *effectively* <~ laws>"); Duffy Ex. 36 (*Am. Heritage Dictionary* 590 (5th ed. 2011)) ("To *compel* observance of or obedience to"); Duffy Ex. 37 (*Random House Dictionary* (2d ed. 1993)) ("compel obedience to:  *to enforce a rule*; . . . to obtain (payment, obedience, etc.) by *force or compulsion*) (first emphasis in original).

Three courts have now concluded this language requires trustee enforcement.  *See Royal Park v. Deutsche Bank*, 2016 WL 439020, at *4-5 (S.D.N.Y.); *IKB v. Lasalle Bank.*, 2021 N.Y. Misc. Lexis 347, at 27-28 (N.Y. Sup. Ct.); *W&S Life v. U.S. Bank*, 69 Misc.3d 1213(A), at *5 (N.Y. Sup. Ct. 2020).  Thus, the Trustee "assumed an affirmative duty to enforce the repurchase" by "'agree[ing] to . . . exercise the rights referred to above.'"  *Id.* at *4 (quoting PSA)*.*  The "rights referred to above," the court explained, referred to the trustee's powers "includ[ing] the right to enforce the repurchase protocol."  *Id.*; *see Royal Park*, 2016 WL 439020, at *4-5 (similar holding, followed by *W&S*); *IKB*, 2021 Misc. Lexis at 27-28 (following *Royal Park* and *W&S*).

**3.**  The sixth PSA describes the "[t]he obligation of the Sponsor to cure, repurchase or substitute for any Mortgage Loan as to which a defect in a constituent document exists" as a remedy available "to *the Trustee*," and provides "[t]he Sponsor shall promptly reimburse the Trustee for any expenses incurred . . . in respect of enforcing the remedies for such breach.  Uhlig Ex. G (NHELI 2007-1 PSA § 2.02(d)).  It then describes the "Purpose and Powers of the Trust" as to engage "in those activities that are *necessary . . . to accomplish the foregoing* or are incidental thereto or connected therewith" and "in such other activities *as may be required in connection with conservation of the Trust Fund*."  *Id.* § 2.10(d), (e).

Comparable to the 'rights referred to above' phrase construed in the *Royal Park* line of cases, here the trustee had an affirmative obligation to do what was "necessary" or "required" to exercise its rights in § 2 including "enforcing the remedies" for breaches.  This is consistent with the structure of the PSAs, which preclude enforcement by certificateholders and require that the Trustee receive information that could support repurchase enforcement claims (*e.g.*, exceptions reports) without requiring it to forward that information to certificateholders.  Leaving enforcement to certificateholders under such circumstances is commercially unreasonable.

6

**B.    Reading "Shall Enforce" to Require Anything Less Than Effectual Litigation Would Ignore Established Canons of Construction.**

HSBC (at 6-7) erroneously contends that providing notice constitutes enforcement.

**1.**  Beyond plain meaning, the rule against superfluity requires that "Trustee shall enforce" means something other than "shall notify" and "request."  *See Kelly v. Honeywell Int'l*, 933 F.3d 173, 183 (2d Cir. 2019) (requiring "reasonable interpretation of a contract that gives independent meaning to each term"); *Law Debenture Tr. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (avoid "render[ing] any individual provision superfluous").

Under PSA § 2.03, HSBC is required — by use of the word "shall" rather than "may" — to take two *separate* steps to address material breaches.  *First*, "[u]pon discovery" of such breaches, "the Trustee shall promptly notify" the warrantor and "request" that the warrantor cure within a specified time.  PSA § 2.03.  *Second*, "[i]f the [warrantor] . . . does not . . . cure . . . the Trustee shall enforce the [warrantor's] obligation . . . to repurchase."  *Id.*  Section 2.03 thus establishes a logical progression of first *requesting* compliance, and then *compelling* it.

Allowing HSBC to stop after requesting compliance would conflate the second step with the first.  It would allow a warrantor, simply by saying "no" or ignoring a demand, to shift the risks from breaching loans onto certificateholders, altering "Trustee shall enforce" to mean only (and ineffectually) that "the warrantor may self-enforce, if it voluntarily chooses."

*Chesapeake Energy v. BNYM*, 773 F.3d 110 (2d Cir. 2014), is instructive.  A contract required 30 days' *notice* before Chesapeake could *redeem* notes at a special price by a redemption deadline.  Chesapeake gave notice less than 30 days before the deadline, which the court held untimely by rejecting Chesapeake's conflation of *redeem* to mean the same as giving *notice*:  "Chesapeake's interpretation gives the term ['redeem'] a very different meaning — not 'the reacquisition of a security by the issuer,' but the *giving of notice* by the issuer that it would

reacquire the security." *Id.* at 116 (quoting *Black's Law Dictionary* 1390 (9th ed. 2009)).

The Trustee would give a similarly "unnatural meaning" to "enforce" — not the *effectual* compulsion of repurchase, but rather mere ineffectual "giving of notice" to a noncompliant warrantor — and often not even that. *Id.* But "ask and then take 'no' for an answer" is not what "enforce" plainly means and would give no meaning at all to the separate enforcement provision.

**2.** The canon of construction requiring courts to read contracts as a whole reinforces that "shall enforce" imposes a duty to enforce through litigation. *See Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002). Here, other provisions in the PSAs establish that the Trustee's duty to enforce repurchase was mandatory, and not subject to certificateholder direction or indemnification. For example, ACE 2005-AG1 § 9.01, titled "Duties of Trustee and Securities Administrator" provides "[a]ny permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty." Uhlig Ex. B. The PSAs mandate that the Trustee "shall enforce," rendering repurchase not a "permissive right" but a mandatory duty.

**C.   HSBC's Manufactured Industry Custom Cannot Change the Plain Meaning of the Contractual Phrase "Trustee Shall Enforce"**

HSBC seeks through its experts and an employee affidavit to use a nonexistent industry custom to nullify the plain meaning of "Trustee shall enforce," claiming the words "shall enforce" did not actually require the Trustee to initiate repurchase litigation against warrantors.

**1.** The Court should exclude such assertions from its construction of § 2.03. "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002). If the sophisticated PSA parties had intended to alter the plain meaning of "enforce," they could have done so in the lengthy PSA definitional § 1, but they did not. Even if there were ambiguity (there is none), certificateholders — unlike the Trustee — were not parties to the PSAs and had to take PSA terms as they found

8

them when purchasing the certificates.  "In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985).[5]

**2.**  Even if "enforce" were ambiguous (it is not), HSBC's expert testimony regarding industry custom is still inadmissible at trial because the undisputed facts confirm there is no well-established industry usage concerning "Trustee shall enforce."  Before a court may consider evidence of industry custom to interpret a contract:

> The trade usage must be so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.  Thus, the proffered custom or usage must establish that the meaning of the term in question was general, uniform and unvarying.  A custom, in order to become a part of a contract, must be so far established and so far known to the parties, that *it must be* supposed that their contract was made in reference to it.  For this purpose the custom must be established, and not casual, *uniform and not varying, general and not personal*, and known to the parties.

*Maverick Tube*, 595 F.3d at 466-67 (emphases in original).

The six trusts at issue here closed in 2005-2007.  *See* 56.1 ¶ 4.  In 2005, however, the Securities and Exchange Commission ("SEC") found — in a major asset-backed securities rulemaking — there was *no* common industry custom regarding RMBS trustee enforcement. The agency thus explained "there has been debate in the market on the nature and role of the trustee in ABS transactions, in particular the *trustee's level of oversight regarding the transaction*." *Final Rule: Asset-Backed Securities*, 70 Fed. Reg. 1506, 1537 (Jan. 7, 2005) (promulgating Regulation AB).

---

[5] *Compare* Duffy Ex. 6,101:12-102:3 (Hillcoat Tr.) ("I am not familiar with a situation where a trustee was handed an agreement that was a fait accompli and did not have the opportunity to provide comments and request changes, if there were issues in it. . . . Trustees . . . did have an opportunity to comment on the documents."); *with* Duffy Ex. 38 at 68622 (Form of Certificate stating "[t]his Certificate is issued under and is subject to the terms, provisions and conditions of the [PSA], to which [PSA] the Holder of this Certificate by virtue of the acceptance hereof assents and by which Holder is bound.")

The SEC cited to dueling policy papers on RMBS trustee duties issued by Moody's Investors Services — which asserted more expansive trustee duties — and the American Bankers Association — which disagreed with Moody's and self-servingly asserted minimal trustee duties on behalf of its bank trustee constituents.  *Id*.  As a result of this demonstrated *lack* of any industry custom or consensus shortly before the trusts at issue closed, the SEC simply ordered "explicit disclosure of the trustee's duties and responsibilities" and "compliance with transaction covenants" to be made in future securities prospectuses.  *Id.*  Indeed, HSBC states (at 10) its own "intent" is alone in the record, precluding any common industry view *with certificateholders*.

Further cutting against any industry custom is the SEC's statement in 2005 that "[t]he ABS market is fairly young and has rapidly become an important part of the U.S. capital markets," such that "U.S. public non-agency ABS issuance [including but not limited to RMBS] grew from $46.8 billion in 1990 to [more than] $416 billion in 2003."  *Id.* at 1508.  And it was not until *after* the trusts at issue had closed in 2005-2007 that the need for mortgage repurchases based on massive numbers of breaching loans revealed itself as the Great Recession unfolded.[6]

In similar litigation, trustee Wells Fargo's Rule 30(b)(6) witness expressly *disclaimed* any such industry custom for repurchase enforcement.  Duffy Ex. 39, 382:7-21 ("Q.  Was there an industry understanding as to what shall enforce meant in that specific context? . . . A. . . .  We didn't look to an industry standard or industry understanding to interpret the documents.").

**3.**  Indeed, at the same time the Trustee's expert *reports* in this case seek to advance a nebulous industry custom of non-enforcement, that same expert has candidly acknowledged in

---

[6] *See The Financial Crisis Inquiry Report*, Financial Crisis Inquiry Commission at 224 (Jan. 2011) ("FCIC Report") ("The housing bust exposed the flaws in the mortgages that had been made and securitized.  After the crisis unfolded, those with exposure to mortgages and structured products — including investors, financial firms, and private mortgage insurance firms — closely examined the representations and warranties made by mortgage originators and securities issuers."), http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

*depositions* the same plain-English reading of "shall enforce" discussed above in Part I.A.  Duffy Ex. 40, 46:17-19 (Burnaman WF Tr.) ("The term 'enforce' to me, in plain English, would mean *to make happen . . . .*"); Duffy Ex. 12, 94:8-10 (Burnaman Tr.) ("I think the last time you asked me [what 'enforce' means], I said 'to make happen.'  I'll stay with that to be consistent.").  HSBC's own expert thus undermines the Trustee's reading of "shall enforce."

