IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent, and<br><br>GRAEME W. BUSH, as Separate Trustee of NCUA GUARANTEED NOTES TRUST 2010-R2, NCUA GUARANTEED NOTES TRUST 2010-R3, NCUA GUARANTEED NOTES TRUST 2011-R1, NCUA GUARANTEED NOTES TRUST 2011-R2, NCUA GUARANTEED NOTES MASTER TRUST 2011-M1,<br>     Plaintiffs,<br>-against-<br><br>HSBC BANK USA, NATIONAL ASSOCIATION,<br>     Defendant. | Case No. 1:15-cv-02144-LGS<br><br>Hon. Lorna G. Schofield<br>Hon. Sarah Netburn |

**NCUA PLAINTIFFS' CONSOLIDATED REPLY BRIEF ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**REDACTED**

**TABLE OF CONTENTS**

I.  THE § 2.03 PHRASE "TRUSTEE SHALL ENFORCE" REQUIRES LITIGATION ...... 1

    A.  This Court Should Enforce the Plain Meaning of "Trustee Shall Enforce" ........... 1

    B.  HSBC Was Required to "Pick Up the Scent and Nose to the Source" ................... 4

        1.  The Mortgage File Breach Claims Should Proceed to Trial ....................... 6

        2.  The R&W Breach Claims Should Proceed to Trial ................................... 8

    C.  HSBC's Reliance on Industry Custom Is Precluded as a Matter of Law ............... 9

II. HSBC WAS REQUIRED TO ENFORCE UNDER § 2.03 WITHOUT DIRECTION AND INDEMNITY FROM CERTIFICATEHOLDERS .................................................. 10

III. HSBC'S AFFIRMATIVE DEFENSE OF FAILURE TO MITIGATE, FOR WHICH IT BEARS THE BURDEN OF PROOF, SHOULD BE DISMISSED ........................... 11

IV. HSBC'S REMAINING CONTENTIONS ARE UNPERSUASIVE ............................... 12

CONCLUSION ................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Carlton Group v. Mirabella SG SPA*, 2018 WL 3520494 (S.D.N.Y.) ....................................... 1, 2

*Chrysafis v. Marks*, 2021 WL 3560766 (S. Ct.) ................................................................ 3

*Commerce Bank v. BNYM*, 35 N.Y.S.3d 63 (App. Div. 2016) ........................................ 5

*Commerzbank v. U.S. Bank*, 277 F. Supp. 3d 483 (S.D.N.Y. 2017)................................. 5

*Commerzbank v. U.S. Bank*, 457 F. Supp. 3d 233 (S.D.N.Y. 2020)................................. 6

*DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006) ......................................................... 3

*FCCD Ltd. v. State Street Bank*, 2011 WL 519228 (S.D.N.Y.) ....................................... 9

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995) ............................................... 3

*Hall v. Orient Overseas*, 401 N.E.2d 189 (N.Y. 1979).................................................... 5

*MARM 2006-OA2 v. UBS Real Estate*, 2015 WL 764665 (S.D.N.Y.) ........................... 12

*Morgan Guaranty v. Bay View*, 2002 WL 818082 (S.D.N.Y.)......................................... 4

*Munoz-Gonzalez v. D.L.C., Limo.*, 904 F.3d 208 (2d Cir. 2018)...................................... 2

*NCUA v. Deutsche Bank*, 410 F. Supp. 3d 662 (S.D.N.Y. 2019) ..................................... 5

*NCUA v. Wells Fargo*, 247 F. Supp. 3d 377 (S.D.N.Y. 2017) ("*WF I*") ............................. 5, 9, 10

*NCUA v. Wells Fargo*, 2017 WL 3610511 (S.D.N.Y.) ("*WF II*") ...................................... 4, 5, 8, 9

*Royal Park v. HSBC*, 2017 WL 945099 (S.D.N.Y.) ....................................................... 5

*Twentieth Century Fox v. Netflix*, 2018 WL 3198560 (Cal. Ct. App.) ............................ 2

*U.S. Bank v. Ables & Hall*, 696 F. Supp. 2d 428 (S.D.N.Y. 2010)................................. 12

**Rules**

Fed. R. Evid. 803(6).......................................................................................................... 7