**4.**  Even if there were such an industry custom that contravened the plain meaning of "enforce" — there is not — it would be perverse and contrary to law to reward trustees with such an interpretation.  The Second Circuit's reasoning in rejecting a "race to the bottom" for due diligence standards by RMBS underwriters is equally applicable here:

> As Judge Hand famously explained in *The T.J. Hooper*, in exceptional cases "a whole calling or industry may have unduly lagged in the adoption of new and available devices.  It never may set its own tests, however persuasive be its usages.  Courts must in the end say what is required."  60 F.2d 737, 740 (2d Cir. 1932).  The *reasonable care standard will not countenance an industry-wide race to the bottom* to set the least demanding standard to assess its conduct.  Thus, particularly where the industry was comprised of only a few participants who controlled the practice, and where industry practices have not previously survived judicial scrutiny, custom is less persuasive evidence of reasonable prudence.

*FHFA v. Nomura Holding Am.*, 873 F.3d 85, 132 (2d Cir. 2017).  The trustee industry was likewise oligopolistic.  *See* Duffy Ex. 6, 143:13-16 (Hillcoat Tr.) (noting "consolidation in the corporate trust industry, as a whole"); Duffy Ex. 7, 167:17-21 (Hillcoat WF Tr.) ("a relatively few number of providers" and "significant amount of consolidation within the market").

The Court should hold that "Trustee shall enforce" as used in § 2.03 required efficacious enforcement through litigation against unwilling warrantors — not a mere ineffectual notice.

## II.  HSBC WAS REQUIRED TO ENFORCE UNDER PSA § 2.03 WITHOUT DIRECTION AND INDEMNITY FROM CERTIFICATEHOLDERS

### A.  The Text of the PSAs Demonstrates Trustee Enforcement Is Not Contingent on Certificateholder Direction

**1.**  HSBC (at 7-8) contends the Trustee was required to enforce warrantor repurchase

duties under PSA § 2.03 only if certificateholders directed and indemnified it to do so.  But *no* PSA provision conditions § 2.03 enforcement on such direction.  The provision on which HSBC relies *permits* — but does *not* require — certificateholder direction for Trustee litigation:

> Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any *litigation* hereunder or in relation hereto *at the request, order or direction of any of the Certificateholders*, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee or the Securities Administrator, as the case may be, reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby . . . .

Uhlig App'x D (ACE 2005-AG1 § 9.02(a)(iii)).  While certificateholders thus *may* direct Trustee litigation, nothing requires they *must*; and nothing in § 2.03 requires such direction as a predicate to Trustee enforcement.  Further, this provision is limited to "trusts or powers" (*id.*) — it does not apply to *duties* such as the "Trustee shall enforce" command.[7]  The PSAs expressly distinguish between rights and duties, providing that "[a]ny permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty."  Uhlig App'x E (ACE 2005-AG1 § 9.01).  Because § 9.02(a)(iii) is limited on its face to "trusts or powers," its proviso for certificateholder direction *cannot* be read to limit Trustee *duties*, including § 2.03 enforcement.

Moreover, § 9.02 applies only *to the extent it does not conflict with* § 9.01.  Uhlig App'x N (starting with "[e]xcept as otherwise provided in Section 9.01 . . ." similar for other trusts).  And § 9.01(ii) provides that "[n]o provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own misconduct*." Id.*  Thus, if it is determined that HSBC was negligent, it is liable *regardless of* anything in Section 9.02.

---

[7] The PSAs make clear such "trusts or powers" are distinct from "duties."  *See* Uhlig Exs. B, C, F, G § 9.02(vi), and Uhlig Exs. D, E § 8.02(vi) ("The Trustee may execute any of the *trusts or powers* hereunder or perform any *duties* hereunder . . . .").

**2.**  HSBC (at 7-8) also cites § 9.02(a)(v), which provides "the Trustee shall not be bound to make any *investigation* into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or documents, unless requested in writing to do so by the Holders of Certificates."  Uhlig App'x C (ACE 2005-AG1).  As with § 9.02(a)(iii), nothing in that provision obviates the Trustee's clear "Trustee shall enforce" command, nor does it apply to enforcement litigation.  "While learning of facts merely suggestive of a breach would not require the Trustee to immediately raise a claim, *upon receipt of such notice*, it becomes incumbent upon the Trustee to pick up the scent and nose to the source."  *NCUA v. Wells Fargo*, 247 F. Supp. 3d 377, 393 (S.D.N.Y. 2017) ("*WF I*") (emphasis in original); *see infra* Part IV.B.  Sections 2.03 and 9.02(a)(v) should thus be read harmoniously to mean that, while the Trustee need not be a roving investigator without cause, once it has "facts merely suggestive of a breach," it must "pick up the scent and nose to the source."  *Id.*  This reading "give[s] full meaning and effect to the material provisions" and does "not render any portion meaningless."  *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007).

**3.**  Where parties "knew how to communicate their intention that a certain condition" would apply by including that condition in one provision, "[t]he absence of any language" in a different provision "confirms that the parties never intended" for it to apply.  *Nicholas Labs. v. Almay*, 900 F.2d 19, 21 (2d Cir. 1990) (per curiam).  The PSAs cross-reference § 2.03 in many provisions.[8]  But the "absence of any language" in § 9.02(a)(iii), or (a)(v) cross-referencing

---

[8]  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 §§ 2.05(c); 3.01, 3.08(vi), 3.09(a)(v), (viii), 4.02, 8.02, 11.01(i), 11.02, 12.03, 12.07); *id.* Ex. C (ACE 2006-OP2 §§ 2.05(c), 3.08(a)(vi), 3.09(a)(v), (viii), 4.02, 8.01, 8.02, 11.01(i), 11.02, 12.03, 12.07(4)); *id.* Ex. D (DBALT 2007-OA1 §§ 3.02, 3.23, 7.02, 10.01(i), 10.02, 11.6); *id.* Ex. E (FHLT 2006-C §§ 2.04(a), (b), 2.06(h), 2.07(d), 3.11(a)(xi), 3.24(a), 3.29, 6.03, 6.05, 7.02, 10.05(a)(iv), 11.01(j), 11.02); *id.* Ex. F (MHL 2007-1 §§ 2.05, 3.08(a)(vi), 3.09(a)(v), (viii), 4.02, 8.01(b)(v), 8.02(a), 11.01(i), 11.02, 12.03, 12.07); *id.* Ex. G (NHELI 2007-1 §§ 2.02, 2.05(a), 3.26(b)(viii), 3.27(a)(vi), 3.31(a)(v), 8.01(b)(i), 8.02).

§ 2.03 "confirms that the parties never intended" such a reference.  *Nicholas*, 900 F.2d at 21.

Indeed, four of the six PSAs *do* cross-reference § 2.03 in providing for reimbursement to "the Trustee" for "any expenses arising out of the *enforcement* of the . . . *purchase obligation under Section 2.03*."  Uhlig Exs. B, C, F § 3.09(viii); Ex. E § 3.11(xi).  Such specific § 2.03 cross-references only confirm the Trustee was expected to enforce upon discovery or notice of material breaches *without* waiting for certificateholder indemnity.  The other two PSAs also generally provide for Trustee reimbursement.  *See* Uhlig Ex. D § 3.24(ix); Ex. G § 3.32(i).

**4.**  Further, Section 2.03 specifically governs Trustee enforcement of warrantor repurchases, whereas §§ 8 or 9 cited by the Trustee are general, catch-all provisions.  A "specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision," *Capital Ventures v. Republic of Argentina*, 652 F.3d 266, 271 (2d Cir. 2011), and "a specific provision will not be set aside in favor of a catchall clause," *Ambac Assurance v. Countrywide*, 31 N.Y.3d 569, 583 (2018); *see Aramony v. United Way*, 254 F.3d 403, 413 (2d Cir. 2001) ("specific terms and exact terms are given greater weight than general language").

**5.**  The lack of a certificateholder-direction requirement is supported by HSBC experts' acknowledgement § 2.03 *requires* it to give *notice* of breaches ("shall promptly notify") *without* certificateholder direction.  *See* Duffy Ex. 6, 173:6-10 (Hillcoat Tr.) ("Sending of the notice upon discovery or receipt of notice of a materially defective … document or a representation and warranty breach . . . *is not discretionary*."); Duffy Ex. 12, 90:19-91:10 (Burnaman Tr.) (Q. "[D]id the trustee have an option not to send such notice?"  A. "[M]y expectation would be that the trustee would notify the warrantor when the trustee discovered a breach.").

Thus, despite acknowledging that "shall" in § 2.03 means *must* for notifying, HSBC contends "shall" means *need not* for enforcing.  This Court should reject such a construction that

14

"causes the [same] word to carry different meanings in different iterations within the same contractual provision, indeed within the same sentence." *Chesapeake Energy*, 773 F.3d at 116.

### B.    The Structure of the PSAs Demonstrates Trustee Enforcement in § 2.03 Cannot Be Made Contingent on Certificateholder Direction

By assuming (at 7-8) § 2.03 enforcement is contingent on § 9 certificateholder direction, HSBC necessarily assumes certificateholders would have the information necessary to make such a decision.  But that is not so.  "[T]he court should give effect to the intent of the parties as revealed by the language *and structure* of the contract." *Reda v. Eastman Kodak*, 233 A.D.2d 914, 914 (4th Dep't 1996).  PSA structure supports the above textual reading because the PSAs did *not* require the Trustee to tell certificateholders about Mortgage File or R&W breaches — the very evidence they would need to have *before* deciding whether to direct litigation.

Under § 2.03, when HSBC discovers or receives notice of material Mortgage File or R&W breaches, it must notify specific parties including the warrantor and servicer — but *not* certificateholders.  Uhlig App'x F.  Indeed, both HSBC and its experts have asserted the Trustee had *no duty* to provide such information to certificateholders, and *did not* do so.[9]  Although the Trustee had a password-protected website where it posted notices and monthly remittance reports for certificateholders (CTSLink.com), it generally made no effort to provide warrantor breach

---

[9] *See* Duffy Ex. 12, 177:4-6 (Burnaman Tr.) ("I don't believe as an investor I was going to get a copy of any exception report or notice of missing documents."); *id.* 182:19-183:1 ("I don't believe and it certainly wasn't my experience that I got any notification of document defects from either a custodian or a trustee in an RMBS."); *id.* 191:9-13 ("I previously testified that in my experience, trustees did not share the exception report with certificateholders, and I don't believe that they were required to share any exception report with certificateholders."); *id.* 177:19-178:3 ("In my many years of investing in RMBS, I do not recall receiving notice from a trustee regarding missing or incomplete documents in a mortgage file, nor would I expect to." (quoting Burnaman)); Duffy Ex. 6, 309:21-310-4 (Hillcoat Tr.) ("Q Did HSBC, or trustees generally, provide the exception reports to certificate holders?  A I wouldn't think so. I've never seen such a requirement in any of these transaction structures."); Duffy Ex. 13, 203:4-5 (Richard Tr.) ("I don't think we [as investors] had access to [exceptions reports,] [w]e certainly weren't sent them."); *id.* 250:19-251:4 ("[I]nvestors did not expect to receive those reports.").

information to certificateholders and asserts it had no duty to do so.  As a result, HSBC's experts admitted certificateholders could *not* know whether to direct Trustee action, because they were not told about the information necessary for such a judgment resting in the Trustee's files:

> Q So how would investors know whether or not to direct the trustee to enforce if they didn't have access to the information showing breaches and Mortgage File defects?
>
> A The short answer is I don't know, because there is no mechanism for the trustee, at least, to provide that to them, or any other party that I am aware of to provide that to them.  [Duffy Ex. 7, 133:14-21 (Hillcoat WF Tr.).]
>
> Q Would investors have had a way of knowing about document exceptions that existed in the trust without the trustee telling them?
>
> A I don't believe so, no.  [Duffy Ex. 40, 124:4-7 (Burnaman WF Tr.).][10]

Under HSBC's misguided theory, then, certificateholders were supposed to know when to direct the Trustee to sue warrantors without having knowledge of the breach information sitting uniquely in the Trustee's files.  To the contrary — the important structural element that requires the Trustee to *enforce* repurchase upon its own discovery or receipt of notice of breaches, *without* providing such information to certificateholders, leads ineluctably to the conclusion § 2.03 is self-executing and certificateholders need not direct Trustee enforcement.