**Other Authorities**

1 William Blackstone, Commentaries ................................................................................... 3

Antonin Scalia & Bryan Garner, *Reading Law* (2012) ....................................................... 2

Blaise Pascal, Thoughts, Letters and Opuscules (O. Wight transl. 1859) ........................... 3

Fed. Res. Bank of St. Louis, S&P/Case-Shiller U.S. National Home Price Index,
    *available at* https://fred.stlouisfed.org/series/CSUSHPINSA ............................... 8

Publius Syrus, Moral Sayings (D. Lyman transl. 1856) ...................................................... 3

The Federalist No. 10 (James Madison) .............................................................................. 3

I.     THE § 2.03 PHRASE "TRUSTEE SHALL ENFORCE" REQUIRES LITIGATION

A.     This Court Should Enforce the Plain Meaning of "Trustee Shall Enforce"[1]

Despite asserting that the terms of the PSAs solely govern its obligations as Trustee, HSBC studiously ignores the core textual command in the PSAs that "the Trustee shall enforce" warrantor repurchase of materially breaching loans.  This Court should enforce that express command to the Trustee and grant partial summary judgment to NCUA.  "Where a contract is unambiguous, courts must effectuate its plain language without resort to extrinsic evidence." *Carlton Group v. Mirabella SG SPA*, 2018 WL 3520494, at *5 (S.D.N.Y.) (Schofield, J.).

Four of the six PSAs specifically provide that "the Trustee shall enforce."  NCUA Br. 4-5.  Three courts have construed language found in the fifth PSA to impose the same obligation, based on a requirement for the Trustee "to exercise the rights referred to above [including warrantor repurchases] for the benefit of all present and future Holders of the Certificates." *Id.* at 5-6.  Although HSBC (at 9) disputes those holdings in conclusory fashion, it does nothing to explain why this Court should create a split within this District and with New York state courts.  The sixth PSA also provides for enforcement by requiring the Trustee to perform "activities . . . necessary to accomplish the foregoing [including warrantor repurchases]" and "such other activities as may be required in connection with conservation of the Trust Fund."  NCUA Br. 6.

**1.** The applicable dictionary definitions of "enforce" all support this reading — indeed, "enforce" contains the word "force." *Id.* at 5 n.4.  The Trustee's response — relegated to a footnote — is that "enforce" might mean merely to "urge with energy."  Opp. 7 n.15.  But no reasonable juror could conclude — for a contract designed to protect the value of thousands of securitized loans by *enforcing* warrantor repurchases — that "enforce" in this context refers to

---

[1] Unless otherwise indicated herein, all emphasis is added; and all alterations, quotation marks, and citations are omitted.  Short citations such as *WF I* and *WF II* are as defined in NCUA's opening brief.

such an ineffectual, hortatory command. "Most common English words have a number of dictionary definitions. A court should assume the *contextually appropriate* ordinary meaning unless there is reason to think otherwise." *Munoz-Gonzalez v. D.L.C. Limo.*, 904 F.3d 208, 214 n.5 (2d Cir. 2018) (quoting Antonin Scalia & Bryan Garner, *Reading Law* 70 (2012)); *see also Carlton Grp*, 2018 WL 3520494, at *6 ("It is common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."). Plainly, the only effectual way to "enforce" compliance by an unwilling warrantor is to sue them.

The Trustee observes (Opp. 7 n.15) that "enforce" need not be "merely a synonym for litigate" in all contexts. That may be true when a warrantor *voluntarily* complies with a repurchase demand; but here the context is an *unwilling* warrantor and a Trustee caring for thousands of loans and charged with the command "Trustee shall enforce the obligations of the Seller . . . to repurchase such Mortgage Loan." NCUA Br. 2 (quoting Uhlig Ex. B). No reasonable juror may conclude this phrase *as used in* the PSAs means merely to "urge with energy but then take 'no' for an answer." Indeed, the PSAs require the Trustee both to "notify" warrantors of breaches and then to "enforce" repurchase. By reading "enforce" to mean merely to "urge," HSBC impermissibly conflates notice — the mere urging of warrantor compliance — with actual enforcement of repurchase by an unwilling warrantor. *See* NCUA Br. 7-8.[2]

In another footnote (Opp. 7 n.16), HSBC candidly recognizes the distinction between notice and enforcement, contrasting (1) "a request to cure" with (2) "[o]nly if no cure is provided may the Trustee then enforce by demanding repurchase of the loan." Even then, HSBC treats its enforcement obligation as optional ("may"), but the PSAs require "the Trustee *shall* enforce."