### C.    HSBC Misrepresents and Misconstrues NCUA Statements on Indemnity

HSBC excerpts (at 11-13) a letter regarding a MANA 2007-A3 trust and claims NCUA admitted direction and indemnification was always required.  But HSBC misleadingly inserts ellipsis removing language indicating NCUA was simply quoting *directly* from PSA § 9.02 which permits certificateholder direction.  *Compare* HSBC Br. 11 n.10 with Uhlig Ex. 7, at 2:

---

[10] *See also* Duffy Ex. 12, 191:1-13 (Burnaman Tr.) ("Q. And the only way investors would have been aware of materially defective documents or documents that were missing from a mortgage file was if the trustee provided them notice of such defects or missing documents.  A. I previously testified that in my experience, trustees did not share the exception report with certificateholders, and I don't believe that they were required to share any exception report with certificateholders.").

| HSBC's Misleading Excerpt | Actual Document |
|---|---|
| NCUA "*acknowledge[d] and agree[d] that . . . the Trustee is under no obligation* 'to exercise any of the trusts or powers vested in it by [the PSA] . . . or *to institute, conduct or defend any litigation* [t]hereunder or in relation [t]hereto at the request, order or direction of any of the Certificateholders . . . pursuant to the provisions of [the PSA], *unless such Certificateholders . . . shall have offered to the Trustee reasonable security or indemnity* | WHEREAS, the Instructing Party and the Indemnifying Party acknowledge and agree **that Section 9.02(iii) of the PSA provides that** the Trustee is under no obligation "to exercise any of the trusts or powers vested in it by [the PSA] … or to institute, conduct or defend any litigation [t]hereunder or in relation [t]hereto at the request, order or direction of any of the Certificateholders … pursuant to the provisions of [the PSA], unless such Certificateholders …shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby;" |

In fact, NCUA's internal communications acknowledge — but do not condone — the Trustees' unilateral position of taking no action unless directed and indemnified; such form agreements were drafted by the Trustee and frequently contained onerous provisions that hampered investors in pursuing repurchase claims; and if NCUA refused to enter them the Trustee would take no action and valuable claims would have been lost.  Fazio Decl. ¶¶ 11-22.[11]

HSBC also suggests (at 1) it was poorly paid as Trustee and therefore not required to enforce under § 2.03, but as shown (*supra* Part II.A.3) the PSAs specifically allow reimbursement from trust funds for § 2.03 enforcement expenses, and in the MANA case HSBC received $300/hour from trust funds — more than sufficient to cover its costs.  *See* Duffy Ex. 33 (Milner Reply ¶¶ 328-332).[12]  Regardless, "hindsight regret about the reasonableness of its compensation agreement does not justify reneging on [a] contract."[13]

---

[11] HSBC's reliance on the MANA 2007-A3 litigation to imply enforcement costs may exceed recoveries is misplaced: 41 loans with over $11 million in losses were repurchased *prior* to negotiation of the settlement agreement, and these repurchases occurred *after* NCUA began directing the trustee, resulting in a net benefit of over $22 million for the trusts.  *See* Fazio Decl. ¶ 17.

[12] This rate would generate $600,000 in annual revenue over a 2,000-hour work year. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Duffy Ex. 33.

[13] *Levy v. Young Adult Inst.*, 2015 WL 13745763, at *1 (S.D.N.Y.), *aff'd*, 744 F. App'x 12 (2d Cir. 2018); *Starr v. Firstmark Corp.*, 2013 WL 4811371, at *7 (E.D.N.Y.) ("Plaintiff is, in effect, improperly seeking a contractual protection that he failed to secure for himself when negotiating"), *aff'd*, 563 Fed

### III.   HSBC'S AFFIRMATIVE DEFENSE OF FAILURE TO MITIGATE, FOR WHICH IT BEARS THE BURDEN OF PROOF, SHOULD BE DISMISSED

HSBC asserted "failure to mitigate" as its twenty-eighth affirmative defense, and has the burden to prove it.  *See Air Et Chaleur v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985).  HSBC served no expert report in support, which suggests abandonment, and it lacks merit in any case.

**1.**  *No calculation.*  "A party seeking to avail itself of the affirmative defense of failure to mitigate damages must establish . . . the extent to which [mitigation] efforts would have diminished . . . damages."  *Eskenazi v. Mackoul*, 72 A.D.3d 1012, 1014 (2d Dep't 2010) (dismissing defense).[14]  HSBC submitted *no calculation* and its damages expert did not address the mitigation defense, which must be dismissed for this reason alone.  *See id.*

**2.**  *No mitigation trigger.*  "[T]here is no such thing as 'pre-breach' mitigation."  *BNYM v. Morgan Stanley*, 2017 WL 698607, at *1 (S.D.N.Y.).  Mitigation is required *only* where "it appears that the breaching party has abandoned or repudiated his obligations under the contract." *U.S. Bank v. Ables & Hall*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010); *see United States. v. Russell Elec.*, 250 F. Supp. 2, 20-21 (S.D.N.Y. 1965) (no duty before "aware[ness]" of breach). HSBC identifies no mitigation trigger event (there is none), and it never repudiated the PSAs.

**3.**  *HSBC had the same ability.*  The "victim of a breach of contract need not make expenditures to mitigate damages where the breaching party had the same opportunity to prevent damages."  *Travelers Indem. v. Maho Mach.*, 952 F.2d 26, 31 (2d Cir. 1991).  HSBC had a far

---

App'x 803 (2d Cir. 2014); *Charlery v. Dep't of Educ.*, 2017 WL 2124447, at *3 (S.D.N.Y.) ("Hindsight regret is insufficient justification to free a party from an agreement that she knowingly and voluntarily entered."), *aff'd*, 737 F. App'x 54 (2d Cir. 2018).

[14] *See also*, *e.g.*, *Int'l Cards v. MasterCard*, 2016 WL 7009016, at *4-5 (S.D.N.Y.) (dismissed for failure to calculate damages reduction); *Sogem-Afrimet, Inc. v. M/V Ikan Selayang*, 951 F. Supp. 429, 444 (S.D.N.Y. 1996) (dismissed for failure in "showing the portion of the loss caused by plaintiff's failure to take additional steps"), *aff'd*, 122 F.3d 1057 (2d Cir. 1997); *NXIVM Corp. v. Sutton*, 2019 WL 4010859, at *11 (D.N.J.) (applying New York law; failure "to offer any evidence at trial showing the amount by which . . . damages would have been reduced . . . alone dooms [the] mitigation defense").

greater opportunity to reduce damages by performing its own contractual duties.

******

The remainder of this brief now *opposes* HSBC's motion for summary judgment.

## IV.   PLAINTIFFS' MORTGAGE FILE CLAIMS SHOULD PROCEED TO TRIAL

HSBC received detailed loan-by-loan final exceptions reports showing numerous

Mortgage File breaches in the months after each trust closed.  56.1 ¶¶ 160-168.  Blum reviewed

those reports and identified, on a loan-by-loan basis, which exceptions materially impacted the

value of the loan; and Milner calculated damages based on 4,422 materially breaching loans:

| ACE 2005-AG1 | ACE 2006-OP2 | DBALT 2007-OA1 | MHL 2007-1 | FHLT 2006-C | NHELI 2007-1 | Total Loans |
|---|---|---|---|---|---|---|
| 881 | 787 | 566 | 511 | 1,267 | 410 | 4,422[15] |

### A.   The Exceptions Reports Provided Discovery or Notice of Material Exceptions

HSBC does not seek summary judgment by challenging a single materiality conclusion

for any of those loans, nor does it deny receiving the exceptions reports detailing those numerous

exceptions.  HSBC also freely admits (as it must) that "[t]he *purpose* of the repurchase process is

t*o remove from the trust* loans that are not of the character and quality represented to investors as

the result of *material deficiencies* in the loan origination process."  Br. 16.  Nevertheless, HSBC

(at 15-19) contends it did not "discover" or "receive notice" of material Mortgage File breaches

listed within those exceptions reports because it did not prepare them — or apparently even read

them given its practice of leaving those reports in metal filing cabinets — and the exceptions

reports did not indicate which missing or defective documents were material.  *Supra* p. 4.  But

that argument is contrary to the plain language of the PSAs and amounts to willful blindness.

---

[15] Blum Part IV (at 28-32) discusses Mortgage File breaches, followed by six trust-specific narratives in Blum Parts VI.B, VII.B, VIII.B, IX.B, X.B, XI.B, and XII.B (Duffy Ex. 4). Supporting those narratives are Appendices 1-6 and Exhibits 1-6 (Duffy Exs. 41-46) setting out Blum's materiality conclusions at a granular level.  Blum's complete report and exhibits are included on Plaintiffs' CD.

Judge Pauley denied summary judgment on indistinguishable Mortgage File breach claims, reasoning:  (1) "[t]he PSAs impose a duty on [the Trustee] to compel repurchase of a loan if the Mortgage File is defective and the Originator fails to cure within a prescribed period"; (2) "[Plaintiffs in that case] identified 112,028 loans out of the 253,033 loans in 53 trusts that contain material Mortgage File defects"; (3) there is "significant evidence that [the Trustee] failed to cure Mortgage File deficiencies"; and (4) "[w]hether [the Trustee] fulfilled its obligations *is a question of fact to be decided by a jury*."  *Commerzbank v. U.S. Bank*, 457 F. Supp. 3d 233, 256, 259 (S.D.N.Y. 2020).  There is no reason for this Court to create a split.