---

[2] In *Twentieth Century Fox v. Netflix*, 2018 WL 3198560 (Cal. Ct. App.), cited Opp. 7 n.15, the court construed a complaint (not a contract) under an anti-SLAPP statute, concluding that "enforce" as used in the complaint might be read not to challenge the protected "exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," *id.* at *3 — a usage context inapposite here.

**2.** HSBC contends (at 8) it could rely on any "document from a warrantor disputing that a breach had occurred." Opp. 7-8 (citing 56.1 App'x C). This ignores the clear command that "[n]o provision of this Agreement shall be construed to relieve the Trustee . . . from liability for its own negligent action, its own negligent failure to act or its own misconduct" — including where "the Trustee . . . was negligent in ascertaining the pertinent facts." Uhlig App'x N; *see* NCUA Br. 12, 29-30. Here, the warrantor has the financial obligation to repurchase breaching loans, which could run into the tens or hundreds of millions of dollars; it would be negligent, therefore, merely to take the warrantor's word in asserting lack of a breach. "To allow otherwise would be to appoint the fox as henhouse guard." *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006). Indeed, HSBC never would allow its own bank clients to be sole determiners of their contract obligations to the bank, and there is no reason to think as Trustee that it could allow self-interested warrantors to be the sole determiners of their obligations to the RMBS trusts.[3]

Moreover, HSBC never requested (or urged) any warrantor to repurchase loans with Mortgage File breaches, despite receiving final exceptions reports listing thousands of loans of which 4,422 had material breaches. NCUA Br. 4, 19, 21. So, while relying on the truth of any warrantor denials, HSBC denies the truth of exceptions reports. The Court should reject HSBC's duplicity: the Trustee credits representations of self-interested and highly conflicted warrantors, while denying the veracity of exceptions reports — created by independent custodians with no repurchase obligation — that the PSAs specifically required to identify deficient Mortgage Files.

---

[3] "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995) (Ginsburg, J.) (quoting The Federalist No. 10 (James Madison)); *see also id.* 428-429 (citing and quoting the following: Publius Syrus, Moral Sayings 51 (D. Lyman transl. 1856) ("No one should be judge in his own cause."); Blaise Pascal, Thoughts, Letters and Opuscules 182 (O. Wight transl. 1859) ("It is not permitted to the most equitable of men to be a judge in his own cause."); 1 William Blackstone, Commentaries *91 ("It is unreasonable that any man should determine his own quarrel."); *see Chrysafis v. Marks*, 2021 WL 3560766, at *1 (S. Ct.) ("ordinarily no man can be a judge in his own case").

### B.     HSBC Was Required to "Pick Up the Scent and Nose to the Source"

The illogical and commercially unreasonable result of HSBC's position is that, although the PSAs designate HSBC as the Trustee to be *sole* enforcer under PSA § 2.03 — "*the Trustee shall enforce*" warrantor breaches for which the Trustee has "discovery or receipt of notice" — the PSAs do not require the Trustee nor anyone else to determine materiality of breaches, thus rendering ineffectual the "the Trustee shall enforce" obligation. Courts repeatedly and properly have rejected similar contentions, concluding that the PSA terms "discovery" or "notice" expressly entail a requirement to "pick up the scent and nose to the source." *See* NCUA Br. 22 (collecting cases). HSBC provides no reason to create a split of authority with those decisions.

HSBC (at 1-2) advances the erroneous theory that "discovery or receipt of notice" of Mortgage File or R&W breaches should be read to mean the same as "actual knowledge." As NCUA explained (at 23 & n.16), both the First Department and Judge Failla in *Wells Fargo II* have held that "discovery" and "actual knowledge" must be read to have different meanings, pointing to use of the term "actual knowledge" elsewhere in the PSAs with respect to events of default as contrasted with "discovery" or "notice" regarding Mortgage File and R&W breaches.