The linchpin of HSBC's argument is that "Section 2.03 does not mention the Custodian's exception report."  Br. 16.  But that is false — § 2.03 plainly incorporates the exceptions reports by conditioning repurchase on "any materially defective document in, or that a document is missing from, a Mortgage File," PSA § 2.03 (Uhlig App'x F), which can *only* refer to the exceptions reports expressly provided for in PSA § 2.01 (Uhlig App'x H, requiring "certifications" with "exceptions noted thereon").  *See Commerzbank*, 457 F. Supp. 3d at 256 ("The PSAs impose a duty on [Trustee] U.S. Bank to compel repurchase of a loan if the Mortgage File is defective and the Originator fails to cure within a prescribed period.").  HSBC's assertion is tantamount to saying 'omelette' (¶ 2.03) doesn't refer in any way to 'eggs' (§ 2.01).

The custodial agreements also require the custodian to provide the initial and final exceptions reports directly to the *Trustee only* (with copies to the Depositor and others).  Uhlig Ex. 2 (§§ 3 & 5) (§ 5: "Custodian . . . shall deliver to the Trustee (with a copy to the Depositor, the Master Servicer, the Servicer and the Seller), a Final Trust Receipt [and exceptions report]"; 56.1 ¶¶ 137-138.  This requirement that the Trustee be the *sole primary recipient* of the exceptions reports is fully consistent with the *Trustee's sole duty* to enforce in § 2.03.

20

HSBC also claims (at 14-19) that it could sit idly by for years based on speculative hope that a siloed custodian might have been receiving trailing documents that might somehow cure exceptions.  This too ignores § 2.03, which requires that "the Trustee shall *promptly* notify" warrantors of defects and then "the Trustee shall enforce" repurchase of any loans not cured, typically "within sixty (60) days."  Uhlig App'x F.  Further, the PSAs already provide for an *initial* exceptions report to be provided at or around the closing date of the trust, Uhlig Ex. 2 (Custodial Agreements § 3), with the final report to follow typically 180 days later (*id.* § 5).

Thus, the PSAs *already* contain a process for trailing documents to arrive after closing, indicating the parties contemplated that such documents should arrive by the time the final exceptions reports were prepared.  HSBC's assertions to the contrary violate its own tenet that the PSA provisions are what govern Trustee duties, not extra-contractual assumptions.  And while HSBC suggests (at 18) that some exceptions may be cured over time, Plaintiff expert Blum still found 4,422 loans with material Mortgage File breaches — a very substantial amount.

HSBC (at 18) faults Blum for relying on exceptions reports rather than reviewing the voluminous custodial files themselves, and claims (56.1 ¶ 100) "there is no admissible evidence that exceptions listed in exception[s] reports were not addressed after trust closing."  However, the exceptions reports are admissible under FRE 803(6) as "Records of a Regularly Conducted Activity" and are supported by business records declarations by the custodians that prepared them, Duffy Ex. 8 (Gorrien Decl.), as well as agreements by counsel for HSBC during discovery on which reports were the final or initial reports for each trust, Duffy Ex. 10, Duffy Ex. 11.

And *Commerzbank* held that Mortgage File claims *based on exceptions reports* should proceed to trial where "[t]he final certifications revealed thousands of *exceptions* in the Mortgage Files."  457 F. Supp. 3d at 254.  The same is true here.

###### B.      "Discovery" Requires Nosing to the Source

HSBC contends (at 17-19) exceptions reports did not provide discovery or notice of materiality, and that — despite the Trustee being *sole* primary recipient of exceptions reports and *sole* enforcer of warrantor repurchases — it could simply ignore them.  This claim is meritless.

*First*, the term "discovery" itself imposes on HSBC a duty to "nose to the source" to assess materiality.  Courts construing "discovery" in the same or similar context repeatedly have concluded that, "while learning of facts merely suggestive of a breach would not require the Trustee to immediately raise a claim, *upon receipt of such notice*, it becomes incumbent upon the Trustee to pick up the scent and nose to the source."  *WF I*, 247 F. Supp. 3d at 393 (emphasis in original); *see Policemen's Annuity v. Bank of Am.*, 907 F. Supp. 2d 536, 553 (S.D.N.Y. 2012) (same, and "'[a] party 'discovers' a breach when it knows *or should know* that the breach has occurred.'") (emphasis in original) (quoting *Morgan Guar. v. Bay View Franchise*, 2002 WL 818082, at *5 (S.D.N.Y.)); *LaSalle Bank v. Capco Am. Sec'n*, 2005 WL 3046292, at *3 (S.D.N.Y.) ("pick up the scent and nose to the source"); *Commerzbank v. U.S. Bank*, 277 F. Supp. 3d 483, 492 (S.D.N.Y. 2017) (same); *BNYM v. Morgan Stanley*, 2013 WL 3146824, at *19-20 (S.D.N.Y.) (same; "a buyer can be said to have 'discovered' a breach, not only if it 'knows' of the breach, but also if it 'should know'").

*Second*, HSBC's position that it can ignore lists of Mortgage File defects it received — thousands of which were in fact material — simply because no one specified for HSBC which of the listed defects were material would create absurd results.  HSBC would be allowed to assume every single exception among the tens of thousands listed was immaterial despite having *no evidence* to support such an assumption.  HSBC's position also absurdly implies *no one* was required to determine materiality.  Yet, HSBC points to no contract language saying the Custodian or anyone else was required to assess materiality, and HSBC did not provide the

22

exceptions reports to certificateholders, depriving them of the ability to make that determination for themselves.  *Supra* Part II.B.  This would render the exceptions reports essentially pointless and would result in the creation of lists of breaches no one was required to address.

*Third*, assessment of whether an exception "materially and adversely affects the value of such Mortgage Loan" (Uhlig App'x F) is hardly "painstaking," as HSBC (at 18) now contends. Whether HSBC was too incompetent or willfully blind to tell from the face of exceptions reports that obviously significant defects were material — including missing Notes, Mortgages, Assignments, and Title Policies — is a question of fact for the jury.  But The Trustee is not permitted "to avoid its obligations under this Section [2.03] through a stance of willful blindness."  *NCUA v. Wells Fargo*, 2017 WL 3610511, at *9 (S.D.N.Y.) ("*WF II*").  A jury could find, to the extent HSBC avoided learning that exceptions listed in the reports it received were material, that it buried its head in the sand — and exceptions reports in a metal filing cabinet — to "avoid liability by willfully blinding itself for the purpose of disclaiming knowledge."  *Id.*

*Fourth*, HSBC erroneously claims (at 5) "[d]iscovery" "requires a showing of actual knowledge."  Courts have rejected that claim because "'discovery' and 'actual knowledge' are different terms that must be given different meanings."  *WF II*, 2017 WL 3610511, at *9; *see Fixed Income Shares v. Citibank*, 157 A.D.3d 541, 542 (1st Dep't 2018) ("The PSA uses the word 'discovery' in section 2.04 and the term 'actual knowledge' in section 8.01, which implies that these terms have different meanings.").  The decision cited by HSBC (at 5) is inapposite.[16]

---

[16] *Royal Park v. HSBC*, 109 F. Supp. 3d 587, 594 (S.D.N.Y. 2015), denied a motion to dismiss contract claims concerning "HSBC's role as trustee for *two hundred eighty-three trusts*" with *no* construction of the term "discovery" as used in any given PSA.  Further, some PSAs *do* use the term "actual knowledge" with respect to Mortgage File or R&W breaches; but those at issue here *do not*.  *E.g.*, *Policemen's Annuity v. Bank of Am.*, 943 F. Supp. 2d 428, 433 (S.D.N.Y. 2013) (PSA: "Upon discovery by any of the Company, the Servicer or the Trustee (*in the case of the Trustee, having actual knowledge thereof*) of a breach of any of the representations and warranties in respect of the Mortgage Loan . . . .").

HSBC next complains Blum found copies of required documents — where the PSAs specifically required originals — to be "'potential indicators of fraud or otherwise flawed origination processes and increase the risk in any foreclosure proceeding.'"  Br. 18 (quoting Blum).  But, there is nothing wrong with findings that apply to documents or problems that are similar and it is obvious that copies of core documents can be problematic — indeed, one would not expect a responsible mortgage lender to close a loan without original documents, so their absence in a Mortgage File is a clear red flag.  As HSBC concedes (at 19), it would not be proper for the Court "to credit one expert over the other," which precludes summary judgment here.[17]

Finally, HSBC (at 19) faults Plaintiffs for modeling repurchase of performing loans with material breaches, but the PSAs in § 2.03 (Uhlig App'x F) measure risk *ex ante* and do not require a loss *ex post* to trigger warrantor repurchase duties.  Further, many loans performing at the time of the exceptions reports later went delinquent or defaulted, and it became increasingly important to preserve certificateholder principal by enforcing repurchase as the Great Recession unfolded and housing prices fell to reduce or eliminate borrowers' home equity.  *See* Duffy Ex. 9 (Blum Reply 63, 91-93).  Indeed, Milner's damages calculations here show that enforcement was far better for investors than the Trustee's unjustified policy of non-enforcement.

Finally, the jury could infer HSBC was influenced by its positional conflicts from related activities as a securities underwriter or sponsor of $16 billion in securitizations, and as the largest U.S. subprime mortgage loan originator by 2007 — roles in which HSBC would face the same types of arguments about breaching loans as a warrantor defendant that it would have to assert against warrantors as a Trustee plaintiff.  *See* Duffy Ex. 4 (Blum 47-53).

---

[17] The so-called non-statistical "sample" referenced by HSBC was comprised of a mere 262 of 5,344 exceptions found by Blum, who showed this claim is deeply flawed.  Duffy Ex. 9 (Blum Reply 77-80).

## V.    PLAINTIFFS' R&W CLAIMS SHOULD PROCEED TO TRIAL

Given the numerous Mortgage File breaches, HSBC should have attempted to get loans

repurchased and, when the warrantor (inevitably) refused, filed suit to enforce repurchase.

Under well-established case law, as a Trustee plaintiff HSBC could have given notice of specific

loans with breaches and further asserted claims for all *other* loans with breaches.[18]  Further,

HSBC could have used sampling to collect damages on *all* breaching loans in the trusts (rather

than proceeding loan-by-loan).[19]  As those suits should have been progressing, HSBC also was

learning about warrantor Deutsche Bank's fundamentally broken loan assembly line.