Indeed, the term "discovery" on its face connotes inquiry notice. Judge Failla also held "discovery" could mean "implied actual knowledge," meaning "knowledge of information that would lead a reasonable person to inquire further." *WF II*, 2017 WL 3610511, at *10 (S.D.N.Y.). Indeed, when RMBS trustees have sued warrantors for loan repurchases, courts have held the term "discovery" means the trustee "knows or should know that the breach has occurred," and that the trustee has a duty "to pick up the scent and nose to the source" "upon receiving notice of facts merely suggesting that a breach has occurred." *Morgan Guaranty v. Bay View*, 2002 WL 818082, at *5 (S.D.N.Y.). It would be incongruous to construe the same word differently here, just because the Trustee is a defendant rather than a plaintiff.

HSBC seeks to avoid this inescapable conclusion by advancing a distinction without a difference, asserting "'discovery' means the *acquisition* of actual knowledge." Opp. 1. To the extent HSBC means the *completed* act of acquiring actual knowledge, that reading means the same as "actual knowledge" with respect to events of default, which multiple courts have rejected based on the fundamental tenet of contract law that "parties must be deemed to have intended different meanings" by using different "language [in] two provisions." *Hall v. Orient Overseas*, 401 N.E.2d 189, 189 (N.Y. 1979). And if HSBC means a *process* of acquiring actual knowledge, then it supports application of the well-established "nose to the source" case law.

HSBC (at 1) cites a discussion of events of default in *Commerce Bank v. BNYM*, 35 N.Y.S.3d 63 (1st Dep't 2016), but Judge Failla properly held that passage was inapplicable to the discovery or receipt-of-notice standard. "[W]hile learning of facts merely suggestive of a breach would not require the Trustee to immediately raise a claim, upon receipt of such notice, it becomes incumbent upon the Trustee to pick up the scent and nose to the source. . . . In *Commerce Bank*, there was no notice, no discovery, and therefore no duty to nose to the source. This is consistent with the law in this Circuit; it does not undermine it." *WF I*, 247 F. Supp. 3d 377, 393 (S.D.N.Y. 2017); *see Commerzbank v. U.S. Bank,* 277 F. Supp. 3d 483, 492 (S.D.N.Y. 2017); *NCUA v. Deutsche Bank*, 410 F. Supp. 3d 662, 684 (S.D.N.Y. 2019).

HSBC (at 1) also cites Magistrate Judge Netburn's statement in a sampling order that "[t]he Court, however, reads 'discovery' as used in Section 2.03 to mean actual knowledge." *Royal Park v. HSBC*, 2017 WL 945099, at *6 (S.D.N.Y.). The same statement was reversed in *WF II* because "'discovery' and 'actual knowledge' are different terms that must be given different meanings." 2017 WL 3610511, at *9. When this Court affirmed the sampling order, it declined to rule on the meaning of "discovery" as used in § 2.03. Order at 5, ECF 314 (Feb. 23,

5

2018); *see also* Order Denying Recon. at 2, ECF 335 (Apr. 24, 2018) ("The Court declines to rule on the issue of the meaning [of] § 2.03 until presented with more comprehensive factual record at an appropriate juncture such as on a motion for summary judgment.").

### 1. The Mortgage File Breach Claims Should Proceed to Trial

HSBC does not dispute that Judge Pauley, in *Commerzbank v. U.S. Bank*, 457 F. Supp. 3d 233 (S.D.N.Y. 2020), denied summary judgment and allowed Mortgage File breach claims to proceed to trial, but contends that decision is distinguishable because "the Trustee also served as custodian in many trusts, or was otherwise assigned the role of reviewing the file for each mortgage and certifying that the loan documentation is accurate and complete." Opp. 3.

However, nothing in that decision turned on whether the Trustee or a third party served as the Mortgage File document *custodian*, but rather on which entity had the duty to *enforce* warrantor repurchase duties. There, as here, it was the Trustee that had the duty to enforce:

> If the Mortgage File is defective, U.S. Bank must demand that the Sponsor cure the defect or repurchase the loan. . . . The PSAs impose an obligation on U.S. Bank as Trustee to provide notice to the Originator or Seller if the Mortgage File is incomplete or noncompliant. And the PSAs require U.S. Bank to enforce the deal parties' obligations to repurchase loans with defective Mortgage Files within a prescribed period.