### A.    HSBC Discovered Pre-EOD R&W Breaches Through Its 16 DBSP Lawsuits

HSBC received and analyzed voluminous evidence indicating strongly suggestive of

R&W breaches in thousands of specific loans in the four bellwether trusts sponsored by

warrantor Deutsche Bank Structured Products ("DBSP"), ACE 2005-AG1, ACE 2006-OP2,

DBALT 2007-OA1, and MHL 2007-1.  In a 14-month period beginning March 2012, HSBC

sued DBSP *16 times* concerning 16 other DBSP-sponsored trusts, alleging DBSP systematically

---

[18] *E.g. Nomura Asset v. Nomura Credit*, 2014 WL 2890341, *11 (N.Y. Sup. Ct.) (valid breach notice "request[ed defendant] repurchase not only the specifically identified loans but 'any loans that did not comply with the representations and warranties made by' it"); *Home Equity 2006-5 v DLJ Mortg.*, 2014 WL 317838, *5-6 (N.Y. Sup. Ct.) (valid notice identified specific loans, notified seller of pervasive breaches, and demanded repurchase of all breaching loans); *Morgan Stanley 2006-14SL v. Morgan Stanley*, 2013 WL 4488367, *3 (N.Y. Sup. Ct.) (valid notice referenced allegedly breaching sampled loans and requested defendant repurchase "every other Defective Loan"); *MSST 2007-1 v. Morgan Stanley*, 289 F. Supp. 3d 484, 505-06 (S.D.N.Y. 2018) (valid "notice" of large number of breaching loans within a representative sample); *SACO I Trust v. EMC Mortg.*, 2014 N.Y. Misc. LEXIS 2494, *16-17 (N.Y. Sup. Ct.) (valid breach notice "referenced statistical sampling of the pools and requested repurchase of all breaching loans"); *Deutsche Bank v. Morgan Stanley*, 97 F. Supp. 3d 548, 552–53 (S.D.N.Y. 2015) (similar); *Deutsche Alt-A Sec. v. DBSP*, 958 F. Supp. 2d 488, 497 n. 3 (S.D.N.Y. 2013) (similar).

[19] *E.g.*, *Ambac v. Countrywide*, 179 A.D.3d 518, 521 (1st Dep't 2020) ("RMBS plaintiffs like Ambac are entitled to introduce sampling-related evidence to prove liability and damages in connection with repurchase claims") (citing *MSST 2007-1*, 289 F Supp at 493, 496; *Flagstar*, 920 F Supp. 2d at 412; and *Nomura*, 873 F.3d 85); *Assured Guar. v. DBSP*, 44 Misc. 3d 1206(A), *6 (N.Y. Sup. Ct. 2014) ("forcing Assured to re-underwrite all of the loans is commercially unreasonable and [] sampling may be used to compute damages"); *ACE Secs. v. DBSP*, 981 N.Y.S. 2d 633, *2 n.3 (N.Y. Sup. Ct. 2013) (table); *MBIA v. Countrywide*, 30 Misc. 3d 1201(A), *4 (N.Y. Sup. Ct. 2010).

securitized breaching loans in a fundamentally broken assembly line.  56.1 ¶¶ 169-206.

HSBC described "vast," "massive," and "pervasive" R&W breaches "suggest[ive] [of] a wholesale breakdown of underwriting standards."  56.1 ¶¶ 171, 175, 177, 181, 186; *see also* 56.1 ¶¶ 182, 187 ("The breaches reveal a fundamental breakdown of applicable loan underwriting standards."); Duffy Ex. 4 (Blum 60-82, cataloging HSBC allegations and other evidence of breaches).  HSBC concluded, "given the extent and severity of the breaches, the Breach Notices were sufficient to put DBSP on *notice* that Mortgage Loans throughout the *entire Trust — not merely the specific Defective Loans identified in the Breach Notices* — were sold to the Trust in breach of DBSP's representations and warranties."  56.1 ¶ 204.  HSBC concluded based on forensic reviews that "it is now clear based that . . . DBSP simply placed into the Trust a Mortgage Loan pool that was *fundamentally defective*."  56.1 ¶ 195, *see also* ¶ 179 (similar).

HSBC alleged R&W breaches must "exist *throughout* many other Mortgage Loans" in the DBSP Trusts, even if those loans have not yet been reviewed; indeed, "[g]iven that [reviews] have uncovered so many breaches of representations and warranties, *it is likely that a significant percentage of the remaining loans which have not yet been reviewed will reveal similar breaches*."  *Id.* ¶ 175, 178.  HSBC described the DBSP "origination process" as "rife with fraud and substantial defects by borrowers and originators alike."  *Id.* ¶ 201.  HSBC concluded "DBSP was — at the very least — grossly negligent in securitizing the Mortgage Loans."  *Id*.

Accordingly, HSBC acknowledged "wholesale" breaches and a general "disregard [of] underwriting guidelines" within loan pools backing DBSP securitizations issued during the same period as the four DBSP-sponsored at-issue R&W Breach trusts.  And nothing in HSBC's allegations suggests the problems it learned about concerning DBSP's securitization process could have possibly been limited to the specific 16 securitizations at issue in their lawsuits.

To the contrary, HSBC described the problems as "so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident."  56.1 ¶¶ 179, 184, 189.  HSBC summarized the findings of a 2011 Senate report, noting "DBSP and ACE *disregarded underwriting guidelines*, and as a result made representations and warranties for mortgages that did not meet stated criteria in the governing documents."  56.1 ¶ 172.  HSBC also summarized the allegations from a complaint brought by the Federal Housing Finance Authority in 2011, asserting "DBSP knowingly misrepresented the quality of the Mortgage Loans," including the ACE 2005-AG1, ACE 2006-OP2, and MHL 2007-1 trusts at issue here.  56.1 ¶ 197.  As HSBC explained in one case, "[t]his Trust is only one of *dozens* of public 'ACE'-identified securitizations sponsored by DBSP in 2006 and 2007, pursuant to which DBSP securitized approximately 187,800 loans, . . . now subject to thousands of repurchase demands."  56.1 ¶ 196.  HSBC also cited a January 2011 FCIC Report noting *half* the loans a third-party due diligence firm DBSP hired to review failed to comply with underwriting guidelines.  56.1 ¶ 172.

Further, HSBC also received multiple large-scale breach notices for DBSP-sponsored trusts, including one notice from Freddie Mac identifying 1,077 breaching loans in MHL 2007-1.  56.1 ¶ 207-208.  Such notices informed HSBC that DBSP's broken assembly line impacted all DBSP trusts including those at issue.  Duffy Ex. 4 (Blum 60-62, cataloging such notices).

**B.**     **HSBC Failed to Pick Up the Scent and Nose to the Source**

As noted above, when faced with such voluminous evidence of a fundamentally broken assembly line at DBSP as alleged by HSBC in 16 complaints, it was required to "pick up the scent and nose to the source," *WF I*, 247 F. Supp. 3d at 393, and had "knowledge of information that would lead a reasonable person to inquire further," *WF II*, 2017 WL 3610511, at *10.

**1.**  At the outset, HSBC had discovery or notice that 2,745 loans in the four DBSP-sponsored trusts contained material Mortgage File breaches.  *Supra* p. 20.  The existence of so

many breaches identified 180 days or so after close of each trust in the 2005-2007 time period, was a red flag strongly indicating the existence of additional R&W breaches in other loans, and as noted above should have caused HSBC to file lawsuits that would have been pending at the time HSBC subsequently learned of DBSP's fundamentally flawed conduit for numerous trusts.

HSBC's own manager, Thomas Musarra, recognized the link between Mortgage File breaches and R&W breaches.  In March 2007, securities underwriter Goldman Sachs informed HSBC that 14 Fremont trusts (including FHLT 2006-C) very likely had numerous R&W breaches.  56.1 ¶ 209.  Musarra promptly emailed custodian Wells Fargo that, "[b]efore we respond to Goldman, we would like to see current exception reports for the deals in question." *Id.*  By first asking for the exceptions reports, Musarra understood loans with Mortgage File breaches may have R&W breaches too, and vice versa — or so a reasonable jury may infer.

**2.**  Such a high volume of Mortgage File breaches together with the 16 lawsuits HSBC filed against DBSP should have caused it to nose to the source of R&W breaches for distressed loans in the DBSP trusts here.  Plaintiffs' expert Gary Shev examined a subset of loans for R&W breaches based on adverse characteristics that enhanced the suspiciousness of the particular loans, including Mortgage File breaches, delinquencies, and defaults; he found 1,973 such loans with material R&W breaches, and exceedingly high breach rates (Uhlig Ex. 34 (Shev 153)):

| Trust | # Breaching | # Reviewed | Breach Rate |
|---|---|---|---|
| ACE 2005-AG1 | 336 | 475 | 70% |
| ACE 2006-OP2 | 490 | 492 | 99% |
| DBALT 2007-OA1 | 513 | 516 | 99% |
| MHL 2007-1 | 634 | 645 | 98% |

**3.**  Every single one of the R&W breach loans Plaintiffs identified was securitized by DBSP, which HSBC repeatedly asserted in court filings was operating a fundamentally defective securitization process, making HSBC aware of underwriting problems necessarily applicable to

28

the specific loans Shev analyzed in the four DBSP trusts at issue.  *Supra* Part V.A.  A reasonable

jury could conclude that information rendering every loan in DBSP's securitization suspect is

"information that would lead a reasonable person to inquire further" into — at the very least —

the specific non-performing loans Shev analyzed here.

**4.**  In addition, every single one of the R&W breach loans Plaintiffs identified in ACE

2005-AG1, ACE 2006-OP2, and MHL 2007-1, and many of such loans in DBALT 2007-OA1,

were originated by entities plagued by systematic failures indicative of R&W breaches —

failures of which HSBC was aware.  *See* 56.1 ¶¶ 210-213 (confirming HSBC knew the loans at

issue were originated by some of the very worst originators in the country).

In sum, this evidence is sufficient for a jury to find the Trustee had "knowledge of

information that would lead a reasonable person to inquire further" into each of the loans Shev

reviewed and identified as breaching.  *WF II*, 2017 WL 3610511, at *10.  By failing to "pick up

the scent and nose to the source," *WF I*, 247 F. Supp. 3d at 393, the jury could find discovery by

the Trustee of each of those materially breaching loans; or that it avoided nosing to the source

"in order later to be able to deny knowledge."  *WF II*, 2017 WL 3610511, at *10.[20]

**C.**     **HSBC Is Not Entitled to Summary Judgment on its Good Faith Defense**

HSBC is not entitled to summary judgment on the affirmative defense of good faith, on

which it bears the burden of proof.  HSBC ignored the plain "Trustee shall enforce" command,

disregarded Mortgage File exceptions reports, and failed to enforce R&W breaches.  HSBC's

"lack of diligence and slacking off," and "willful rendering of imperfect performance,"

Restatement (Second) of Contracts § 205 (1981), is glaringly present in the record.

---

[20] Plaintiffs have not asserted events of default here, but may later do so for non-bellwether trusts.
Plaintiffs also do not here pursue TIA, Streit Act, or tort claims.  *See* HSBC Br. Parts III, V, VI.

Regardless, the relevant standard is ordinary negligence, not bad faith.  The PSAs provide the Trustee may not be liable "for an error of judgment made in good faith  . . . *unless it shall be proved that the Trustee . . . was negligent in ascertaining the pertinent facts*."  Uhlig App'x N.  Further, "[n]o provision of this Agreement shall be construed to relieve the Trustee . . . from liability for its own negligent action, its own negligent failure to act or its own misconduct."  *Id*.