*Commerzbank*, 457 F. Supp. 3d at 256. In *Commerzbank*, the evidence at summary judgment was that "U.S. Bank attempted to enforce repurchase of defective loans in only two trusts," and the court held for all trusts (including those two) that the Mortgage File breach claims "may proceed to trial." *Id.* at 259. There is no basis for a contrary ruling or intra-District split here.

In a footnote, HSBC (at 4 n.6) disputes HSBC was sole primary recipient of exceptions reports, but the custodial agreements (Uhlig Ex. 2) provide for direct delivery of those reports *only* to the Trustee, with a mere "copy" provided to other parties, none of which has a PSA enforcement duty against warrantors. This only confirms the Trustee's duty to enforce, and

6

undermines HSBC's unfounded assertions (at 4 n.6) — made without textual support — that other parties were responsible for enforcing Mortgage File breaches.  Similarly, HSBC's prevaricating contention (at 5) § 2.03 "does not even mention exception[s] reports" ignores PSA structure that refers in § 2.01 to "certifications" with "exceptions noted thereon," Uhlig App'x H, followed by the § 2.03 duty conditioning repurchase on "any materially defective document in, or that a document is missing from, a Mortgage File," Uhlig App'x F.  This structure makes clear such defective or missing documents were to be catalogued in exceptions reports that § 2.01 required to be delivered to the Trustee within a prescribed period (180 days).  *See* NCUA Br. 21.

Although HSBC (at 4) claims again that NCUA's expert Len Blum could not rely on the exceptions reports, it does not dispute Judge Pauley allowed similar Mortgage File breach claims to proceed to trial *based on exceptions reports*, nor does it dispute those reports are *admissible at trial* under Federal Rule of Evidence 803(6) as business records.  *See* NCUA Br. 21.

HSBC (at 4) next complains "exception[s] reports routinely list a significant portion if not the majority of each the trust's collateral."  That fact does not help HSBC, but rather is a major red flag in the crucial documents necessary to secure the Trustee's security, interest, and possession of the loans backing an RMBS.  Further, PSA § 2.03 provided for a notice-and-cure period *before* the Trustee was required to enforce repurchase.  *See* NCUA Br. 21.

Nor would Trustee enforcement of repurchases "essentially unravel[ ] the transaction the sophisticated parties had just consummated."  Opp. 4.  It was the *lack* of Trustee enforcement that caused huge losses on bonds rated AAA at issuance.  Corrected First Am. Compl. Ex. M, ECF 65-13 (Aug. 19, 2015).  As the financial crisis unfolded, it became increasingly important to *preserve* certificateholder principal by enforcing repurchase as housing prices fell to reduce or eliminate borrower home equity.  NCUA Br. 24.



### 2. The R&W Breach Claims Should Proceed to Trial

HSBC does not dispute it sued warrantor DBSP 16 times concerning 16 trusts in a 14-month period alleging DBSP operated a fundamentally defective assembly line rife with loan pools repeatedly riddled with defective loans. HSBC contended those fundamental and numerous problems showed wholesale R&W breaches throughout each of the 16 trusts that could not be the result of mere accident. HSBC also does not dispute those complaints relied on publicly available documents indicating DBSP systematically securitized breaching loans, and that each of the four DBSP trusts in this case contained loans originated by the worst originators in the country. Nor does HSBC dispute that a review of any of the distressed loans in the trusts would have resulted in findings of exceedingly high breach rates. *See* NCUA Br. 25-30.

HSBC instead argues (at 5-6) that the above is insufficient evidence that HSBC "discovered" or received "notice" of R&W breaches here. To the contrary, based on HSBC's own admissions in 16 court filings, the jury permissibly may find HSBC received sufficient facts suggestive of a breach that would "lead a reasonable person to inquire further" into each one of

---

[4] Fed. Res. Bank of St. Louis, S&P/Case-Shiller U.S. National Home Price Index, *available at* https://fred.stlouisfed.org/series/CSUSHPINSA; Duffy Ex. 9 at 64 (Blum reproduction of same chart).

8

the breaching loans at issue in this case. *WF II*, 2017 WL 3610511, at *10. By failing to "pick up the scent and nose to the source," *WF I*, 247 F. Supp. 3d at 393, the jury could find discovery by the Trustee of each of those materially breaching loans. Further, the four DBSP trusts here had 2,745 loans with material Mortgage File breaches, and HSBC manager Thomas Musarra's request for exceptions reports upon being told by Goldman Sachs of numerous R&W breaches shows HSBC's awareness that the two were linked in the same sets of loans. NCUA Br. 27-28.