## VI.   PLAINTIFFS' CLAIMS ARE TIMELY

### A.     The Extender Statute Applies to All Claims By the Separate NGN Trustee

HSBC contends (at 26) claims held by the Separate NGN Trustee are untimely because the Extender Statute does not apply to assigned claims.  However, five federal courts of appeal have held extender statutes for similar federal agencies apply to assigned claims.[21]  Judge Stein applied those precedents to hold the Extender applies to claims by the Separate NGN Trustee.  *See NCUA v. Deutsche Bank*, 410 F. Supp. 3d 662, 680 (S.D.N.Y. 2019) ("claims are timely.").

There is no basis for this Court to create an intra-district split on this issue.  And, in any case, the issue of assignments is now moot because the final NGN Trust unwound on June 12, 2021, and NCUA is once again the direct holder of *all* certificates relevant to this case.[22]

HSBC (at 27-28) notes that one rationale for allowing the Extender to travel with an assignment is marketability of the agency-held assets, but none of the courts required a case-

---

[21] *See UMLIC VP v. Matthias*, 364 F.3d 125, 133 (3d Cir. 2004); *Beckley Cap. v. DiGeronimo*, 184 F.3d 52, 57 (1st Cir. 1999); *UMLIC-Nine Corp. v. Lipan Springs*, 168 F.3d 1173, 1177 n.3 (10th Cir. 1999); *United States v. Thornburg*, 82 F.3d 886, 890-91 (9th Cir. 1996); *FDIC v. Bledsoe*, 989 F.2d 805, 809-12 (5th Cir. 1993).

[22] Judge Scheindlin (then presiding) held the Extender applies to claims brought by NCUA derivatively on behalf of NGN Trusts, *HSBC*, 117 F. Supp. 3d at 401-03, but that decision was abrogated when the Second Circuit held NCUA lacked standing to sue in a derivative capacity, *NCUA v. U.S. Bank*, 898 F.3d 243, 252 (2d Cir. 2018).  This Court then allowed Graeme Bush, as the newly appointed Separate NGN Trustee, to substitute as Plaintiff for claims based on certificates then held by NGN Trusts.  *See HSBC*, 2020 WL 91390, at *8.  As NGN Trusts have unwound, this Court has granted two amendments to the complaint.  *See* ECF 369, 399.  NCUA today (July 13, 2021) files a third and final such motion to reflect the fact it is now the direct holder of *all* certificates at issue in this case.

specific finding for each future assignment.  In any event, NCUA satisfies that rationale here because it re-securitized the RMBS certificates into the NGN trusts and issued notes backed by the cash flows in those trusts, which then were sold to purchasers for value in the open market. *See HSBC*, 117 F. Supp. 3d at 396.  Part of the economic viability of that arrangement for NCUA was to ensure the claims filed in this case could *continue* to be litigated to a judgment, and not immediately dismissed as untimely as a result of conveyance to the NGN Trusts.  As HSBC readily concedes (at 27), those claims "were timely when conveyed" to the NGN Trusts.

     **B.**     **NCUA's Complaint Was Timely Filed**

     **1.**  The Orders of Conservatorship for two of the liquidated credit unions were issued on March 19, 2009, and only made "effective upon service."  Uhlig Exs. 19, 20; *see also* Duffy Ex. 5 (NCUA Enforcement Manual).  Indeed, to avoid a run on a credit union or having insiders alter or destroy documents, the NCUA Board makes conservatorship decisions in closed session and the decision is made public — and effective — only when NCUA staff arrive to serve the order and take immediate control without advance notice to the credit union.  Fazio Decl. ¶ 8.  It is undisputed that both conservation orders were served on March 20, 2009.  56.1 Resp. ¶ 19.

     HSBC nevertheless claims (at 29-30) the date of conservation, and thus accrual under the Extender, was March 19, 2009, rendering NCUA's claims one day late under the six-year Extender when filed on March 20, 2015.  HSBC is wrong.  *First*, in a law-of-the-case ruling, Judge Scheindlin held "the statute of limitations began to run on March 20, 2009, for claims related to U.S. Central and WesCorp credit unions."  *HSBC*, 117 F. Supp. 3d at 403.  *Second*, that period began to run on the "date of [] appointment," 12 U.S.C. § 1787(b)(14)(B)(i), and NCUA was appointed only when the Order of Conservatorship became *effective* upon service

March 20, 2009.[23]  *Third*, multiple courts (in addition to this one) have held that March 20, 2009

is the conservatorship date for WesCorp and U.S. Central.[24]  Because "NCUA filed the

Complaint on March 20, 2015 — exactly six years after the first two credit unions were placed

into conservatorship . . . [—] the contract claims are timely."  *HSBC*, 117 F. Supp. 3d at 403.

**2.**  HSBC next maintains (at 30-31) that, even if the accrual date was March 20, 2009, the

limitations period expired on March 19, 2015 because the Extender provides the limitations

period begins "on the date the claim accrues."  12 U.S.C. § 1787(14)(A)(i)(I).  But, because the

Extender Statute does not "specify a method of computing time," the default counting method of

"exclude[ing] the day of the event that triggers the period" applies here.  Fed. R. Civ. P.

6(a)(1)(A); *see United States v. Inn Foods*, 383 F.3d 1319, 1325 (Fed. Cir. 2004) ("statutes of

limitations and waivers often identify the date on which a time period starts, but not the date on

which the period ends. . . . courts have chosen to follow the guidance of Rule 6(a) absent clear

language to the contrary in the statute or waiver in question."); *Mickens v. United States*, 148

F.3d 145, 148 (2d Cir. 1998) (for limitations periods "measured in years, the last day for

instituting the action is the anniversary date of the start of the limitations period").

As noted above, this Court and others have repeatedly applied the default rule to find

NCUA's claims timely as of March 20, 2015.  *HSBC*, 117 F. Supp. 3d at 403; *Deutsche Bank*,

410 F. Supp. 3d at 680; *NCUA v. Barclay*, 785 F.3d 387, 391 (10th Cir. 2015).  The principal

case on which HSBC relies, *FDIC v. Enventure V*, 77 F.3d 123 (5th Cir. 1996), was squarely

---

[23] The "effective date" is the "date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect," and "sometimes differs from the date on which the instrument was enacted or signed."  Black's Law Dictionary (11th ed. 2019).

[24] *NCUA v. RBS*, 833 F.3d 1125, 1130 (9th Cir. 2016) ("NCUA placed Wescorp into conservatorship on March 20, 2009."); *Deutsche Bank*, 410 F. Supp. 3d at 680 ("Under the Extender Statute, claims would have only started accruing on March 20, 2009, the day the first credit unions went into conservatorship — thus those claims would expire six years later on March 20, 2015.").

rejected by the Federal Circuit as "an anomaly" that also conflicted with earlier Fifth Circuit precedent. *Inn Foods, Inc.*, 383 F.3d at 1325 ("The decision in *Enventure V* . . . has been questioned by a later panel of the Fifth Circuit, which pointed out that *Enventure V* appears to be inconsistent with an earlier decision of the same circuit.") (citing *Flanagan v. Johnson*, 154 F.3d 196, 202 n. 4 (5th Cir. 1998), *Bledsoe*, 989 F.2d at 811-12). NCUA's claims are timely.

## VII.   THE SEPARATE NGN TRUSTEE HAS STANDING

Whether Bush as Separate NGN Trustee lacks standing is moot. As noted, the final NGN Trust has unwound and NCUA is again the direct holder of *all* certificates relevant to this case.

HSBC failed to assert champerty in its rejected challenges to standing, *see HSBC*, 2020 WL 91390, at *4, which now should be considered waived. In any event, Bush was appointed pursuant to the Separate Trustee Agreement to pursue the NGN claims, and was *not* an arms-length assignee. *See id.* at *2. *Deutsche Bank* rejected a similar argument "because nowhere is Bush purported to be an assignee" but "was appointed as a trustee." 410 F. Supp. 3d at 680.

HSBC's reliance (at 33) on *Phoenix Light v. U.S. Bank*, 2020 WL 1285783, at *16 (S.D.N.Y.), is misplaced. The champerty doctrine is "limited in scope" to "curtail the commercialization of or trading in litigation," *Trust v. Love Funding*, 13 N.Y.3d 190, 198-99 (2009), but here Bush is paid a fee as a Separate Trustee; must remit any proceeds back to BNYM; was appointed by BNYM to pursue claims *already* in litigation (only because NCUA was held not to have derivative standing); and has not "bought an interest in a claim under litigation . . . to share the benefits if the suit succeed[s]." *Id.* The logic of HSBC's argument would invalidate any successor trustee appointment, an absurd result this Court should reject.[25]

---

[25] *See Swartwout v. Johnson*, 5 Cow. 74, 87 (N.Y. Sup. Ct. 1825) ("The statute against champerty and maintenance has no application to a deed given by a trustee to his *cestui que* trust, in pursuance of the trust. Their titles constitute but one, and it must be immaterial, as to other persons, whether their titles be united in one person or not. There can be no danger, that a *cestui que* trust will purchase in his own title

## VIII.   PLAINTIFFS' DAMAGES EVIDENCE SHOULD PROCEED TO TRIAL

A jury should hear plaintiffs' damages claims.  The PSAs *required* the Trustee to compel

warrantors to repurchase breaching loans.  PSA § 2.03.  By *failing* to do so, HSBC caused the

trusts to lose millions of dollars.  Plaintiffs' expert Milner calculated economic damages that

HSBC caused by modeling a but-for world in which it enforced warrantor repurchases, running

the resulting higher cash flows through the trust-by-trust waterfall rules set out in the PSAs.

### A.      Plaintiffs Seek To Recover General Damages, Not Consequential Damages

HSBC (at 34-35) asserts five PSAs have "clauses that bar consequential damage," but

Plaintiffs in fact seek general damages.  General damages "are the natural and probable

consequence of the breach."  *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989).  "Lost

profits may be either general or consequential damages, depending on whether the non-breaching

party bargained for such profits and they are the direct and immediate fruits of the contract."

*Biotronik v. Conor Medsystems*, 22 N.Y.3d 799, 806 (2014).  The PSAs make clear warrantor

repurchases the Trustee failed to enforce "are the direct and immediate fruits of the contract."  *Id.*

The PSAs plainly require that the "Trustee" — not certificateholders — "shall enforce"

warrantor repurchase duties.  Damages to certificateholders flow *directly* from the Trustee's

*failure* to enforce as required by the PSAs.  The PSAs require Trustee enforcement precisely to

ensure repurchase monies are deposited into trust funds and flow proportionately to each

certificateholder.  An RMBS buyer "pays a lump sum in exchange for a certificate representing

the right to a future stream of income from the mortgage loans' principal and income payments."