The *sui generis* nature of the facts here makes the cases HSBC cites inapplicable, and the fact of and allegations made in HSBC's 16 lawsuits in a 14-month period against DBSP allows a jury reasonably to conclude HSBC had "knowledge of information that would lead a reasonable person to inquire further." *WF II*, 2017 WL 3610511, at *10. Further, HSBC concedes by its silence that it could have proven its claims by providing notice of both known and unknown breaches and then using sampling to collect damages for *all* breaching loans. *See* NCUA Br. 25.

    **C.**  **HSBC's Reliance on Industry Custom Is Precluded as a Matter of Law**

Seeming to recognize the lack of any textual hook to support its interpretation, HSBC claims (at 9-10) that industry custom changes the phrase "the Trustee shall enforce" in effect to mean "the Trustee may do whatever it wants." But HSBC does not dispute that the SEC specifically found *no* industry custom regarding the trustee's level of oversight in 2005. NCUA Br. 9-10. And its claim (at 10) that 2005 "is not even from within the relevant timeframe" is erroneous because the trusts at issue closed between October 2005 and May 2007, *see* 56.1 ¶ 4 — the time when any industry custom would have needed to be already firmly established.

HSBC cites *FCCD Ltd. v. State Street Bank*, 2011 WL 519228 (S.D.N.Y.), but there the court found the provision at issue "unambiguous" when read in conjunction with its "context" and "sole purpose." *Id.* at *6. Similarly, here the "sole purpose" (*id.*) of the "Trustee shall enforce" provision was to require the Trustee to recover 100 cents on the dollar of outstanding

9

principal for materially breaching loans, and "enforce" is neither a defined term in the PSAs nor a technical word that has taken on a specialized meaning such as a "baker's dozen."

Moreover, any industry custom set by an oligopolistic industry is inherently suspect as a race to the bottom, whether as a matter of tort or contract. NCUA Br. 11. Further, HSBC nowhere disputes the plain fact that its own expert *twice* has agreed that the PSA term "enforce" in plain English must mean "to make happen," thus impeaching HSBC's contrary position. *Id.*

## II. HSBC WAS REQUIRED TO ENFORCE UNDER § 2.03 WITHOUT DIRECTION AND INDEMNITY FROM CERTIFICATEHOLDERS

The PSAs give a certificateholder quorum the *option* to direct the Trustee, but do not *require* such direction as a precondition to § 2.03 enforcement. NCUA Br. 11-12 (discussing PSA § 9.02(a)(iii)). HSBC concedes this is correct by failing to address Plaintiffs' reading of the text of § 9.02(a)(iii). HSBC (at 8) merely cites a paraphrasing of § 9.02(a)(iii) from a prospectus supplement, which likewise is limited to actions "at the request" of a certificateholder.

None of the PSA provisions cited by HSBC (at 8) calls into question the self-effectuating nature of the enforcement duty in § 2.03. As noted, while the Trustee need not be a roving investigator without cause, upon discovery or notice of a breach "it becomes incumbent on the Trustee to pick up the scent and nose to the source." *WF I*, 247 F. Supp. 3d at 393; *see* NCUA Br. 13. HSBC's interpretation would impermissibly read "the Trustee shall enforce" duty out of the contract. Nor would enforcement require HSBC to "expend or risk its own funds," Opp. 8, because the PSAs permit reimbursement from trust funds for reasonable enforcement expenses, and HSBC has profitably billed $300 per hour to do so. NCUA Br. 17 & n.12.

HSBC likewise fails to dispute the structural fact that the PSA *text* does *not* require the Trustee to notify certificateholders about breaches. NCUA Br. 15-16. Nor did HSBC ever inform certificateholders of the evidence in its files showing Mortgage File and R&W breaches;

10

and its experts testified repeatedly certificateholders would *not* have factual information necessary to decide whether to direct Trustee litigation. *Id.*; 56.1 ¶ 154.