*Nomura*, 873 F.3d at 100.  Damages therefore flow directly from the contract because Plaintiffs

seek their *pro rata* share of repurchase monies *the Trustee was bound to enforce*.

---

at an under value, for the purpose of litigation or oppression.").

Repurchase enforcement by HSBC "bore a direct relationship" to its performance — indeed, such enforcement was at the *core* of the Trustee's performance. *Biotronik*, 22 N.Y.3d at 803-07; *see id.* at 808 (lost profits from reselling defendant's product were general damages because they were the "very essence of the contract"). Plaintiffs seek damages from HSBC's failure to enforce and thus "to recover the value of the very performance promised." *Shonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000). Damages are consequential rather than general when they concern "lost profits from lost sales to third-parties that are *not* governed by the agreement" — that is, "collateral business arrangements" that are *not* addressed in the contract between the parties. *Biotronik*, 22 N.Y.3d at 807-08. The cases cited by HSBC fall into this category.[26]

Damages are based directly on the warrantor repurchases the Trustee *expressly promised to enforce*, and calculated by simulating the flow of repurchase funds through the trust waterfalls. General damages thus flow directly from the core PSA "Trustee shall enforce" duty. Courts properly have held such lost profits to be *general* damages when they flowed from the contract itself rather than collateral acts or contracts separate and apart from a plaintiff's contract with the defendant. *See Biotronik*, 22 N.Y.3d at 808-09 (lost profits from sales contract were general damages even where "contract did not require any payments from defendant to plaintiff").[27]

Finally, it is true the PSA language cited by HSBC refers to consequential damages

---

[26] *See* HSBC Br. 34-35; *MMS USA v PricewaterhouseCoopers*, 2013 WL 1154932, at *5 (N.Y. Sup. Ct.) (contract for accounting services; "taxes did not result from the alleged misrepresentation or actions of the defendant, but from the taxable events in which the taxpayer engaged"); *N. Indus. Holdings v. E. Env't Grp.*, 2016 WL 8541049, at *6-7 (N.D.N.Y.) (contract for asbestos survey; extra hauling and disposal costs due to cross-contamination caused by survey error were not "general damages").

[27] *See also Tractebel Energy v. AEP Power*, 487 F.3d 89, 109-10 (2d Cir. 2007) (power producer's lost profits were general damages for breach of supply contract); *Am. List Corp. v. U.S. News & World Rep.*, 75 N.Y.2d 38, 42-43 (1989) (lost profits from ten-year rental contract were general damages); *Orester v. Dayton Rubber Mfg.*, 228 N.Y. 134, 138-39 (1920) (lost profits were general damages for breach of exclusive distribution agreement); *Taboola, Inc. v. Ezoic Inc.*, 2019 WL 465003, at *15 (S.D.N.Y.) (lost advertising revenue from third parties were general damages for breach of contract).

35

"including but not limited to lost profits" (Uhlig App'x Q), but courts in this district have construed similar language by applying the canon of *noscitur a sociis* —"a word is known by the company it keeps" — to conclude "lost profits" comprising *general* damages are *not excluded* by a limitation on lost profits as *consequential* damages.[28]  The same is true here.

## B.   Plaintiffs are Entitled to "Make Whole" Amounts, Including With Respect to Liquidated Loans and Litigation Expenses

HSBC contends (at 35) that Plaintiffs are not entitled to "Make Whole" amounts and similarly argues (at 37) that, for four of the trusts, mortgage loans that were liquidated (*i.e.*, foreclosed) have a PSA-defined warrantor repurchase price of zero.  HSBC does not quantify its claim.  Moreover, the argument is absurd on its face as no one would expect a warrantor to be fortuitously let off the hook for damages to the trust when a loan with a balance of $200,000, for example, was sold in foreclosure for $100,000.[29]

Such a construction would improperly incentivize warrantors to delay repurchase as long as possible in hopes loans would foreclose, significantly reducing the ultimate repurchase price. *See Deutsche Alt-A Securities v. DBSP,* 958 F. Supp. at 504 ("[F]oreclosure cannot be an alternative to a repurchase remedy for non-conforming loans of which DBSP breached its RWs; this implication would give DBSP the ability to frustrate the Trust's repurchase remedy by

---

[28] *Nielsen Co. v. Success Sys.*, 112 F. Supp. 3d 83, 103 (S.D.N.Y. 2015) ("Despite [plaintiff's] description of these losses as 'lost profits,' they do not fall into any of the six excluded categories of damages . . . [and thus] constitute general damages which are not limited."); *see also In re Indesco*, 451 B.R. 274, 316 (Bankr. S.D.N.Y. 2011) ("[L]ost profit damages that are direct or general, and *not* within a subset of 'punitive, consequential, liquidated, incidental, or indirect damages,' can be recovered.").  The provisions construed in those cases are similar to the ones at issue here.  *See* Uhlig App'x Q.

[29] *See Wells Fargo v. Bank of Am.*, 2014 WL 476299, at *4 (S.D.N.Y.) ("a repurchase provision is intended to *shift risk to the seller*"); *Reichert v. N. MacFarland Builders*, 85 A.D.2d 767, 768 (3d Dep't 1981) (rejecting as "obviously unacceptable" a "reading of the contract [that] produces the absurd result that the less time plaintiff spent on the project, the greater the gross profit, and hence a correspondingly larger bonus would accrue"); *In re NXXI Inc.*, 216 F. Supp. 3d 381, 389-90 (S.D.N.Y. 2016) ("where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner").

delaying or refusing to repurchase the breaching Mortgage Loans until the servicer had, in mitigation of the Trust's losses, foreclosed on them.").

Judge Castel properly rejected this argument in concluding similar PSA language set the repurchase price to zero only for purposes of internal trust accounting — but not to absolve the warrantor from paying the balance of the repurchase price after foreclosure. *See MARM 2006-OA2 v. UBS Real Estate*, 2015 WL 764665, at *12-14 (S.D.N.Y). The "argument turns on the PSAs' definitions of 'Purchase Price,' 'Principal Balance' and 'Liquidated Mortgage Loan.'" *Id.* at *13. The PSAs here use similar terms with similar definitions. Uhlig App'x P. "As to the definition of 'Principal Balance,' the PSAs state that 'the Principal Balance of any Mortgage Loan that has become a Liquidated Loan during the related Prepayment Period shall be zero.'" *MARM*, 2015 WL 764665, at *13. As explained by the court, the definition of Purchase Price — "a price equal to the outstanding Principal Balance of such Mortgage Loan *as of the date of purchase*," *id.* (emphasis in original) — refutes the view warrantors get a windfall at liquidation:

> If, at some point after "the date of purchase," a Mortgage Loan were to become a Liquidated Mortgage Loan with a Principal Value of zero, it does not follow that the Principal Balance "as of the date of purchase" was also zero. Nothing in the language that UBS cites moves the Purchase Price to a point after "the date of purchase." Thus, if a loan were eventually to be liquidated subsequent to purchase, that Liquidated Loan would not automatically render the Purchase Price as zero.

*Id.* Further, the court reasoned:

> The Prepayment Period and Distribution Date govern the Trusts' *payments to the certificateholders*. They are *not part of the PSAs' remedial scheme*. The entire definition of "Liquidated Mortgage Loan" is conditioned on the language, "With respect to any Distribution Date." Under the PSAs, then, with respect to any Distribution Date, if a loan becomes a Liquidated Mortgage Loan during the relevant Prepayment Period, it has zero value for the purposes of calculating distribution to the shareholders. *For the purposes of the current dispute, these definitional sections do not alter the remedies available under section 2.03 of the PSAs.*[30]

---

[30] Many of the PSAs here likewise define "Liquidated Mortgage Loan" in a similar way. *See* Uhlig Ex. B (ACE 2005-AG1 at 44: defining "Liquidation Proceeds" to mean "[t]he amounts . . . received by

*Id.* at \*14; *see also Deutsche Alt-A Securities*, 958 F. Supp. at 504.[31]

Even if the repurchase price for the unidentified liquidated loans referenced by HSBC were zero *after* liquidation, the jury still could find the Trustee breached its enforcement duties by not obtaining the full repurchase price *before* liquidation and award damages accordingly.

### C.   Warrantors Were Liable to Pay the Trustee's Litigation Expenses

HSBC concedes (at 35) it would have been entitled to recover litigation expenses from warrantors, but notes that a recent case from New York's highest court would preclude recovery for attorney fees based on the relevant contract language for the trusts at issue here. *See In re Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 362 (2020). The effect on damages including prejudgment interest would be a $2.7 million reduction. *See* Milner Aff. ¶¶ 5-6. *But cf. id.* ¶ 7 (prejudgment interest calculated as of 7/31/2019 will grow by $21 million through 12/31/2021).

### D.   A Third-Party Settlement Raised by HSBC Is Inapplicable Here

HSBC contends (at 25-26, 38-39) a previous NCUA settlement agreement ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ HSBC is wrong.

*First*, as a "non-party" and non-beneficiary of that settlement, HSBC "lacks standing to enforce the agreement." *Premium Mortg. v. Equifax*, 583 F.3d 103, 108 (2d Cir. 2009). HSBC therefore has no basis to try and enforce the rights of a third party collaterally in this case.

*Second*, █████████████████████████████████████████████████████

---

the Servicer in connection with . . . (ii) the liquidation of a defaulted Mortgage Loan . . . [or] (iii) the repurchase . . . of a Mortgage Loan . . . pursuant to . . . Section 2.03."). If the proceeds earned from liquidated loans were zero dollars, there would be no need to list "Liquidated Proceeds" as a defined term.

[31] The sole contrary decision cited by HSBC is unpersuasive. In *BNYM v. WMC Mortgage*, No. 12-cv-7096, ECF 323 (S.D.N.Y. 2015), the court neither considered Judge Castel's thorough reasoning nor provided a rationale (there is none) for absolving the warrantor of liability after a foreclosure.

███████ it would not absolve HSBC from its own liability for failure to perform its trustee duties.

████████████████████████████████████████████████ — is

irrelevant to whether the party is entitled to damages from a defendant in the first instance.[32]

     *Third*, the settlement is dated October 28, 2011, well *after* Plaintiffs contend HSBC

should have filed lawsuits to enforce repurchase for Mortgage File breaches.  Duffy Ex. 33

(Milner Reply Ex. E).  Had those suits then been in process, the October 2011 third-party

agreement likely would have been structured differently, and HSBC should not be allowed to

benefit from its malfeasance as Trustee by assuming a settlement agreed to in the absence of

Trustee enforcement would have been the same as if Trustee enforcement then were pending.

     *Fourth*, HSBC wrongly argues (at 25) that NCUA ███████████████████

████████████████████████████████████████████████████

███████████████████████████████████████.”  HSBC's argument

ignores even the possibility of trustee enforcement without investor direction *and* ignores that

*other* investors could have directed action that would have benefitted Plaintiffs.  In any event,

HSBC lacks standing to seek collateral enforcement of a third party's rights in this case.