HSBC contends NCUA otherwise had information available to decide whether to direct repurchase, but this is not true. As to Mortgage File breaches, HSBC *never* provided NCUA or other certificateholders with the exceptions reports that showed massive numbers of breaches 180 days or so after the close of each trust. NCUA Br. 15; 56.1 ¶ 154. As to R&W breaches, on occasion some certificateholders went through an arduous and expensive process to get loan files and re-underwrite loans, but even then HSBC did not distribute those materials to other certificateholders and its own experts have admitted in testimony that there was no way for certificateholders to get the breach information in the Trustee's own files. NCUA Br. 16.

Given this structural element — and the lack of a textual hook requiring certificateholder direction — the Court should hold such direction is *not* a prerequisite for § 2.03 enforcement.

## III. HSBC'S AFFIRMATIVE DEFENSE OF FAILURE TO MITIGATE, FOR WHICH IT BEARS THE BURDEN OF PROOF, SHOULD BE DISMISSED

HSBC concedes it bears the burden of proof yet cites *no evidence* showing the amount NCUA's damages allegedly would have been reduced by mitigation. It claims (at 14-15) NCUA "could have directed HSBC to pursue repurchase for every loan at issue." If the Court rules (as it should) that HSBC must enforce *without* direction and indemnity, HSBC essentially faults NCUA for failing to do HSBC's job. Regardless, HSBC offers *no evidence* NCUA itself held enough voting rights to direct HSBC or that NCUA could have identified other investors for that purpose, much less that such unidentified investors would have joined NCUA even if they could be found. *See* Duffy Ex. 63 (Blum Reply 96-100) (explaining difficulty of locating investors).

HSBC also concedes (by not disputing) that it has never identified a trigger event for NCUA's alleged mitigation duties even though mitigation is required only where "it appears that

11

the breaching party has abandoned or repudiated [its] obligations under the contract." *U.S. Bank v. Ables & Hall*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010).  HSBC asserts that when NCUA reached a certain settlement and ███████████, NCUA "knew that HSBC was not unilaterally pursuing litigation for repurchases," but it cites *nothing* to support that factual claim. Opp. 15 (no citation to 56.1 statement).  In any case, HSBC would *also* have to show NCUA knew it had discovered Mortgage File and R&W breaches and was still not enforcing repurchase, but HSBC never told certificateholders it was ignoring thousands of Mortgage File breaches or had altogether abandoned enforcement duties.  NCUA Br. 15-16; *supra* pp. 10-11.

### IV.     HSBC'S REMAINING CONTENTIONS ARE UNPERSUASIVE

*Timeliness*.  HSBC ignores that five federal courts of appeals have held the Extender travels with an assignment.  Nor does HSBC credibly dispute the Order of Conservatorship became effective only upon service on March 20, 2009, and it fails to explain why this Court should disregard the weight of authority (*see* NCUA Br. 32-33) applying the default counting rule that the limitations period excludes the day of the event that triggers the period.

*Damages and Prejudgment Interest*.  HSBC does not refute the weight of authority demonstrating NCUA's damages are direct rather than consequential because they flow *directly* from HSBC's failure to adhere to the core "Trustee shall enforce" command.  NCUA Br. 34-36.

With respect to make-whole payments**,** HSBC ignores Judge Castel's holding the zero-price provision is limited to "purposes of calculating distribution to the shareholders," and does not let warrantors off the hook for shortfalls between the loan foreclosure price and remaining principal balance.  *MARM 2006-OA2 v. UBS Real Estate*, 2015 WL 764665, at *14 (S.D.N.Y.).

HSBC's remaining contentions likewise are unpersuasive.  *See* NCUA Br. 38-43.

### CONCLUSION

NCUA's cross-motion should be granted and HSBC's motion should be denied.

Dated: August 24, 2021

George A. Zelcs
John A. Libra
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
stillery@koreintillery.com

Of Counsel:
Jeffrey A. Zick
Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
jzick@ncua.gov

Respectfully submitted,

/s/ *Scott K. Attaway*
David C. Frederick
Scott K. Attaway
Matthew M. Duffy
Ana Nikolic
Catherine M. Redlingshafer
Travis G. Edwards
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
dfrederick@kellogghansen.com
sattaway@kellogghansen.com
mduffy@kellogghansen.com
apaul@kellogghansen.com
credlingshafer@kellogghansen.com
tedwards@kellogghansen.com

*Attorneys for the National Credit Union Administration Board, as Liquidating Agent, and Graeme W. Bush, as Separate Trustee*