## IX.  HSBC'S POST-TRIAL ISSUES ARE PREMATURE AND LACK MERIT

### A.  There Is No Double Recovery, an Issue That Will Be Ripe Only After Trial

     HSBC (at 37-38) cites settlement proceeds related to certain RMBS certificates received

from different defendants, in different cases, based on different duties, injuries, and claims.

     **1.**  The Court need not address this issue now because such settlements are inadmissible

---

[32] The sole case cited by HSBC, is inapposite because it concerned two insurance companies with economically offsetting claims *against each other*.  *See Maryland Cas. v. Emps. Mut.*, 208 F.2d 731, 733 (2d Cir. 1953) (Hand, J.) ("Therefore, after paying the plaintiff a third of the settlement, the defendant, as surrogate of the Smedley Company, could have obtained a judgment for the same amount against Amendola, the driver; and if Amendola had paid this claim, he could have recovered it from the plaintiff under his policy of insurance. That would have been a complete circuity of action.").

at trial "to prove or disprove the validity or amount of a disputed claim."  Fed. R. Evid. 408(a).

In the absence of a money judgment rendered at trial, there is yet no basis to address offsets.[33]

    **2.**  In any case, damages offsets do not apply because the litigations HSBC references

involved different defendants, different claims, different conduct, and, most importantly,

different injuries.  NCUA sued securities underwriters, which created and brought the RMBS

deals to market, under Blue Sky laws and the Securities Act.  Those actions were not based on

contracts with trustees that failed to enforce warrantor repurchases, but rather federal or state

securities laws applicable to securities underwriters for making false representations.  56.1

¶¶ 214-218.

    Further, the Trustee's failure to enforce warrantor repurchases *in the years after the trusts*

*closed* is fundamentally different from the securities underwriters' failure to make true

representations *at the time the trusts closed*.  *See Tart v. Elementis Pigments*, 191 F. Supp. 2d

1019, 1024 n.2 (S.D. Ill. 2001) (no offsets between claims for "discrimination based upon a

disability versus retaliation for filing a workers' compensation claim," which were "markedly

different and did not overlap," and "for different claims involving different conduct").[34]  The

---

[33] *See Portugues-Santana v. Rekomdiv*, 657 F.3d 56, 63-64 (1st Cir. 2011) ("Rule 408 clearly prohibits the admission of a settlement agreement at trial for the purpose of arguing a reduction in the damages award."); *id.* ("post-trial" decision whether "damages award should be offset"); CPLR § 4547 (New York rule similar to Fed. R. Evid. 408); *Neenan v. Kamalian*, 292 A.D.2d 433 (2d Dep't 2002) ("To determine the amount of any offset, a verdict must [first] be rendered."); CPLR § 4533-b (setoff of monies paid by joint tortfeasor "shall be taken out of the hearing of the jury").  *See also Turnbull v. USAir*, 133 F.3d 184, 188 (2d Cir. 1998) (party asserting offset must prove it with "reasonable certainty").

[34] *See also U.S. Bank v. Dexia*, 2016 WL 6996176, at *7 (S.D.N.Y.) ("no principle precluding [non-breaching party] from exercising its contractual right to demand that [breaching party] pay its reasonable attorneys' fees" regardless of any recoveries received in separate litigation); *Sch. Dist. of Niagara Falls v. CrossPointe*, 2012 WL 1144618, at *2-3 (W.D.N.Y.) (refusing to find "plaintiff's damages were limited because the plaintiff was later reimbursed by a third party"); *Isaacs v. Jefferson Tenants*, 270 A.D.2d 95, 95-96 (1st Dep't 2000) ("Plaintiff was properly required to pay defendant['s] legal costs and . . . may not benefit from the circumstance that the cooperative had an insurance policy to cover its legal costs."); *O'Neill v. 225 E. 73rd Owners*, 298 A.D.2d 239 (1st Dep't 2002) ("[P]laintiffs were not effectively relieved of their counsel fee obligation by reason of the payment of those fees by defendant's insurance carrier."); *ADM Inv. Servs. v. Collins*, 515 F.3d 753, 755 (7th Cir. 2008) ("That a third party reimburses

cases cited by the Trustee are inapposite.[35]

As certificateholders, moreover, Plaintiffs would have been entitled to receive the benefit of any trust funds recovered by Trustee enforcement of warrantor repurchases. That Plaintiffs received settlement funds from separate actions does not and could not alter Plaintiffs contractual right to trust fund distributions under the PSAs. The PSAs provide they may only be amended by a prescribed set of parties — "the Depositor, the Servicer, the Master Servicer, the Securities Administrator and the Trustee" — and only in certain ways. Uhlig Ex. B (ACE 2005-AG1 § 12.01). But modification to PSA terms or provisions is permitted only if it does not "adversely affect in any material respect the interests of any Certificateholder." *Id.* Additionally, the Trustee may not consent to any amendment to the PSAs without having "first received an Opinion of Counsel." *Id.* Such requirements were not satisfied here.

**3.** Even if the Court prematurely were to consider damages offsets and find they apply (they do not), HSBC's calculations are nevertheless incorrect. *If* offsets were to apply (they do not), then they should be analyzed in the context of the *total* economic harm incurred by NCUA on its investment in the RMBS certificates, measured by the rescissionary damages available in Blue Sky or Securities Act suits against securities underwriters. This would result in a diminution of only $3.2 million in damages. *See* Duffy Ex. 33 (Milner Reply ¶¶ 306-307).

HSBC is wrong (at 38 n.23) to assert *Singer v. Olympia Brewing*, 878 F.2d 596 (2d Cir. 1989), rejected this approach. *Singer* merely declined to offset a damages award in the litigated

---

part of a loss does not disable the injured person from recovering under tort or contract law.").

[35] *Singleton Mgmt.v. Compere*, 243 A.D.2d 213, 218 (1st Dep't 1998) (*dicta* concerning possible future contract setoff); *In re Refco, Inc. Sec. Litig.*, 2007 WL 57872, at *4 (S.D.N.Y.) (analyzing proposed settlement agreement that includes discussion of hypothetical future settlements); *In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 18 F.3d 126, 132-33 (2d Cir. 1994) (analyzing the calculation of prejudgment interest pursuant to Estates, Powers & Trusts Law § 5-4.3(a) and, in *dicta*, commenting on setoffs under New York General Obligations Law § 15-108(a)).

case against a prior settlement amount trebled under RICO, where the "parallel RICO claim" in

the litigated case "*was dismissed prior to trial*."  *Id.* at 601.  Here, there is no such parallel claim

on which Plaintiffs have lost in this case; Plaintiffs do not seek to measure offsets against trebled

damages; and subsequent decisions have limited *Singer* to its facts.[36]

### B.  Plaintiffs Are Entitled to Prejudgment Interest

In New York, prejudgment interest has been set by the legislature at 9 per cent.  *See*

CPLR § 5001 ("Interest shall be recovered upon a sum awarded because of a breach of

performance of a contract."); CPLR § 5004 ("nine per centum per annum"); *U.S. Naval Inst. v.

Charter Commc'ns*, 936 F.2d 692, 698 (2d Cir.1991) ("Under New York law . . . a plaintiff who

prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of

right.").  In any event, it is "premature" for the Court to rule on prejudgment interest "until after

trial, after we see whether any damages are awarded and what they might be."  *Fleisher v.

Phoenix Life Ins.*, 997 F. Supp. 2d 230, 240-41 (S.D.N.Y. 2014).

HSBC's argument (at 39) that prejudgment interest is limited to matters that involve

debtor-creditor relationships is contrary to the plain language of the New York statute, and the

cases it cites were decided before enactment of CPLR § 5004 which necessarily abrogated those

decisions.  And contrary to HSBC's related contention (at 40), "[t]here is no requirement that the

breaching party obtain some benefit from the wronged party's money for statutory [prejudgment]

interest to be paid," because interest simply serves to "compensate the wronged party for the loss

of use of the money."  *J. D'Addario & Co. v. Embassy Indus.*, 20 N.Y.3d 113, 117 (2012).

---

[36] *See Gerber v. MTC*, 329 F.3d 297, 303 n.2 (2d Cir. 2003) ("*Singer* suggests that where a plaintiff *loses* on a claim at trial, the plaintiff cannot allocate a portion of the settlement to damages *for that losing claim* in order to reduce a non-settling defendant's judgment credit."); *Barkley v. United Homes*, 848 F. Supp. 2d 248, 266 (E.D.N.Y. 2012) ("[T]he argument . . . that the scope of the settlements with some defendants is broader than the jury verdict [] was not addressed by the Second Circuit in *Singer*.").

### C.   Plaintiffs are Entitled to Damages on the M1 Certificate for ACE 2005-AG1

HSBC wrongly argues (at 35-37) that Plaintiffs suffered no damages on a certain "M1 Certificate," and thus cannot claim prejudgment interest due to the lack of damages.

HSBC's argument ignores the time value of money.  If HSBC had not abandoned its duties, it would have made remediation payments related to the M1 in 2012.  In that but-for world, Plaintiffs would have had the benefit of the money owed nearly ten years ago, and could have re-invested that money.  To account for Plaintiff's "loss of the use of money they were entitled to receive," the law provides for application of prejudgment interest.  *Kassis v. Teachers' Ins. & Annuity Ass'n,* 13 A.D.3d 165, 165 (1st Dep't 2004) ("The purpose of prejudgment interest is to compensate parties for the loss of the use of money they were entitled to receive, taking into account the 'time value' of money." ); *McCoy v. Goldberg,* 810 F. Supp. 539, 547 (S.D.N.Y. 1993) ("The intent of awarding prejudgment interest under CPLR § 5001 is to compensate an aggrieved party for damages due to the loss of the use of money or its equivalent, or a loss of the opportunity to realize a fair return on that money.").  Thus, Plaintiffs' expert properly calculated prejudgment interest on the M1 damages as of the date of remediation.

### CONCLUSION

The Court should grant partial summary judgment to Plaintiffs and deny summary judgment to HSBC.

Dated: July 13, 2021

Respectfully submitted,

George A. Zelcs
John A. Libra
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
stillery@koreintillery.com

/s/ *Scott K. Attaway*
David C. Frederick
Scott K. Attaway
Matthew M. Duffy
Ana Nikolic
Catherine M. Redlingshafer
Travis G. Edwards
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
dfrederick@kellogghansen.com
sattaway@kellogghansen.com
mduffy@kellogghansen.com
apaul@kellogghansen.com
credlingshafer@kellogghansen.com
tedwards@kellogghansen.com

*Attorneys for the National Credit Union
Administration Board, as Liquidating Agent, and
Graeme W. Bush, as Separate Trustee*

Of Counsel:
Jeffrey A. Zick,
Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
jzick@ncua.gov