**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> HSBC BANK USA, NATIONAL ASSOCIATION, <br><br> Defendant. | **Case No. 15-cv-2144-LGS-SN** |

**CONSOLIDATED STATEMENTS AND COUNTERSTATEMENTS OF**
**UNDISPUTED FACTS BY DEFENDANT AND PLAINTIFFS**
**PURSUANT TO LOCAL RULE 56.1**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**REDACTED**

## TABLE OF CONTENTS

HSBC's Preliminary Statement ...................................................................................1

Plaintiffs' Opposition to HSBC's Preliminary Statement ............................................2

Defendant HSBC's Reply Statement Of Undisputed Facts in Support of its Motion for
    Summary Judgment (Statements 1-131) ..................................................................3

I.       Background.............................................................................................................3

       A.     The Corporate Credit Unions Originally Invested in the RMBS
            Certificates That Are the Subject of Plaintiffs' Claims. ...............................8

       B.     The Corporate Credit Unions That Invested in the Relevant RMBS
            Certificates Were Placed into Conservatorship and Liquidated by NCUA....10

       C.     Beginning in 2010, NCUA Recovered $107.7 Million in the Six Trusts
            through Settlement Agreements with Sellers and Underwriters............................13

       D.     In NCUA's October 28, 2011 Settlement Agreement with Deutsche Bank,
            NCUA Agreed ███████████████████████████.....................16

       E.     In 2010–2011, NCUA Resecuritized All but One of the Certificates In the
            Trusts Into NGN Trusts. ...............................................................................19

       F.     NCUA Understood RMBS Trustees Needed To Be Directed and
            Indemnified To Initiate Repurchase Litigation................................................22

       G.     In 2013, NCUA Directed and Indemnified HSBC as Trustee To Initiate
            Repurchase Litigation for a Trust Not At-Issue in this Case. ..........................25

       H.     Additional Procedural History .......................................................................32

II.     Additional Facts Relevant to plaintiffs' pre-EOD R&W Breach claims...........................34

III.    Additional Facts Relevant to Plaintiffs' Document Defect Claims. ..............................54

IV.    Additional Facts Relevant to plaintiffs' EOD Claims. ...............................................66

V.     Additional Facts Relevant to HSBC's Good Faith. ....................................................71

VI.    Additional Facts Relevant to Plaintiffs' Claims for Breach of Fiduciary Duty...............72

VII.   Additional Facts Relevant to Plaintiffs' claim for Damages. ......................................73

       A.     Consequential Damages................................................................................73

       B.     "Make Whole" Amounts and Litigation Expenses.................................................73

       C.     Negative Damages ........................................................................................75

       D.     Repurchase Price...........................................................................................76

       E.     THE DB/NCUA Settlement...........................................................................77

HSBC's Preliminary Statement Regarding its Responses and Objections to Plaintiffs'
    "Statement of Additional Facts" ...............................................................................78

Plaintiffs' Opposition to HSBC's Preliminary Statement ............................................78

Plaintiffs' Reply Statement of Undisputed Additional Facts In Support of its Motion
Summary Judgment and In Opposition to HSBCs' Motion for Summary Judgment
(Statements 132-215) ........................................................................................................79

VIII.   Facts Relevant to the PSA Phrase "Trustee Shall Enforce" and Relevant to Both
        Mortgage File and R&W Breaches ..................................................................................79

        A.      Trustee Duties Relating to the Acceptance of Right, Title, and Interest in
                the Mortgage Loans and Review of "Mortgage Files" ..........................................79

        B.      Trustee Enforcement of Warrantor Repurchase of Loans with Mortgage
                File or R&W Breaches ...........................................................................................90

        C.      HSBC Implemented a Policy of Declining To Compel Repurchase Against
                Unwilling Warrantors Absent a Party "Pushing the Repurchase" .......................102

        D.      HSBC's Lack of Reliance on Any Industry Custom Regarding Trustee
                Enforcement .........................................................................................................108

IX.     Facts Relevant to Plaintiffs' Mortgage File Claims, HSBC's Receipt of
        Exceptions Reports, and Its Non-Enforcement of Warrantor Repurchases ....................110

X.      Additional Facts Relevant to Plaintiffs R&W Claims ....................................................125

XI.     Additional Facts Relevant to Defendant's Affirmative Defense of Damages
        Offsets ...........................................................................................................................160

## HSBC'S PRELIMINARY STATEMENT

In moving for summary judgment, HSBC submitted a 24-page statement of 131 undisputed material facts in support of HSBC's motion, as required by Local Civil Rule 56.1(a). Pursuant to this Court's Individual Rule III.C.6, HSBC's statement "include[d] only those facts that [HSBC] genuinely believes to be both material and undisputed."  Plaintiffs were required to respond to each statement and authorized, "if necessary," to submit a "short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b).  Plaintiffs took this as license to submit their own, separate, affirmative "statement of facts."  Plaintiffs added 84 new "facts," most of which are irrelevant to HSBC's motion (or Plaintiffs' separate cross-motion), improper legal argument, and/or unsupported assertions.

HSBC responds, paragraph by paragraph, to Plaintiffs' counter-statement, despite its global defects and notes on a paragraph-by-paragraph basis those instances in which Plaintiffs (a) improperly seek to insert immaterial facts, (b) improperly seek to assert legal argument, or (c) otherwise violate the local and federal rules concerning summary judgment.  First, HSBC demonstrates that Plaintiffs have failed to controvert any of the undisputed facts in HSBC's Rule 56.1 statement.  Then, HSBC addresses each of Plaintiffs' asserted additional "facts" in turn, none of which impede summary judgment for HSBC on Plaintiffs' claims or support NCUA's cross-motion for summary judgment.

To the extent HSBC states below that a statement of material fact proffered by Plaintiffs is disputed or undisputed, HSBC does so for the purposes of this summary judgment briefing only.  HSBC preserves all potential evidentiary objections and does not hereby agree that any

purported fact proffered by Plaintiffs or evidence offered by them in support of a purported fact is either admissible or may properly be considered by the Court.

## PLAINTIFFS' OPPOSITION TO HSBC'S PRELIMINARY STATEMENT

Plaintiffs respectfully object to HSBC's preliminary statement, and note that cross-motions are at issue and thus Plaintiffs were entitled to submit their own "statement of material undisputed facts" which "shall not exceed 25 double-spaced pages."  Individual Rule III.C.6. Plaintiffs thus submitted a 20-page statement of 84 undisputed material facts in support of Plaintiffs' cross-motion for summary judgment, as required by Local Civil Rule 56.1(a), the Court's Individual Rule III.C.6, and the Court's May 11, 2021 Order (ECF 437) setting a schedule providing for cross-motions for summary judgment.

Plaintiffs' 56.1 responses and affirmative statements of fact are proper and identify genuine material disputes that plainly require trial on all of Plaintiffs' claims concerning Mortgage File breaches and R&W breaches.  HSBC's own statements and responses are in many cases laden with advocacy either in their express statement (e.g., HSBC ¶ 100) or by omitting key contract language or other materials that should be considered for proper context (e.g., HSBC ¶ 50) and frequently assert legal arguments (e.g., HSBC Reply ¶ 62).  Plaintiffs respectfully respond further below on a paragraph-by-paragraph basis.

**DEFENDANT HSBC'S REPLY STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (STATEMENTS 1-131)**

Pursuant to Local Rule 56.1, Defendant HSBC Bank USA, N.A. ("HSBC") submits the following replies to NCUA's responses to HSBC's statement of material facts as to which there can be no genuine dispute for trial.

## I.    BACKGROUND

1.    Plaintiff National Credit Union Administration Board ("NCUA") claims that it is bringing this action as the liquidating agent for five failed corporate credit unions ("CCUs") for which NCUA claims to have "succeeded to all rights, titles, powers, and privileges of." [Compl.[1] ¶¶ 17–22 (ECF 371).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party [] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

Plaintiffs' Further Response:  HSBC replies to this and *every other one* of Plaintiffs' responses (both "Undisputed" and "Disputed") with the form language above — a total of 131 instances.  When Plaintiffs have responded that a fact is "Undisputed," the language is unnecessary.  When Plaintiffs have responded that a fact is "Disputed," the automatic assertion that the disputed facts should be deemed admitted is inappropriate.  For the sake of brevity and to avoid burdening the Court, but to avoid any suggestion of waiver, Plaintiffs dispute that all of the

---

[1] "Compl." refers to Plaintiffs' Supplemental First Amended Complaint (ECF 371) filed on May 28, 2019.  Plaintiffs filed additional amendments by interlineation on June 4, 2020 (ECF 400), which will be referred to herein as "Compl. Am. Interlineation."

facts HSBC claims should be deemed admitted are in fact admitted, and refer the Court to Plaintiffs' responses to each paragraph below.

2.    The five CCUs for which NCUA is pursuing claims are U.S. Central Federal Credit Union ("U.S. Central"), which had its principal place of business in Kansas; Western Corporate Federal Credit Union ("Wescorp"), which had its principal place of business in California; Members United Corporate Federal Credit Union ("Members United"), which had its principal place of business in Illinois; Southwest Corporate Federal Credit Union ("Southwest"), which had its principal place of business in Texas; and Constitution Corporate Federal Credit Union ("Constitution"), which had its principal place of business in Connecticut.  [Compl. (ECF 371) ¶¶ 17–22; Compl. Am. Interlineation (ECF 400) ¶ 26.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

3.    Plaintiff Graeme W. Bush is a lawyer at the law firm of Zuckerman Spaeder who identifies himself as the "Separate Trustee of NCUA Guaranteed Notes Trust 2010-R2 ('NCUA 2010-R2 Trust'); NCUA Guaranteed Notes Trust 2010-R3 ('NCUA 2010-R3 Trust'); and NCUA Guaranteed Notes Master Trust ('NCUA 2011-M1 Trust') (in such capacity, the 'Separate Trustee'[)]."  [Compl. Am. Interlineation at Preamble (ECF 400).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

4.    Six RMBS Trusts at issue in this motion (the "Trusts") that issued certificates relevant in this action were chosen through a bellwether process.  The six Trusts are:

4

a. ACE Securities Corp. Home Equity Loan Trust, Series 2005-AG1 Asset Backed Pass-Through Certificates ("ACE 2005-AG1"), which closed on October 28, 2005, and was backed by 2,610 loans.  [Uhlig Ex.[2] A (App'x R) (hereinafter, this exhibit will be cited as "App'x"); Uhlig Decl. ¶ 3.]

b. ACE Securities Corp. Home Equity Loan Trust, Series 2006-OP2 Asset Backed Pass-Through Certificates ("ACE 2006-OP2"), which closed on October 30, 2006, and was backed by 4,472 loans.  [App'x R; Uhlig Decl. ¶ 4.]

c. Deutsche Alt-A Securities Inc. Mortgage Pass-Through Certificates, Series 2007-OA1 ("DBALT 2007-OA1"), which closed on February 28, 2007, and was backed by 1,164 loans.  [App'x R; Uhlig Decl. ¶ 5.]

d. Fremont Home Loan Trust 2006-C ("FHLT 2006-C"), which closed on September 7, 2006, and was backed by 7,806 loans.  [App'x R; Uhlig Decl. ¶ 6.]

e. MortgageIT Securities Corp. Mortgage Loan Trust, Series 2007-1 Mortgage Pass-Through Certificates ("MHL 2007-1"), which closed on May 31, 2007, and was backed by 1,248 loans in Group 2.  [App'x R; Uhlig Decl. ¶ 7.]

f. Nomura Home Equity Loan, Inc. Asset-Backed Certificates, Series 2007-1 ("NHELI 2007-1"), which closed on January 31, 2007, and was backed by 3,496 loans.  [App'x R; Uhlig Decl. ¶ 8.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

---

[2] "Uhlig Ex." refers to the exhibits attached to the Declaration of Lauren H. Uhlig.

5

5.      Within the Trusts are 20,796 loans at issue ("At-Issue Loans").  [*Supra* ¶ 4(a)-(f).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

6.      HSBC is the Indenture Trustee for the Trusts. [Compl. (ECF 371) ¶ 1.]

Plaintiffs' Response:  Disputed.  The Trusts are governed by Pooling and Servicing Agreements, not Indentures, as noted by HSBC in the next statement.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs do not specifically controvert the stated fact.  *See* L.R. 56(c).  The term "Indenture Trustee" does not require that the trust be governed by an indenture; it merely makes clear that the trustee is not a common-law trustee with fiduciary duties.  Indeed, this Court already determined that "HSBC served as Indenture Trustee" for the trusts at issue in Plaintiffs' Complaint.  Opinion & Order (ECF 56) at 3.

7.      Each Trust is governed by a Pooling and Servicing Agreement ("PSA"), which is governed by New York law.  [Uhlig Ex. B (ACE 2005-AG1 PSA); Uhlig Ex. C (ACE 2006-OP2 PSA); Uhlig Ex. D (DBALT 2007-OA1 PSA); Uhlig Ex. E (FHLT 2006-C PSA); Uhlig Ex. F (MHL 2007-1 PSA); Uhlig Ex. G (NHELI 2007-1 PSA).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

8.      HSBC, as Trustee, is a party to the PSAs for each of the Trusts.  [Acebedo Decl. ¶ 4; Uhlig Ex. B (ACE 2005-AG1 PSA); Uhlig Ex. C (ACE 2006-OP2 PSA); Uhlig Ex. D

(DBALT 2007-OA1 PSA); Uhlig Ex. E (FHLT 2006-C PSA); Uhlig Ex. F (MHL 2007-1 PSA); Uhlig Ex. G (NHELI 2007-1 PSA).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

9.     Plaintiffs are not parties to the PSAs, but contend that they are third party beneficiaries.  [Compl. (ECF 371) ¶ 494.]

Plaintiffs' Response:  Disputed insofar as Plaintiffs are parties to the certificates, which in turn, incorporate the PSAs.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact and they fail to provide supporting citations to record evidence, as required.  *See Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) ("[A] party opposing a motion for summary judgment *shall* file a short and concise statement of the material facts in dispute accompanied by citation to evidence which would be admissible."); L.R. 56.1(d) ("[E]ach statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible."); L.R. 56.1 Committee Note ("[A]ny opposing statement must respond specifically and separately to each numbered paragraph in the statement, and that all such paragraphs in both statements and opposing statements must be supported by citations to specific evidence.").  Plaintiffs are not listed as parties to any of the PSAs (*see* Uhlig Exs. B-G (PSAs) at 1 (listing parties to the PSA)), and Plaintiffs contend in their Complaint that they are "third party beneficiaries under the PSAs."  Compl. (ECF 371) ¶ 494.  Plaintiffs have not introduced any evidence showing otherwise.  Accordingly, there is no genuine dispute concerning this fact and it should be deemed admitted.

Plaintiffs' Further Response:  Whether Plaintiffs are or are not parties to the PSAs involves legal questions and interpretation of the applicable agreements and therefore cannot properly be characterized as an undisputed statement of fact.  The certificates at issue are explicitly "issued under and [are] subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound."  [*See*, *e.g.*, Uhlig Ex. D (DBALT 2007-OA1 PSA Ex. A-1 at HSBCCTLA0082218); *see also* ECF No. 445-6 at 119].  Certificateholders thus accept the PSAs and are bound by their terms.

**A.    The Corporate Credit Unions Originally Invested in the RMBS Certificates That Are the Subject of Plaintiffs' Claims.**

10.    Plaintiffs allege Wescorp purchased interests in three certificates issued by ACE 2005-AG1:  M1 Certificate (CUSIP 004427CC2), M2 Certificate (CUSIP 004427CD0), and M3 Certificate (CUSIP 004427CE8).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

11.    Plaintiffs allege U.S. Central purchased interests in two certificates issued by ACE 2006-OP2: M1 Certificate (CUSIP 00441YAF9) and A2D Certificate (CUSIP 00441YAE2).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

12.     Plaintiffs allege Wescorp purchased interests in two certificates issued by DBALT 2007-OA1:  A2 Certificate (CUSIP 25151VAB1) and A3 Certificate (CUSIP 25151VAC9).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

13.     Plaintiffs allege Members United purchased interests in one certificate issued by DBALT 2007-OA1:  A1 Certificate (CUSIP 25151VAA3).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

14.     Plaintiffs allege Southwest purchased interests in one certificate issued by FHLT 2006-C:  2A2 Certificate (CUSIP 35729TAD4).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

15.     Plaintiffs allege U.S Central purchased interests in one certificate issued by MHL 2007-1:  2A11 Certificate (CUSIP 61915YAB7), which was backed exclusively by loans in Group 2.  [Ex. A to Compl. (ECF 371-1); Uhlig Decl. ¶ 7; Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

9

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

16.     Plaintiffs allege U.S. Central purchased interests in one certificate issued by NHELI 2007-1:  1A4 Certificate (CUSIP 65537KAY6).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

17.     Plaintiffs allege Wescorp purchased interests in one certificate issued by NHELI 2007-1: 2A1B Certificate (CUSIP 65537KAC4).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

18.     Plaintiffs allege Members United and Wescorp purchased interests in one certificate issued by NHELI 2007-1:  2A1A Certificate (CUSIP 65537KAB6).  [Ex. A to Compl. (ECF 371-1); Uhlig Ex. 29 (Ex. A to Milner Report).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

**B.     The Corporate Credit Unions That Invested in the Relevant RMBS Certificates Were Placed into Conservatorship and Liquidated by NCUA.**

19.     NCUA placed Wescorp and U.S. Central into conservatorship on March 19, 2009. [Uhlig Ex. 19 (March 19, 2009 Order of Conservatorship for Wescorp); Uhlig Ex. 20 (March 19,

10

2009 Order of Conservatorship for U.S. Central); Uhlig Ex. 21 (NCUA 30(b)(6) Tr. I 63:11–13);

Uhlig Ex. 22 (March 19, 2009 Closed Board Meeting of NCUA); Uhlig Ex. 23 (*NCUA Places*

*U.S. Central and Wescorp Into Conservatorship*, CU Times, Mar. 19, 2009); Uhlig Ex. 24 (*NCUA*

*v. Siravo*, CV10-01597 (C.D. Cal.), ECF 116 (2d Am. Compl., Feb. 22, 2011) ¶ 1); Uhlig Ex. 25

(*NCUA v. Siravo*, CV10-01597 (C.D. Cal.), ECF 190 (Am. Ans., Oct. 31, 2011) ¶ 1); Uhlig Ex.

26 (*NCUA v. Wells Fargo Bank, N.A.*, 14-cv-10067 (S.D.N.Y), ECF 558 (Consolidated Statements

and Counterstatements of Undisputed Facts by Defendant and Plaintiffs Pursuant to Local Rule

56.1 on Cross-Motions for Summary Judgment, S.D.N.Y. Oct. 30, 2020) Statement 22 (NCUA

does not dispute that it placed Wescorp into conservatorship on March 19, 2009) & Statement 24

(NCUA does not dispute that it placed U.S. Central into conservatorship on March 19, 2009)).]

Plaintiffs' Response:  Disputed.  NCUA placed U.S. Central and WesCorp into

conservatorship on March 20, 2009.  "A conservatorship order takes effect immediately upon

service of the order to the credit union." [Duffy Ex. 5 (NCUA Enforcement Manual at 38); *see*

*also* Fazio Decl. ¶¶ 6, 8.]  The Orders of Conservatorship explicitly state that they are only

"effective upon service."  [Uhlig Exs. 19 & 20.]  And it is undisputed that both U.S. Central and

WesCorp federal credit unions were served with the Orders on March 20, 2009.  [Duffy Ex. 1,

(WesCorp); Duffy Ex. 2 (U.S. Central); *see also* Fazio Decl. ¶¶ 6, 8.]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs fail to

specifically controvert the stated fact that "NCUA placed Wescorp and U.S. Central into

conservatorship on March 19, 2009" with supporting citations to relevant record evidence, as

required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  To the

contrary, Plaintiffs repeatedly admitted that NCUA placed U.S. Central and WesCorp into

conservatorship on March 19, 2009, including in NCUA's own summary judgment court filings

before the Southern District of New York.  *See, e.g.*, Uhlig Ex. 26 (*NCUA v. Wells Fargo Bank, N.A.*, 14-cv-10067 (S.D.N.Y), ECF 558 (56.1 Statements of NCUA and Wells Fargo, S.D.N.Y. Oct. 30, 2020) ¶ 22 (NCUA does not dispute that it "placed Wescorp into conservatorship on March 19, 2009") & ¶ 24 (NCUA does not dispute that it "placed U.S. Central into conservatorship on March 19, 2009")); Uhlig Ex. 24 (*NCUA v. Siravo*, CV10-01597 (C.D. Cal.), ECF 116 (2d Am. Compl., Feb. 22, 2011) ¶ 1 ("On March 19, 2009, WesCorp was placed into conservatorship by the National Credit Union Administration Board[.]")).

Moreover, Plaintiffs do not dispute that the Orders of Conservatorship for both Wescorp and U.S. Central are dated March 19, 2009.  *See* Uhlig Ex. 19 (March 19, 2009 Order of Conservatorship for Wescorp); Uhlig Ex. 20 (March 19, 2009 Order of Conservatorship for U.S. Central); *see also* Uhlig Ex. 21 (NCUA 30(b)(6) Tr. I at 63:11-14 (NCUA admitting that the "orders of conservatorship of U.S. Central and WesCorp were entered on March 19, 2009")). Plaintiffs' claim that "it is undisputed that both U.S. Central and WesCorp federal credit unions were served with the Orders on March 20, 2009" should be disregarded because Plaintiffs failed to produce their cited documents during discovery, *see* Fed. R. Civ. P. 37(c), but it is immaterial in any event.

Plaintiffs' Further Response:  HSBC's citations to the Wells Fargo record are irrelevant because Wells Fargo did not make the (erroneous) legal argument about the *effective date* of the orders that HSBC makes here.  And the documents cited here by Plaintiffs to show the effective date based on the date of service are publicly available court documents.  Plaintiffs otherwise rest on their legal arguments for this legal issue.  [*See* NCUA Br. 31-33.]

20.     NCUA placed Members United and Southwest into conservatorship on September 24, 2010.  [Compl. ¶ 24 (ECF 371).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322

F.3d at 140.

### C.    Beginning in 2010, NCUA Recovered $107.7 Million in the Six Trusts through Settlement Agreements with Sellers and Underwriters.

Plaintiffs' Response:  Plaintiffs dispute heading I.C, as NCUA did not recover $107.7

million "in the Six Trusts," as those recoveries did not flow through the Trusts.

HSBC's Reply:  Plaintiffs' response should be disregarded as inaccurate and unsupported

by record evidence.  As described below in undisputed paragraph 24, NCUA allocated $107.7

million of settlement funds it received to certificates at issue in the Trusts at issue.  *See also* Uhlig

Ex. 31 (Pls' Supp. Responses & Objections to Def's 3d Set of Interrogatories, at 12).  At best,

NCUA raises a linguistic quibble that does not amount to a genuine dispute.

21.    After NCUA put Wescorp and U.S. Central into conservatorship, NCUA conducted

a formal investigation and issued subpoenas to industry participants.  [Uhlig Decl. ¶ 10.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322

F.3d at 140.

22.    NCUA retained outside contingency-fee counsel and sued and threatened to sue the

underwriters and sellers of RMBS for alleged investment losses incurred, including for the same

securities at issue in this case.  [Uhlig Ex. 30 (Legal Recoveries from the Corporate Crisis,

https://www.ncua.gov/support-services/corporate-system-resolution/legal-recoveries-

corporatecrisis, at 2); *see, e.g.*, Uhlig Ex. 18 (RBS Compl.).]

Plaintiffs' Response:  Disputed.  NCUA did not *threaten* to sue the underwriters and

sellers of RMBS.  Plaintiffs sued the underwriters and sellers of RMBS in their capacity as

underwriters and sellers of the securities at issue, not as trustees.  [Duffy Ex. 3 (RBS Second

Am. Compl. ¶ 3).]  Securities underwriters and trustees have divergent and different duties.

[*Compare id. with* Uhlig Ex. B (ACE 2005-AG1 PSA § 2.01);  C (ACE 2006-OP2 PSA § 2.01);

D (DBALT 2007-OA1 PSA § 2.1); E (FHLT 2006-C PSA § 2.01); F (MHL 2007-1 PSA § 2.01);

G (NHELI 2007-1 PSA § 2.01).]  NCUA sought to recover rescission damages and not

"investment losses."  [Duffy Ex. 3 (RBS Second Am. Compl. ¶ 500).]  Undisputed that NCUA

retained outside contingency-fee counsel.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not

specifically controvert the stated fact with supporting citations to relevant record evidence, as

required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  NCUA both

"sued" and "threatened to sue" underwriters and sellers.  Indeed, it is undisputed that NCUA

*threatened* to sue Deutsche Bank, an underwriter and seller of RMBS, including for the same

securities at issue in this case, and thereafter reached a settlement agreement with it.  *See* Uhlig

Ex. 13 (DB/NCUA Settlement, at DBUSH_000001–03); Uhlig Ex. 31 (Plaintiffs' list of

recoveries from underwriters and sellers of RMBS, including Deutsche Bank, for the same

securities at issue in this case); HSBC's 56.1 ¶¶ 25-30.  Plaintiffs cite no record evidence

demonstrating that NCUA, in fact, sued Deutsche Bank.  Moreover, it is publicly known that

NCUA did not sue Deutsche Bank.  *See, e.g.*, "Deutsche Bank, Citi Settle Credit-Union Cases,

Wall Street Journal (Nov. 15, 2011), available at

*https://www.wsj.com/articles/SB10001424052970204190504577038291116645760* ("'We are

pleased to have resolved the NCUA's claims without the parties having resorted to litigation,' a

Deutsche Bank spokesman said.").

Likewise, Plaintiffs' claim that NCUA did not seek to recover investment losses is inaccurate. In the same exact paragraph cited by Plaintiffs, NCUA requests "compensatory damages." *See* Duffy Ex. 3 (RBS 2d Am. Compl. ¶ 500).

Plaintiffs' "additional fact" that "[s]ecurities underwriters and trustees have divergent and different duties" should be disregarded as irrelevant and immaterial to the undisputed fact that HSBC asserts, as well as legal argument that is not properly included as part of a Rule 56.1 counter-statement.

23.    NCUA recovered over $5.1 billion in settlements in those lawsuits and threatened lawsuits. [Uhlig Ex. 30 (Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/support-services/corporate-system-resolution/legal-recoveries-corporatecrisis, at 3).]

Plaintiffs' Response:  Disputed that NCUA recovered losses from threatened lawsuits. Undisputed that NCUA recovered over $5.1 billion in settlements with underwriters and sellers of RMBS who were sued in that capacity.

HSBC's Reply:  This fact should be deemed admitted. *See* L.R. 56(c). Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required. *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note. NCUA recovered settlements in both "lawsuits and threatened lawsuits." Indeed, it is undisputed that NCUA *threatened* to sue Deutsche Bank, an underwriter and seller of RMBS, including for the same securities at issue in this case, and thereafter reached a settlement agreement with it. *See* Uhlig Ex. 13 (DB/NCUA Settlement, at DBUSH_000001–03); Uhlig Ex. 31 (Plaintiffs' list of recoveries from underwriters and sellers of RMBS, including Deutsche Bank, for the same securities at issue in this case); HSBC's 56.1 ¶¶ 25-30. Plaintiffs cite no record evidence

demonstrating that NCUA, in fact, sued Deutsche Bank.  Moreover, it is publicly known that NCUA did not sue Deutsche Bank.  *See, e.g.*, "Deutsche Bank, Citi Settle Credit-Union Cases, Wall Street Journal (Nov. 15, 2011), available at *https://www.wsj.com/articles/SB10001424052970204190504577038291116645760* ("'We are pleased to have resolved the NCUA's claims without the parties having resorted to litigation,' a Deutsche Bank spokesman said.").

24.     Of those settlements, NCUA allocated $107.7 million to certificates at issue in the Trusts.  [Uhlig Ex. 31 (Pls' Supp. Responses & Objections to Def's 3d Set of Interrogatories, at 12).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

**D.     In NCUA's October 28, 2011 Settlement Agreement with Deutsche Bank,** ███████████████████████████████████████

25.     On October 28, 2011 NCUA entered into a Settlement Agreement ("DB/NCUA Settlement") with Deutsche Bank entities through which NCUA received ███████████. [Uhlig Ex. 13 (DB/NCUA Settlement, at DBUSH_000001–03).]

Plaintiffs' Response:  Undisputed, with the proviso NCUA thus acted as liquidating agent for U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, Members United Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

26.     The DB/NCUA Settlement ███████████████████████████████

███████████████████████████████████     [Uhlig Ex. 13 (DB/NCUA Settlement, at

DBUSH_000001, 000017–19).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322

F.3d at 140.

27.     NCUA allocated $19,755,809.70 from the DB/NCUA Settlement to the five Trusts

in the following amounts: $1,473,515.97 to ACE 2005-AG1; $8,526,977.52 to ACE 2006-OP2;

$2,390,213.55 to DBALT 2007-OA1; $38,495.58 to FHLT 2006-C; and $7,326,607.08 to MHL

2007-1.   [Uhlig Ex. 31 (Ex. A to Pls' Supp. Responses & Objections to Def's Third Set of

Interrogatories).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322

F.3d at 140.

28.     ████████████████████████████████████████



[Uhlig Ex. 13 (DB/NCUA Settlement, at DBUSH_000006 at § 5.1 (emphasis added)).]

---

[3] ████████████████████████████████████████████     [Uhlig Ex. 13
(DB/NCUA Settlement, at DBUSH_000001).]

    <u>Plaintiffs' Response:</u>  Undisputed that the document contains the quoted language, but disputed as to the emphases added by HSBC.

    <u>HSBC's Reply:</u>  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.  There is no dispute that the emphasis was added by HSBC and is clearly indicated in the citation ("emphasis added").

    29.      ███████████████████████████████████████████

███████████████████████████████ [Uhlig Ex. 13 (DB/NCUA Settlement, at DBUSH_000003, -6, -22).]

    <u>Plaintiffs' Response:</u>  Undisputed.

    <u>HSBC's Reply:</u>  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

    30.     Also as part of the DB/NCUA settlement, ██████████████████████



[Uhlig Ex. 13, at  DBUSH_000023) (emphasis added).]

    <u>Plaintiffs' Response:</u>  Undisputed the document contains the quoted language, but disputed as to the emphases added by HSBC.

---

[4] The DB-RMBS included four Trusts:  ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1.  [Uhlig Ex. 13 at DBUSH_000031.]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.  There is no dispute that the emphasis was added by HSBC and is clearly indicated in the citation ("emphasis added").

E.      **In 2010–2011, NCUA Resecuritized All but One of the Certificates In the Trusts Into NGN Trusts.**

31.     In 2010, NCUA created the NCUA Guaranteed Notes Program (the "NGN Program") to resecuritize some of the certificates purchased by the five CCUs.  [Compl. (ECF 371) ¶ 27.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

32.     Of the 6 Trusts, NCUA transferred all of the certificates at issue, except for a single certificate in NHELI 2007-1 that allegedly was originally purchased by Wescorp, to the NGN Trusts between October 2010 and June 2011.  [Ex. A to March 20, 2015 Compl. (ECF 1-2).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

33.     Under the NGN Trust Agreements, when NCUA sold certificates into the NGN Trusts, NCUA "transferred and assigned its rights, title, and interest to assert the claims at issue" related to the Trusts to the NGN Trusts.  [Compl. (ECF 371) ¶ 30.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

19

34.    The Indenture Trustee of the NGN Trusts is the Bank of New York Mellon ("BNYM").  [Compl. (ECF 371) ¶ 28.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

35.    Under the NGN Indentures, BNYM was granted "all right, title, and interest to all present and future claims, demands, causes and choses in action in respect of the [Resecuritized Certificates]."  [Compl. (ECF 371) ¶ 32 (internal quotation marks omitted) (alteration in original).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

36.    On January 30, 2014, NCUA requested that BNYM, as the Indenture Trustee for the NGN Trusts, pursue the claims alleged in this suit, and BNYM declined to do so.  [Compl. (ECF 371) ¶¶ 28, 33.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

37.    On March 20, 2015, NCUA initiated this case by filing its original complaint, in which it was the only plaintiff and it brought claims on behalf of itself as liquidating agent for the CCUs and attempted to also bring claims "derivatively" on behalf of the NGN Trusts.  [Mar. 20, 2015 Compl. (ECF 1) ¶ 54.]

Plaintiffs' Response:  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

38.      In 2018, "[i]n order to facilitate the enforcement of claims against HSBC asserted in this action, NCUA directed BNYM to transfer: 'all legal title, claims, powers, rights, authorities, and duties of BNYM' as they pertain specifically to this action [to Separate Trustee Graeme Bush] . . . Those rights and authorities are limited entirely to the prosecution of this action."  [Uhlig Ex. 28 (NCUA's Resps. to HSBC's 5th Set of Interrog.) ¶ 2.]

<u>Plaintiffs' Response:</u>  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

39.      Mr. Bush became a plaintiff in this case on May 28, 2019, and purports to bring claims on the securities that remain resecuritized in NGN Trusts.  [Compl. (ECF 371); Compl. Am. Interlineation at Preamble (ECF 400).]

<u>Plaintiffs' Response:</u>  Undisputed, except that Mr. Bush does not merely "purport" to bring the NGN claims.  Rather, this Court has held that he has standing to do so.  *See NCUA v. HSBC,* 2020 WL 91390, at *4 (S.D.N.Y.).

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs' response raises the issue of standing, but the stated fact does not concern standing.  In any event, the opinion to which Plaintiffs cite did not hold that Bush "has standing" to sue; rather it granted Plaintiffs' motion to amend their complaint to substitute Bush as a plaintiff for certain claims.  *See NCUA v. HSBC,* 2020 WL 91390 (S.D.N.Y. Jan. 8, 2020).

**F.    NCUA Understood RMBS Trustees Needed To Be Directed and Indemnified To Initiate Repurchase Litigation.**

Plaintiffs' Response:  Plaintiffs dispute heading I.F.  This heading is misleading.  NCUA acknowledged that the PSAs provided for the option to direct and indemnity RMBS Trustees to initial repurchase litigation.

HSBC's Reply:  Plaintiffs' response should be disregarded.  NCUA specifically and repeatedly  Uhlig Ex. 7 (Ex. B to Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter, at 2; *see also* Uhlig Ex. 8 (Ex. B to Aug. 26, 2014 MANA 2007-A3 Direction & Indemnification Letter, at Recitals); Uhlig Ex. 9 (Jan. 10, 2020 MANA 2007-A3 Direction Letter, at 3); HSBC's 56.1 ¶¶ 46-56.

40.    NCUA routinely deliberated and voted internally on whether to take action to direct a Trustee when Responsible Parties refused to repurchase loans in response to alleged R&W breaches.  [Uhlig Ex. 11 (Ex. 200 to Barton Tr.).]

Plaintiffs' Response:  Disputed.  NCUA only sometimes did so and only when made aware by Trustees of instances where Responsible Parties refused to repurchase loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required.  *See* 56.1(d); *Brannon v. Delta Airlines, Inc.*, 434 F. Supp. 3d 124, 128 n.3 (S.D.N.Y. 2020) ("[F]acts in a party's Rule 56.1 statement that are supported by testimonial or documentary evidence, and

denied only by way of a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, are deemed to be true."). HSBC's cited evidence supports the stated fact. Uhlig Exhibit 11 is an excerpt of a four-page chart that includes over 50 examples of NCUA deciding whether to take action to direct a Trustee. *See* Uhlig Ex. 11 (Ex. 200 to Barton Tr.). Additionally, Uhlig Exhibit 12 is an example of NCUA's internal deliberations after receiving a notice from the Trustee for NAAC 2007 Trust stating that the Responsible Party denied repurchase. *See* Uhlig Ex. 12 (Ex. 643 to NCUA 30(b)(6) Tr. II); Uhlig Ex. 21 (NCUA 30(b)(6) Tr. II at 258:13–261:20). NCUA decided against pursuing claims for breach. *Id.*

Plaintiffs' Further Response:  Plaintiffs' response inadvertently omitted the following citation: [Fazio Decl. ¶¶ 11-16 (explaining NCUA process as conservator regarding direction and indemnity).]

41.     In 2013, after receiving a notice from the Trustee for Nomura Asset Acceptance Corp 2007 Trust stating that the Responsible Party denied repurchase, NCUA voted against pursuing claims of breach. [Uhlig Ex. 12 (Ex. 643 to NCUA 30(b)(6) Tr. II); Uhlig Ex. 21 (NCUA 30(b)(6) Tr. II at 258:13–261:20.)]  In internal communications, NCUA personnel stated that "There would be some time and expense related to *entering into an indemnity* and *providing a direction* and we have no idea whether the breach claims have merit (at least one of the three has apparently been resolved) or what the delta between the liquidation value and the repurchase amount is." [Uhlig Ex. 12 (Ex. 643 to NCUA 30(b)(6) Tr. II, at NCUA_A_5063985.0002).]

Plaintiffs' Response:  Undisputed, except that NCUA did not vote against pursuing claims, but merely chose to take "no action" at the time. [Uhlig Ex. 12 at NCUA_A_5063985 (Ex. 643 to NCUA 30(b)(6) Tr. II).]  NCUA's decision was partially informed by the "limited information available" regarding the claims. [*Id.*]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as immaterial and inaccurate.  By deciding to take "no action" to direct the trustee, NCUA decided against pursuing claims.  Uhlig Ex. 12 at NCUA_A_5063985.0002; *see also* Uhlig Ex. 11 (showing instances in which NCUA voted and decided to take no action in response to trustee requests for direction).  Indeed, the email states that the trustee planned "no further action without direction" from certificateholders.  Uhlig Ex. 12 at NCUA-A_5063985.0004.  The second sentence of Plaintiffs' response is irrelevant and immaterial to the stated fact and should be disregarded.  Plaintiffs also fail to pincite any evidence to support the statement.  *See Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 13 (2d Cir. 2018) (affirming district court's decision to deem facts admitted in defendant's 56.1 statement that plaintiff denied without citation "or cited, for example, an entire deposition transcript without a point cite").

Plaintiffs' Further Response:  HSBC's response that Plaintiffs fail to include a pincite is inaccurate, the second sentence includes an *Id.* cite, as both quotes occur on the first page of the document, at NCUA_A_5063985.

42.     As of May 2017, NCUA was involved in four different repurchase litigations involving at least four trusts not at issue in this suit.  NCUA directed and indemnified the RMBS trustee to initiate litigation for each of those suits.  [Uhlig Ex. 32 (NCUA Repurchase Summary).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

43.     As of May 2017, NCUA directed Bank of New York Mellon, as Indenture Trustee for the NGN Trusts, to direct and indemnify RMBS Trustees in repurchase actions for at least eight

trusts not at issue in this suit, and then later chose to discontinue those actions.  [Uhlig Ex. 32 (NCUA Repurchase Summary).]

Plaintiffs' Response:  Undisputed, except that while NCUA did direct Bank of New York Mellon to begin negotiations with the RMBS Trustees, those negotiations did not always result in formal directions and indemnities to the underlying RMBS Trustees.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c); *Giannullo*, 322 F.3d at 140. Everything after "[u]ndisputed" in the Plaintiffs' response should be disregarded as irrelevant and immaterial.

44.     As of May 2017, NCUA engaged in repurchase-related discussions with at least 15 other large investors, including BlackRock, PIMCO, Fannie Mae, and Freddie Mac.  [Uhlig Ex. 32 (NCUA Repurchase Summary).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

45.     NCUA did not direct and indemnify HSBC to initiate repurchase litigation for any of the Certificates at issue.  [Acebedo Decl. ¶ 13; Uhlig Ex. 5 (Acebedo Tr. 486:18–487:4); Uhlig Ex. 32 (NCUA Repurchase Summary).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

**G.     In 2013, NCUA Directed and Indemnified HSBC as Trustee To Initiate Repurchase Litigation for a Trust Not At-Issue in this Case.**

46.     Beginning in 2013, NCUA had a series of Direction and Indemnification letters sent to HSBC as Trustee requesting that HSBC take certain actions regarding certain RMBS trusts

sponsored by Merrill Lynch that are not at issue in this litigation.  [Acebedo Decl. ¶ 9; *see, e.g.*, Uhlig Ex. 7 (Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter); Uhlig Ex. 8 (Aug. 26, 2014 MANA 2007-A3 Direction & Indemnification Letter).]

    Plaintiffs' Response:  Undisputed.

    HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

    47.    Ultimately, in a letter that was signed, acknowledged, and agreed to by NCUA, HSBC was directed and indemnified to commence repurchase litigation against Merrill Lynch in connection with only one of those trusts, Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 ("MANA 2007-A3").  [Acebedo Decl. ¶ 9; Uhlig Ex. 8 (Aug. 26, 2014 MANA 2007-A3 Direction & Indemnification Letter) at 21–28.]

    Plaintiffs' Response:  Undisputed.

    HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

    48.    The PSA for MANA 2007-A3 includes the specific "shall enforce" language at issue here.  [Uhlig Ex. 6 (MANA 2007-A3 § 2.02).]

    Plaintiffs' Response:  Undisputed.

    HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

    49.    In December 2013, NCUA directed NGN Indenture Trustee, Bank of New York Mellon, to direct HSBC as Trustee of MANA 2007-A3 to request a report from the Master Servicer regarding the status of certain loans in MANA 2007-A3 and to seek certain loan files from the

Master Servicer.  [Uhlig Ex. 7 (Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter) at 1–2.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

50.     In conjunction with that letter, NCUA, as the indemnifying party, entered into a Confidentiality and Indemnification Agreement with HSBC.  [Uhlig Ex. 7 (Ex. B to Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter).]  That agreement expressly stated that BNYM[5] and NCUA "*acknowledge and agree that . . . the Trustee is under no obligation* 'to exercise any of the trusts or powers vested in it by [the PSA] . . . or *to institute, conduct or defend any litigation* [t]hereunder or in relation [t]hereto at the request, order or direction of any of the Certificateholders . . . pursuant to the provisions of [the PSA], *unless such Certificateholders . . . shall have offered to the Trustee reasonable security or indemnity* against the costs, expenses, and liability which may be incurred therein or thereby.'"  [Uhlig Ex. 7 (Ex. B to Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter, at 2 (emphases added).]

Plaintiffs' Response:  Disputed, as HSBC's ellipses exclude relevant language.  The full provision provides:  "WHEREAS, the Instructing Party and the Indemnifying Party acknowledge and agree that Section 9.02(iii) of the PSA provides that the Trustee is under no obligation 'to exercise any of the trusts or powers vested in it by [the PSA] . . . or to institute, conduct or defend any litigation [t]hereunder or in relation [t]hereto at the request, order or direction of any of the

_____

[5] BNYM was technically the "instructing party" because NCUA directed it, as the Indenture Trustee for two NGN Trusts, to direct HSBC as Indenture Trustee of MANA 2007-A3.  [Uhlig Ex. 7 (Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter) at 1–3.]

Certificateholders . . . pursuant to the provisions of [the PSA], unless such Certificateholders . . . shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby.'" [*Id.* (alterations in original).]

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs do not specifically controvert the stated fact.  *See* L.R. 56(c).  Moreover, Plaintiffs' quotation fails to account for the fact that NCUA was the "Indemnifying Party" and therefore "acknowledge[d] and agree[d]" to the quotation provided above in HSBC's stated fact.  *See* Uhlig Ex. 7 (Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter, at 1–2 ("the National Credit Union Administration, as indemnifying party (the 'Indemnifying Party')"); Uhlig Ex. 7 (Ex. B to Dec. 19, 2013 MANA 2007-A3 Direction & Indemnification Letter, at 2) ("WHEREAS, the Instructing Party and the Indemnifying Party acknowledge and agree . . . .").

51.     Several months later, in an August 26, 2014 letter that was signed, acknowledged, and agreed to by NCUA, BNYM (as indenture trustee of the NGN trusts) and another investor in MANA 2007-A3 directed HSBC to retain special litigation counsel and pursue litigation in MANA 2007-A3.  [Uhlig Ex. 8 (Aug. 26, 2014 MANA 2007-A3 Direction & Indemnification Letter, at 1–4).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

52.     In the Amended and Restated Confidentiality and Indemnification Agreement attached to the August 26, 2014 Direction & Indemnification Letter, NCUA again acknowledged and agreed, using the same language as in the December 19, 2013 letter, that ███████████ *no obligation* 'to exercise any of the trusts or powers vested in it by [the PSA] . . . or *to institute,*

*conduct or defend any litigation* [t]hereunder or in relation [t]hereto at the request, order or direction of any of the Certificateholders . . . pursuant to the provisions of [the PSA], *unless such Certificateholders . . . shall have offered to the Trustee reasonable security or indemnity* against the costs, expenses, and liability which may be incurred therein or thereby.'" [Uhlig Ex. 8 (Ex. B to Aug. 26, 2014 MANA 2007-A3 Direction & Indemnification Letter, at Recitals).]

<u>Plaintiffs' Response:</u>  Disputed, as HSBC's ellipses exclude relevant language.  The full provision provides:  "WHEREAS, the Instructing Party and the Indemnifying Party acknowledge and agree that Section 9.02(iii) of the PSA provides that the Trustee is under no obligation 'to exercise any of the trusts or powers vested in it by [the PSA] . . .  or to institute, conduct or defend any litigation [t]hereunder or in relation [t]hereto at the request, order or direction of any of the Certificateholders . . .  pursuant to the provisions of [the PSA], unless such Certificateholders . . . shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby.'" [*Id.* (alterations in original).]

<u>HSBC's Reply:</u>  This fact should be deemed admitted because Plaintiffs do not specifically controvert the stated fact.  *See* L.R. 56(c).  Moreover, Plaintiffs' quotation fails to account for the fact that NCUA was the "Indemnifying Party" and therefore "acknowledge[d] and agree[d]" to the quotation provided above in HSBC's stated fact.  *See* Uhlig Ex. 8 (Ex. B to Aug. 26, 2014 MANA 2007-A3 Direction & Indemnification Letter, at 1) ("the National Credit Union Administration (the 'Indemnifying Party')"); *id.* at 2 ("WHEREAS, the Instructing Party and the Indemnifying Party acknowledge and agree . . . .").

53.    HSBC, solely in its capacity as Trustee of MANA 2007-A3, through its counsel and at the direction of Certificateholders filed a Complaint against the Sponsor on March 2, 2015, alleging that certain loans conveyed to the trust breached certain R&Ws. [Compl*., Merrill Lynch*

*Alternative Note Asset Trust, Series 2007-A3, by HSBC Bank USA, National Assoc., in its capacity as Trustee v. Merrill Lynch Mortg. Lending, Inc.*, No. 652727/2014 (N.Y. Sup. Ct. filed Mar. 2, 2015).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

54.     On January 10, 2020, a letter that was signed, acknowledged, and agreed to by NCUA, BNYM (as indenture trustee of the NGN trusts) and another investor in MANA 2007-A3 directed HSBC to enter into a settlement agreement with the Sponsor.  [Uhlig Ex. 9 (Jan. 10, 2020 MANA 2007-A3 Direction Letter, at 3).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

55.     In that January 10, 2020 MANA 2007-A3 Direction Letter, NCUA acknowledged and agreed that "[t]he indemnities, agreements, representations, warranties, and other statements of the Instructing Parties set forth in or made pursuant to the [Direction & Indemnification] Agreements will remain in full force and effect following the execution hereof, and will survive the execution hereof and . . . shall be binding upon the Instructing Parties and NCUA . . . and shall inure to the benefit of HSBC, both individually and as Trustee."  [Uhlig Ex. 9 (Jan. 10, 2020 MANA 2007-A3 Direction Letter, at 3).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

56.     Ultimately, the settlement agreement that NCUA reached and directed was insufficient to cover the litigation costs for the MANA 2007-A3 litigation, and the litigation resulted in a net loss.  [Uhlig Ex. 10 (MANA 2007-A3 Bill Litigation Costs Summary, McKool MANA A3 ITD Billing History as of May 13 2020 v.1.xlsx).]  Specifically, the overall cost of the litigation was $██████████, but the settlement agreement was for $11,021,437.  [Uhlig Ex. 10 (MANA 2007-A3 Bill Litigation Costs Summary, McKool MANA A3 ITD Billing History as of May 13 2020 v.1.xlsx); Uhlig Ex. 33 (MANA 2007-A3 Holder Notice re Settlement, at 2).]

Plaintiffs' Response:  Undisputed that the settlement agreement was for $11,021,437.  Disputed that the "overall cost" of the litigation was $██████████.  HSBC has provided only a portion of the document purporting to show such a fact and NCUA has no independent way to assess the validity of the claim.  Disputed to the extent the statement implies that enforcement costs exceeded recoveries as 41 loans with over $11 million in losses were repurchased prior to negotiation of the settlement agreement, and these repurchases occurred after NCUA began directing the trustee, resulting in a net benefit for the trusts.  [Fazio Decl. ¶ 17.]  Disputed to the extent the statement implies that the settlement agreement applied to the entire trust.  Only a portion of the MANA 2007-A3 loans were subject to settlement, namely, the Group 2 loans. [Uhlig Ex. 33 (1/20/20 Holder Notice re Settlement at 2).]

HSBC's Reply:  This fact should be deemed admitted.  See L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required.  See Monahan, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Plaintiffs' response that they "ha[ve] no independent way to assess the validity of" the stated fact must be disregarded.  See Russell, 753 F. App'x at 13 (affirming district court's decision to deem admitted facts from defendant's 56.1 statement when plaintiff responded that she "could not admit or deny

as worded, or lacked information sufficient to admit or deny Defendants' facts").  Exhibit 10 to the Uhlig Declaration is a comprehensive spreadsheet of the litigation costs for the MANA 2007-A3 litigation and settlement that NCUA directed and indemnifying HSBC, as RMBS Indenture Trustee, to undertake.  *See* Uhlig Ex. 10 (MANA 2007-A3 Bill Litigation Costs Summary, McKool MANA A3 ITD Billing History as of May 13 2020 v.1.xlsx).  The overall cost of the litigation was $███████, *id.*, whereas the settlement for those same claims was only $11,021,437, *see* Uhlig Ex. 33 (MANA 2007-A3 Holder Notice re Settlement, at 2).  Plaintiffs' third through fifth sentences of their response should also be disregarded as immaterial and irrelevant:  to the extent other loans were repurchased outside of the litigation and settlement that NCUA directed and indemnified HSBC to undertake, that is wholly irrelevant to the fact that the Trust lost a significant amount of money ($███████) by undertaking the litigation and settlement at NCUA's direction.  *See* Uhlig Ex. 10; Uhlig Ex. 33 at 2.

### H.   Additional Procedural History

57.    After the statute of limitations had expired on the ability to sue Sponsors relating to the repurchase of loans, NCUA—through its outside, contingency-fee counsel—began suing RMBS trustees.    [Uhlig Ex. 30 (Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/support-services/corporate-system-resolution/legal-recoveries-corporatecrisis, at 2); Mar. 20, 2015 Compl. (ECF 1).]

Plaintiffs' Response:  Undisputed that NCUA brought suits against RMBS Trustees, but disputed that relevant statutes of limitations for actions by HSBC as Trustee had or should have expired.  HSBC provides no support for the contention that the statute of limitations had expired.  In addition, for the Trusts at issue in this case, HSBC had notice of thousands of Mortgage File breaches by virtue of receiving the final exceptions reports, as well as additional evidence regarding R&W breaches.  As a result, HSBC should have persuaded warrantors voluntarily to

repurchase breaching loans, and then, if those efforts were not successful, either filed timely lawsuits or entered tolling agreements to prevent expiration of any statutes of limitations.

      <u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56(c).  None of Plaintiffs' response controverts the stated fact that "[a]fter the statute of limitations had expired on the ability to sue Sponsors relating to the repurchase of loans, NCUA—through its outside, contingency-fee counsel—began suing RMBS trustees."  Instead, Plaintiffs purport to dispute (without citation to any controverting evidence) that the "relevant statutes of limitations for actions by HSBC as Trustee had or should have expired."  Plaintiffs' response is therefore immaterial and irrelevant to the stated fact and should be disregarded.  Likewise, sentences three and four of Plaintiffs' response should be disregarded as immaterial and irrelevant to the stated fact, as well as inaccurate, and as legal argument that is not properly included as part of a Rule 56.1 counter-statement.  Additionally, NCUA's claim that "HSBC had notice of thousands of Mortgage File breaches by virtue of receiving the final exceptions reports, as well as additional evidence regarding R&W breaches" is wholly unsupported.  Exception reports do not include any allegations of "Mortgage File breaches."  *See* Duffy Exs. 50-53 (excerpts from exception reports).  And the PSAs for the Trusts that NCUA re-underwrote do not include a R&W relating to Mortgage File documents.  Indeed, those PSAs make clear that alleged mortgage-file defects are not a type of R&W breach.  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03) (distinguishing between a defective or missing document and a R&W breach); *see also* Uhlig Exs. C (ACE 2006-OP2 PSA § 2.03), D (DBALT 2007-OA1 PSA § 2.3), F (MHL 2007-1 PSA § 2.03).

## II.   ADDITIONAL FACTS RELEVANT TO PLAINTIFFS' PRE-EOD R&W BREACH CLAIMS.

58.   Plaintiffs, through their proposed expert, re-underwrote only 475 loans in ACE 2005-AG1 and claim that 336 of those loans materially breach representations and warranties. [Uhlig Ex. 34 (Shev Report at 149–50).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

59.   Plaintiffs, through their proposed expert, re-underwrote only 516 loans in DBALT 2007-OA1 and claim that 513 of those loans materially breach representations and warranties. [Uhlig Ex. 34 (Shev Report at 151).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

60.   Plaintiffs, through their proposed expert, re-underwrote only 645 loans in MHL 2007-1 and claim that 634 of those loans materially breach representations and warranties.  [Uhlig Ex. 34 (Shev Report at 152).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

61.   NCUA did not re-underwrite any loans in FHLT 2006-C and NHELI 2007-1, nor is there any other evidence of loan-specific breaches in these trusts.  [Uhlig Ex. 34 (Shev Report at 153).]

Plaintiffs' Response:  Undisputed that NCUA did not re-underwrite any loans in FHLT 2006-C and NHELI 2007-1.  Disputed there is no evidence of loan-specific breaches, as Plaintiffs expert Blum identified 4,414 material Mortgage File breaches in FHLT 2006-C and 559 material Mortgage File breaches in NHELI 2007-1.  [Duffy Ex. 4 (Blum 128, 140).]

HSBC's Reply:  This fact should be deemed admitted.  See L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required.  See Monahan, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs are attempting to manufacture a dispute where there is none by claiming their purported expert found evidence of "Mortgage File breaches."  But Blum does not reference "Mortgage File breaches" anywhere in his report, including the pages cited by NCUA.

In any event, the Blum report is inadmissible because Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration.  See L.R. 56.1(d) ("[E]ach statement by the movant or opponent . . . must be followed by citation to evidence which would be admissible[.]"); see also Fed. R. Civ P. 56(c)(4), (e); Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."); United States v. All Right, Title & Int. in Real Prop. & Appurtenances, 77 F.3d 648, 657–58 (2d Cir. 1996) (submission of unsworn letter "was an inappropriate response to the government's motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court" (citing Fed. R. Civ. P. 56)).

Plaintiffs' Further Response:  The Blum report is admissible, as Plaintiffs' expert Blum's opinions were both "tested or reaffirmed at [his] deposition."  Berk v. St. Vincent's Hosp. & Med.

*Ctr.*, 380 F. Supp. 2d 334, 352-53 (S.D.N.Y. 2005); *see also Miller v. Astucci U.S. Ltd.*, 2007 WL 102092, at *14 (S.D.N.Y.) (accepting opinions in unsworn expert report, because "his opinions were explored in detail at his sworn deposition."); Duffy Ex. 54 (Blum Tr.).  To the extent there remains any doubt as to the admissibility of the opinions in Blum's report, Plaintiffs submit a sworn affidavit from Blum and each of their experts.  [*See* Blum Aff.; Shev. Aff.; Milner Aff. ]

62.     For ACE 2006-OP2, NCUA provides no evidence that HSBC discovered or had notice of any loan-specific breach that NCUA claims existed.  [Acebedo Decl. ¶¶ 19–20; Uhlig Ex. 34 (Shev Report at 45 n.46).]

Plaintiffs' Response:  Disputed.  Plaintiffs' expert Shev underwrote these loans.  [Uhlig Ex. 34 (Shev 153).]  Moreover, HSBC had evidence that would have prompted a reasonable person to inquire further into each and every one of the loans in which NCUA claims a breach existed including the fact that each loan (a) was in a trust with a significant number of Mortgage File breaches and/or was listed in an exceptions report, (b) was in a trust created by Deutsche Bank Structured Products, which HSBC knew systematically securitized breaching loans as HSBC alleged in 16 complaints it filed against DBSP, (c) was originated by a suspect entity, (d) was non-performing and caused a loss, often a substantial loss early in the life of the loan, and (e) was in a trust that performed significantly worse than expected.  [*See* ¶¶ 169-213.]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Whether Plaintiffs' purported expert, Mr. Shev, reunderwrote the loans in ACE 2006-OP2 is irrelevant to whether "HSBC discovered or had notice of any loan-specific breach that NCUA claims existed." And Plaintiffs do not dispute that they failed to provide any evidence that HSBC discovered or

had notice of any loan-specific breach that NCUA claims existed.  Instead, in sentence three of their response, which should be disregarded as immaterial, irrelevant, inaccurate, and improper legal argument, Plaintiffs again reference "Mortgage File breaches," without any supporting evidence, *see* HSBC Reply to ¶¶ 57, 61 (incorporated herein), and reference purported evidence of "pervasive breach," i.e., breaches in other loans in other trusts, which is not evidence of loan-specific breaches for the loans in the trusts at issue and is therefore irrelevant.  *See Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2017 WL 945099, at \*4-5 (S.D.N.Y. Mar. 10, 2017) (theories of "generalized wrongdoing" or "pervasive breach" cannot survive beyond the pleading stage; instead, plaintiffs must establish breaches "on a loan-by-loan basis"); *Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2018 U.S. Dist. LEXIS 31157, at \*36 (S.D.N.Y. Feb. 23, 2018) ("Given the limited and loan-specific nature of the trustee's duties under § 2.03, the 'discovery or receipt of notice' requirement must require HSBC to have information about a specific loan, rather than generalized knowledge or notice extrapolated from other loans."); *NCUA v. HSBC*, 2020 WL 5913755, at \*1 (S.D.N.Y. Oct. 6, 2020) (ECF 416) (finding NCUA's argument that HSBC had "overall awareness" of "pervasive defects" to be "immaterial to the claims at issue").  Accordingly, there is no genuine dispute concerning this fact and it should be deemed admitted.

63.    For all but nine of the loans in which NCUA alleges material breach of representations and warranties in the remaining three trusts, DBALT 2007-OA1, MHL 2007-1, and ACE 2005-AG1, there is no evidence that HSBC discovered or received notice of specific breaches in specific loans.  [Acebedo Decl. ¶¶ 21–30; Uhlig Ex. 34 (Shev Report at 45 n.46).]

Plaintiffs' Response:  Disputed.  Plaintiffs' expert Shev underwrote these loans.  [Uhlig Ex. 34 (Shev 153).]  Moreover, HSBC had evidence that would have prompted a reasonable person

to inquire further into each and every one of the loans in which NCUA claims a breach existed including the fact that each loan (a) was in a trust with a significant number of Mortgage File breaches and/or was listed in an exceptions report, (b) was in a trust created by Deutsche Bank Structured Products, which HSBC knew systematically securitized breaching loans as HSBC alleged in complaints it filed against DBSP, (c) was originated by a suspect entity, (d) was non-performing and caused a loss, often a substantial loss early in the life of the loan, and (e) was in a trust that performed significantly worse than expected.  [*See* ¶¶ 169-213.]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Whether Plaintiffs' purported expert, Mr. Shev, reunderwrote the loans in DBALT 2007-OA1, MHL 2007-1, and ACE 2005-AG1 is irrelevant to whether "HSBC discovered or had notice of any loan-specific breach that NCUA claims existed."  And Plaintiffs do not dispute that they failed to provide any evidence that HSBC discovered or had notice of any loan-specific breach that NCUA claims existed.  Instead, in sentence three of their response, which should be disregarded as immaterial, irrelevant, inaccurate, and improper legal argument, Plaintiffs again reference "Mortgage File breaches," without any supporting evidence, *see* HSBC Reply to ¶¶ 57, 61 (incorporated herein), and reference purported evidence of "pervasive breach," i.e., breaches in other loans in other trusts, which is not evidence of loan-specific breaches for the loans in the trusts at issue and is therefore irrelevant.  *See Royal Park*, 2017 WL 945099, at *4-5; *Royal Park*, 2018 U.S. Dist. LEXIS 31157, at *36; *NCUA v. HSBC*, 2020 WL 5913755, at *1.  Accordingly, there is no genuine dispute concerning this fact and it should be deemed admitted

64.     For at least six of those nine loans, HSBC took the required action under the PSAs. [Acebedo Decl. ¶¶ 31–35.]

Plaintiffs' Response:  Disputed, as this is a legal conclusion and contrary to the plain language of the PSA.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to record evidence, as required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  HSBC's cited evidence demonstrates the truth of the stated fact:  HSBC took the required action under the PSAs.  *See* Acebedo Decl. ¶¶ 31–35.

65.     The PSAs for DBALT 2007-OA1, MHL 2007-1, ACE 2006-OP2, and ACE 2005-AG1 provide that, upon discovery or notice of a loan-specific R&W breach that materially and adversely affects the loan's value or the Certificateholders' interest, the trustee (1) shall notify the Responsible Party of such breach and request the Seller cure the breach, and (2) if the Responsible Party does not cure, the trustee "shall enforce the obligations of the [Responsible Party]."  [App'x F.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

66.     The PSAs for FHLT 2006-C and NHELI 2007-1 do not contain the above-referenced phrase "shall enforce the obligations of the [Responsible Party]."  [App'x F.]

Plaintiffs' Response:  Undisputed the PSAs do not contain that exact quote, but those PSAs contain language requiring the Trustee to enforce.  The FHLT 2005-C PSA provides that "[i]n the event that the Trustee . . . receives notice of a breach by the Originator of any of the representations

and warranties set forth in clauses I(tt), I(uu) or I(lll) of Schedule IV, the Trustee *shall . . . request the Originator to repurchase the Mortgage Loan*" and "[t]he Originator *shall* repurchase each such Deleted Mortgage Loan."  [Uhlig Ex. E (FHLT 2006-C § 2.03(c)).]  The PSA then provides "the Originator shall indemnify . . . the Trustee and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, *reasonable and necessary legal fees and related costs*, judgments, and other costs and expenses resulting from any *claim, demand, defense or assertion* based on . . . a breach by the Originator of any of its representations and warranties contained in this Agreement."  [*Id.* § 2.03(g).]  The PSA further provides "[t]he Trustee agrees to hold the Trust Fund and *exercise the rights referred to above* for the benefit of all present and future Holders of the Certificates."   [*Id.* § 2.05.]   The NHELI 2007-1 PSA contains comparable language and describes "[t]he obligation of the Sponsor to cure, repurchase or substitute for any Mortgage Loan as to which a defect in a constituent document exists" as a remedy available "to *the Trustee*," and provides "[t]he Sponsor shall promptly reimburse the Trustee for any expenses incurred . . . in respect of enforcing the remedies for such breach," which further confirms the Trustee was required to enforce.  [Uhlig Ex. G (NHELI 2007-1 PSA § 2.02(d)).]  This PSA then describes the "Purpose and Powers of the Trust" as to engage "in those activities that are *necessary . . . to accomplish the foregoing* or are incidental thereto or connected therewith" and "in such other activities *as may be required in connection with conservation of the Trust Fund*."  [*Id.* § 2.10(d), (e).]  As explained in Part I of Plaintiffs' July 13, 2021 merits brief, that language requires Trustee enforcement.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs admit the fact is undisputed, but then put forth a legal argument that is not properly included in their Rule 56.1 counter-statement and which should be disregarded.

67.     The PSAs for FHLT 2006-C and NHELI 2007-1 instead provide only that the Trustee must "give prompt written notice" if it discovers a breach of certain representations and warranties.  [App'x F.]

Plaintiffs' Response:  Disputed.  Those Trusts contain language requiring the Trustee to enforce as explained in Plaintiffs' Response to ¶ 66 and Part I of Plaintiffs' July 13, 2021 merits brief.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Plaintiffs' citation to their response to HSBC's 56.1 ¶ 66 does not controvert the stated fact; to the contrary, it corroborates it.  HSBC's reply to paragraph 66 is incorporated herein.  Plaintiffs' other citation, which is to their brief, is improper citation to a legal argument.  HSBC's cited evidence, Appendix F, lists the quoted language from the PSAs for FHLT 2006-C and NHELI 2007-1, which is indisputably accurate.  *See* App'x F.

68.     The PSAs expressly provide that, prior to an EOD, the Trustee is required to "undertake to perform such duties and only such duties as are specifically set forth in this Agreement as duties of the Trustee."  [App'x A.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

69.     The PSAs expressly provide that, prior to an EOD, the Trustee's duties and obligations are "determined solely by the express provisions" of the PSA and no "[implied] obligations shall be read into this Agreement against the Trustee."  [App'x A.]

41

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

70.   The PSAs expressly provide that the Trustee shall not "be under any obligation to exercise any of the trusts or powers vested in it by [the PSAs]" unless the Trustee is offered "reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred."  [App'x D.]

Plaintiffs' Response:  Disputed, as HSBC only includes part of the provision, which provides:  "(a) Except as otherwise provided in Section 9.01, . . . (iii) Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee or the Securities Administrator, as the case may be, reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby. . . .".  Accordingly, this provision expressly provides that *if* the certificateholders chose to direct the Trustee, they must *also* indemnify the Trustee.  [Uhlig Ex. B (ACE 2005-AG1 PSA § 9.02(a)(iii)); *see also* Uhlig Ex C (ACE 2006-OP2 PSA § 9.02(a)(iii)); D (DBALT 2007-OA1 PSA § 8.2(a)(iii) referring to § 8.1 (iii)); E (FHLT 2006-C PSA § 8.02(a)(iii) referring to § 8.01 (iii)); F (MHL 2007-1 PSA § 9.02(a)(iii)); G (NHELI 2007-1 PSA § 9.02(a)(iii)).]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact but instead respond with a legal argument that is improper to include in a Rule 56.1 counter-statement and that is unsupported by record evidence.  *See*

42

*Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Furthermore, the quoted language in Plaintiffs' description of the provision incorrectly splices "Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement" with "at the request, order or direction of any of the Certificateholders," which is not how the provision is written.  *See* App'x D.  Instead, as accurately described by HSBC in the stated fact, the PSAs provide that the Trustee shall not "be under any obligation to exercise any of the trusts or powers vested in it by [the PSAs]" unless the Trustee is offered "reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred."  *Id.*

71.     The PSAs expressly provide that the Trustee shall not "be under any obligation" "to institute, conduct, or defend any litigation hereunder" or litigation "in relation hereto at the request, order, or direction" of certificateholders, unless the Trustee is offered "reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred." [App'x D.]

Plaintiffs' Response:   Disputed, as HSBC only includes part of the provision, which provides:  "(a) Except as otherwise provided in Section 9.01, . . . (iii) Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee or the Securities Administrator, as the case may be, reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby. . . .".  Accordingly, this provision expressly provides that *if* the Certificateholders chose to direct the Trustee, they must

43

*also* indemnify the Trustee.  [Uhlig Ex. B (ACE 2005-AG1 PSA § 9.02(a)(iii)); Uhlig Ex. C (ACE 2006-OP2 PSA § 9.02(a)(iii)); D (DBALT 2007-OA1 PSA § 8.2(a)(iii) referring to § 8.1 (iii)); *see also* E (FHLT 2006-C PSA § 8.02(a)(iii) referring to § 8.01 (iii)); F (MHL 2007-1 PSA § 9.02(a)(iii)); G (NHELI 2007-1 PSA § 9.02(a)(iii)).]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact but instead respond with a legal argument that is improper to include in a Rule 56.1 counter-statement and that is unsupported by record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Furthermore, Plaintiffs' description of the provision incorrectly splices "Neither the Trustee nor the Securities Administrator shall be under any obligation . . . to institute, conduct or defend any litigation hereunder" with "at the request, order or direction of any of the Certificateholders," which is not how the provision is written.  *See* App'x D.  Instead, as accurately described by HSBC in the stated fact, the PSAs provide that the Trustee shall not "be under any obligation" "to institute, conduct, or defend any litigation hereunder" or litigation "in relation hereto at the request, order, or direction" of certificateholders, unless the Trustee is offered "reasonable security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred."  *Id*.

72.    The PSAs expressly exempt the Trustee from conducting any investigation without direction and indemnity from the Certificateholders prior to an EOD.  [App'x C.]

Plaintiffs' Response:  Disputed, as this is a legal conclusion, and this provision does not affect the separate "Trustee shall enforce" duty in the PSAs (typically § 2.03). In any event, the pertinent PSA language for the cited provision provides:  "(a) Except as otherwise provided in Section 9.01, . . . (v) Prior to the occurrence of a Master Servicer Event of Default hereunder and after the curing or waiver of all Master Servicer Events of Default which may have occurred with

respect to the Trustee and at all times with respect to the Securities Administrator, neither the Trustee nor the Securities Administrator shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Holders of Certificates entitled to at least 25% of the Voting Rights; provided, however, that if the payment within a reasonable time to the Trustee or the Securities Administrator of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee or the Securities Administrator, as applicable, not reasonably assured to the Trustee or the Securities Administrator by such Certificateholders, the Trustee or the Securities Administrator, as applicable, may require reasonable indemnity satisfactory to it against such expense, or liability from such Certificateholders as a condition to taking any such action." [Uhlig App'x C (ACE 2005-AG1 PSA § 9.02(a)(v); *see also* Uhlig App'x C (ACE 2006-OP2 PSA § 9.02(a)(v); DBALT 2007-OA1 PSA § 8.2(a)(v); FHLT 2006-C PSA § 8.02(a)(v); MHL 2007-1 PSA § 9.02(a)(v); NHELI 2007-1 PSA § 9.02(a)(v)).]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact but instead respond with a legal argument that is improper to include in a Rule 56.1 counter-statement and that is unsupported by record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Furthermore, the PSA language quoted by Plaintiffs supports the stated fact.

73.    The PSAs expressly protect the Trustee from expending or risking its own funds and entitle the Trustee to satisfactory indemnity from the Certificateholders.  [App'x C & D.]

Plaintiffs' Response:  Undisputed, but Plaintiffs note the PSAs provided for the Trustee to recover enforcement expenses from warrantors or trust funds.  [Uhlig App'x P (ACE 2005-AG1

PSA § 1.01: "'Purchase Price': With respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.13(c) or Section 10.01 of this Agreement, and as confirmed by a certification of a Servicing Officer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 10.01), (ii) in the case of (x) a Mortgage Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or a P&I Advance by the Servicer, which payment or P&I Advance had as of the date of purchase been distributed pursuant to Section 5.01, through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or a P&I Advance by the Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income, Insurance Proceeds, Liquidation Proceeds and P&I Advances that as of the date of purchase had been distributed as or to cover REO Imputed Interest pursuant to Section 5.01, (iii) any unreimbursed Servicing Advances and P&I Advances (including Nonrecoverable P&I Advances and Nonrecoverable Servicing Advances) and any unpaid Servicing Fees allocable to such Mortgage Loan or REO Property, (iv) any amounts previously withdrawn from the Collection Account pursuant to Section 3.09(a)(ix) and Section 3.13(b) and (v) *in the case of a Mortgage Loan required to be purchased pursuant to Section 2.03, expenses*

*reasonably incurred or to be incurred by the Servicer or the Trustee in respect of the breach or defect giving rise to the purchase obligation . . ..*" (emphasis added)); *see also* Uhlig App'x P (ACE 2006-OP2 PSA § 1.01; DBALT 2007-OA1 PSA § 1.1; FHLT 2006-C PSA § 1.01; MHL 2007-1 PSA § 1.01; NAA 2005-AR6 PSA § 1.01; NHELI 2007-1 PSA § 1.01).]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as immaterial and irrelevant to the stated fact, as well as improper legal argument.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.

74.     The PSAs expressly provide that "[a]ny permissive right of the Trustee enumerated in [the PSAs] shall not be construed as a duty."  [App'x E.]

Plaintiffs' Response:  Undisputed that language appears in the PSAs, disputed to the extent the Trustee means to suggest "*shall* enforce" (emphasis added) is a permissive right.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as immaterial and irrelevant to the stated fact, as well as improper legal argument.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.

75.     The PSAs contain no provision that expressly requires the Trustee to unilaterally initiate repurchase litigation.  [Uhlig Ex. B (ACE 2005-AG1 PSA); Uhlig Ex. C (ACE 2006-OP2 PSA); Uhlig Ex. D (DBALT 2007-OA1 PSA); Uhlig Ex. E (FHLT 2006-C PSA); Uhlig Ex. F (MHL 2007-1 PSA); Uhlig Ex. G (NHELI 2007-1 PSA).]

Plaintiffs' Response:    Disputed.    The PSAs require that the "Trustee"—not certificateholders—"shall enforce" warrantor repurchase duties.  Enforcement means litigation if the warrantors refuse repurchase.  [Uhlig App'x F (ACE 2005-AG1 PSA § 2.03(a): "(a) Upon

discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller and the Servicer of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within sixty (60) days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within ninety (90) days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement."); *see also* Uhlig App'x F (ACE 2006-OP2 PSA § 2.03(a); DBALT 2007-OA1 PSA § 2.3(a); FHLT 2006-C PSA § 2.03(b); MHL 2007-1 PSA § 2.03(a); NHELI 2007-1 PSA § 2.03(c)).]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact but instead respond with a legal argument that is improper to include in a Rule 56.1 counter-statement and that is unsupported by record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  None of Plaintiffs' cited language controverts the stated fact.  *See* Uhlig Ex. B (ACE 2005-AG1 PSA); Uhlig Ex. C (ACE 2006-OP2 PSA); Uhlig Ex. D (DBALT 2007-OA1 PSA); Uhlig Ex. E (FHLT 2006-C PSA); Uhlig Ex. F (MHL 2007-1 PSA); Uhlig Ex. G (NHELI 2007-1 PSA).

76.     NCUA does not point to a single instance in which an RMBS trustee has ever unilaterally initiated repurchase litigation.  [*See, e.g.*, Uhlig Ex. 15 (Blum Tr. 154:3–156:11).]

<u>Plaintiffs' Response</u>:  Undisputed, but this is a self-serving statement by a race-to-the-bottom participant in an oligopolistic industry, *see* Duffy Ex. 4 (Blum 47-49); Duffy Ex. 6, 143:13-16 (Hillcoat Tr.); Duffy Ex. 7, 167:17-21 (Hillcoat WF Tr.); which contravenes the plain language of the PSAs, *see* Uhlig App'x F, as explained in Part I.C. of Plaintiffs' July 13, 2021 merits brief.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as irrelevant, immaterial legal argument that is improper to include in a Rule 56.1 counter-statement and unsupported by record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.

77.     HSBC has not pursued repurchase litigation unilaterally.  [Acebedo Decl. ¶ 10.]

<u>Plaintiffs' Response</u>:  Plaintiffs cannot respond as to all litigations HSBC may ever have filed, and in any event this is a self-serving statement by a race-to-the-bottom participant in an oligopolistic industry, which contravenes the plain language of the PSAs, as explained in Plaintiffs' Response to ¶ 76.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact but instead respond with a legal argument that is improper to include in a Rule 56.1 counter-statement and that is unsupported by record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Furthermore, Plaintiffs' statement that they "cannot respond as to all litigations HSBC may ever have filed" must be disregarded.  *See Russell*, 753 F. App'x at 13 (affirming district court's decision to deem admitted facts from defendant's 56.1 statement when plaintiff responded that she "could not admit or deny as worded, or lacked information sufficient to admit or deny Defendants' facts").

78.     Plaintiffs identified the claims on the following loans purchased by Wescorp in ACE 2005-AG1 as accruing before March 20, 2011: 14687776, 14665988, 14687545, 14678965, 14679299, 14678650, 14675540, and 14671796.  [Uhlig Decl. ¶ 11a.]

Plaintiffs' Response:  Disputed.  Plaintiffs identified the dates on which HSBC discovered or received notice of R&W breaches with respect to those loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a factual dispute where there is none.   The dates that Plaintiffs' allege "HSBC discovered or received notice of R&W breaches" indisputably are the accrual dates under the applicable state law, and Plaintiffs cite nothing showing otherwise.

79.     Plaintiffs identified the claims on the following loans purchased by U.S. Central in ACE 2006-OP2 as accruing before March 20, 2010: 112442563, 112440911, 112443040, 112440315, 112439182, 112442195, 112441336, 112439727, 112442061, 112439472, 112439746, and 112438975.  [Uhlig Decl. ¶ 11b.]

Plaintiffs' Response:  Disputed.  Plaintiffs identified the dates on which HSBC discovered or received notice of R&W breaches with respect to those loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a factual dispute where there is none.   The dates that Plaintiffs' allege "HSBC discovered or received notice of R&W breaches" indisputably are the accrual dates under the applicable state law, and Plaintiffs cite nothing showing otherwise.

80.     Plaintiffs identified the claims on the following loans purchased by Wescorp in DBALT 2007-OA1 as accruing before March 20, 2011: 114262740, 114262852, 114262803,

114262891, 113481719, 113481967, 114430175, 114429474, 114429996, 114430044, and 114430036.  [Uhlig Decl. ¶ 11c.]

Plaintiffs' Response:  Disputed.  Plaintiffs identified the dates on which HSBC discovered or received notice of R&W breaches with respect to those loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a factual dispute where there is none.   The dates that Plaintiffs' allege "HSBC discovered or received notice of R&W breaches" indisputably are the alleged accrual dates under the applicable state law, and Plaintiffs cite nothing showing otherwise.

81.     Plaintiffs identified the claims on the following loans purchased by Southwest in FHLT 2006-C as accruing before March 20, 2011: 40221863, 40205239, 40202319, 40237307, 40191066, 40199614, 40234486, and 40216749.  [Uhlig Decl. ¶ 11d.]

Plaintiffs' Response:  Disputed.  Plaintiffs identified the dates on which HSBC discovered or received notice of R&W breaches with respect to those loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a factual dispute where there is none.   The dates that Plaintiffs' allege "HSBC discovered or received notice of R&W breaches" indisputably are the alleged accrual dates under the applicable state law, and Plaintiffs cite nothing showing otherwise.

82.     Plaintiffs identified the claims on the following loans purchased by U.S. Central in MHL 2007-1 as accruing before March 20, 2010: 1158068515, 1158066642, 1158068748, 115182590, 114880948, 114966186, 115264570, and 1153340264.  [Uhlig Decl. ¶ 11e.]

Plaintiffs' Response:  Disputed.  Plaintiffs identified the dates on which HSBC discovered or received notice of R&W breaches with respect to those loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a factual dispute where there is none.   The dates that Plaintiffs' allege "HSBC discovered or received notice of R&W breaches" indisputably are the alleged accrual dates under the applicable state law, and Plaintiffs cite nothing showing otherwise.

83.     Plaintiffs identified the claims on the following loans purchased by Wescorp in NHELI 2007-1 as accruing before March 20, 2011: 171815166, 171823866, 171823839, and 171823826.  [Uhlig Decl. ¶ 11f.]

Plaintiffs' Response:  Disputed.  Plaintiffs identified the dates on which HSBC discovered or received notice of R&W breaches with respect to those loans.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a factual dispute where there is none.   The dates that Plaintiffs' allege "HSBC discovered or received notice of R&W breaches" indisputably are the alleged accrual dates under the applicable state law, and Plaintiffs cite nothing showing otherwise.

84.     Exception reports do not include any allegations of R&W breaches.  [Uhlig Decl. ¶ 16; App'x H.]

Plaintiffs' Response:  Disputed.  Exceptions reports include material Mortgage File breaches which are a type of R&W breach.  Those reports containing Mortgage File breaches also suggested the existence of additional R&W breaches.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, NCUA attempts to manufacture a dispute where there is none by claiming (without any support) that exception reports contain "Mortgage File breaches," which NCUA argues "are a type of R&W breach."  But exception reports do not include any allegations of "Mortgage File breaches."  *See* Duffy Exs. 50-53 (excerpts from exception reports).  And the PSAs for the Trusts that NCUA re-underwrote do not include a R&W relating to Mortgage File documents.  Indeed, those PSAs make clear that alleged mortgage-file defects are not a type of R&W breach.  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03) (distinguishing between a defective or missing document and a R&W breach); *see also* Uhlig Exs. C (ACE 2006-OP2 PSA § 2.03), D (DBALT 2007-OA1 PSA § 2.3), F (MHL 2007-1 PSA § 2.03).  Furthermore, there is no evidence in the record to support NCUA's claim that "reports containing Mortgage File breaches also suggested the existence of additional R&W breaches," and NCUA cites none.

Plaintiffs' Further Response:  Plaintiffs refer the Court to Plaintiffs' Reply ¶ 139, explaining why missing and defective documents subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  Plaintiffs further refer the Court to Plaintiffs' 56.1 ¶ 209, explaining why Mortgage File breaches are suggestive of additional R&W breaches.

## III.    ADDITIONAL FACTS RELEVANT TO PLAINTIFFS' DOCUMENT DEFECT CLAIMS.

85.     The PSAs for DBALT 2007-OA1, MHL 2007-1, ACE 2006-OP2, and ACE 2005-AG1 provide that, upon discovery or notice of defective or missing documents from a Mortgage File that materially and adversely affects the loan's value or the Certificateholders' interest, the trustee (1) shall notify the Responsible Party of such breach and request the Seller cure the breach, and (2) if the Responsible Party does not cure, the trustee "shall enforce the obligations of the [Responsible Party]." [App'x F.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

86.     The PSAs for FHLT 2006-C and NHELI 2007-1 do not contain the language that the Trustee "shall enforce the obligations of the [Responsible Party]," and instead provide only that the Trustee must "give prompt written notice" if it discovers defective or missing documents from a Mortgage File that materially and adversely affect the loan's value or the Certificateholders' interest.  [App'x F.]

Plaintiffs' Response:  Undisputed the PSAs for FHLT 2006-C and NHELI 2007-1 do not contain that exact quote, but those Trusts contain language requiring the Trustee to enforce as explained in Plaintiffs' Response to ¶ 66 and Part I of Plaintiffs' July 13, 2021 merits brief.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required, but instead offer improper legal argument.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Plaintiffs' citation to their response to Paragraph 66 does not controvert this stated fact; to the contrary, it corroborates it.  HSBC's reply to Paragraph 66 is

54

incorporated herein.  Plaintiffs' other citation, which is to their brief, is improper citation to a legal argument.  HSBC's cited evidence, Appendix F, lists the quoted language from the PSAs for FHLT 2006-C and NHELI 2007-1, which is indisputably accurate.

87.     Sections 2.03(a) of the MHL 2007-1, ACE 2006-OP2, ACE 2005-AG1, and NHELI 2007-1 PSAs; Section 2.3 of DBALT 2007-OA1 PSA; and Section 2.03(b)-(c) of the FHLT 2006-C PSA do not mention the Custodian's exception report.  [App'x F.]

Plaintiffs' Response:  Disputed.  The reference in § 2.03 to "any materially defective document in, or that a document is missing from, a Mortgage File," plainly incorporates the exceptions reports, which are discussed right before § 2.03 in PSA §§ 2.01 or 2.02.  That language in the PSA can only be read to refer to the exceptions reports discussed in § 2.01.  The exceptions reports constitute discovery or notice of such breaches under PSA § 2.03.

HSBC's Reply:  This fact should be deemed admitted.  See L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required, but instead offer improper legal argument.  See Monahan, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  HSBC's stated fact that these provisions of the PSAs "do not mention the Custodian's exception report" is indisputably accurate.  Plaintiffs' contention that a different phrase "incorporates" Custodian's exception reports is not supported by any cited evidence.  Moreover, the fact that the PSAs separately refer to exception reports in other provisions does not contradict this stated fact; to the contrary, it corroborates it because it shows that the drafters knew how to refer to exception reports but chose not to in these particular sections of the PSA.  See App'x F.  Indeed, the PSAs assign the Depositor, not HSBC, the role of working with the Sponsor to cure exceptions.  See App'x H.

88.    The PSAs assign responsibility for "custody, acceptance, inspection, and release" of Mortgage File documents to the Custodian, who makes certifications within 90-180 days after the Closing Date.  [*See, e.g.*, App'x G; Uhlig Ex. 2 (Custodial Agreement Compilation, ACE 2005-AG1 Custodial Agreement §§ 3, 5).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

89.    The Trustee is not responsible for the acts or omissions of other trust parties, including the Custodian, the Master Servicer, the Servicer, and the Sponsor/Seller.  [App'x I.]

Plaintiffs' Response:  Disputed.  The Trustee is responsible for enforcing repurchase of breaching loans against warrantors.  [*See, e.g.,* Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03); *see also* Uhlig App'x F (PSA § 2.03).]  The exceptions reports constitute discovery or notice of such breaches because § 2.03 incorporates the exceptions reports by conditioning repurchase on "any materially defective document in, or that a document is missing from, a Mortgage File," Uhlig App'x F (PSA § 2.03), and only the Trustee receives those reports directly, [*see* Uhlig Ex. 2 (§§ 3, 5).]

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required, but instead offer improper legal argument.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  HSBC's cited PSA language clearly supports the stated fact.  *See* Uhlig Ex. A (App'x I) ("None of the Securities Administrator, the Master Servicer, the Servicer, the Seller, the Depositor, the Custodian or the Trustee shall be responsible for the acts or omissions of the others or the Swap Provider, it being understood that this Agreement shall not be construed

56

to render those partners joint venturers or agents of one another.").  Nothing in Plaintiffs' answer contradicts this stated fact.

Moreover, nothing in Section 2.03 "incorporates" exception reports, *see* HSBC's Reply to ¶ 87 (incorporated herein), and Plaintiffs' claim that "only the Trustee receives those reports" is plainly not supported by Plaintiffs' citation to the custodial agreements, *see* Uhlig Ex. 2 § 5 (referencing Depositor, Master Servicer, and Servicer), or the PSAs, *see* Uhlig Ex. A (App'x H) (referencing the Depositor, Servicer, and Seller).

90.    The Custodian, not the Trustee, is responsible for preparing exception reports and working with the Depositor to address exceptions even after delivering a "final" certification and exception report at trust closing.  [App'x H.]

Plaintiffs' Response:  Disputed.  The Trustee, not the Custodian or Depositor, is contractually obligated to "notify" the warrantor of "materially defective document[s] in" or documents "missing from" the Mortgage File and request the warrantor "deliver" the missing document or "cure" the defect or missing document.  [*See*, *e.g.,* Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03); *see also* Uhlig App'x F (PSA § 2.03).]  If the warrantor does not do so within the prescribed time period, then "the Trustee shall enforce" warrantor repurchase of breaching loans with "materially defective document[s] in" or documents "missing from" the Mortgage File.  [*See*, *e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03); *see also* Uhlig App'x F (PSA § 2.03).]  In other words, the Trustee is to "address exceptions" — as explained in Part IV.A. of Plaintiffs' July 13, 2021 merits brief.  Instead of addressing exceptions, HSBC simply filed the exception reports away in metal filing cabinets.  [Duffy Ex. 15 254:2-24 (Zheng Tr.) (testifying that, upon receipt of an exceptions report, HSBC would "[f]ile [the report] in the cabinet with the rest of the hard copies," that she didn't "recall that [it] was my job [as trust administrator] to check this document," and

that she "wouldn't know" whether it was anybody's job at HSBC to review exceptions reports).] Moreover, the Depositor is not the Warrantor, it cannot "address exceptions."

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required, but instead offer improper legal argument.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  HSBC's cited PSA language clearly supports the stated fact.  *See* Uhlig Ex. A (App'x H) ("In connection with such transfer and assignment, the *Depositor does hereby deliver to, and deposit with the Custodian pursuant to the Custodial Agreement the documents with respect to each Mortgage Loan* as described under Section 2 of the Custodial Agreement (the 'Mortgage Loan Documents'). In connection with such delivery and as further described in the Custodial Agreement, the *Custodian will be required to review such Mortgage Loan Documents* and deliver to the Trustee, the Depositor, the Servicer and the Seller certifications (in the forms attached to the Custodial Agreement) with respect to such review with exceptions noted thereon. In addition, under the Custodial Agreement *the Depositor will be required to cure certain defects with respect to the Mortgage Loan Documents for the related Mortgage Loans after the delivery thereof by the Depositor to the Custodian* as more particularly set forth therein.") (emphases added).  Nothing in Plaintiffs' answer contradicts this stated fact.  Instead, Plaintiffs' response is immaterial, inaccurate, and improper legal argument.

91.     Exception reports routinely list hundreds if not thousands of mortgage loans, constituting a significant portion of each trust's collateral.  [Uhlig Ex. 14 (Blum Report at 113).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

92.     The purpose of the exception report is to inform the responsible party (*e.g.*, the Depositor or Sponsor/Seller) of loan files with potentially missing or defective documents and to commence a cure period for the responsible party to correct any such issues that are material. [App'x H; Acebedo Decl. ¶ 38; Uhlig Ex. 17 (Musarra Tr. 464:6–465:18).]

Plaintiffs' Response:   Undisputed; the exceptions reports also serve the purpose of informing the Trustee of material Mortgage File breaches that the Trustee is bound to enforce.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded.  Plaintiffs' assertions are unsupported by record evidence and are plainly inaccurate; exception reports do not include any allegations of "Mortgage File breaches," *see* Duffy Exs. 50-53 (excerpts from exception reports), nor do such reports provide the Trustee with notice of any such breaches or trigger any obligation to seek repurchase.  *See* Acebedo Decl. ¶¶ 38, 40; Uhlig Ex. 17 (Musarra Tr. 465:13-18, 471:24-472:5). The record evidence explicitly contradicts Plaintiffs' assertions.  *See id.*; *see also* ¶¶ 84, 87 herein and HSBC's replies thereto.

93.     The PSAs acknowledge that "trailing" mortgage file documents will continue to be delivered to the trust after Closing and potentially after issuance of the Custodian's exception report.  [App'x H.]

Plaintiffs' Response:  Disputed.  The cited provisions provide, in the same or substantially similar language, that:  "The Depositor shall deliver or cause the Originator to deliver to the Servicer copies of all trailing documents required to be included in the Mortgage File *at the same time the originals or certified copies thereof are delivered to the Trustee or Custodian*, such documents including the mortgagee policy of title insurance and any Mortgage Loan Documents upon return from the recording office."  [Uhlig Ex. B (ACE 2005-AG1 § 2.01 (emphasis added))].

Thus, any such trailing documents must be provided initially in a copy form with originals to follow shortly thereafter, for example, "upon return from the recording office." [*Id.*] In no way do these provisions support HSBC's position that such trailing documents may simply remain outstanding and without enforcement action by the Trustee year after year.

HSBC's Reply: This fact should be deemed admitted. *See* L.R. 56(c). Plaintiffs do not specifically controvert the stated fact with supporting citations to relevant record evidence, as required. *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note. Plaintiffs' quoted language does not controvert the stated fact. Rather, it explains that "Depositor shall deliver or cause the Originator to deliver to the Servicer copies of all trailing documents" at the same time that "the originals or certified copies thereof are delivered to the Trustee or Custodian." Uhlig Ex. B (ACE 2005-AG1 § 2.01). This language provides no temporal deadline for trailing documents, but rather explains that, when copies of trailing documents are delivered to the Servicer, the originals or certified copies are to be delivered to the Trustee or Custodian. *See id.*

94.     The PSAs identify no duties for the Trustee upon receipt of the Custodian's certification and exception report. [App'x H.]

Plaintiffs' Response: Disputed. PSA § 2.03 obligated the Trustee — not the Custodian — to enforce repurchase, "[u]pon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File," language that can only be read to refer to the exceptions reports discussed in § 2.01. *See also Commerzbank v. U.S. Bank*, 457 F. Supp. 3d 233, 256 (S.D.N.Y. 2020) (interpreting nearly identical PSA language and concluding "[t]he PSAs impose a duty on U.S. Bank [the trustee] to compel repurchase of a loan if the Mortgage File is defective and the Originator fails to cure within a prescribed period"). Further, the Trustee is the sole primary recipient (others are merely copied) for the final certification and exceptions

report, which is fully consistent with and thus reinforces the enforcement duty in PSA § 2.03. [Uhlig Ex. 2 §§ 5].

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to record evidence, as required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Instead, Plaintiffs attempt to manufacture a dispute by arguing for their legal interpretation of Section 2.03 of some of the PSAs, which is improper to include in a 56.1 counter-statement.  Moreover, Plaintiffs' legal argument is irrelevant, immaterial, and inaccurate.   Section 2.03 does not mention the Custodian's certifications and exception reports, *see* HSBC's Reply to ¶ 87 (incorporated herein), and Plaintiffs do not cite any evidence to the contrary.  Likewise, Plaintiffs' claim that "the Trustee is the sole primary recipient (others are merely copied) for the final certification and exceptions report" is false.  *See* Uhlig Ex. A (App'x H) ([T]he Custodian will be required to review such Mortgage Loan Documents and deliver to the Trustee, the Depositor, the Servicer and the Sponsor certifications (in the forms attached to the Custodial Agreement) with respect to such review with exceptions noted.").

95.    The PSAs provide that: "Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files . . . and preparation and delivery of the certifications shall be performed by the Custodian pursuant to the terms and conditions of the Custodial Agreement."  [App'x G.]

Plaintiffs' Response:  Undisputed.  Notably, however, the *enforcement* duty is placed squarely on the Trustee in PSA § 2.03, and not the custodian as asserted elsewhere by HSBC.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as immaterial, irrelevant, inaccurate, and improper legal argument.

96.     Nothing on the face of the exception reports themselves identifies a listed item as being material.  [Acebedo Decl. ¶ 38.]

<u>Plaintiffs' Response</u>:  Disputed, as the description of each exception in an exceptions report, together with PSA requirements for Mortgage Files, readily allow for identification of any breach that "materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders."  [Uhlig App'x F].

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56(c).  Plaintiffs do not specifically controvert the stated fact with supporting citations to record evidence, as required.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Nothing in Plaintiffs' response contradicts the stated fact that "[n]othing on the face of the exception reports themselves identifies a listed item as being material."  *See also* Duffy Exs. 50-53 (excerpts from exception reports); Acebedo Decl. ¶ 38 ("The exception reports do not identify which entries, if any, purportedly are associated with material defects.").

97.     In third party discovery in this litigation, the Custodians for the Trusts produced certain "cured" exception reports, reflecting the status of mortgage files at the time those reports were generated, which show that many so-called document exceptions were later cured.  [Uhlig Decl. ¶ 14; Uhlig Ex. 35 (Corcoran Decl. ¶ 6); Acebedo Decl. ¶ 39.]  The Custodian did not provide the Trustee with such "cured" exception reports in the normal course.  [Acebedo Decl. ¶ 39.]

<u>Plaintiffs' Response</u>:  Undisputed that certain Custodians produced reports reflecting the status of mortgage files at the time those reports were generated but disputed that the cited evidence

shows that any exceptions were in fact cured.  The reports referenced in the cited paragraph of the Corcoran Declaration do not even purport to show that any exceptions were cured; rather, those reports exclude exceptions that were identified in the final exceptions reports for various reasons including that the loans "were withdrawn, including for servicing activity" (*e.g.*, foreclosure), regardless of whether exceptions were in fact cured.  [Uhlig Ex. 35 (Corcoran Decl. ¶ 6).] Similarly, Custodian Wells Fargo explained that with respect to its reports reflecting the status of mortgage files at the time the reports were generated, "if it receives a release request showing that a loan was removed from the trust, then such loan is no longer considered active in the database. At that point, no further reporting is done on the removed loan, *regardless of whether any still-outstanding exceptions had been cured.*"  [Duffy Ex. 8 (Gorrien Decl. ¶ 7) (emphasis added).] Undisputed that Custodians did not provide reports purporting to list cured exceptions to the Trustee in the normal course, and the Trustee's decision not to enforce repurchase based on exceptions thus was not based on Custodian reports purporting to show that exceptions had been cured.  In any event, nothing in the PSAs allowed for such a cure process beyond the deadline for the final exceptions reports, let alone the process asserted here by the Trustee that Mortgage File breaches could be allowed to remain outstanding year after year.  Further, to the extent subsequent exceptions reports did purport to show that exceptions had actually been cured (rather than that loans had simply removed from the trusts), Plaintiffs' expert Blum credited such cures.  [Duffy Ex. 4 (Blum 87-88, 100-101, 128.)]  Even so, there remained 4,422 material Mortgage File breaches even *after* crediting HSBC for such purported cures.  [*Id.* at 58, 87-88, 100-101, 113, 128, 140.]

HSBC's Reply:  This fact should be deemed undisputed because Plaintiffs fail to controvert the fact with record evidence.  To the contrary, Plaintiffs' Response admits the entirety of this fact.

Plaintiffs state: "Undisputed that certain Custodians produced reports reflecting the status of mortgage files at the time those reports were generated"; "Undisputed that Custodians did not provide reports purporting to list cured exceptions to the Trustee in the normal course"; and "Plaintiffs' expert Blum credited such cures." The remainder of Plaintiffs' Response is immaterial, irrelevant, inaccurate, and improper legal argument.

98.     NCUA's position in this litigation is that even fully performing loans should have been put back based on exception reports received at or near the time of trust closing.  [Uhlig Ex. 29 (Milner Reply Rep. at 64).]

Plaintiffs' Response:  Undisputed, because the PSAs make no exceptions for performing loans.  Moreover, many loans that were initially performing later became nonperforming, and in the falling housing market that existed during the relevant time period recovering principal for the trusts before borrowers defaulted was the best course overall.  [Duffy Ex. 9 (Blum Reply 61-64).].

HSBC's Reply:  This fact should be deemed admitted.  See L.R. 56(c).  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as immaterial, irrelevant, inaccurate, and improper legal argument.

99.     NCUA's proposed expert, Leonard Blum, did not examine the Mortgage File for a single loan.  [Uhlig Ex. 15 (Blum Tr. 242:18-21, 251:11–252:22).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  See L.R. 56.1(c); Giannullo, 322 F.3d at 140.

100.     Accordingly, there is no admissible evidence that exceptions listed in exception reports were not addressed after trust closing or that documents required to be maintained by the

Custodian in the Mortgage File are or remained missing and/or caused any damages.  [Uhlig Decl. ¶ 15.]

Plaintiffs' Response:  Disputed.  This statement includes inappropriate legal conclusions. Regardless, final exceptions reports are prepared months after closing, *see* Uhlig Ex. 2, § 5 (final report due 180 days after closing), and the fact that exceptions still remained at that time is admissible evidence that exceptions were not addressed after trust closing or within contractual cure periods.  Plaintiffs' expert Blum used versions of the final exceptions reports that the parties agreed were correctly identified as final and authentic.  [Duffy Ex. 10 (Chart of Exceptions Reports Accompanying 7/14/17 Ltr. from S. Attaway to E. Reddington); Duffy Ex. 11 (8/11/17 Ltr. from E. Weiner to S. Attaway).]  Moreover, each such report was either produced by HSBC from its own files or produced by a third party that submitted a business records declaration, and HSBC offers no explanation why such documents would be inadmissible.  [*See id.*; *see also* Uhlig Ex. 35 (Corcoran Decl. ¶ 6); Duffy Ex. 8 (Gorrien Decl. ¶ 5).]  HSBC cites no evidence suggesting that the reports were inaccurate.  Further, as noted above *supra* ¶ 97, to the extent subsequent exceptions reports purported to show that exceptions had been cured, expert Len Blum credited such cures.  [Duffy Ex. 4 (Blum 87-88, 100-101, 128.)]  HSBC's statement concerning damages appears to assume, incorrectly, that an exception had to cause damages, when, under the PSAs, exceptions supported repurchase if they created risk that impacted loan value, regardless of any actual loss.  [Uhlig App'x F (PSA § 2.03).]  Plaintiffs' expert Milner calculated the damages that resulted from the Trustee allowing loans with such material, adverse Mortgage File exceptions to remain in the trusts rather than enforcing warrantor repurchases.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence. *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee

Note.  Nothing in Plaintiffs' Response or their citations contradicts the stated fact that "there is no admissible evidence that exceptions listed in exception reports were not addressed after trust closing or that documents required to be maintained by the Custodian in the Mortgage File are or remained missing and/or caused any damages."  A party moving for summary judgment may point to a failure of evidence supporting its opponent's case, s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the Plaintiffs bear the burden to show otherwise, which they have failed to do.

## IV.   ADDITIONAL FACTS RELEVANT TO PLAINTIFFS' EOD CLAIMS.

101.    Under the PSAs, the Trustee is not assigned a duty to service the loans in the Trusts or to supervise Servicers.  Uhlig Ex. B (ACE 2005-AG1 PSA); Uhlig Ex. C (ACE 2006-OP2 PSA); Uhlig Ex. D (DBALT 2007-OA1 PSA); Uhlig Ex. E (FHLT 2006-C PSA); Uhlig Ex. F (MHL 2007-1 PSA); Uhlig Ex. G (NHELI 2007-1 PSA).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

102.    The PSAs assign the duty to service the loans to Servicers and the duty to supervise Servicers to the Master Servicer.  [App'x S; Uhlig Ex. B (ACE 2005-AG1 PSA § 3.01); Uhlig Ex. C (ACE 2006-OP2 PSA§ 3.01); Uhlig Ex. D (DBALT 2007-OA1 PSA§ 3.1); Uhlig Ex. E (FHLT 2006-C PSA § 3.01); Uhlig Ex. F (MHL 2007-1 PSA § 3.01); Uhlig Ex. G (NHELI 2007-1 PSA § 3.01).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

103.    The PSAs for ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, FHLT 2006-C, and MHL 2007-1 provide that only upon a *Master Servicer* EOD, HSBC shall exercise such of

the rights and powers vested in it under the PSAs using the same degree of care and skill as would a prudent person.  [App'x M.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140

104.    For example, the ACE 2005-AG1 PSA § 9.01 provides:  "During the continuance of a Master Servicer Event of Default, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. Any permissive right of the Trustee enumerated in this Agreement shall not be construed as a duty."  [App'x M.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

105.    Only the NHELI 2007-1 PSA includes a provision that a "Servicer Default *with respect to Wells Fargo*" gives rise to an obligation on the part of the trustee to exercise rights and powers as would a prudent person.  [App'x M (emphasis added).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

106.    Wells Fargo was both the Master Servicer and Servicer for NHELI 2007-1.  [Uhlig Ex. G (NHELI 2007-1 PSA § 1.01 (definitions of "Master Servicer" and "Servicer")).]

Plaintiffs' Response:  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

107.    The Trustee's prudent-person standard is triggered only when a Responsible Officer of the Trustee has actual knowledge of a Master Servicer EOD or the Trustee receives written notice of a Master Servicer EOD.  [App'x J.]  That notice and knowledge must be trust-specific.  [App'x J.]

<u>Plaintiffs' Response:</u>  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

108.    The PSAs expressly set forth what conduct could constitute a Servicer EOD or a Master Servicer EOD.  [App'x K & L.]

<u>Plaintiffs' Response:</u>  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

109.    Such conduct includes, for example, the Master Servicer's failure "to observe or perform in any material respect any other of the covenants or agreements" contained in the PSA, "which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Depositor or the Trustee or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates entitled to at least 25% of the Voting Rights."  [App'x L.]

<u>Plaintiffs' Response:</u>  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

110.    An EOD requires certain procedural requirements to be met, including (1) written notice of the purported EOD to the breaching party (here, either the Servicer or Master Servicer), and (2) expiration of a cure period (typically 30 days) without the breaching party curing the purported EOD for which it received notice.  [App'x K & L.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

111.    On August 11, 2017, Plaintiffs entered into an agreement with HSBC that Plaintiffs would answer the following stipulated interrogatory within 14 days of service of its expert reports:

> As to each Trust at Issue, please state and describe each alleged "Event of Default," "Servicer Event of Default," "Master Servicer Event of Default," "Indenture Event of Default," and/or "Issuer Event of Default," as those phrases are defined in each applicable Governing Agreement, including when you learned of each such alleged event, and how you learned of each such alleged event.

[Uhlig Ex. 27 (NCUA/HSBC Agreement re Interrogs.) at 1–3).  Plaintiffs failed to provide any evidence (or to respond at all) to this stipulated interrogatory.  [Uhlig Decl. ¶ 12.]

Plaintiffs' Response:  Undisputed.  However, HSBC has not previously identified this oversight by Plaintiffs.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

112.    Plaintiffs have proffered no testimony—from a servicing expert or otherwise—that the Master Servicer's conduct gave rise to an EOD in any Trust.  [Uhlig Decl. ¶ 13.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

113.    The record contains no evidence of a written notice to the Servicer or Master Servicer of a material failure to perform or EOD, as the PSAs require.  [Acebedo Decl. ¶ 15.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

114.    The record contains no evidence that HSBC received a trust-specific notice of a Master Servicer EOD in any Trust.  [Acebedo Decl. ¶¶ 14–15, 17.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

115.    Even during an EOD, a trustee is still not required to expend, advance, or risk its own funds, or incur financial liability without an indemnity satisfactory to it.  [App'x D.]

Plaintiffs' Response:  Disputed inasmuch as a trustee need not be indemnified by a certificateholder, *see* Plaintiffs' Response to ¶ 71, but may reimburse itself from trust funds for reasonable expenses, *see* Uhlig Exs. B, C, F § 3.09(viii); Ex. E § 3.11(xi), and recover from enforcement expenses from warrantors, *see* Plaintiffs' Response to ¶ 73.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Nothing in Plaintiffs' Response or their citations contradicts the stated fact, and HSBC's cited evidence supports the stated fact.  *See* Uhlig Ex. A (App'x D).

116.    There is no evidence that Plaintiffs, or any certificateholder, directed and indemnified HSBC to take the actions that Plaintiffs now claim HSBC should have taken following the purported EODs that Plaintiffs allege in this litigation.  [Acebedo Decl. ¶ 13.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

## V.    ADDITIONAL FACTS RELEVANT TO HSBC'S GOOD FAITH.

117.    Under the PSAs, HSBC as Trustee cannot be held liable "for any action taken, suffered or omitted by it in good faith and believed by it to be authorized."  [App'x N.]

Plaintiffs' Response:  Disputed, as HSBC only includes part of the provision, which provides:  "(a) Except as otherwise provided in Section 9.01, . . ."  And, PSA § 9.01 provides the Trustee may not be liable "for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee or an officer or officers of the Securities Administrator, respectively, unless it shall be proved that the Trustee or the Securities Administrator was negligent in ascertaining the pertinent facts."  [Uhlig App'x N.]

HSBC's Reply:  This fact should be deemed admitted.  There is no dispute concerning the actual text of the PSAs.

118.    Under the PSAs, "Neither the Trustee nor the Securities Administrator shall be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee or an officer or officers of the Securities Administrator, respectively, unless it shall be proved that the Trustee or the Securities Administrator, respectively, was negligent in ascertaining the pertinent facts."  [App'x N.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

71

## VI.   ADDITIONAL FACTS RELEVANT TO PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY DUTY.

119.   There is no evidence that HSBC was beholden to the Bellwether Trusts' Servicers, Master Servicers, or Sponsors/Sellers.  [Acebedo Decl. ¶¶ 41–42.]

Plaintiffs' Response:  Disputed.  The structure of the trustee industry was oligopolistic. HSBC controlled nearly 10% of the market, and it had aggressive growth targets requiring it to sell trustee services to warrantors (RMBS sponsors).  Moreover, HSBC affiliates acted as sponsor and/or warrantor for billions of dollars of RMBS and/or mortgage loans under its HSI Asset Securitization Corp., HSBC Home Equity Loan Trust, and HSBC Home Equity Loan Trust(USA) securitization shelf labels, as well as sales of whole loans.  [Duffy Ex. 4 (Blum 47-49).]

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to specifically controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  A party moving for summary judgment may point to a failure of evidence supporting its opponent's case, s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and Plaintiffs bear the burden to show otherwise, which they have failed to do.  Plaintiffs' response recites only immaterial speculation and improper legal argument.

120.   There is no evidence that HSBC looked the other way so that Servicers, Master Servicers, or Sellers in the Bellwether Trusts would return the favor when the roles were reversed. [Acebedo Decl. ¶¶ 41–42.]

Plaintiffs' Response:  Disputed.  *See* Plaintiffs' Response to ¶ 119.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to specifically controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  A party moving for summary judgment may point to a failure of evidence supporting its opponent's case, s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and

72

Plaintiffs bear the burden to show otherwise, which they have failed to do.  Plaintiffs' response recites only immaterial speculation and improper legal argument.

## VII.   ADDITIONAL FACTS RELEVANT TO PLAINTIFFS' CLAIM FOR DAMAGES.

### A.   Consequential Damages

121.   The PSAs for the Trusts bar consequential damages.  [App'x Q.]

Plaintiffs' Response:  Undisputed.  However, this fact is irrelevant, as explained in Part VIII.A. Plaintiffs' July 13, 2021 merits brief, the damages sought are general, not consequential, damages.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.  Everything after "[u]ndisputed" in Plaintiffs' response should be disregarded as irrelevant, immaterial, inaccurate, and improper legal argument.

122.   For example, the ACE 2005-AG1 PSA provides:  "In no event shall the Trustee or the Securities Administrator be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits)."  [App'x Q.]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

### B.   "Make Whole" Amounts and Litigation Expenses.

123.   In calculating the amounts that Plaintiffs say HSBC should have recovered as repurchase proceeds, Plaintiffs include within the repurchase price so-called "make whole" amounts, i.e., losses incurred on the loan prior to the hypothetical repurchase.  [Uhlig Ex. 29 (Milner Rep. at 26–27).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

124.    Under the PSAs, the definition of "Purchase Price" or "Repurchase Price" does not include "make whole" amounts.  [App'x P.]

Plaintiffs' Response:  Disputed.  The definitions of those terms set the repurchase price to zero only for the purposes of internal trust accounting.  [Uhlig App'x P.]  As explained in Part VIII.B. of Plaintiffs' July 13, 2021 merits brief, HSBC ignores key language in the Governing Agreements showing, that, for purposes of the Purchase Price owed by a warrantor, the Principal Balance of Liquidated Loans is *not* zero.  [*Id.*]

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to specifically controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Nothing in Plaintiffs' cited evidence, Uhlig Ex. A (App'x P), supports Plaintiffs' claim that "[t]he definition of those terms set the repurchase price to zero only for the purposes of internal trust accounting."  Plaintiffs' other citation, which is to their brief, is improper citation to a legal argument.  HSBC's cited evidence, Uhlig Ex. A (App'x P), expressly supports the stated fact that "the definition of 'Purchase Price' or 'Repurchase Price' does not include 'make whole' amounts."

125.    Instead, each of the PSAs at issue defines the primary element of the Purchase Price as the principal balance of the loan at the time of repurchase.  When a loan incurs a loss, its principal balance is reduced by the amount of the loss.  Therefore, if the loan is repurchased after the loss is incurred, the Purchase Price is at the reduced amount.  [App'x P.]

Plaintiffs' Response:  Disputed.  *See* Plaintiffs' Response to ¶ 124.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to specifically controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.   HSBC additionally incorporates its reply to Plaintiffs' Response to ¶ 124 above.

126.    Plaintiffs' damages calculations also include litigation costs that would have been incurred in hypothetical repurchase litigation.  [Uhlig Ex. 29 (Milner Rep. at 29).]

Plaintiffs' Response:  Undisputed.

HSBC's Reply:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

### C.    **Negative Damages**

127.    In the opinion of Plaintiffs' own expert, Mr. Milner, Plaintiffs have negative damages on their investment in tranche M1 of trust ACE 2005-AG1.  [Uhlig Ex. 29 (Ex. J to Milner Rep.).]

Plaintiffs' Response:  Disputed.  As explained in Part IX.C. of Plaintiffs' July 13 2021 merits brief, HSBC's claim that Plaintiffs incurred "negative damages" ignores the time value of money.  When considering that HSBC should have started making remediation payments related to the M1 in 2012, it is clear that Plaintiffs suffered damages from HSBC's misconduct and delayed payment.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to specifically controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.   Moreover, Plaintiffs' sole citation, which is to their brief, is improper citation to a legal argument.  HSBC's cited evidence expressly supports the stated fact that "[i]n the opinion of Plaintiffs' own expert, Mr. Milner, Plaintiffs have negative damages on their investment in tranche M1 of trust ACE 2005-AG1."  *See* Uhlig Ex. 29 (Ex. J to Milner Rep.).

### D.      Repurchase Price.

128.    Under the PSAs for the Trusts, when a warranting party repurchases a loan, it does so at a defined Purchase Price.  The definition of that price varies between trusts.  In four of the Trusts (ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1), the PSAs define the Stated Principal Balance for liquidated loans as zero.  [App'x P.]

Plaintiffs' Response:  Disputed, HSBC ignores key language in the Governing Agreements showing that, for purposes of the Purchase Price owed by a warrantor, the Principal Balance of Liquidated Loans is *not* zero, *see* Uhlig App'x P; Plaintiffs' Response to ¶ 124, as explained in Part VIII.B. Plaintiffs' July 13, 2021 merits brief.

HSBC's Reply:  This fact should be deemed admitted because Plaintiffs fail to specifically controvert the fact with record evidence.  *See Monahan*, 214 F.3d at 292; L.R. 56.1(d); L.R. 56.1 Committee Note.  Nothing in Plaintiffs' cited evidence, Uhlig Appendix P, supports Plaintiffs' claim that "for purposes of the Purchase Price owed by a warrantor, the Principal Balance of Liquidated Loans is *not* zero," and Plaintiffs point to nothing.  Plaintiffs' other citation, which is to their brief, is improper citation to a legal argument.  HSBC's cited evidence, Uhlig Ex. A (App'x P), expressly supports that the stated fact that "[i]n four of the Trusts (ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1), the PSAs define the Stated Principal Balance for liquidated loans as zero."  *See* Uhlig Ex. A (App'x P).  HSBC additionally incorporates its reply to Plaintiffs' Response to ¶ 124 above.

129.    For example, the ACE 2005-AG1 PSA defines the price at which loans are to be repurchased, which it calls the "Purchase Price," as "100% of the Stated Principal Balance thereof as of the date of purchase," with certain adjustments.  [App'x P.]

Plaintiffs' Response:  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

130.    The PSA defines "Stated Principal Balance" at any time "coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed" as "zero."  [App'x  P.]

<u>Plaintiffs' Response</u>:  Undisputed.

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

**E.    THE DB/NCUA Settlement.**

131.    ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████   [Uhlig Ex. 13 (DB/NCUA Settlement at DBUSH_000002–03).]

<u>Plaintiffs' Response</u>:  Undisputed except that HSBC omitted by ellipses a portion of the DB/NCUA Settlement, which was dated October 28, 2011:  "███████████████████████████

███████████████████████████████████████████████"  [*Id.*]

<u>HSBC's Reply</u>:  This fact should be deemed admitted.  *See* L.R. 56.1(c); *Giannullo*, 322 F.3d at 140.

**HSBC'S PRELIMINARY STATEMENT REGARDING ITS RESPONSES AND OBJECTIONS TO PLAINTIFFS' "STATEMENT OF ADDITIONAL FACTS"**

HSBC sets forth below its responses and objections to Plaintiffs' 84-paragraph "statement of additional facts," purportedly submitted pursuant to Local Civil Rule 56.1(b). Rule 56.1 allows a party opposing summary judgment to file, "if necessary," a "short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." But, as explained in HSBC's Preliminary Statement, Plaintiffs have ignored that Rule. They do not limit themselves to raising facts that are material to HSBC's pending motion about which they contend there is a genuine issue to be tried. Instead, their Statement includes facts largely immaterial to the issues before the Court and achieves the opposite result of Rule 56.1's purpose. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("The purpose of Local Rule 56.1 is to streamline the consideration of Summary Judgment Motions by freeing district courts from the need to hunt through voluminous records.").

**PLAINTIFFS' OPPOSITION TO HSBC'S PRELIMINARY STATEMENT**

Plaintiffs respectfully refer the Court to Plaintiffs' opposition to HSBC's preliminary statement, *supra* page 2, which explains that Plaintiffs' properly submitted a statement of material undisputed facts pursuant to Local Rule 56.1 and the Court's Individual Rules in support of its cross-motion for summary judgment and well within the Court's page limits.

**PLAINTIFFS' REPLY STATEMENT OF UNDISPUTED ADDITIONAL FACTS IN
SUPPORT OF ITS MOTION SUMMARY JUDGMENT AND IN OPPOSITION TO
HSBCS' MOTION FOR SUMMARY JUDGMENT (STATEMENTS 132-215)**

Plaintiffs' Rule 56.1 Statement of Additional Facts is comprised of statements in

numbered paragraphs 132 through 215.  Set forth below are Plaintiffs' statements (under the

headings provided by Plaintiffs), HSBC's responses, and Plaintiffs' replies.

**VIII.   FACTS RELEVANT TO THE PSA PHRASE "TRUSTEE SHALL ENFORCE"
AND RELEVANT TO BOTH MORTGAGE FILE AND R&W BREACHES[6]**

HSBC's Response:  HSBC disputes Plaintiffs' section heading VIII, which should be

disregarded by the Court as inaccurate.  The vast majority of the following "facts" are immaterial

to HSBC's motion for summary judgment, and none of the facts impede summary judgment for

HSBC on Plaintiffs' claims or support NCUA's cross-motion for summary judgment.

Plaintiffs' Reply:  HSBC is incorrect that these facts are immaterial to HSBC's motion

for summary judgment and/or Plaintiffs' cross-motion for summary judgment, as these facts

form the legal predicate for HSBC's contract duties to enforce repurchase of breaching loans by

warrantors.

**A.      Trustee Duties Relating to the Acceptance of Right, Title, and Interest in the
Mortgage Loans and Review of "Mortgage Files"**

HSBC's Response:  HSBC disputes Plaintiffs' section heading VIII.A, which should be

disregarded by the Court as inaccurate.  HSBC as Trustee for the Six Trusts had no duty to

review mortgage files; indeed, the PSAs state that all duties related to the "custody, acceptance,

inspection, and release of the Mortgage Files" are performed by the Custodian.  *See* Uhlig Ex. A

(App'x G).  The PSAs define "Mortgage File" as "The Mortgage Loan Documents pertaining to

---

[6] Unless otherwise stated, all emphasis is added.

a particular Mortgage Loan," and expressly state that "the Custodian will be required to review such Mortgage Loan Documents."  Uhlig Exs. B (ACE 2005-AG1 PSA §§ 1.01, 2.01); C (ACE 2006-OP2 PSA §§ 1.01, 2.01); D (DBALT 2007-OA1 PSA §§ 1.1, 2.1); E (FHLT 2006-C PSA §§ 1.01, 2.01); F (MHL 2007-1 PSA §§ 1.01, 2.01); G (NHELI 2007-1 PSA §§ 1.01, 2.01).

Plaintiffs' Reply:  Plaintiffs respectfully refer the Court to Plaintiffs' legal briefs concerning the legal issues raised in HSBC's response.  [NCUA Br. 4-11; NCUA Reply Br. 1-11, 19-24.]  The text of the PSAs make clear that "the Trustee shall enforce" repurchase of materially breaching loans as identified on the custodian exceptions reports that were provided contemporaneously to HSBC, as the RMBS Trustee with sole enforcement duties for thousands of materially breaching loans.  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.03(a)); C (ACE 2006-OP2 PSA § 2.03(a)), D (DBALT 2007-OA1 PSA § 2.03(a)); F (MHL 2007-1 PSA § 2.03(a)); *see also* E (FHLT 2006-C PSA §§ 1.01, 2.01) (similarly requiring enforcement); G (NHELI 2007-1 PSA § 2.03) (similarly requiring enforcement).]

132.    The PSAs for the Trusts provide the depositor transfers and assigns to HSBC, for the benefit of the certificateholders, all of its rights, title, and interest in the Mortgage Loans and all of its rights in the transfer agreement pursuant to which the depositor purchased the loans, including the depositor's rights, title, and interest in R&Ws.  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.01); C (ACE 2006-OP2 PSA § 2.01); D (DBALT 2007-OA1 PSA § 2.1); E (FHLT 2006-C PSA § 2.01); F (MHL 2007-1 PSA § 2.01); G (NHELI 2007-1 PSA § 2.01).]

HSBC's Response:  Disputed, but immaterial.  Plaintiffs' cited evidence does not support Plaintiffs' claim that the PSAs provide that "the depositor transfers and assigns to HSBC" "all of its rights in the transfer agreement pursuant to which the depositor purchased the loans, including the depositor's rights, title, and interest in R&Ws."  Undisputed that the PSAs provide, using this

language or similar language, that: "The Depositor, concurrently with the execution and delivery

hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee, on behalf of

the Trust, without recourse, for the benefit of the Certificateholders, all the right, title and interest

of the Depositor, including any security interest therein for the benefit of the Depositor, in and to

the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under

the Mortgage Loan Purchase Agreement . . ." *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA

§ 2.01).

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts,

and admits that there is not a genuine issue of *material* fact.  Indeed, HSBC quotes language —

the same language Plaintiffs cite in ¶ 132 — that substantiates the asserted fact:  "The Depositor

. . . does hereby transfer, assign, set over and otherwise covey to the Trustee . . . all the right,

title, and interest of the Depositor."  [*See*, *e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.01).]

133.    The PSAs for each of the at-issue Trusts provide that the Mortgage Loan

Documents must include the documents evidencing or relating to each Mortgage Loan delivered

to the Custodian under the Custodial Agreement on behalf of the Trustee defined in the PSAs as

the "Mortgage File."  [Uhlig Exs. B (ACE 2005-AG1 PSA § 1.01); C (ACE 2006-OP2 PSA

§ 1.01); D (DBALT 2007-OA1 PSA § 1.1); E (FHLT 2006-C PSA § 1.01); F (MHL 2007-1 PSA

§ 1.01); G (NHELI 2007-1 PSA § 1.01).]

HSBC's Response:  Disputed, but immaterial.  The PSAs do not provide that the

"Mortgage Loan Documents must include" the documents listed in Plaintiffs' claim; rather the

PSAs define "Mortgage Loan Documents" to be, using this language or similar language: "[t]he

documents evidencing or relating to each Mortgage Loan delivered to the Custodian under the

Custodial Agreement on behalf of the Trustee."  *See e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA

§ 1.01 (definition of "Mortgage Loan Documents")).  The definition of "Mortgage Loan Documents" does not use Plaintiffs' term "include," which implies that the definition could include other documents.  *Id.*  "Mortgage File," in turn, is defined as "[t]he Mortgage Loan Documents pertaining to a particular Mortgage Loan.  *Id.* (definition of "Mortgage File").

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  Indeed, HSBC admits as much by quoting the definition of "Mortgage Loan Documents," which substantiates the facts in ¶ 133 and is the same definition Plaintiffs cited in ¶ 133.  [Uhlig Ex. B (ACE 2005-AG1 PSA § 1.01 (defining "Mortgage Loan Documents")).]

134.    The PSAs for each of the at-issue Trusts required HSBC, or its designated agent acting as Custodian on its behalf, to acknowledge receipt of the Mortgage Files on behalf of the Trust and to hold them, as Trustee, for the benefit of the Certificateholders.  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.02); C (ACE 2006-OP2 PSA § 2.02); D (DBALT 2007-OA1 PSA § 2.2); E (FHLT 2006-C PSA § 2.02); F (MHL 2007-1 PSA § 2.02); G (NHELI 2007-1 PSA § 2.02).]

HSBC's Response:  Disputed, but immaterial.  The PSAs expressly state that HSBC is not the party that performs these duties, that the party that does (the Custodian) is not an agent of HSBC, and that the Trustee is not liable for any act or omission of the Custodian.  *See* Uhlig Exs. B (ACE 2005-AG1 PSA § 2.01); C (ACE 2006-OP2 PSA § 2.01); D (DBALT 2007-OA1 PSA § 2.1); E (FHLT 2006-C PSA § 2.01); F (MHL 2007-1 PSA § 2.01); G (NHELI 2007-1 PSA § 2.01); Uhlig Ex. A (App'x I).  Specifically, the PSA for each Trust expressly provides, using this language or similar language, that: "the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files," as well as "preparation and delivery of the certifications" "shall be performed by the Custodian."  Uhlig Ex. A (App'x G).  Additionally,

the Custodian is not an "agent" of HSBC, as expressly provided in the PSAs: "None of the
Securities Administrator, the Master Servicer, the Servicer, the Seller, the Depositor, the
Custodian or the Trustee shall be responsible for the acts or omissions of the others or the Swap
Provider, it being understood that this Agreement shall not be construed to render those partners
joint venturers or agents of one another."  Uhlig Ex. A (App'x I).  Furthermore, "[t]he Trustee
shall not be liable for any acts or omissions of the Servicer, the Depositor or the Custodian."  *Id.*

　　　Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts,
and admits that there is not a genuine issue of *material* fact.  HSBC appears to take issue with the
use of the word "agent."  But the governing documents clearly provide that the Custodian acted
as the Trustee's "agent."  [*See*, *e.g.*, Duffy Ex. 55 at HSBCCTLA0068924 (Exhibit 2 of ACE
2005-AG1 Custodial Agreement) ("The Custodian hereby confirms that it is holding each such
Custodial File *as agent* and bailee of, and custodian for the exclusive use and benefit, and subject
to the sole direction, of the Trustee pursuant to the terms and conditions of the Custodial
Agreement.") (emphasis added); Duffy Ex. 56 at HSBCCTLA0080132 (Exhibit 2 of ACE 2006-
OP2 Custodial Agreement) (same); Duffy Ex. 57 at HSBCCTLA0073464 (Exhibit 2 of DBALT
2007-OA1 Custodial Agreement) (same); Duffy Ex. 58 at HSBCCTLA0087530 (Exhibit 2 of
MHL 2007-1 Custodial Agreement) (same); Duffy Ex. 59 at HSBCCTLA0055948 (Exhibit 2 of
NHELI 2007-1 Custodial Agreement) (same);] (HSBC failed to produce the Custodial
Agreement for the Fremont FHLT 2006-C trust.)  Moreover, HSBC does not dispute the primary
assertion in ¶ 134 that each PSA for each of the at-issue Trusts required HSBC to acknowledge
receipt of the Mortgage Files on behalf of the Trust and to hold them, as Trustee, for the benefit
of the Certificateholders.  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.02); C (ACE 2006-OP2 PSA

§ 2.02); D (DBALT 2007-OA1 PSA § 2.2); E (FHLT 2006-C PSA § 2.02); F (MHL 2007-1 PSA § 2.02); G (NHELI 2007-1 PSA § 2.02).]

135.    HSBC appointed third-party custodian Deutsche Bank National Trust Company in the ACE 2005-AG1 and MHL 2007-1 Trusts to receive and review the Mortgage Files "on its behalf."  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.03); F (MHL 2007-1 PSA § 2.03).]

HSBC's Response:  Disputed, but immaterial.  Neither of Plaintiffs' citations support Plaintiffs' paragraph 135.  Indeed, nowhere in the PSAs does it say that HSBC "appointed" a custodian, let alone appointed one "to receive and review Mortgage Files 'on its behalf."  To the contrary, the PSAs expressly state, using this language or similar language, that: "[T]he Custodian will be required to review such Mortgage Loan Documents."  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.01).  Likewise, the PSAs state that custodial functions, including related to the "custody [and] inspection" of Mortgage Files, shall be performed by the Custodian. *See* Uhlig Ex. A (App'x G).  Additionally, insofar as Plaintiffs are attempting to claim that the Custodian was an agent of HSBC, the PSAs expressly provide that the Custodian is not the agent of HSBC: "None of the Securities Administrator, the Master Servicer, the Servicer, the Seller, the Depositor, the Custodian or the Trustee shall be responsible for the acts or omissions of the others or the Swap Provider, it being understood that this Agreement shall not be construed to render those partners joint venturers or agents of one another."  Uhlig Ex. A (App'x I). Furthermore, "[t]he Trustee shall not be liable for any acts or omissions of the Servicer, the Depositor or the Custodian."  *Id.*

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  As mentioned, the governing documents clearly provide that the Custodian acted as the Trustee's "agent."  [*See*, *e.g.*, Duffy

Ex. 55 at HSBCCTLA0068924 (Exhibit 2 of ACE 2005-AG1 Custodial Agreement) ("The

Custodian hereby confirms that it is holding each such Custodial File *as agent* and bailee of, and

custodian for the exclusive use and benefit, and subject to the sole direction, of the Trustee

pursuant to the terms and conditions of the Custodial Agreement.") (emphasis added); Duffy Ex.

58 at HSBCCTLA0087530 (Exhibit 2 of MHL 2007-1 Custodial Agreement) (same).]  The

Custodial Agreements also confirm that HSBC appointed the Custodian, providing — in an

agreement signed by the Trustee and the Custodian — that "the Trustee desires to have the

Custodian take possession of the Mortgages and Mortgage Notes along with certain other

documents specified herein, as custodian of the Trustee . . . ."  [Duffy Ex. 55 at

HSBCCTLA0068903 (ACE 2005-AG1 Custodial Agreement); *see also* Duffy Ex. 58 at

HSBCCTLA0087504 (MHL 2007-1 Custodial Agreement) (similar).]  Moreover, HSBC does

not dispute the primary assertion in ¶ 135:  that Deutsche Bank National Trust Company, as

Custodian in the ACE 2005-AG1 and MHL 2007-1 Trusts, received and reviewed the Mortgage

Files "on [the Trustee's] behalf."  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.03); F (MHL 2007-1

PSA § 2.03); *see also* Uhlig Exs. B (ACE 2005-AG1 PSA § 2.06) ("The Trustee acknowledges

the assignment to it of the Mortgage Loans and the delivery to the Custodian on its behalf of the

Mortgage Loan Documents, subject to the provisions of Section 2.01 and Section 2.02 hereof

and Section 2 of the Custodial Agreement, together with the assignment to it of all other assets

included in REMIC I, the receipt of which is hereby acknowledged."); F (MHL 2007-1 PSA

§ 2.02) ("The Trustee acknowledges receipt . . .  of the Mortgage Loan Documents . . . and

declares that it holds (or the Custodian on its behalf holds) and will hold such documents and the

other documents delivered to it constituting a Mortgage Loan Document . . . in trust for the

exclusive use and benefit of all present and future Certificateholders.")].

136.    HSBC appointed third-party custodian Wells Fargo for the DBALT 2007-OA1 and NHELI 2007-1 Trusts to receive and review the Mortgage File "on behalf of the Trustee." [Uhlig Exs. D (DBALT 2007-OA1 PSA § 2.3); G (NHELI 2007-1 PSA § 2.03).]

HSBC's Response:  Disputed, but immaterial.  Neither of Plaintiffs' citations support Plaintiffs' claim.  Indeed, nowhere in the PSAs does it say that HSBC "appointed" a custodian, let alone appointed one "to receive and review Mortgage Files 'on its behalf."  To the contrary, the PSAs expressly state, using this language or similar language, that: "[T]he Custodian will be required to review such Mortgage Loan Documents."  *See, e.g.*, Uhlig Ex. D (DBALT 2007-OA1 PSA § 2.1).  Likewise, the PSAs state that custodial functions, including related to the "custody [and] inspection" of Mortgage Files, shall be performed by the Custodian.  *See* Uhlig Ex. A (App'x G).  Additionally, insofar as Plaintiffs are attempting to claim that the Custodian was an agent of HSBC, the PSAs expressly provide that the Custodian is not the agent of HSBC: "None of the Securities Administrator, the Master Servicer, the Servicer, the Seller, the Depositor, the Custodian or the Trustee shall be responsible for the acts or omissions of the others or the Swap Provider, it being understood that this Agreement shall not be construed to render those partners joint venturers or agents of one another."  Uhlig Ex. A (App'x I).  Furthermore, "[t]he Trustee shall not be liable for any acts or omissions of the Servicer, the Depositor or the Custodian."  *Id.*

Plaintiffs' Reply: HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  As mentioned, the governing documents clearly provide that the Custodian acted as the Trustee's "agent."  [*See*, *e.g.*, Duffy Ex. 57 at HSBCCTLA0073464 (Exhibit 2 of DBALT 2007-OA1 Custodial Agreement) ("The Custodian hereby confirms that it is holding each such Custodial File as agent and bailee of, and custodian for the exclusive use and benefit, and subject to the sole direction, of the Trustee pursuant to the

terms and conditions of the Custodial Agreement.") (emphasis added); Duffy Ex. 59 at

HSBCCTLA0055948 (Exhibit 2 of NHELI 2007-1 Custodial Agreement) (same).]  The

Custodial Agreements also confirm that HSBC appointed the Custodian, providing — in an

agreement signed by the Trustee and the Custodian — that "[t]he Trustee desires to have the

Custodian take possession of the Mortgages and Mortgage Notes, along with certain other

documents specified herein, as Custodian of the Trustee . . . ."  [Duffy Ex. 59 at

HSBCCTLA0055923 (NHELI 2007-1 Custodial Agreement); *see also* Duffy Ex. 57 at

HSBCCTLA0073437 (DBALT 2007-OA1 Custodial Agreement) (similar).]  Moreover, HSBC

does not dispute the primary assertion in ¶ 136:  that Wells Fargo Company, as Custodian in the

DBALT 2007-OA1 and NHELI 2007-1 Trusts, received and reviewed the Mortgage Files "on

[the Trustee's] behalf."  [Uhlig Exs. D (DBALT 2007-OA1 PSA § 2.3); G (NHELI 2007-1 PSA

§ 2.03); *see also* Uhlig Ex. D (DBALT 2007-OA1 PSA § 2.2 ("The Trustee acknowledges

receipt . . .  of the Loan Documents . . . and declares that it holds (or the Custodian on its behalf

holds) and will hold such documents and the other documents delivered to it constituting a Loan

Document . . . in trust for the exclusive use and benefit of all present and future

Certificateholders.); Uhlig Ex. G (NHELI 2007-1 PSA § 2.02) (similar).]

     137.    The custodial agreements provide that "the Custodian shall deliver to the Trustee

a Trust Receipt and Initial Certification [and exception report]."  [Uhlig Ex. 2 (§§ 3)].

    <u>HSBC's Response</u>:  Disputed, but immaterial.  The quoted language of the custodial

agreements does not include Plaintiffs' bracketed language, but rather states: "Not later than the

Closing Date, the Custodian shall deliver to the Trustee a Trust Receipt and Initial Certification,

wherein the Custodian shall state that as to each Mortgage Loan, other than any Mortgage Loan

specifically identified on the exception report attached to such Trust Receipt and Initial

Certification," *see, e.g.*, Uhlig Ex. 2 (ACE 2005-AG1 Custodial Agreement § 3), which must also be read in conjunction with the PSAs, which state, using this language or similar language, that: "the Custodian will be required to review such Mortgage Loan Documents and deliver to the Trustee, the Depositor, the Servicer and the Seller certifications (in the forms attached to the Custodial Agreement) with respect to such review with exceptions noted thereon.  In addition, under the Custodial Agreement the Depositor will be required to cure certain defects with respect to the Mortgage Loan Documents for the related Mortgage Loans after the delivery thereof by the Depositor to the Custodian. . . ."  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.01).

<u>Plaintiffs' Reply</u>:  HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  Indeed, the language HSBC quotes supports the factual assertion in ¶ 137.  Specifically, that language provides that "the Custodian shall deliver to the Trustee a Trust Receipt" and that "the exception report [is] attached to such Trust Receipt."  [Uhlig Ex. 2 (ACE 2005-AG1 Custodial Agreement § 3); *id.* (ACE 2006-OP2 Custodial Agreement § 3) (similar); *id.* (MHL 2007-1 Custodial Agreement § 3) (same); *id.* (DBALT 2007-OA1 Custodial Agreement § 3) (similar); *id.* (NHELI 2007-1 Custodial Agreement § 3) (same).]  (HSBC failed to produce the Custodial Agreement for the Fremont FHLT 2006-C trust.)  Thus, the bracketed language in ¶ 137 is accurate, and undisputed.

138.    The custodian agreements provide that "the Custodian . . . shall deliver to the Trustee (with a copy to the Depositor, the Master Servicer, the Servicer and the Seller), a Final Trust Receipt [and exception report.]."  [Uhlig Ex. 2 (§§ 5).]

<u>HSBC's Response</u>:  Disputed, but immaterial.  The quoted language of the custodial agreement does not contain Plaintiffs' bracketed language, but rather states:  "Within one hundred eighty (180) days after the Closing Date, the Custodian shall review each Custodial File,

and shall deliver to the Trustee (with a copy to the Depositor, the Master Servicer, the Servicer and the Seller), a Final Trust Receipt the effect that, as to each Mortgage Loan listed on the Mortgage Loan Schedule . . . ," *see, e.g.*, Uhlig Ex. 2 (ACE 2005-AG1 Custodial Agreement § 5), which must also be read in conjunction with the PSAs, which state "the Custodian will be required to review such Mortgage Loan Documents and deliver to the Trustee, the Depositor, the Servicer and the Seller certifications (in the forms attached to the Custodial Agreement) with respect to such review with exceptions noted thereon. In addition, under the Custodial Agreement the Depositor will be required to cure certain defects with respect to the Mortgage Loan Documents for the related Mortgage Loans after the delivery thereof by the Depositor to the Custodian. . . ."  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.01).

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  Indeed, the Custodial Agreements make clear that Final Trust Receipts include exception reports as attachments.  [*See, e.g.*, Uhlig Ex. 2 (ACE 2005 Custodial Agreement § 3) ("With respect to each Mortgage Loan, the Custodian shall indicate on the exception report attached to the Trust Receipt and Initial Certification whether . . . ."); *id.* (ACE 2006-OP2 Custodial Agreement § 3) (similar); *id.* (MHL 2007-1 Custodial Agreement § 3) (same); *id.* (DBALT 2007-OA1 Custodial Agreement § 3) (same); *id.* (NHELI 2007-1 Custodial Agreement § 3) (same); *id.* (NHELI 2007-1 Custodial Agreement § 5) ("Within one hundred eighty (180) days after the Closing Date, the Custodian shall review each Custodial File, and shall deliver to the Trustee (with a copy to the Depositor, the Master Servicer, the Servicer and the Seller), a Final Trust Receipt to the effect that, as to each Mortgage Loan listed on the Mortgage Loan Schedule (other than any Mortgage Loan (i) paid in full, or (ii) specifically identified *on the exception report attached to such Final Trust*

*Receipt* as not covered by such Final Trust Receipt). . . .") (emphasis added).]  (HSBC failed to produce the Custodial Agreement for the Fremont FHLT 2006-C trust.).  Because the exceptions report was attached to the Final Trust Receipt, which the Custodian was required to deliver to the Trustee, the bracketed language in ¶ 138 is accurate, and undisputed.

> **B.      Trustee Enforcement of Warrantor Repurchase of Loans with Mortgage File or R&W Breaches**

HSBC's Response:  HSBC disputes Plaintiffs' section heading VIII.B, which should be disregarded by the Court.  The PSAs for the Trusts that NCUA re-underwrote do not include a R&W relating to Mortgage File documents.  Indeed, those PSAs make clear that alleged mortgage-file defects are not a type of R&W breach.  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03) (distinguishing between a defective or missing document and a R&W breach); *see also* Uhlig Exs. C (ACE 2006-OP2 PSA § 2.03), D (DBALT 2007-OA1 PSA § 2.3), F (MHL 2007-1 PSA § 2.03).

Plaintiffs' Reply: Plaintiffs refer the Court to Plaintiffs' Reply ¶ 139, explaining why missing and defective documents subject to enforcement pursuant to § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.

139.    The PSAs for each of the at-issue Trusts set out HSBC's notice and enforcement duties relating to both Mortgage File and R&W breaches.  [Uhlig Exs. B (ACE 2005-AG1 PSA § 2.03); C (ACE 2006-OP2 PSA § 2.03); D (DBALT 2007-OA1 PSA § 2.3); E (FHLT 2006-C PSA § 2.03); F (MHL 2007-1 PSA § 2.03); G (NHELI 2007-1 PSA § 2.03).]

HSBC's Response:  Disputed.  The PSAs for the Trusts that NCUA re-underwrote do not include a R&W relating to Mortgage File documents.  Indeed, those PSAs make clear that alleged mortgage-file defects are not a type of R&W breach.  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03) (distinguishing between a defective or missing document and a R&W breach);

90

*see also* Uhlig Exs. C (ACE 2006-OP2 PSA § 2.03), D (DBALT 2007-OA1 PSA § 2.3), F (MHL

2007-1 PSA § 2.03).  And the PSAs for the Trusts that NCUA did not re-underwrite do not

include any enforcement duties.  *See* ¶¶ 61, 66, 67 herein.  To the extent the PSAs provide other

duties for HSBC, each Agreement provides that before an EOD, HSBC is obligated to perform

"such duties and only such duties as are specifically set forth" in the PSAs.  HSBC's 56.1 ¶ 68.

Moreover, the PSAs provide that the Trustee's duties and obligations are "determined solely by

the express provisions" of the PSA and "no implied covenants or obligations shall be read into

this Agreement against the Trustee."  HSBC's 56.1 ¶ 69.

       Plaintiffs' Reply: PSA § 2.03 references two situations that require notice and

enforcement:  (1) breaches of loan representations and warranties regarding the Mortgage File

for each loan in a trust, for which § 2.03 refers both to "missing" and "defective" documents; and

(2) breaches of other loan representations and warranties regarding the loan origination process.

[Uhlig Exs. B (ACE 2005-AG1 PSA § 2.03(a)); C (ACE 2006-OP2 PSA § 2.03(a)), D (DBALT

2007-OA1 PSA § 2.03(a)); F (MHL 2007-1 PSA § 2.03(a)); *see also* E (FHLT 2006-C PSA

§§ 1.01, 2.01) (similar); G (NHELI 2007-1 PSA § 2.03) (similar).]  HSBC seeks to quibble

semantically regarding whether the warrantor's representations and warranties regarding the

contents of the Mortgage Files can appropriately be referred to as Mortgage File *breaches*.  But

HSBC does not (and could not) dispute that the Trustee has a duty to enforce repurchase of a

loan with missing or defective Mortgage File documents; and that a warrantor correspondingly

had a duty to repurchase such a loan; all based on *representations and warranties* that the

warrantor made about the Mortgage Files.  Put another way, the PSAs consider the Mortgage

Files to be so crucial to the transaction that they set out Mortgage File representations and

warranties separately from other types of representations and warranties.

140.     As to Mortgage File breaches, the PSAs for the ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1 and MHL 2007-1 Trusts provide (in essence, if not exactly) that, "upon discovery or receipt of notice" "of any materially defective document in, or that a document is missing from, a Mortgage File" "that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders," HSBC shall promptly notify the warrantor of such "defect" or "missing document" and request that the warrantor cure such defect or deliver the missing document within 60 days of receiving notice.  [Uhlig App'x F.]

HSBC's Response:  Disputed.  The PSAs for the ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1 and MHL 2007-1 Trusts do not include a R&W relating to Mortgage File documents.  Indeed, those PSAs make clear that alleged mortgage-file defects are not a type of R&W breach.  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03) (distinguishing between a defective or missing document and a R&W breach); *see also* Uhlig Exs. C (ACE 2006-OP2 PSA § 2.03), D (DBALT 2007-OA1 PSA § 2.3), F (MHL 2007-1 PSA § 2.03).

Concerning a "defective document" or a "missing document," the PSAs for ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1 contain the following language, or similar language:  "Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File . . . in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller and the Servicer of such defect [or] missing document . . . and request that the Seller deliver such missing document [or] cure such defect . . . within sixty (60) days from the date the Seller was notified of such missing document [or] defect. . . ."  Uhlig Ex.  A (App'x F).

Plaintiffs' Reply: Plaintiffs refer the Court to Plaintiffs' Reply ¶ 139, explaining why missing and defective documents subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  Indeed, HSBC quotes the same PSA provision Plaintiffs cited in ¶ 140.

141.    As to R&W breaches, the PSAs for the ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1 and MHL 2007-1 Trusts provide (in essence, if not exactly) that, "upon discovery or receipt of notice" by the Trustee of a "breach" by the warrantor "of any representation or warranty" "that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders," the Trustee shall promptly notify the warrantor of such breach and request that the warrantor "cure such breach within 60 days" of receiving notice.  [Uhlig App'x F.]

HSBC's Response:  Disputed.  Plaintiffs' quoted language is incorrect and excludes important language.  The PSAs for ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1, and MHL 2007-1 contain the following language, or similar language, concerning a R&W breach: "Upon discovery or receipt of notice of . . . a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller and the Servicer of such . . . breach and request that the Seller . . . cure such . . . breach within sixty (60) days from the date the Seller was notified of such . . . breach . . . ."  Uhlig Ex. A (App'x F).

93

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts, and admits that there is not a genuine issue of *material* fact.  Indeed, HSBC quotes the same PSA provision Plaintiffs' cited and quoted in ¶ 141.

142.   As to Mortgage File breaches, the PSA for the FHLT 2006-C Trust provides, "(b) . . . Upon discovery by any of the Originator, the Depositor, the Trustee, the Trust Administrator, the Master Servicer or the Servicer of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others" and that "(c) . . . within 30 days of the earlier of either discovery by or notice to the Originator that any Mortgage Loan does not conform to the requirements as determined in the Trustee's or the Trust Administrator's review of the related Custodial File" . . . "that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the Originator shall use its best efforts to cause to be remedied a material defect in a document . . . ."  [Uhlig Ex. E (FHLT 2006-C PSA § 2.03 (b), (c)).]

HSBC's Response:  Disputed.  Plaintiffs' selective quotation of Section 2.03(c) is incorrect, includes an ellipsis where there is none, and excludes relevant language.  *See* Uhlig Ex. E (FHLT 2006-C PSA § 2.03 (b), (c)).

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated fact, and does not create a genuine issue of *material* fact.  Plaintiffs inadvertently included ellipses after "(b)" and "(c)" and also excerpted the provision to present only the pertinent text.  HSBC does not (and cannot) explain how those factors in any way change the meaning of § 2.03 or make the facts in ¶ 142 inaccurate or disputed.

143.   As to R&W breaches, the PSA for the FHLT 2006-C Trust provides, "(b) . . . . Upon discovery by any of the Originator, the Depositor, the Trustee, the Trust Administrator, the

Master Servicer or the Servicer of a breach of any of the foregoing representations and

warranties, the party discovering such breach shall give prompt written notice to the others" and

that "(c) . . . within 60 days of the earlier of either discovery by or notice to the Originator of any

breach of a representation or warranty set forth in Schedule IV hereto, that materially and

adversely affects the value of any Mortgage Loan or the interest of the Trustee or the

Certificateholders therein, the Originator shall use its best efforts to cause . . . promptly to cure

such breach in all material respects . . . ."  [Uhlig Ex. E (FHLT 2006-C PSA § 2.03 (b), (c)).]

     HSBC's Response:  Undisputed that the quoted language above appears in the PSA for

FHLT 2006-C.

     144.    As to both Mortgage Files and R&W breaches, the PSA for the NHELI 2007-1

Trust provides that, "(c) Upon discovery by any of the parties hereto of a breach of a

representation or warranty" . . . "that materially and adversely affects the interests of the

Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt

written notice thereof to the other parties."  [Uhlig Ex. E (FHLT 2006-C PSA § 2.03 (c)).]

     HSBC's Response:  Disputed.  The NHELI 2007-1 PSA does not include a R&W relating

to Mortgage File documents.  See Ex. G (NHELI 2007-1 PSA).  Regarding R&W breaches,

HSBC does not dispute that the selective quoted language in paragraph 144 appears in the

NHELI 2007-1 PSA, although Plaintiffs miscite the quote as coming from the FHLT 2006-C

PSA.

     Plaintiffs' Reply: Plaintiffs refer the Court to Plaintiffs' Reply ¶ 139, explaining why

missing and defective documents subject to enforcement pursuant to PSA § 2.03 are properly

referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  HSBC's

response does not dispute the substance of the stated facts, and admits that there is not a genuine

issue of *material* fact.  HSBC correctly notes the citation in  ¶ 144 should be to the NHELI 2007-1 PSA, not the FHLT 2006-PSA.

145.    The PSAs for the ACE 2005-AG1, ACE 2006-OP2, DBALT 2007-OA1 and MHL 2007-1 Trusts provide that, if the responsible party "does not deliver such missing document or cure such defect" within 60 days, "the Trustee shall enforce" warrantor repurchase obligations for materially breaching loans. [Uhlig App'x F; Uhlig Exs. B (ACE 2005-AG1 PSA § 2.03 (a)); C (ACE 2006-OP2 PSA § 2.03 (a)); D (DBALT 2007-OA1 PSA § 2.3 (a)); F (MHL 2007-1 PSA § 2.03 (a)).]

HSBC's Response:  HSBC does not dispute that the selective quoted language in Plaintiffs' paragraph 145 appears in the cited PSAs.

146.    For example, § 2.03(a) of the ACE 2005-AG1 PSA provides [Uhlig App'x F]:

> *"(a) Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File or of a breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Seller and the Servicer of such defect, missing document or breach and request that the Seller deliver such missing document, cure such defect or breach within sixty (60) days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within ninety (90) days after the date on which the Seller was notified of such missing document, defect or breach, if and to the extent that the Seller is obligated to do so under the Mortgage Loan Purchase Agreement…"*

HSBC's Response:  HSBC does not dispute that the selective quoted language in Plaintiffs' paragraph 146 appears in the cited PSA.

147.    The FHLT 2006-C Trust PSA contains language that two courts have held also requires a Trustee to enforce repurchase, providing "[i]n the event that the Trustee . . . receives

notice of a breach by the Originator of any of the representations and warranties set forth in clauses I(tt), I(uu) or I(lll) of Schedule IV, the Trustee . . . shall . . . request the Originator to repurchase the Mortgage Loan" and "[t]he Originator shall repurchase each such Deleted Mortgage Loan." [Uhlig Ex. E (FHLT 2006-C § 2.03(c)).]

<u>HSBC's Response</u>: Disputed.  Plaintiffs fail to cite anything to support their claim that "two courts have held" the quoted language "requires a Trustee to enforce repurchase." Moreover, no court cases or other authority supports Plaintiffs' made-for-litigation interpretation of "enforce" to mean "unilaterally initiate repurchase litigation."

As for Plaintiffs' selective quotation, it appears in the text of the FHLT 2006-C PSA, but excludes important language.  Without Plaintiffs' ellipses, the quoted language reads:  "In the event that the Trustee or the Trust Administrator receives notice of a breach by the Originator of any of the representations and warranties set forth in clauses I(tt), I(uu) or I(lll) of Schedule IV, the Trustee or the Trust Administrator shall give notice of such breach to the Originator and request the Originator to repurchase the Mortgage Loan at the Repurchase Price within sixty (60) days of the Originator's receipt of such notice. The Originator shall repurchase each such Deleted Mortgage Loan within 60 days of the earlier of discovery or receipt of notice with respect to each such Deleted Mortgage Loan."  Uhlig Ex. E (FHLT 2006-C § 2.03(c)).

<u>Plaintiffs' Reply</u>:  Plaintiffs' July 13, 2021 brief explains the cases that have held that the FHLT 2006-C Trust PSA language requires a Trustee to enforce repurchase.  [NCUA Br. 6.]  As such, HSBC's response does not raise a genuine issue of material fact.

148.    The FHLT 2006-C Trust PSA then provides "the Originator shall indemnify . . . the Trustee and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and

expenses resulting from any claim, demand, defense or assertion based on . . . a breach by the Originator of any of its representations and warranties contained in this Agreement." [Uhlig Ex. E (FHLT 2006-C § 2.03(g)).]

HSBC's Response:  Disputed.  This provision does not immediately follow from the provision quoted in paragraph 147, but is several sub-sections later.  As for Plaintiffs' selective quotation, it appears in the text of the FHLT 2006-C PSA.  The PSA also provides that: "Neither the Trustee nor the Trust Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to it security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby…."  Uhlig Ex. E (FHLT 2006-C § 8.02(a)(iii)).

Plaintiffs' Reply:  HSBC does not dispute that the quotation in ¶ 148 appears in the PSA for the FHLT 2006-C Trust.  Thus, there is no genuine issue of material fact as to ¶ 148.

149.     The FHLT 2006-C Trust PSA further provides "[t]he Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates." [Uhlig Ex. E (FHLT 2006-C § 2.05).]

HSBC's Response:  Undisputed that the FHLT 2006-C Trust PSA contains the selective quotation in paragraph 149.

150.     [Omitted]

HSBC's Response:  No response necessary.

151.     The NHELI 2007-1 Trust PSA describes the "[t]he obligation of the Sponsor to cure, repurchase or substitute for any Mortgage Loan as to which a defect in a constituent

document exists" as a remedy available "to the Trustee," and provides "[t]he Sponsor shall promptly reimburse the Trustee for any expenses incurred . . . in respect of enforcing the remedies for such breach."  [Uhlig Ex. G (NHELI 2007-1 PSA § 2.02(d)).]

HSBC's Response:  Disputed.  Plaintiffs' description and selective quotation misconstrues the language of the PSA and omits important text.  The NHELI 2007-1 PSA provides that: "The obligation of the Sponsor to cure, repurchase or substitute for any Mortgage Loan as to which a defect in a constituent document exists shall be the *sole remedies* respecting such defect *available to the Certificateholders or to the Trustee on their behalf*.  The Sponsor shall promptly reimburse the Trustee for any expenses incurred by the Trustee in respect of enforcing the remedies for such breach."  Uhlig Ex. G (NHELI 2007-1 PSA § 2.02(d) (emphasis added)).

Plaintiffs' Reply:  HSBC's response does not dispute the substance of the stated facts, and does not create a genuine issue of *material* fact.  Plaintiffs excerpted NHELI 2007-1 PSA § 2.02(d) for the convenience of the Court.  HSBC's inclusion of the entire provision does not make inaccurate or change the meaning of ¶ 151.  [Uhlig Ex. G (NHELI 2007-1 PSA § 2.02(d).]  Nor does it create a genuine issue of material fact.

152.    The NHELI 2007-1 Trust PSA describes the "Purpose and Powers of the Trust": to engage "in those activities that are necessary . . . to accomplish the foregoing or are incidental thereto or connected therewith" and "in such other activities as may be required in connection with conservation of the Trust Fund."  [Uhlig Ex. G (NHELI 2007-1 PSA § 2.10(d), (e)).]

HSBC's Response:  Disputed.  Plaintiffs' selective quotation misconstrues the language of the PSA and omits important text.  Section 2.10 of the NHELI 2007-1 PSA, titled "Purpose and Powers of the Trust," includes several activities, not just Plaintiffs' selective quoted

language in paragraph 152.  Uhlig Ex. G (NHELI 2007-1 PSA § 2.10).  Moreover, Plaintiffs'

quotation misleadingly omits important text.  Section 2.10(d) & (e) provide that some of

purposes of the trust are "(d) to engage in those activities that are necessary, suitable or

convenient to accomplish the foregoing or are incidental thereto or connected therewith; and (e)

subject to compliance with this Agreement, to engage in such other activities as may be required

in connection with conservation of the Trust Fund and the making of distributions to the

Certificateholders."  *Id.*  The Section then provides that "The Trustee shall not cause the trust to

engage in any activity other than in connection with the foregoing or other than as required or

authorized by the terms of this Agreement while any Certificate is outstanding."  *Id.*

       <u>Plaintiffs' Reply</u>:  HSBC's response does not dispute the substance of the stated facts,

and does not create a genuine issue of *material* fact.  Plaintiffs excerpted NHELI 2007-1 PSA

§ 2.10(d) and (e) for the convenience of the Court.  The additional language from the same

provision HSBC's cites in response does not make inaccurate or change the meaning of ¶ 152.

[Uhlig Ex. G (NHELI 2007-1 PSA § 2.10).]  Nor does it create a genuine issue of material fact.

       153.    Under § 2.03, when HSBC discovers or receives notice of material Mortgage File

or R&W breaches, it must notify specific parties including the warrantor and servicer — but not

certificateholders.  [Uhlig App'x F.]

       <u>HSBC's Response</u>:  Undisputed that, upon discovery or notice of material document

defects and R&W breaches, the individual PSAs specifically list to whom the Trustee,

Originator, Depositor, and/or Trust Administrator must provide notice, including the Seller,

Sponsor, Servicer, Originator, Depositor, Trust Administrator, and/or the parties to the PSA.  *See*

Uhlig Ex. A (App'x F).  None of the PSAs provide for notice to certificateholders.  *Id.*  Disputed

to the extent Plaintiffs are arguing that "Mortgage File breaches," which is not a term that

appears in the PSAs, are a form of R&W breach.  *See* ¶¶ 84, 87 (including HSBC's Replies to

those paragraphs).  Furthermore, to the extent Plaintiffs assert that exceptions appearing on an

exception report are "Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is

contradicted by record evidence.  *See supra* ¶¶ 87, 90, 92, 94 (including HSBC's Replies to those

paragraphs).

       <u>Plaintiffs' Reply</u>:  Plaintiffs' refer the Court to Plaintiffs' Reply ¶ 139, explaining why

missing and defective documents subject to enforcement pursuant to PSA § 2.03 are properly

referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  HSBC's

response does not dispute the substance of the stated facts, and admits that there is not a genuine

issue of *material* fact.

       154.    HSBC and its experts have asserted the Trustee had no duty to provide such

information to certificateholders.  [*See* Duffy Ex. 12, 177:4-6 (Burnaman Tr.) ("I don't believe as

an investor I was going to get a copy of any exception report or notice of missing documents.");

*id.* 182:19-183:1 ("I don't believe and it certainly wasn't my experience that I got any

notification of document defects from either a custodian or a trustee in an RMBS."); *id.* 191:9-13

("I previously testified that in my experience, trustees did not share the exception report with

certificateholders, and I don't believe that they were required to[.]"); *id.* 177:19-178:3 ("In my

many years of investing in RMBS, I do not recall receiving notice from a trustee regarding

missing or incomplete documents in a mortgage file, nor would I expect to." (quoting Burnaman

Report)); Duffy Ex. 6, 309:21-310-4 (Hillcoat Tr.) ("Q Did HSBC, or trustees generally, provide

the exception reports to certificate holders?  A I wouldn't think so.  I've never seen such a

requirement in any of these transaction structures."); Duffy Ex. 13, 203:4-5 (Richard Tr.) ("I

don't think we [as investors] had access to [exceptions reports,] [w]e certainly weren't sent

them."); *id.* 250:19-251:4 ("[I]nvestors did not expect to receive those reports.").]

    <u>HSBC's Response</u>:  Disputed.  Paragraph 154 refers ambiguously to "such information," without describing what such information is.  For the purposes of this response, HSBC will assume Plaintiffs mean to refer to "notice of material Mortgage File or R&W breaches" from the prior paragraph 153.  The PSAs for the Trusts that NCUA re-underwrote do not include a R&W relating to Mortgage File documents.  Indeed, those PSAs make clear that alleged mortgage-file defects are not a type of R&W breach.  *See, e.g.*, Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03) (distinguishing between a defective or missing document and a R&W breach); *see also* Uhlig Exs. C (ACE 2006-OP2 PSA § 2.03), D (DBALT 2007-OA1 PSA § 2.3), F (MHL 2007-1 PSA § 2.03).  And none of the citations to any of the testimony in paragraph 154 refer to "Mortgage File breaches."  Likewise, none of the citations to any of the testimony in paragraph 154 refer to Plaintiffs' claim for R&W breaches.  Instead, the cited testimony concerns "exception reports" or "document defects."

    <u>Plaintiffs' Reply</u>:  Plaintiffs' refer the Court to Plaintiffs' Reply ¶ 139, explaining why missing and defective documents subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  HSBC's response does not dispute the substance of the stated facts and admits that there is not a genuine issue of *material* fact.

### C.    HSBC Implemented a Policy of Declining To Compel Repurchase Against Unwilling Warrantors Absent a Party "Pushing the Repurchase"

    <u>HSBC's Response</u>:  Defendant disputes Plaintiffs' section heading VIII.C, which should be disregarded by the Court.  HSBC never implemented a policy of "declining to compel repurchase against unwilling warrantors" for any reason and Plaintiffs cite no evidence showing otherwise.

Plaintiffs' Reply:  Plaintiffs refer the Court to its facts and replies in this subsection. And, as explained in Plaintiffs' merits brief, HSBC had a policy of failing to enforce repurchase absent direction and indmenity.  [NCUA Br. 3.]  HSBC cites no evidence contradicting this fact and, in fact, admits as much.  [*See* Acebedo Dec. ¶ 10.]

155.    HSBC adopted a policy of terminating the repurchase process after sending repurchase demand letters, even if the warrantor never responded and regardless of the validity of the breach notice or any rebuttal received, if there was not a party "pushing" repurchase. [Duffy Ex. 14 (Hillcoat ¶ 198) (" ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ .]

HSBC's Response:  Disputed.  Plaintiffs' paragraph 155 is not supported by specific and relevant evidence, as required.  Instead, Plaintiffs cite HSBC's expert's report, which does not support Plaintiffs' claim.  To the contrary, as is clear from the quoted language, the expert noted that ████████████████████████████████████████████████████

████████████████████████████████ *See* Duffy Ex. 14 (Hillcoat ¶ 198).  This policy is confirmed by the declaration of HSBC's Vice President Fernando Acebedo, in which he states: "HSBC has not pursued RMBS repurchase litigation unilaterally. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████ I am not aware of another RMBS trustee unilaterally initiating repurchase litigation."  Acebedo Dec. ¶ 10.  In situations in which "the warrantor never responded," HSBC produced numerous documents showing that HSBC would continue to follow up with the warrantor until it received a response. *See, e.g.*, Acebedo Ex. 15; *see also* Acebedo Decl. ¶¶ 32-33, 35.  If the warrantor refused to

repurchase, ████████████████████████████████████████████

████████████████████████████████████   *See* Uhlig Ex. 39

(HSBCCTLA1162174 ¶ 6).  HSBC also produced numerous documents showing that HSBC

provided such notice to certificateholders.  *See, e.g.*, Uhlig Ex. 41 (HSBCCTLA0278340-41)

(after warrantor rejected repurchase request, HSBC notified certificateholders in NHELI 2007-1

of alleged breach claims and requested direction and indemnification to pursue claims; in

response, certificateholders did not provide direction or indemnification); *see also* Acebedo Exs.

11, 13, 16.

    Plaintiffs' Reply:  HSBC does not dispute but instead reinforces the pertinent fact in

¶ 155:  that HSBC's policy was not to enforce repurchase against an unwilling warrantor unless a

party was pushing HSBC to do so.  Specifically, HSBC agrees that where HSBC did send

repurchase letters, HSBC did not complete the repurchase process by "enforcing" the warrantors'

obligation to repurchase loans if the warrantor did not agree to repurchase after receiving a

notice.  As Plaintiffs have explained, the PSAs provided certificateholders the option to direct

and indemnify, but the PSAs require the Trustee to enforce.

    HSBC confirms that it required certificateholder direction and indemnification before it

would enforce repurchase and claims that it notified certificateholders when warrantors refused

to repurchase.  HSBC cites a handful of breach notices for which warrantors refused repurchase,

e.g., Acebedo Ex. 11 (8 loans); Acebedo Ex. 14 (13 loans); Acebedo Ex. 16 (20 loans); Uhlig Ex

41 (30 loans), but HSBC did not inform certificateholders that it discovered or received notice of

the thousands of Mortgage File breaches in the exceptions reports, ¶ 139, and did not take any

other action to notify or enforce warrantors' repurchase in response to the thousands of loans

with Mortgage File breaches, ¶ 154.  Nor did HSBC inform certificateholders that it discovered

or received notice of R&W breaches but never even notified applicable warrantors.  For example, with respect to the DBSP trusts at issue here, HSBC had discovery of R&W breaches based on the 16 suits HSBC filed against DBSP, among other evidence cited by Plaintiffs, ¶¶ 169-213, but never notified the applicable warrantors or the certificateholders.

156.    There is no evidence HSBC had a policy of informing certificateholders of breach notices it received or that warrantors either failed to respond to or rejected repurchase demands.

HSBC's Response:  Disputed.  In situations in which "the warrantor never responded," HSBC produced numerous documents showing that HSBC would continue to follow up with the warrantor until it received a response.  *See, e.g.*, Acebedo Ex. 15; *see also* Acebedo Decl. ¶¶ 32-33, 35.  If the warrantor refused to repurchase, ████████████████████████████████

████████████████████████████████████████████  *See* Uhlig Ex. 39 (HSBCCTLA1162174 ¶ 6).  HSBC also produced numerous documents showing that HSBC provided such notice to certificateholders.  *See, e.g.*, Uhlig Ex. 41 (HSBCCTLA0278340-41) (after warrantor rejected repurchase request, HSBC notified certificateholders in NHELI 2007-1 of alleged breach claims and requested direction and indemnification to pursue claims; in response, certificateholders did not provide direction or indemnification); *see also* Acebedo Exs. 11, 13, 16.

Plaintiffs' Reply:  HSBC confirms that it required certificateholder direction and indemnification before it would enforce repurchase and claims that it notified certificateholders when warrantors refused to repurchase.  HSBC cites a handful of breach notices for which warrantors refused repurchase,, e.g. Acebedo Ex. 11 (8 loans); Acebedo Ex. 14 (13 loans); Acebedo Ex. 16 (20 loans); Uhlig Ex 41 (30 loans), but HSBC does not dispute that it did not inform certificateholders that it discovered or received notice of the thousands of Mortgage File

breaches in the exceptions reports, ¶ 139, and did not take any other action to notify or enforce warrantors' repurchase in response to the thousands of loans with Mortgage File breaches, ¶ 154. Nor does HSBC dispute that it did not inform certificateholders that it discovered or received notice of R&W breaches but never even notified applicable warrantors.  For example, with respect to the DBSP trusts at issue here, HSBC had discovery of R&W breaches based on the 16 suits HSBC filed against DBSP, among other evidence cited by Plaintiffs, ¶¶ 169-213, but never notified the applicable warrantors or the certificateholders.

157.    There is no evidence HSBC told certificateholders that it did not intend to enforce warrantor repurchase obligations or that it was repudiating its contractual obligations.

HSBC's Response:  Disputed.  If the warrantor refused to repurchase, ███████████████
████████████████████████████████████████████████████████████
██████████████████████████          *See* Uhlig Ex. 39 (HSBCCTLA1162174 ¶ 6).  In its notices to certificateholders, HSBC often stated expressly that "Please note that the Trustee does not intend to take any further action with respect to the [allegations for repurchase] at this time unless the Trustee receives a direction to pursue such claims from the requisite percentage of Certificateholders of the Trust together with a satisfactory indemnity as required by the terms of the PSA."  *E.g.*, Acebedo Ex. 16 at 2.  HSBC also produced numerous documents showing that HSBC provided notice to certificateholders.  *See, e.g.*, Uhlig Ex. 41 (HSBCCTLA0278340-41) (after warrantor rejected repurchase request, HSBC notified certificateholders in NHELI 2007-1 of alleged breach claims and requested direction and indemnification to pursue claims; in response, certificateholders did not provide direction or indemnification); *see also* Acebedo Exs. 11, 13, 16.

Plaintiffs' reference to "repudiating its contractual obligations" is baseless legal argument that is not properly included in a 56.1 statement and warrants no further response.

Plaintiffs' Reply:  HSBC confirms that it required certificateholder direction and indemnification before it would enforce repurchase and claims that it notified certificateholders when warrantors refused to repurchase.  HSBC cites a handful of breach notices for which warrantors refused repurchase, e.g., Acebedo Ex. 11 (8 loans); Acebedo Ex. 14 (13 loans); Acebedo Ex. 16 (20 loans); Uhlig Ex 41 (30 loans), but HSBC does not dispute that it did not inform certificateholders that it discovered or received notice of the thousands of Mortgage File breaches in the exceptions reports, ¶ 139, and did not take any other action to notify or enforce warrantors' repurchase in response to the thousands of loans with Mortgage File breaches, ¶ 154. Nor does HSBC dispute that it did not inform certificateholders that it discovered or received notice of R&W breaches but never even notified applicable warrantors.  For example, with respect to the DBSP trusts at issue here, HSBC had discovery of R&W breaches based on the 16 suits HSBC filed against DBSP, among other evidence cited by Plaintiffs, ¶¶ 169-213, but never notified the applicable warrantors or the certificateholders.

158.    There is no evidence that, when warrantors failed to respond to or rejected repurchase demands, HSBC pursued legal remedies such as litigation to enforce warrantor repurchase obligations absent direction from an interested party such as a certificateholder.

HSBC's Response:  Undisputed that, "when warrantors failed to respond to or rejected repurchase demands," HSBC would not pursue "litigation to enforce warrantor repurchase obligations absent direction" and indemnification from a certificateholder. Plaintiffs' reference to "legal remedies" is ambiguous and so HSBC interprets it as synonymous with litigation.  Likewise, Plaintiffs' reference to "an interested party" is ambiguous and so HSBC

interprets it as synonymous with certificateholder.  HSBC's policy is confirmed by the

declaration of HSBC's Vice President Fernando Acebedo, in which he states: "HSBC has not

pursued RMBS repurchase litigation unilaterally. ████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████   I am not aware of another RMBS trustee

unilaterally initiating repurchase litigation."  Acebedo Dec. ¶ 10.  In situations in which "the

warrantor never responded," HSBC produced numerous documents showing that HSBC would

continue to follow up with the warrantor until it received a response.  *See, e.g.*, Acebedo Ex. 15;

*see also* Acebedo Decl. ¶¶ 32-33, 35.  If the warrantor refused to repurchase, ██████████

████████████████████████████████████████████████████████████

██████████████   *See* Uhlig Ex. 39 (HSBCCTLA1162174 ¶ 6).  HSBC also produced

numerous documents showing that HSBC provided such notice to certificateholders.  *See, e.g.*,

Uhlig Ex. 41 (HSBCCTLA0278340-41) (after warrantor rejected repurchase request, HSBC

notified certificateholders in NHELI 2007-1 of alleged breach claims and requested direction and

indemnification to pursue claims; in response, certificateholders did not provide direction or

indemnification); *see also* Acebedo Exs. 11, 13, 16.

>    Plaintiffs' Reply:  HSBC admits the primary assertion in ¶ 158:  that HSBC did not

enforce warrantor repurchase obligations absent direction.

>    **D.    HSBC's Lack of Reliance on Any Industry Custom Regarding Trustee Enforcement**

>    HSBC's Response:  HSBC disputes Plaintiffs' section heading VIII.D, which should be

disregarded by the Court.  As RMBS Trustee, HSBC is and was an actor in the RMBS industry,

relied on industry custom and practice in performing its duties, and its own actions are indicative

of industry custom and practice.  HSBC did not unilaterally pursue repurchase litigation, in

accordance with industry custom and practice, as demonstrated by the undisputed fact that Plaintiffs have not pointed to any evidence of an RMBS Trustee unilaterally pursuing repurchase litigation.  *See* ¶ 76.

Plaintiffs' Reply:  HSBC's response should be disregarded, as it is not supported by any evidence.  Moreover, as explained in Plaintiffs' July 13, 2021 Brief:  (1) evidence of industry custom and practice is irrelevant in the face of unambiguous contract language and (2) contemporaneous evidence demonstrates that, in fact, no standard custom and practice existed at all relevant times.  [*See* NCUA Br. 8-11.]

159.    HSBC did not rely on any purported industry understanding of the meaning of "Trustee shall enforce" in PSA § 2.03, but rather referred to the language of the PSAs.  [Duffy Ex. 15, 134:4-10 (Zheng Tr.) ("Q What were those instructions typically in a situation where 'the trustee shall enforce the repurchase obligation'? . . .  A I would just follow the PSA and see what we need to do.").]

HSBC's Response:  Disputed.  Plaintiffs' paragraph 159 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is not supported by citations to specific and relevant evidence.  The only evidence cited by Plaintiffs is Ms. Zheng's testimony in which she explains that she would "follow the PSA."  Duffy Ex. 15, 134:4-10 (Zheng Tr.).  Ms. Zheng did not disclaim HSBC's reliance on industry custom and practice.  Furthermore, relying on the language of the PSAs is not distinct from relying on industry custom and practice, which is shaped in part by the PSAs.

Plaintiffs' Reply:  The witness testimony cited in ¶ 159 speaks for itself.  Moreover, HSBC's reference to purported industry custom and practice is irrelevant, and not supported by any evidence.  In addition, as explained in Plaintiffs' July 13, 2021 Brief:  (1) evidence of

industry custom and practice is irrelevant in the face of unambiguous contract language and (2) contemporaneous evidence demonstrates that, in fact, no standard custom and practice existed at all relevant times.  [*See* NCUA Br. 8-11.]

## IX.   FACTS RELEVANT TO PLAINTIFFS' MORTGAGE FILE CLAIMS, HSBC'S RECEIPT OF EXCEPTIONS REPORTS, AND ITS NON-ENFORCEMENT OF WARRANTOR REPURCHASES

HSBC's Response:  HSBC disputes Plaintiffs' section heading IX, which should be disregarded by the Court as inaccurate.  As shown both by the undisputed facts and by HSBC's brief in support of its motion for summary judgment, Plaintiffs have failed to prove any purported breaches of alleged "enforcement" duties on the part of HSBC.  Furthermore, the vast majority of the following "facts" are immaterial to HSBC's motion for summary judgment, and none of the facts impede summary judgment for HSBC on Plaintiffs' claims or support NCUA's cross-motion for summary judgment.

Plaintiffs' Reply:  HSBC's response should be disregarded, as it calls for a legal conclusion.  Moreover, HSBC is incorrect that these facts are immaterial to HSBC's motion for summary judgment and/or NCUA's cross-motion for summary judgment, as these facts form the legal predicate for HSBC's contract duties to enforce repurchase of breaching loans by warrantors.

160.    The ACE 2005-AG1 Trust Contained 2,610 mortgage loans.  [Duffy Ex. 4 (Blum 58).]  The ACE 2005-AG1 Custodial Agreement required a final exceptions report be issued 180 days after closing [Uhlig Ex. 2, at 9], but neither HSBC nor Custodian Deutsche Bank were able to locate this document, and there is no evidence the final exceptions report was ever received. [Duffy Ex. 10 (7/14/17 Ltr. from S. Attaway); Duffy Ex. 11 (8/11/17 Ltr. from E.Wiener).]

HSBC's Response:  Disputed, but immaterial.  Plaintiffs' paragraph 160 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is not

supported by citations to specific and relevant evidence.  The portion of paragraph 160 that states

"The ACE 2005-AG1 Trust Contained 2,610 mortgage loans" should be disregarded as

duplicative of undisputed paragraph 4(a) herein.  For the remainder of paragraph 160, Plaintiffs

fail to provide supporting citations to relevant evidence.  Plaintiffs' cited portion of the ACE

2005-AG1 Custodial Agreement does not state that it "required a final exceptions report be

issued 180 days after closing."  *See* Uhlig Ex. 2, at 9.  Likewise, Plaintiffs' citations to Exhibits

10 and 11 to the Duffy Exhibit do not support Plaintiffs' claim in paragraph 160 that "neither

HSBC nor Custodian Deutsche Bank were able to locate [a final exceptions report], and there is

no evidence the final exceptions report was ever received."  *See* Duffy Ex. 10 (7/14/17 Ltr. from

S. Attaway); Duffy Ex. 11 (8/11/17 Ltr. from E. Wiener).  The letters, instead, demonstrate that

HSBC agreed with Plaintiffs that a final Certification and Exception Report had not been

produced by the third party custodian (Deutsche Bank).  *See* Duffy Ex. 10 (7/14/17 Ltr. from S.

Attaway); Duffy Ex. 11 (8/11/17 Ltr. from E. Wiener).  Indeed, Deutsche Bank's

representative's declaration states that "It was the Custodian's regular practice to create and/or

deliver the Documents pursuant to the terms of the governing agreements for each Trust.  The

fact that certain documents related to transactions that closed more than 10 years ago were not

located now in response to this subpoena does not indicate to me that they were not created

and/or delivered pursuant to the terms of the governing agreements."  *See* Uhlig Ex. 35 ¶ 9.d.  As

RMBS Trustee, HSBC was not involved in either the creation of the exception report or the

process "to cure certain defects . . . after the delivery thereof," which were the responsibilities of

the Custodian and the Depositor.  *See, e.g.*, Uhlig Ex. A (App'x H) ("the Custodian will be

required to review such Mortgage Loan Documents and deliver to the Trustee, the Depositor, the

Servicer and the Seller certifications (in the forms attached to the Custodial Agreement) with

respect to such review with exceptions noted thereon.  In addition, under the Custodial

Agreement the Depositor will be required to cure certain defects with respect to the Mortgage

Loan Documents for the related Mortgage Loans after the delivery thereof by the Depositor to

the Custodian as more particularly set forth therein.").  HSBC also was not responsible for the

acts or omissions of the Custodian or the Depositor.  To the contrary, "[n]one of the Securities

Administrator, the Master Servicer, the Servicer, the Seller, the Depositor, the Custodian or the

Trustee shall be responsible for the acts or omissions of the others or the Swap Provider, it being

understood that this Agreement shall not be construed to render those partners joint venturers or

agents of one another."  Uhlig Ex. A (App'x I).  Furthermore, the PSAs expressly provide that

"[t]he Trustee shall not be liable for any acts or omissions of the Servicer, the Depositor or the

Custodian."  *Id.*

      Plaintiffs' Reply:  HSBC does not dispute the fundamental premise of Plaintiffs'

statement, that no final exceptions report for this trust was produced in discovery, nor was there

any evidence HSBC received the report.  Whether HSBC created the report is immaterial, as the

Custodial Agreement required HSBC to receive the report, [Uhlig Ex. 2, at 8, 9,] and the PSA

required HSBC to enforce Mortgage File breaches, [Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03

(a))].

      Moreover, The Custodian Agreement indeed requires the final exception report be

delivered 180 day after closing, providing:  "Within one hundred eighty (180) days after the

Closing Date, the Custodian shall review each Custodial File, and shall deliver to the Trustee

(with a copy to the Depositor, the Master Servicer, the Servicer and the Seller), a Final Trust

Receipt. . . ."  [*See* Uhlig Ex. 2, at 9.]

      161.    The initial exceptions report for ACE 2005-AG1 showed 1,800 loans with 2,515

exceptions.  Plaintiffs' expert Blum concluded that 881 of the loans listed in the initial

exceptions report had Mortgage File breaches that materially diminished the value of the loans.

[Duffy Ex. 4 (Blum 58), *see also* Duffy Ex. 48 (ACE 2005-AG1 Initial Exceptions).]

      HSBC's Response:  Disputed.  Plaintiffs' paragraph 161 should be disregarded for failure

to comply with the requirements for a 56.1 statement because it is not supported by citations to

specific and relevant evidence.  *See* L.R. 56.1(d); L.R. 56.1 Committee Note.  Plaintiffs' claim

that "[t]he initial exceptions report for ACE 2005-AG1 showed 1,800 loans with 2,515

exceptions" should be disregarded because Plaintiffs' Ex. 48, which purports to be an excerpt

from the ACE 2005-AG1 Initial Exception report, does not include any of this information.  *See*

Duffy Ex. 48 (ACE 2005-AG1 Initial Exceptions).  Likewise, the report of Plaintiffs' purported

expert did not, as Plaintiffs' paragraph 161 claims, "conclude[] that 881 of the loans listed in the

initial exceptions report had Mortgage File breaches that materially diminished the value of the

loans." *See* Duffy Ex. 4 (Blum 58).  To the contrary, Blum does not reference "Mortgage File

breaches" anywhere in his report.  *See id.*  In any event, the Blum report is inadmissible because

Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration.  *See* L.R. 56.1(d);

Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.  Likewise, to the extent Plaintiffs

assert that exceptions appearing on an exception report are "Mortgage File breaches" triggering a

duty for HSBC, Plaintiffs' assertion is contradicted by record evidence.  *See supra* ¶¶ 84, 87, 90,

92, 94 (including HSBC's Replies to NCUA's Responses to those paragraphs).

      Plaintiffs' Reply:  In view of the 225-page limit for all exhibits, Plaintiffs could not

submit the entirety of the cited exceptions report.  The Trustee's objection is therefore not well

taken, and HSBC very well knows that the complete report contains 2,515 rows — with each

row listing each missing or defective document in the Mortgage Files for the trust.  Duffy Ex. 48

contains the last page to illustrate this indisputable fact, showing the total number of exceptions; further, an electronic version of the complete report will be submitted to the Court on September 3 pursuant to the governing order, ECF 439 at 2.  Plaintiffs' expert Blum reviewed the exceptions report and determined 881 of the loans had material exceptions.  [Duffy Ex. 4 (Blum 58)].  Further, Plaintiffs' Reply ¶ 139 explains why material missing and defective Mortgage File documents that are subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  The PSA plainly required that "the Trustee shall enforce" Mortgage File breaches.  [Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03 (a)).]  Finally, the Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

162.    The ACE 2006-OPT2 Trust contained 4,472 loans.  The final exceptions report showed 1,687 loans with 2,375 exceptions.  Plaintiffs' expert Blum concluded that 1,625 of the loans listed in the final exceptions report had Mortgage File breaches that materially diminished the value of the loans, and such breaches remain in 787 loans.  [Duffy Ex. 4 (Blum 87-88), *see also* Duffy Ex. 49 (ACE 2006-OP2 Final Exceptions).]

HSBC's Response:  Disputed.  Plaintiffs' paragraph 162 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is not supported by citations to specific and relevant evidence.  *See* L.R. 56.1(d); L.R. 56.1 Committee Note.  The portion of paragraph 162 that states "The ACE 2006-OPT2 Trust contained 4,472 loans" should be disregarded as duplicative of undisputed paragraph 4(b) herein.  For the remainder of paragraph

162, Plaintiffs fail to provide supporting citations to relevant evidence. The portion of paragraph 162 that states "The final exceptions report showed 1,687 loans with 2,375 exceptions" should be disregarded because Plaintiffs' Ex. 49, which purports to be an excerpt from the ACE 2006-OP2 Final Exceptions report, does not include any of this information. *See* Duffy Ex. 49 (ACE 2006-OP2 Final Exceptions report). Likewise, the report of Plaintiffs' purported expert did not, as Plaintiffs' paragraph 162 claims, "conclude[] that 1,625 of the loans listed in the final exceptions report had Mortgage File breaches that materially diminished the value of the loans, and such breaches remain in 787 loans." *See* Duffy Ex. 4 (Blum 87-88). To the contrary, Blum does not reference "Mortgage File breaches" anywhere his report. *See id.* In any event, the Blum report is inadmissible because Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration. *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352. Likewise, to the extent Plaintiffs assert that exceptions appearing on an exception report are "Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is contradicted by record evidence. *See supra* ¶¶ 84, 87, 90, 92, 94 (including HSBC's Replies to NCUA's Responses to those paragraphs).

Plaintiffs' Reply: In view of the 225-page limit for all exhibits, Plaintiffs could not submit the entirety of the cited exceptions report. The Trustee's objection is therefore not well taken, and HSBC very well knows that the complete report contains 2,375 rows — with each row listing each missing or defective document in the Mortgage Files for the trust. Duffy Ex. 49 contains the last page to illustrate this indisputable fact, showing the total number of exceptions; further, an electronic version of the complete report will be submitted to the Court on September 3 pursuant to the governing order, ECF 439 at 2. Plaintiffs' expert Blum reviewed the exceptions report and determined 787 of the loans had material exceptions. [Duffy Ex. 4 (Blum

87-88)].  Further, Plaintiffs' Reply ¶ 139 explains why material missing and defective Mortgage

File documents that are subject to enforcement pursuant to PSA § 2.03 are properly referred to as

Mortgage File breaches, despite HSBC's semantic dispute over the term.  The PSA plainly

required that "the Trustee shall enforce" Mortgage File breaches.  [Uhlig Ex. B (ACE 2005-AG1

PSA § 2.03 (a)).]  Finally, the Blum report reflects what Mr. Blum will testify to at trial, such

live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that

at trial he can and will testify to all of the opinions set out in his reports, such that the Court at

summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to

¶ 61.]

     163.    The DBALT 2007-OA1 Trust contained 1,164 loans.  The final exceptions report

showed 908 loans with 2,375 exceptions.  Plaintiffs' expert Blum concluded that 901 of the loans

listed in the final exceptions report had Mortgage File breaches that materially diminished the

value of the loans, and such breaches remain in 566 loans.  [Duffy Ex. 4 (Blum 100-101), *see*

*also* Duffy Ex. 50 (DBALT 2007-OA1 Final Exceptions).]

    <u>HSBC's Response</u>:  Disputed.  Plaintiffs' paragraph 163 should be disregarded for failure

to comply with the requirements for a 56.1 statement because it is not supported by citations to

specific and relevant evidence.  *See* L.R. 56.1(d); L.R. 56.1 Committee Note.  The portion of

paragraph 163 that states "The DBALT 2007-OA1 Trust contained 1,164 loans" should be

disregarded as duplicative of undisputed paragraph 4(c) herein.  For the remainder of paragraph

163, Plaintiffs fail to provide supporting citations to relevant evidence.  The portion of paragraph

163 that states "The final exceptions report showed 908 loans with 2,375 exceptions" should be

disregarded because Plaintiffs' Ex. 50, which purports to be an excerpt from the DBALT 2007-

OA1 Final Exceptions report, does not include any of this information.  *See* Duffy Ex. 50

(DBALT 2007-OA1 Final Exceptions).  Likewise, the report of Plaintiffs' purported expert did not, as Plaintiffs' paragraph 163 claims, "conclude[] that 901 of the loans listed in the final exceptions report had Mortgage File breaches that materially diminished the value of the loans, and such breaches remain in 566 loans."  *See* Duffy Ex. 4 (Blum 100-101).  To the contrary, Blum does not reference "Mortgage File breaches" anywhere in his report.  *See id.*  In any event, the Blum report is inadmissible because Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.  Likewise, to the extent Plaintiffs assert that exceptions appearing on an exception report are "Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is contradicted by record evidence.  *See supra* ¶¶ 84, 87, 90, 92, 94 (including HSBC's Replies to NCUA's Responses to those paragraphs).

Plaintiffs' Reply:  In view of the 225-page limit for all exhibits, Plaintiffs could not submit the entirety of the cited exceptions report.  The Trustee's objection is therefore not well taken, and HSBC very well knows that the complete report contains 2,588 rows — with each row listing each missing or defective document in the Mortgage Files for the trust.  (Plaintiffs' did inadvertently state the final exceptions report contained 2,375 exceptions, the correct number is 2,588).  Duffy Ex. 50 contains the last page to illustrate this indisputable fact, showing the total number of exceptions; further, an electronic version of the complete report will be submitted to the Court on September 3 pursuant to the governing order, ECF 439 at 2.  Plaintiffs' expert Blum reviewed the exceptions report and determined 566 of the loans had material exceptions.  [Duffy Ex. 4 (Blum 100-101)].  Further, Plaintiffs' Reply ¶ 139 explains why material missing and defective Mortgage File documents that are subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's

semantic dispute over the term.  The PSA plainly required that "the Trustee shall enforce" Mortgage File breaches.  [Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03 (a)).]  Finally, the Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

164.   The MHL 2007-1 Trust contained 3,259 loans.  The final exceptions report showed 1,861 loans with 2,227 exceptions.  Plaintiffs' expert Blum concluded that 511 of the loans listed in the final exceptions report had Mortgage File breaches that materially diminished the value of the loans.  [Duffy Ex. 4 (Blum 113), *see also* Duffy Ex. 51 (MHL 2007-1 Final Exceptions).]

HSBC's Response:  Disputed.  Plaintiffs' paragraph 164 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is not supported by citations to specific and relevant evidence.  *See* L.R. 56.1(d); L.R. 56.1 Committee Note.  The portion of paragraph 164 that states "The MHL 2007-1 Trust contained 3,259 loans" should be disregarded, because as Plaintiffs admit in paragraphs 4(e) and 15 herein, Plaintiffs' interest in MHL 2007-1 was backed exclusively by Group 2 loans, of which there were only 1,248 loans.  *See* HSBC 56.1 ¶¶ 4(e), 15.  For the remainder of paragraph 164, Plaintiffs fail to provide supporting citations to relevant evidence.  The portion of paragraph 164 that states "The final exceptions report showed 1,861 loans with 2,227 exceptions" should be disregarded because Plaintiffs' Ex. 51, which purports to be an excerpt from the MHL 2007-1 Final Exceptions report, does not include any of this information.  Duffy Ex. 51 (MHL 2007-1 Final Exceptions report).  Likewise, the report of Plaintiffs' purported expert did not, as Plaintiffs' paragraph 164 claims, "conclude[] that 511 of

the loans listed in the final exceptions report had Mortgage File breaches that materially

diminished the value of the loans." *See* Duffy Ex. 4 (Blum 113).  To the contrary, Blum does not

reference "Mortgage File breaches" anywhere in his report.  *See id.*  In any event, the Blum

report is inadmissible because Plaintiffs fail to verify Blum's unsworn report with an affidavit or

declaration.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Likewise, to the extent Plaintiffs assert that exceptions appearing on an exception report are

"Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is contradicted by

record evidence.  ¶¶ 84, 87, 90, 92, 94 (including HSBC's Replies to NCUA's Responses to

those paragraphs).

     <u>Plaintiffs' Reply</u>:  In view of the 225-page limit for all exhibits, Plaintiffs could not

submit the entirety of the cited exceptions report.  The Trustee's objection is therefore not well

taken, and HSBC very well knows that the complete report listed a "loan count" of 1,861 loans

— with each row listing each missing or defective document in the Mortgage Files for the trust.

Duffy Ex. 51 contains the last page to illustrate this indisputable fact, showing the total number

of exceptions; further, an electronic version of the complete report will be submitted to the Court

on September 3 pursuant to the governing order, ECF 439, at 2.  Plaintiffs' expert Blum

reviewed the exceptions report and determined 511 of the loans had material exceptions.  [Duffy

Ex. 4 (Blum 113)].  Further, Plaintiffs' Reply ¶ 139 explains why material missing and defective

Mortgage File documents that are subject to enforcement pursuant to PSA § 2.03 are properly

referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  The PSA

plainly required that "the Trustee shall enforce" Mortgage File breaches.  [Uhlig Ex. B (ACE

2005-AG1 PSA § 2.03 (a)).]  Finally, the Blum report reflects what Mr. Blum will testify to at

trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn

declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

165.    The FHLT 2006-C Trust contained 7,806 loans.  The final exceptions report showed 3,274 loans with 4,763 exceptions.  Plaintiffs' expert Blum concluded that 3,110 of the loans listed in the final exceptions report had Mortgage File breaches that materially diminished the value of the loans, and such breaches remain in 1,267 loans.  [Duffy Ex. 4 (Blum 128), *see also* Duffy Ex. 52 (FHLT 2006-C Final Exceptions).]

HSBC's Response:  Disputed.  Plaintiffs' paragraph 165 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is not supported by citations to specific and relevant evidence.  *See* L.R. 56.1(d); L.R. 56.1 Committee Note.  The portion of paragraph 165 that states "The FHLT 2006-C Trust contained 7,806 loans" should be disregarded as duplicative of undisputed paragraph 4(d) herein.  For the remainder of paragraph 165, Plaintiffs fail to provide supporting citations to relevant evidence.  The portion of paragraph 165 that states "The final exceptions report showed 3,274 loans with 4,763 exceptions" should be disregarded because Plaintiffs' Ex. 52, which purports to be an excerpt from the FHLT 2006-C Final Exceptions report, does not include any of this information.  *See* Duffy Ex. 52 (FHLT 2006-C Final Exceptions Report).  Likewise, the report of Plaintiffs' purported expert did not, as Plaintiffs' paragraph 165 claims, "conclude[] that 3,110 of the loans listed in the final exceptions report had Mortgage File breaches that materially diminished the value of the loans, and such breaches remain in 1,267 loans."  *See* Duffy Ex. 4 (Blum 128).  To the contrary, Blum does not reference "Mortgage File breaches" anywhere in his report.  *See id.*  In any event, the Blum report is inadmissible because Plaintiffs fail to verify Blum's unsworn report with an affidavit or

120

declaration.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Likewise, to the extent Plaintiffs assert that exceptions appearing on an exception report are

"Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is contradicted by

record evidence.  *See supra* ¶¶ 84, 87, 90, 92, 94 (including HSBC's Replies to NCUA's

Responses to those paragraphs).

<u>Plaintiffs' Reply</u>:  In view of the 225-page limit for all exhibits, Plaintiffs could not

submit the entirety of the cited exceptions report.  The Trustee's objection is therefore not well

taken, and HSBC very well knows that the complete report contains 4,763 rows — with each

row listing each missing or defective document in the Mortgage Files for the trust.  Duffy Ex. 52

contains the last page to illustrate this indisputable fact, showing the total number of exceptions;

further, an electronic version of the complete report will be submitted to the Court on September

3 pursuant to the governing order, ECF 439 at 2.  Plaintiffs' expert Blum reviewed the

exceptions report and determined 1,267 of the loans had material exceptions.  [Duffy Ex. 4

(Blum 128)].  Further, Plaintiffs' Reply ¶ 139 explains why material missing and defective

Mortgage File documents that are subject to enforcement pursuant to PSA § 2.03 are properly

referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  The PSA

plainly required that "the Trustee shall enforce" Mortgage File breaches.  [Uhlig Ex. B (ACE

2005-AG1 PSA § 2.03 (a)).]  Finally, the Blum report reflects what Mr. Blum will testify to at

trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn

declaration that at trial he can and will testify to all of the opinions set out in his reports, such

that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs'

Further Response to ¶ 61.**]**

166.    The NHELI 2007-1 Trust contained 3,496 loans.  [Duffy Ex. 4 (Blum 140).]  The

PSA for NHELI 2007-1 required a final exceptions report be issued within 180 days after closing [Uhlig Ex. G (NHELI 2007-1 PSA § 2.02(c))], however neither HSBC nor Custodian Wells Fargo were able to locate this document, and there is no evidence the final exceptions report was ever received.  Custodian Wells Fargo was able to produce a list of "Current" exceptions reports. [Duffy Ex. 4 (Blum 139-140), *see also* Duffy Ex. 53 (NHELI 2007-1 Current Exceptions).]

       <u>HSBC's Response</u>:  Disputed.  Plaintiffs' paragraph 166 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is not supported by citations to specific and relevant evidence.  The portion of paragraph 166 that states "The NHELI 2007-1 Trust contained 4,396 loans" should be disregarded as duplicative of undisputed paragraph 4(f) herein.  Disputed that Custodian Wells Fargo provided a list of "'Current' exception reports." The declaration of Wells Fargo's representative states that Wells Fargo produced a "Cleared Exception Report" and an "Uncleared Exception Report," which "reflect[] the status of the mortgage loan files" as of the date the reports were run, February 15, 2017.  Duffy Ex. 8 (Gorrien Decl. ¶¶ 6, 9).  The declaration further stated that "It was Wells Fargo's ordinary practice to create and send trust receipts, certifications, and exception reports in accordance with the governing documents.  Accordingly, Wells Fargo's inability to locate certain documents is not determinative that such documents were not created or delivered as required by the governing documents."  *Id.* ¶ 11.  Further disputed that Duffy Ex. 53 (which Plaintiffs describe as the NHELI 2007-1 "Current Exceptions" report) is the Uncleared Exception Report for NHELI 2007-1 produced by Wells Fargo.  Rather, Column C in that document indicates that the trust at issue is NHELI 2007-2, and the Bates number indicates this document was not produced by Wells Fargo.  Undisputed that party discovery conducted in 2016 was unable to locate a copy of the final exceptions report for NHELI 2007-1 provided within 180 days after closing in 2007.

Plaintiffs' Reply:  HSBC does not dispute the fundamental premise of Plaintiffs'
statement, that no final exceptions report for this trust was produced in discovery, nor was there
any evidence HSBC received the report.  Instead, discovery revealed that the CD HSBC received
that purported to contain the NHELI 2007-1 final exceptions report actually contained the final
exceptions report for NHELI 2007-2.  [Duffy Ex. 4 (Blum 139-140).]  Duffy Ex. 53 contains an
excerpt from the NHELI 2007-2 report, which is what HSBC received in lieu of the NHELI
2007-1 report.  Duffy Ex. 60 contains the current exceptions report for NHELI 2007-1, as
produced by Wells Fargo during discovery.  HSBC's semantic issue with Plaintiffs' referring to
the report Wells Fargo produced as the "current" exceptions report does not warrant a response.

167.    The NHELI 2007-1 current exceptions report showed 847 loans with 1,216
exceptions.  Plaintiffs' expert Blum concluded that 410 of the loans listed in the final exceptions
report had Mortgage File breaches that materially diminished the value of the loans.  [Duffy
Ex. 4 (Blum 140).]

HSBC's Response:  Disputed.  Plaintiffs' paragraph 167 should be disregarded for failure
to comply with the requirements for a 56.1 statement because it is not supported by citations to
specific and relevant evidence.  See L.R. 56.1(d); L.R. 56.1 Committee Note.  The portion of
paragraph 167 that states "The NHELI 2007-1 current exceptions report showed 847 loans with
1,216 exceptions" should be disregarded because Plaintiffs' Ex. 53, which purports to be an
excerpt from the NHELI 2007-1 "Current exceptions report," does not include any of this
information, see Duffy Ex. 53, nor is that document what Plaintiffs claim it to be, as explained in
HSBC's response to paragraph 166.  Likewise, the report of Plaintiffs' purported expert did not,
as Plaintiffs' paragraph 167 claims, "conclude[] that 410 of the loans listed in the final
exceptions report had Mortgage File breaches that materially diminished the value of the loans."

*See* Duffy Ex. 4 (Blum 140).  To the contrary, Blum does not reference "Mortgage File breaches" anywhere in his report.  *See id.*  In any event, the Blum report is inadmissible because Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.  Likewise, to the extent Plaintiffs assert that exceptions appearing on an exception report are "Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is contradicted by record evidence.  *See supra* ¶¶ 84, 87, 90, 92, 94 (including HSBC's Replies to NCUA's Responses to those paragraphs).

Plaintiffs' Reply:  In view of the 225-page limit for all exhibits, Plaintiffs could not submit the entirety of the cited exceptions report.  The Trustee's objection is therefore not well taken, and HSBC very well knows that the current exceptions report contains 1,600 rows — with each row listing each missing or defective document in the Mortgage Files for the trust, and 1,216 rows representing a missing or defective document exception opened before 2008.  Duffy Ex. 60 contains the last page to illustrate this indisputable fact, showing the total number of exceptions; further, an electronic version of the complete report will be submitted to the Court on September 3 pursuant to the governing order, ECF 439 at 2.  Plaintiffs' expert Blum reviewed the exceptions report and determined 410 of the loans had material exceptions.  [Duffy Ex. 4 (Blum 140)].  Further, Plaintiffs' Reply ¶ 139 explains why material missing and defective Mortgage File documents that are subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.  The PSA plainly required that "the Trustee shall enforce" Mortgage File breaches.  [Uhlig Ex. B (ACE 2005-AG1 PSA § 2.03 (a)).]  Finally, the Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such

that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

168.    There is no record evidence HSBC notified any warrantor or sought to enforce warrantor repurchase of any loans in the Trusts with material Mortgage File breaches for which Plaintiffs seek damages.  There is also no record evidence HSBC entered tolling agreements with any warrantors regarding the Trusts to prevent expiration of the statute of limitations.

HSBC's Response:  Undisputed, but immaterial.  HSBC never received notice of a "Mortgage File breach" in any of the Trusts at issue.  *See* Acebedo Decl. ¶ 40.  To the extent Plaintiffs assert that exceptions appearing on an exception report are "Mortgage File breaches" triggering a duty for HSBC, Plaintiffs' assertion is contradicted by record evidence.  *See supra* ¶¶ 84, 87, 90, 92, 94 (including HSBC's Replies to NCUA's Responses to those paragraphs).

Plaintiffs' Reply:  HSBC does not dispute the primary assertion.  As explained above, ¶¶ 160-167, HSBC discovered and/or received notice of a total of 4,422 loans with Mortgage File breaches via the exceptions reports, and had a duty to enforce warrantor repurchase of those breaching loans, ¶¶ 139-154.  Plaintiffs refer the Court to Plaintiffs' Reply ¶ 139, explaining why material missing and defective documents subject to enforcement pursuant to PSA § 2.03 are properly referred to as Mortgage File breaches, despite HSBC's semantic dispute over the term.

X.    **ADDITIONAL FACTS RELEVANT TO PLAINTIFFS R&W CLAIMS**

169.    Over a 14-month period, between March 28, 2012 and May 31, 2013, HSBC sued warrantor Deutsche Bank Structured Products ("DBSP") 16 times alleging R&W breaches:

HSBC's Response:  Undisputed that HSBC solely in its representative capacity as Trustee and at the express written direction and indemnification of certificate holders brought the referenced actions, but paragraph 169 is immaterial in any event.  Plaintiffs' paragraphs 169-206 should be disregarded for failure to comply with the requirements for a 56.1 statement because

they are not relevant to the claims at issue and therefore are not "material facts" properly included in a 56.1 statement.  *See* L.R. 56(a) (56.1 statement must contain only "material facts"); J. Schofield Indiv. R. III.C.6 ("The statement shall identify key issues and include only those facts that the movant genuinely believes to be both material and undisputed."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."). Plaintiffs' paragraphs 169-206 are irrelevant to Plaintiffs' R&W and document defect claims because such claims must be proven loan-by-loan and cannot be proven based on "pervasive breach."  *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. BNYM* ("Ret. Bd."), 775 F.3d 154, 162 (2d Cir. 2014); *Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2017 WL 945099, at *4-5 (S.D.N.Y. Mar. 10, 2017) (theories of "generalized wrongdoing" or "pervasive breach" cannot survive beyond the pleading stage; instead, plaintiffs must establish breaches "on a loan-by-loan basis").  Paragraphs 169-206 do not concern any loan in any of the trusts at issue and therefore are immaterial and should be disregarded.  *See* Pls' 56.1 ¶¶ 169-206 (all concerning loans in trusts not at issue).  Indeed, in this case, Judge Netburn already rejected NCUA's contention that these repurchase cases are "highly relevant" because they allegedly "shed light on Defendants 'overall awareness' of 'the pervasive defects,'" and instead found that the alleged "'overall awareness' is immaterial to the claims at issue."  *NCUA v. HSBC*, 2020 WL 5913755, at *1 (S.D.N.Y. Oct. 6, 2020) (ECF 416).  The Court also reiterated that "Judge Schofield has ruled already that 'the 'discovery or receipt of notice' requirement must require HSBC to have information about a *specific loan*, rather than *generalized knowledge* or notice *extrapolated from other loans*.'"  *Id.* (citing ECF 314) (emphasis in original).

Plaintiffs' Reply:  HSBC does not dispute the primary factual assertion that it sued

warrantor DBSP 16 times alleging R&W breaches.  The Court should disregard HSBC's

response beginning with the second sentence as legal rather than factual argument.  HSBC is also

incorrect in asserting this issue was resolved in prior opinions.  [*See* NCUA Br. 22-23; NCUA

Reply 4-6.]

170.    *(1) ACE 2006-SL2.*  HSBC filed a summons on March 28, 2012 and a complaint

on September 13, 2012 against DBSP alleging R&W breaches in the ACE 2006-SL2 trust.

[Duffy Ex. 16 (ACE 2006-SL2 Compl. at 1); Duffy Ex. 4 (Blum 64 n.176).]  The complaint

alleged that at least "696 . . . out of the 697 [loan] files that were analyzed" breached one or more

of DBSP's R&Ws, and "analysis of publicly-available data about the Mortgage Loans uncovered

breaches . . . [in] 946 Mortgage Loans."  [Duffy Ex. 16 (ACE 2006-SL2 Compl. ¶¶ 8, 28).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its

representative capacity as Trustee of the ACE 2006-SL2 Trust and at the express written

direction and indemnification of certificate holders in that trust; further undisputed that the

complaint, based on an investigation conducted independently by the directing certificate holder,

contained allegations including the partial and incomplete allegations identified above; however,

the second quotation is not worded the same as the complaint.  But Paragraph 170 is immaterial

in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is

material.  *See* Plaintiffs' Reply ¶ 169.  The word "about" in the second quote should read

"regarding."

171.    In the complaint, HSBC explained the trust contained "*pervasive* breaches" of

representations and warranties.  [Duffy Ex. 16 (ACE 2006-SL2 Compl. ¶ 29).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 171 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

172.     HSBC also summarized the findings of "[r]ecent government investigations" that "revealed that Deutsche Bank, via its wholly-owned subsidiaries DBSP and ACE, *disregarded underwriting guidelines*, and as a result made representations and warranties for mortgages that did not meet stated criteria in the governing documents."  [Duffy Ex. 16 (ACE 2006-SL2 Compl. ¶ 31).]  HSBC cited a 2011 Senate report, which, among other things, the report noted DBSP employees "internally disparage[ed] the quality of the loans it was securitizing."  [*Id.* ¶ 32.] HSBC also cited a January 2011 FCIC Report noting a third-party due diligence firm DBSP hired to review the loan stated that that "Deutsche Bank still securitized almost half the loans [it had] rejected for failing to comply with underwriting guidelines."  [*Id.* ¶ 34.]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint and their final quotation is inaccurate.  The reference to the FCIC Report was as follows: "Deutsche Bank still securitized almost half the loans Clayton rejected for failing

to comply with underwriting guidelines."  Duffy Ex. 16 ¶ 34.  But Paragraph 172 is immaterial

in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is

material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated,

all emphasis is added."

173.    HSBC elaborated on the importance of the representations and warranties that

were breached to certificateholders:

> *6. These and other Representations and Warranties were meant to ensure that the Mortgage Loans met an agreed-upon level of creditworthiness and that the information provided by DBSP and the Originators regarding those Mortgage Loans was true and accurate for the purposes of, among other things, the assignment of correct credit ratings to the Certificates by rating agencies. . . .  The Representations and Warranties were also intended to provide the purchasers of Certificates (the "Certificateholders") with comfort that the Trust held Mortgage Loans that met certain essential characteristics, which served as indicators of the quality and value of each Mortgage Loan and, ultimately, the price at which the Trust purchased the Mortgage Loans from DBSP.*
>
> *7. With this understanding, DBSP agreed in the Purchase Agreement that if any Mortgage Loan was found to be in breach of the Representations and Warranties and such breach materially and adversely affected the value of that Mortgage Loan or the interest therein of the Certificateholders (each such Mortgage Loan, a "Defective Loan"), DBSP would cure such breach in all material respects within 60 days of DBSP's discovery of, or receipt of notice of, such breach, or, in the event DBSP could not cure such breach, DBSP must repurchase the Defective Loan within 90 days of its discovery of, or receipt of notice of, such breach (the "Cure Period"). (See Exhibit A, Purchase Agreement § 7(a); PSA § 2.03(a)). . . .*
>
> *21. In order to execute the sale of the Mortgage Loans in a commercially-efficient manner – i.e., to relieve investors of the burden of verifying the quality of every single Mortgage Loan in the pool – DBSP guaranteed the quality of each Mortgage Loan in the Trust.  DBSP's guarantee consisted of two components:  (1) DBSP made specific representations and warranties regarding the quality of each Mortgage Loan, and (2) DBSP agreed to cure any breach of the Representations and Warranties or repurchase any Defective Loan.  DBSP had direct access to the detailed information contained in each Mortgage Loan file and possessed unique knowledge regarding the Mortgage Loans.  In contrast, investors in the Certificates did not have access to the underlying Mortgage Loan files when the Certificates were issued.*

*22. DBSP's guarantee provided investors in the Certificates with comfort and assurance that the Mortgage Loans were of a certain quality. Consequently, the Certificates derived their value from the veracity of the Representations and Warranties and DBSP's agreed-upon obligations to cure or repurchase. Thus, the Representations and Warranties, as well as DBSP's cure and repurchase obligations, were, and continue to be, critical components of the Securitization.*

[Duffy Ex. 16 (ACE 2006-SL2 Compl. ¶¶ 6-7, 21-22).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 173 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

174.  *(2) ACE 2006-HE2.*  HSBC filed a summons on April 27, 2012 and a complaint on December 21, 2012 against DBSP alleging R&W breaches in the ACE 2006-HE2 trust. [Duffy Ex. 17 (ACE 2006-HE2 Compl. at 1); Duffy Ex. 4 (Blum 64 n.177).]  The complaint alleged that "[a]ll but three of the 193 forensically reviewed loans, or 98.4 percent, were found to be in breach."  [Duffy Ex. 17 (ACE 2006-HE2 Compl. ¶ 8).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2006-SL2 Trust and at the express written direction and indemnification of certificate holders in that trust; although contrary to Plaintiffs' allegation, the complaint was not filed on December 21, 2012 but rather October 3, 2012.  An amended complaint was filed on December 21, 2012.  Further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained

allegations including the partial and incomplete allegations identified above. But Paragraph 174 is immaterial in any event. *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply: HSBC does not dispute Plaintiffs' primary assertion, and this fact is material. *See* Plaintiffs' Reply ¶ 169. Plaintiffs' quote the December 21, 2012 Amended Complaint.

175.    In the complaint, HSBC alleged "*numerous, fundamental breaches*" of representations and warranties and concluded "[g]iven that the Forensic Review and the separate analysis of loan-level data have uncovered so many breaches of representations and warranties, it *is likely that a significant percentage of the remainder of Loan Group I includes similar breaches*." [Duffy Ex. 17 (ACE 2006-HE2 Compl. ¶¶ 1, 8).] HSBC elaborated that "[t]he high volume, and high rate, of breaches uncovered by the Forensic Review and the larger sampling of loans suggest a *wholesale breakdown* of underwriting standards for the Mortgage Loan Pool conveyed to the Trust." [*Id.* ¶ 9.] Because of the "extremely high percentage of cases" in which warrantors filed to adhere to underwriting guidelines, HSBC also alleged that breaches must "exist *throughout* many other Mortgage Loans in the Trust." [*Id.* ¶ 41.]

HSBC's Response: Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint. But Paragraph 175 is immaterial in any event. *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply: HSBC does not dispute Plaintiffs' primary assertion, and this fact is material. *See* Plaintiffs' Reply ¶ 169. As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

176.    *(3) ACE 2006-HE3.*  HSBC filed a summons on June 26, 2012 and a complaint

on December 21, 2012 against DBSP alleging R&W breaches in the ACE 2006-HE3 trust.

[Duffy Ex. 17 (ACE 2006-HE3 Compl. at 1); Duffy Ex. 4 (Blum 64 n.178).]  HSBC alleged "81

out of the 134 Mortgage Loans reviewed — 60.4%—breached one or more of DBSP's

representations and warranties" in one forensic review, and in "617 [out of 627], or 98.4%" of

loans in a subsequent review.  [Duffy Ex. 18 (ACE 2006-HE3 Compl. ¶ 8).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its

representative capacity as Trustee of the ACE 2006-HE3 Trust and at the express written

direction and indemnification of certificate holders in that trust; further undisputed that the

complaint, based on an investigation conducted independently by the directing certificate holder,

contained allegations including the partial and incomplete allegations identified above, but

Paragraph 176 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is

material.  *See* Plaintiffs' Reply ¶ 169.

177.    In the complaint, HSBC alleged the trust contained "*pervasive* inaccuracies" in

the representations and warranties.  [Duffy Ex. 18 (ACE 2006-HE3 Compl. ¶ 55).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted

independently by the directing certificate holder, contained allegations including the partial and

incomplete allegations identified above; however, the allegation of "pervasive inaccuracies"

referred to the loans, not the trust as described by Plaintiffs above.  But Paragraph 177 is

immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is

material.  *See* Plaintiffs' Reply ¶ 169.

132

178.    HSBC described "*numerous and fundamental* breaches" of representations and warranties and concluded "[g]iven that the Forensic Review and the separate analysis of loan-level data have uncovered so many breaches of representations and warranties, it *is likely that a significant percentage of the remaining loans which have not yet been reviewed will reveal similar breaches*."  [Duffy Ex. 18 (ACE 2006-HE3 Compl. ¶¶ 1, 8).]  Because of the "extremely high percentage of cases" where warrantors failed to adhere to underwriting guidelines, HSBC alleged breaches must "exist *throughout* many other Mortgage Loans in the Trust."  [*Id.* ¶ 46).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 178 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

179.    HSBC concluded that the findings reveal "inaccuracies, misrepresentations and omissions were *so fundamental and numerous* as to preclude any notion that they were the result of mere inadvertence or accident.  In *loan after loan*, core information about the borrower or the property was simply wrong or glaringly incomplete.  It is now clear that, *from day one*, the Mortgage Loan Pool was littered with *fundamentally defective loans*."  [Duffy Ex. 18 (ACE 2006-HE3 Compl. ¶ 47).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and

incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 179 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

180.    *(4) ACE 2006-FM1.*  HSBC filed a summons on August 24, 2012 and a complaint on January 28, 2013 against DBSP alleging R&W breaches in the ACE 2006-FM1 trust.  [Duffy Ex. 19 (ACE 2006-FM1 Compl. at 1); Duffy Ex. 4 (Blum 65 n.179).]  The complaint alleged "the Trustee [HSBC] received two notices indicating that a massive number — an aggregate of at least 946—of the Mortgage Loans breached DBSP's representations and warranties."  [Duffy Ex. 19 (ACE 2006-FM1 Compl. ¶ 2).]  The reviews revealed that "*every single loan reviewed* was found to be in breach of at least one representation and warranty."  [*Id.* ¶ 11 (emphasis in original).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2006-FM1 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 180 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

181.    In the complaint, HSBC alleged the trust contained a "vast" and "massive

number" of breaching loans.  [Duffy Ex. 19 (ACE 2006-FM1 Compl. ¶¶ 16, 65).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 181 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

182.    HSBC explained "[i]t is now clear based on the Forensic Reviews that, despite its representations and warranties, DBSP simply placed into the Trust a Mortgage Loan pool that was *fundamentally defective – i.e.*, it contained *voluminous breaches* that materially and adversely affected the value of the Mortgage Loans or the interest of the Trust or the Certificateholders in Mortgage Loans.  *The numbers tell the story*."  [Duffy Ex. 19 (ACE 2006-FM1 Compl. ¶ 46).]  HSBC explained that "[t]he breaches reveal a *fundamental breakdown* of applicable loan underwriting standards."  [*Id.* ¶ 123.]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 182 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

183.    HSBC described "the number, extent and nature of the breaches," and concluded

"[h]ere, where the Mortgage Loan pool was riddled with approximately 1,000 loans, almost each of which contained multiple material breaches, due diligence on even a small random sample would have alerted DBSP to *fundamental problems* with the pool."  [Duffy Ex. 19 (ACE 2006-FM1 Compl. ¶ 66).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 183 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

184.    HSBC concluded that the findings reveal "inaccuracies, misrepresentations and omissions, and other breaches were *so fundamental and numerous* as to preclude any notion that they were the result of mere inadvertence or accident.  In *loan after loan*, core information about the borrower or the property was simply wrong or glaringly incomplete. It is now clear that, *from day one*, the Mortgage Loan Pool was littered with *fundamentally defective loans*."  [Duffy Ex. 19 (ACE 2006-FM1 Compl. ¶ 52).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 184 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

185.    *(5) ACE 2006-HE4.*  HSBC filed a summons on September 27, 2012 and a complaint on March 4, 2013 against DBSP alleging R&W breaches in the ACE 2006-HE4 trust. [Duffy Ex. 20 (ACE 2006-HE4 Compl. at 1); Duffy Ex. 4 (Blum 65 n.181).]  The complaint alleged that "the Forensic Reviews revealed that 1,055 out of the 1,940 Mortgage Loans review[ed]—over 54 %—breached one or more of DBSP's representations and warranties." [Duffy Ex. 20 (ACE 2006-HE4 Compl. ¶ 11); Duffy Ex. 4 (Blum 65).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2006-HE4 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 185 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

186.    In the complaint, HSBC alleged the trust contained a "vast" and "massive number" of breaching loans.  [Duffy Ex. 20 (ACE 2006-HE4 Compl. ¶¶ 15, 16).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 186 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

137

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

187.    HSBC explained "[i]t is now clear based on the First Forensic Review that, despite its representations and warranties, DBSP simply placed into the Trust a Mortgage Loan pool that was *fundamentally defective – i.e.*, it contained *voluminous breaches* that materially and adversely affected the value of the Mortgage Loans or the interest of the Trust or the Certificateholders in Mortgage Loans.  *The numbers tell the story*."  [Duffy Ex. 20 (ACE 2006-HE4 Compl. ¶ 49); *see also id.* ¶ 52 (same, for Second Forensic Review).]  HSBC remarked that "[a]lthough each of the Forensic Reviews was completely autonomous, their findings were remarkably similar.  The consultants found *numerous, fundamental breaches* of DBSP's representations and warranties that materially and adversely affect the value of the Mortgage Loans or the interests therein of the Trust or Certificateholders, including inaccuracies, outright misrepresentations, material omissions, and other breaches, *across the Mortgage Loan pool*."  [*Id.* ¶ 47.]  HSBC explained that "[t]he breaches reveal a *fundamental breakdown* of applicable loan underwriting standards."  [*Id.* ¶ 127.]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 187 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

188.    HSBC described "the number, extent and nature of the breaches," and concluded "[h]ere, where nearly 1,100 of the Mortgage Loans in the pool were riddled with material breaches, due diligence on even a small random sample would have alerted DBSP to *fundamental problems* with the pool."  [Duffy Ex. 20 (ACE 2006-HE4 Compl. ¶ 68).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 188 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

189.    HSBC concluded that the findings reveal "inaccuracies, misrepresentations, omissions, and other breaches were *so fundamental and numerous* as to preclude any notion that they were the result of mere inadvertence or accident.  In *loan after loan*, core information about the borrower or the property was simply wrong or glaringly incomplete.  It is now clear that, *from day one*, the Mortgage Loan Pool was littered with *fundamentally defective loans*."  [Duffy Ex. 20 (ACE 2006-HE4 Compl. ¶ 53).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 189 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

<u>Plaintiffs' Reply</u>:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

190.   HSBC explained that "[t]he whole purpose of DBSP's representations and warranties, and of the cure/substitution/repurchase remedy, was to ensure that the Trust did not ultimately bear the risks associated with so much as a single loan that was in breach of a single one of DBSP's representations and warranties.  Yet, on day one, DBSP placed more than one thousand defective loans into the Trust." [Duffy Ex. 20 (ACE 2006-HE4 Compl. ¶ 54).]

<u>HSBC's Response</u>:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 190 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

<u>Plaintiffs' Reply</u>:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

191.   *(6) DBALT 2006-OA1.*  HSBC filed a complaint against DBSP on November 27, 2012 alleging R&W breaches in the DBALT 2006-OA1 trust.  [Duffy Ex. 21 (DBALT 2006-OA1 Compl. at 1).]  The complaint alleged that re-underwriting revealed R&W breaches in "[o]ver 93 percent of the 347 loan files that were forensically reviewed."  [Duffy Ex. 4 (Blum 65); *see also* Duffy Ex. 21 (DBALT 2006-OA1 Compl. ¶ 10).]

<u>HSBC's Response</u>:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the DBALT 2006-OA1 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained

allegations including the partial and incomplete allegations identified above, but Paragraph 191 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

192.     *(7) ACE 2007-WM1.*  HSBC filed a summons on January 28, 2013 and a complaint on June 3, 2013 against DBSP alleging R&W breaches in the ACE 2007-WM1 trust. [Duffy Ex. 22 (ACE 2007-WM1 Compl. 1); Duffy Ex. 4 (Blum 65 n.183).]  The complaint alleged that "[a] staggering *100 percent* of the Mortgage Loans subject to the Forensic Review — 496 out of 496 Mortgage Loans — breached DBSP's representations and warranties."  [Duffy Ex. 4 (Blum 65); *see also* Duffy Ex. 22 (ACE 2007-WM1 Compl. ¶ 11).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2007-WM1 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 192 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

193.     *(8) ACE 2007-HE1.*  HSBC filed a complaint against DBSP on January 29, 2013 alleging R&W breaches in the ACE 2007-HE1 trust.  [Duffy Ex. 23 (ACE 2007-HE1 Compl. at 1).]  The complaint alleged that HSBC received notice "indicating that a massive number — an aggregate of at least 2,375 — of the Mortgage Loans breached DBSP's representations and warranties."  [Duffy Ex. 4 (Blum 65); *see also* Duffy Ex. 23 (ACE 2007-HE1 Compl. ¶ 2).]

Forensic re-underwriting reviews revealed R&W breaches in "68.68 percent" and "93 percent of the sample[s]."  [Duffy Ex. 4 (Blum 65); *see also* Duffy Ex. 23 (ACE 2007-HE1 Compl. ¶ 48).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2006-HE1 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 193 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

194.    *(9) ACE 2007-ASAP1.*  HSBC filed a summons on March 15, 2013 and complaint on May 7, 2014 against DBSP alleging R&W breaches in the ACE 2007-ASAP1 trust. [Duffy Ex. 24 (ACE 2007-ASAP1 Compl. at 1); Duffy Ex. 4 (Blum 65 n.186).]  The complaint alleged that HSBC "received notices indicating that over 1,350 of the Mortgage Loans were sold to the Trust in breach of DBSP's representations and warranties."  [Duffy Ex. 4 (Blum 65); *see also* Duffy Ex. 24 (ACE 2007-ASAP1 Compl. ¶ 3).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2007-ASAP1 and at the express written direction and indemnification of certificate holders in that trust; although contrary to Plaintiffs' allegation, the complaint was not filed on May 7, 2014 but rather August 1, 2013.  An amended complaint was filed on May 7, 2014.  Further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the

partial and incomplete allegations identified above.  But Paragraph 194 is immaterial in any

event.  *See* HSBC's Response to ¶ 169.

> Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is
>
> material.  *See* Plaintiffs' Reply ¶ 169.  Plaintiffs' quote the May 7, 2014 Amended Complaint.

195.    In the complaint, HSBC explained "it is now clear that, despite its representations

and warranties, DBSP simply placed into the Trust a Mortgage Loan pool that was

*fundamentally defective,* resulting in *numerous breaches* that materially and adversely affected

the value of the Mortgage Loans or the interests of the Trust or the certificateholders in the

Mortgage Loans.  The Data Review found that approximately 1,350 Mortgage Loans were sold

to the Trust in breach of one or more of DBSP's representations and warranties regarding the

Mortgage Loans.  It is now clear that DBSP was – at the very least – grossly negligent in

securitizing the Mortgage Loans."  [Duffy Ex. 24 (ACE 2007-ASAP1 Compl. ¶ 60).]

> HSBC's Response:  Undisputed the complaint, based on an investigation conducted
>
> independently by the directing certificate holder, contained allegations including the partial and
>
> incomplete allegations identified above; however, Plaintiffs have added italics where there are
>
> none in the complaint.  But Paragraph 195 is immaterial in any event.  *See* HSBC's Response to
>
> ¶ 169.

> Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is
>
> material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated,
>
> all emphasis is added."

196.    HSBC recognized that "[t]his Trust is only one of *dozens* of public 'ACE'-

identified securitizations sponsored by DBSP in 2006 and 2007, pursuant to which DBSP

securitized approximately 187,800 loans, which . . . are now subject to thousands of repurchase

demands.  It is alleged in several complaints – bringing claims sounding in both fraud and breach

of contract – that DBSP knew that the 'ACE' securitizations were rife with breaching mortgage

loans."  [Duffy Ex. 24 (ACE 2007-ASAP1 Compl. ¶ 12).]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted

independently by the directing certificate holder, contained allegations including the partial and

incomplete allegations identified above, but Paragraph 196 is immaterial in any event.  *See*

HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is

material.  *See* Plaintiffs' Reply ¶ 169.

197.    HSBC also cited a 2011 complaint brought by the Federal Housing Finance

Authority alleging "DBSP knowingly misrepresented the quality of the Mortgage Loans," and

that DBSP was "on notice of breaches *throughout the Trust*," including in the ACE 2005-AG1,

ACE 2006-OP2, MHL 2007-1.  [Duffy Ex. 24 (ACE 2007-ASAP1 Compl. ¶ 7 (citing Compl.,

*Fed. Hous. Fin. Agency v. Deutsche BankAG*, 11-cv-06192 (S.D.N.Y. Sept, 2, 2011)).]

HSBC's Response:  Disputed.  Nothing in the complaint mentions or refers to ACE 2005-

AG1, ACE 2006-OP2, MHL 2007-1.  *See* Duffy Ex. 24.  To the contrary the complaint alleges

that DBSP was "on notice of breaches throughout the Trust," referring solely to the ACE 2007-

ASAP1 Trust.  *Id.*  But Paragraph 197 is immaterial in any event.  *See* HSBC's Response to ¶

169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion.  *See* Plaintiffs'

Reply ¶ 169.  The FHFA Complaint listed 40 securitizations at issue, including ACE 2005-AG1,

ACE 2006-OP2, and MHL 2007-1.  *See* Complaint ¶ 2, *FHFA v. Deutsche Bank AG*, 11-cv-

06192 (S.D.N.Y. filed Sept, 2, 2011).

198.    *(10) ACE 2007-HE3.*  HSBC filed a complaint against DBSP on March 20, 2013 alleging R&W breaches in the ACE 2007-HE3 trust.  [Duffy Ex. 25 (ACE 2007-HE3 Compl. at 1).]  The complaint alleged that "[m]ore than 72 percent of the Mortgage Loans subject to the Forensic review — 994 out of 1,375 Mortgage Loans — breached DBSP's representations and warranties."  [Duffy Ex. 4 (Blum 65-66); *see also* Duffy Ex. 25 (ACE 2007-HE3 Compl. ¶ 11).]

<u>HSBC's Response</u>:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2007-HE3 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 198 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

<u>Plaintiffs' Reply</u>:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

199.    *(11) ACE 2007-WM2.*  HSBC filed a complaint against DBSP on March 27, 2013 alleging R&W breaches in the ACE 2007-WM2 trust.  [Duffy Ex. 26 (ACE 2007-WM2 Compl. at 1).]  The complaint alleged that "at least 1,302 Mortgage Loans breached DBSP's representations and warranties," representing "[m]ore than 59 percent" of the reviewed loans. [Duffy Ex. 4 (Blum 66); *see also* Duffy Ex. 26 (ACE 2007-WM2 Compl. ¶ 11).]

<u>HSBC's Response</u>:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2007-WM2 and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained

allegations including the partial and incomplete allegations identified above, but Paragraph 199
is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is
material.  *See* Plaintiffs' Reply ¶ 169.

200.   *(12) ACE 2007-HE4.*  HSBC filed a complaint against DBSP on April 29, 2013
alleging R&W breaches in the ACE 2007-HE4 trust.  [Duffy Ex. 27 (ACE 2007-HE4 Compl. at
1).]  The complaint alleged that "[m]ore than 69 percent of the Mortgage Loans subject to
Forensic Review . . . breached DBSP's representations and warranties," — "at least 1,231" loans.
[Duffy Ex. 4 (Blum 66); *see also* Duffy Ex. 27 (ACE 2007-HE4 Compl. ¶¶ 2, 12).]

HSBC's Response:  Disputed.  Plaintiffs' quotations are inaccurate.  The complaint,
based on an investigation conducted independently by the directing certificate holder,  contains
allegations including that a Data Review and Forensic Review "revealed that at least 1,231
Mortgage Loans breaches DBSP's representations and warranties," and "[m]ore than 69 percent
of the Mortgage Loans subject to the Forensic Review – 1,117 out of 1,607 Mortgage Loans –
breached DBSP's representations and warranties."  Duffy Ex. 27 ¶ 12.  Undisputed the
referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the
ACE 2007-HE4 trust and at the express written direction and indemnification of certificate
holders in that trust.  But Paragraph 200 is immaterial in any event.  *See* HSBC's Response to ¶
169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is
material.  *See* Plaintiffs' Reply ¶ 169.

201.   HSBC described "the number, extent and nature of the breaches," and concluded
that "[h]ere, where at least 1,231 of the Mortgage Loans in the pool were riddled with material

breaches, due diligence on even a small sample would have alerted DBSP to *fundamental*

*problems* with the pool."  [Duffy Ex. 27 (ACE 2007-HE4 Compl. ¶ 66).]  The results "revealed

that the origination process was rife with fraud and substantial defects by borrowers and

originators alike" and HSBC concluded "there can be little doubt that DBSP had discovered

multitudes of breaching Mortgage Loans as of the closing of the securitization."  [*Id.* ¶ 66).]

> HSBC's Response:  Undisputed the complaint, based on an investigation conducted

independently by the directing certificate holder, however, the quotations in the second sentence

as presented by Plaintiffs is misleading.  The full quotation reads: "Where more than 61% of the

Mortgage Loans in the pool were originated by DBSP's affiliate, DB Home, and the Reviews

revealed that the origination process was rife with fraud and substantial defects by borrowers and

originators alike, there can be little doubt that DBSP had discovered multitudes of breaching

Mortgage Loans as of the closing of the securitization."  Duffy Ex. 27 ¶ 66.  Plaintiffs also add

italics where there is none in the complaint.  *See id.*  But Paragraph 201 is immaterial in any

event.  *See* HSBC's Response to ¶ 169.

> Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is

material.  *See* Plaintiffs' Reply ¶ 169.

> 202.    ***(13) DBALT 2007-OA3.***  HSBC filed a complaint against DBSP on April 30,

2013 alleging R&W breaches in the DBALT 2007-OA3 trust.  [Duffy Ex. 28 (DBALT 2007-

OA3 Compl. at 1).]  The complaint alleged that "[m]ore than 88 percent of the Mortgage Loans

subject to . . . Forensic Review — 184 out of 209 Mortgage Loans — breached DBSP's

representations and warranties."  [Duffy Ex. 4 (Blum 66); *see also* Duffy Ex. 28 (DBALT 2007-

OA3 Compl. ¶ 13).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the DBALT 2007-OA1 trust and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 202 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

203.    *(14) ACE 2007-ASAP2.*  HSBC filed a summons on May 30, 2013 and complaint on November 4, 2013 against DBSP alleging R&W breaches in the ACE 2007-ASAP2 trust. [Duffy Ex. 29 (ACE 2007-ASAP2 Compl. at 1); Duffy Ex. 4 (Blum 66 n.191).]  The complaint alleged that "[t]he Data Review revealed that 851 of the 1,254 Mortgage Loans reviewed — over 67 *percent*— were sold to the Trust in breach of one or more of DBSP's representations and warranties."  [Duffy Ex. 4 (Blum 66); *see also* Duffy Ex. 29 (ACE 2007-ASAP2 Compl. ¶ 35).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2007-ASAP2 trust and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 203 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

204.    In the complaint, HSBC concluded that "given the extent and severity of the

148

breaches, the Breach Notices were sufficient to put DBSP on *notice* that Mortgage Loans *throughout the entire Trust — not merely the specific Defective Loans identified in the Breach Notices* — were sold to the Trust in breach of DBSP's representations and warranties." [Duffy Ex. 29 (ACE 2007-ASAP2 Compl. ¶ 49.]

HSBC's Response:  Undisputed the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above; however, Plaintiffs have added italics where there are none in the complaint.  But Paragraph 204 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.  As explained in Plaintiffs' fn. 6, "Unless otherwise stated, all emphasis is added."

205.    *(15) DBALT 2007-OA4.*  HSBC filed a complaint against DBSP on May 31, 2013 alleging R&W breaches in the DBALT 2007-OA4 trust.  [Duffy Ex. 30 (DBALT 2007-OA4 Compl. at 1.]  HSBC alleged that "[m]ore than 91 percent of the Mortgage Loans subject to . . . Forensic Review — 137 out of 150 Mortgage Loans — breached DBSP's representations and warranties."  [Duffy Ex. 4 (Blum 66); *see also* Duffy Ex. 30 (DBALT 2007-OA4 Compl. ¶ 13).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the DBALT 2007-OA4 trust and at the express written direction and indemnification of certificate holders in that trust; further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, but Paragraph 205 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

149

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

206.    *(16) ACE 2007-HE5.*  HSBC filed a complaint against DBSP on May 31, 2013 alleging R&W breaches in the ACE 2007-HE5 trust.  [Duffy Ex. 31 (ACE 2007-HE5 Compl. at 1).]  The complaint alleged that "[m]ore than 61% of the Mortgage Loans subject to the Forensic Review . . . breached DBSP's representations and warranties," and "at least 395" breaching loans were identified.  [Duffy Ex. 4 (Blum 66); *see also* Duffy Ex. 31 (ACE 2007-HE5 Compl. ¶ 12).]

HSBC's Response:  Undisputed the referenced complaint was filed by HSBC solely in its representative capacity as Trustee of the ACE 2007-HE5 trust and at the express written direction and indemnification of certificate holders in that trust.  Further undisputed that the complaint, based on an investigation conducted independently by the directing certificate holder, contained allegations including the partial and incomplete allegations identified above, however, the allegation concerning "at least 395" breaching loans was not the result solely of the Forensic Review, but also a Data Review, according to the complaint.  Duffy Ex. 31 ¶ 12.  But Paragraph 203 is immaterial in any event.  *See* HSBC's Response to ¶ 169.

Plaintiffs' Reply:  HSBC does not dispute Plaintiffs' primary assertion, and this fact is material.  *See* Plaintiffs' Reply ¶ 169.

207.    Between October 2011 and November 2013, HSBC received breach notices from certificateholders (in some instances their attorneys) for at least nine DBSP sponsored trusts listing large-scale breaches throughout DBSP-sponsored trust.  [Duffy Ex. 4 (Blum 60-62).]

HSBC's Response:  Disputed, but immaterial.  The referenced breach notices did not "list[] large-sale breaches throughout DBSP-sponsored trust," as Plaintiffs allege without any citation to the breach notices themselves.  In any event, Plaintiffs' claim in paragraph 207 should

be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6); *see also Anderson*, 477 U.S. at 248. Plaintiffs' claim in paragraph 207 is irrelevant to Plaintiffs' R&W claims because such claims must be proven loan-by-loan and cannot be proven based on "pervasive breach."  *Royal Park*, 2017 WL 945099, at *4-5; *see* HSBC's Response to ¶ 169.

Furthermore, Plaintiffs cite no evidence to demonstrate that, as Plaintiffs claim, "[b]etween October 2011 and November 2013, HSBC received breach notices from certificateholders (in some instances their attorneys) for at least nine DBSP sponsored trusts listing large-scale breaches throughout DBSP-sponsored trust."  *See* L.R. 56.1(d) ("[E]ach statement by the movant or opponent . . . must be followed by citation to evidence which would be admissible[.]"); Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").  Instead, Plaintiffs improperly cite to the report of their own purported expert who claims to describe purported "breach notices" for other loans in other trusts.  *See* Duffy Ex. 4 (Blum 93-94).  Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration, and it is therefore inadmissible. *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Plaintiffs' Reply:  HSBC does not dispute the primary assertion: that HSBC received breach notices for other DBSP trusts.  These notices did in fact include "large scale" breaches. [*E.g.*, Duffy Ex. 61, at HSBCCTLA1815818-819 (10/27/2011 Kasowitz Letter) (giving notice of 310 R&W breaches in ACE 2007-HE3); Duffy Ex. 62, at DBSP_NCUA-HSBC_00001353

(8/29/2012 Stradley Letter) (giving notice of 1,065 R&W breaches in ACE 2007-WM2).]  The Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  *See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.

208.    On January 4, 2012, HSBC received a breach notice letter from Freddie Mac, a certificateholder of the MHL 2007-1 Trust, identifying 1,077 loans in MHL 2007-1 breaching "one or more of the representations and warranties regarding the Mortgage Loans made by the Sponsor in the Mortgage Loan Purchase Agreement."  [Duffy Ex. 32 at HSBCCTLA95198 (1/4/12 Freddie Mac Ltr.).]

HSBC's Response:  Undisputed, but immaterial.  Plaintiffs' claim in paragraph 208 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6); *see also Anderson*, 477 U.S. at 248.  As Plaintiffs admit in paragraphs 4(e) and 15 herein, Plaintiffs' interest in MHL 2007-1 was backed exclusively by Group 2 loans.  *See* HSBC 56.1 ¶¶ 4(e), 15.  The January 4, 2012 letter that Plaintiffs cite in paragraph 208 concerned Group 1 loans.  *See* Duffy Ex. 32 at HSBCCTLA95198 (1/4/12 Freddie Mac Ltr.).  Even Plaintiffs' purported expert, Shev, admits that the January 4, 2012 letter does not concern loans at issue in this case.  *See* Uhlig Ex. 42 (Shev Report at 46).  Plaintiffs' paragraph 208 is therefore irrelevant to Plaintiffs' R&W claims because Plaintiffs must prove their claims with loan-specific evidence and cannot rely on theories of "pervasive breach."  *Royal Park*, 2017 WL 945099, at *4-5; *see* HSBC's Response to

¶ 169.  Plaintiffs also cite no evidence to support their claim that HSBC "received" this letter on January 4, 2012.

> Plaintiffs' Reply:  HSBC does not dispute the primary assertion that HSBC received breach notices for the MHL 2007-1 Trusts.  As evidenced by the Shev Report, Plaintiffs did not cite this fact to suggest this letter concerned the at-issue loans, but rather as additional evidence of red flags HSBC received and ignored regarding the at issue trusts.

209.    In March 2007, securities underwriter Goldman Sachs informed HSBC that 14 Fremont trusts (including FHLT 2006-C) very likely had numerous R&W breaches.  Thomas Musarra, HSBC CTLA Vice President, responded by emailing custodian Wells Fargo, requesting that, "[b]efore we respond to Goldman, we would like to see current exception reports for the deals in question."  [Duffy Ex. 47 (3/15/2007 Musarra email).]  Musarra recognized the link between Mortgage File breaches and R&W breaches.

> HSBC's Response:  Disputed, but immaterial.  Plaintiffs' claim in paragraph 209 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6; *see also Anderson*, 477 U.S. at 248. Judge Netburn already rejected NCUA's attempt to claim that the Goldman letter was relevant. *See RP/HSBC I, 2017 WL 945099*, at *7 ("As an example of inquiry notice, plaintiffs cite a letter from Goldman Sachs, the trusts' securities underwriter, warning HSBC's Corporate Trust and Loan Agency group of potential breaches in 14 trusts backed by loans from the same originator without identifying specific breaches. Plaintiffs argue that HSBC 'discovered' the breaches in these 14 trusts because it should have known they existed due to the pervasive breach rates.  But

without knowing the specific document defects in specific loans, HSBC could not have 'discovered' any breaches in the trust and provide notice.").

Furthermore, the March 2007 letter to which Plaintiffs refer does not state anywhere that the trusts at issue in the letter "very likely had numerous R&W breaches. *See* Duffy Ex. 47 (3/7/2007 Goldman Letter). To the contrary, it states "there may exist breaches of the originators' representations and warranties." *Id.* Likewise, the email chain cited by Plaintiffs does not say anywhere that "Musarra recognized the link between Mortgage File breaches and R&W breaches," and Plaintiffs cite no evidence to support their claim. *See id.*

Plaintiffs' Reply:  HSBC does not dispute the primary assertion, that in response to a communication that "there may exist breaches of the originators' representations and warranties" in 14 Fremont trusts (including FHLT 2006-C), HSBC's trust manager Thomas Musarra requested "to see current exception reports for the deals in question." [Duffy Ex. 47 (3/15/2007 Musarra email).] Accordingly, a jury reasonably may infer that Mr. Musarra thought there was some connection between R&W breaches and exceptions reports. Plaintiffs also have addressed the "discovery" or "receipt of notice" standard in their merits briefs. [*See* NCUA Br. 22-23; NCUA Reply 4-6.]

210.    HSBC was aware of systematic failures in the assembly line and breaches in loans originated by Argent, who originated 100% of the ACE 2005-AG1 loans. In 2008, the U.S. Office of the Comptroller of the Currency ranked Argent among the very worst originators in the country (of which HSBC was aware), and a 2011 lawsuit, of which HSBC was aware, alleged in detail systematic failure by Argent to follow underwriting standards, citing 2008 and 2010 public information that that Argent employees committed fraud and assisted in falsifying borrower information. [Duffy Ex. 4 (Blum 79-80).]

HSBC's Response:  Disputed, but immaterial.  Plaintiffs' claim in paragraph 210 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6); *see also Anderson*, 477 U.S. at 248. Plaintiffs' alleged "systematic failures in the assembly line and breaches in loans" and claim that "HSBC was aware" of a 2011 lawsuit are irrelevant to Plaintiffs' R&W claims because such claims must be proven loan-by-loan and cannot be proven based on "pervasive breach."  *Royal Park*, 2017 WL 945099, at *4-5; *see* HSBC's Response to ¶ 169.

Furthermore, Plaintiffs cite no evidence to demonstrate that, as Plaintiffs claim, "HSBC was aware of systematic failures in the assembly line and breaches in loans originated by Option One."  Plaintiffs also fail to cite any evidence to support their claims that "[i]n 2008, the Comptroller also ranked Argent among the very worst originators in the country (of which HSBC was aware)," and "a 2011 lawsuit, of which HSBC was aware, alleged in detail systematic failure by Argent to follow underwriting standards, citing 2008 and 2010 public information that that Argent employees committed fraud and assisted in falsifying borrower information."  *See* L.R. 56.1(d); L.R. 56.1 Committee Note; Fed. R. Civ. P. 56(c); Fed. R. Evid. 1002.  Instead, Plaintiffs improperly cite to the report of their own purported expert who claims to describe an article from the internet, several produced documents, and a complaint in a federal law suit.  *See* Duffy Ex. 4 (Blum 79-80).  Furthermore, Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration, and it is therefore inadmissible.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Plaintiffs' Reply:  HSBC does not dispute the primary assertion that HSBC knew of systematic problems regarding the originator and did nothing.  Plaintiffs also have addressed the

"discovery" or "receipt of notice" standard in their merits briefs.  [*See* NCUA Br. 22-23; NCUA Reply 4-6.]  The Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

211.    HSBC was aware of systematic failures in the assembly line and breaches in loans originated by Option One, who originated 100% of the loans in ACE 2006-OP2.  In 2008, the Comptroller also ranked Option One among the very worst originators in the country, and in 2011 HSBC employees exchanged emails regarding a FHFA complaint alleging the systemic failure of Option One to adhere to underwriting guidelines.  [Duffy Ex. 4 (Blum 93-94).]

<u>HSBC's Response</u>:  Disputed, but immaterial.  Plaintiffs' claim in paragraph 211 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6); *see also Anderson*, 477 U.S. at 248.  Plaintiffs' alleged "systematic failures in the assembly line and breaches in loans" are irrelevant to Plaintiffs' R&W claims because such claims must be proven loan-by-loan and cannot be proven based on "pervasive breach."  *Royal Park*, 2017 WL 945099, at *4-5; *see* HSBC's Response to ¶ 169.

Furthermore, Plaintiffs cite no evidence to demonstrate that, as Plaintiffs claim, "HSBC was aware of systematic failures in the assembly line and breaches in loans originated by Option One."  Plaintiffs also fail to cite any evidence to support their claims that "[i]n 2008, the Comptroller also ranked Option One among the very worst originators in the country," and "in 2011 HSBC employees exchanged emails regarding a FHFA complaint alleging the systemic

failure of Option One to adhere to underwriting guidelines," in violation of the Local and Federal Rules.  *See* L.R. 56.1(d); L.R. 56.1 Committee Note; Fed. R. Civ. P. 56(c); Fed. R. Evid. 1002. Instead, Plaintiffs improperly cite to the report of their own purported expert who claims to describe an article from the internet, several produced documents, and a complaint in a federal law suit.  *See* Duffy Ex. 4 (Blum 93-94).  Furthermore, Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration, and it is therefore inadmissible.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Plaintiffs' Reply:  HSBC does not dispute the primary assertion, that HSBC knew of systematic problems regarding the originator and did nothing.  Plaintiffs also have addressed the "discovery" or "receipt of notice" standard in their merits briefs.  [*See* NCUA Br. 22-23; NCUA Reply 4-6.]  The Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

212.    Countrywide originated 39% of the DBALT 2007-OA1 loans.  In 2008, the Comptroller also ranked Countrywide among the very worst originators in the country, and an SEC lawsuit and public reporting indicated Countrywide's assembly line process disregarded guidelines, producing breaching loans.  [Duffy Ex. 4 (Blum 106-107).]

HSBC's Response:  Disputed, but immaterial.  Plaintiffs' claim in paragraph 212 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6); *see also Anderson*, 477 U.S. at 248. Plaintiffs' claim in paragraph 212 is irrelevant to Plaintiffs' R&W claims because such claims

must be proven loan-by-loan and cannot be proven based on "pervasive breach." *Royal Park*, 2017 WL 945099, at *4-5; *see* HSBC's Response to ¶ 169.

Furthermore, Plaintiffs fail to cite any evidence to support their claim that "[i]n 2008, the Comptroller also ranked Countrywide among the very worst originators in the country" or that "an SEC lawsuit and public reporting indicated Countrywide's assembly line process disregarded guidelines, producing breaching loans," in violation of the Local and Federal Rules. *See* L.R. 56.1(d); L.R. 56.1 Committee Note; Fed. R. Civ. P. 56(c); Fed. R. Evid. 1002.  Instead, Plaintiffs improperly cite to the report of their own purported expert who claims to describe an article from the internet, several produced documents, and a complaint in a federal law suit. *See* Duffy Ex. 4 (Blum 106-107).  Furthermore, Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration, and it is therefore inadmissible. *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Plaintiffs' Reply:  HSBC does not dispute the primary assertion, that HSBC knew of systematic problems regarding the originator and did nothing.  Plaintiffs also have addressed the "discovery" or "receipt of notice" standard in their merits briefs.  [*See* NCUA Br. 22-23; NCUA Reply 4-6.]  The Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can and will testify to all of the opinions set out in his reports, such that the Court at summary judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

213.    HSBC was aware of systematic failures and breaches in loans originated by MortgageIT, who originated 100% of the MHL 2007-1 loans.  In 2011, Mr. Musarra and Acebedo exchanged a newspaper article regarding a "fraud lawsuit" the U.S. Attorney's Office in New York filed against Deutsche Bank alleging "blatant disregard" by MortgageIT of

underwriting standards.  [Duffy Ex. 4 (Blum 75-76, 121).]

HSBC's Response:  Disputed, but immaterial.  Plaintiffs' claim in paragraph 213 should be disregarded for failure to comply with the requirements for a 56.1 statement because it is neither relevant to the claims at issue nor supported by citations to specific and relevant evidence.  *See* L.R. 56(a); J. Schofield Indiv. R. III.C.6); *see also Anderson*, 477 U.S. at 248.  Plaintiffs' alleged "systematic failures and breaches" are irrelevant to Plaintiffs' R&W claims because such claims must be proven loan-by-loan and cannot be proven based on "pervasive breach."  *Royal Park*, 2017 WL 945099, at *4-5; *see* HSBC's Response to ¶ 169.

Furthermore, Plaintiffs cite no evidence to demonstrate that, as Plaintiffs claim, "HSBC was aware of systematic failures and breaches in loans originated by MortgageIT."  Plaintiffs also fail to cite any admissible evidence of the purported communication between Mr. Musarra and Mr. Acebedo or the purported attached "newspaper article."  *See* L.R. 56.1(d); L.R. 56.1 Committee Note; Fed. R. Civ. P. 56(c); Fed. R. Evid. 1002.  Instead, Plaintiffs improperly cite to the report of their own purported expert who claims to describe an email between Mr. Musarra and Mr. Acebedo and an attached article, and who baselessly proclaims that Mr. Musarra and Mr. Acebedo "read this article."  *See* Duffy Ex. 4 (Blum 75-76).  Furthermore, Plaintiffs fail to verify Blum's unsworn report with an affidavit or declaration, and it is therefore inadmissible.  *See* L.R. 56.1(d); Fed. R. Civ P. 56(c)(4), (e); *Berk*, 380 F. Supp. 2d at 352.

Plaintiffs' Reply:  HSBC does not dispute the primary assertion that HSBC knew of systematic problems regarding the originator and did nothing.  Plaintiffs also have addressed the "discovery" or "receipt of notice" standard in their merits briefs.  [*See* NCUA Br. 22-23; NCUA Reply 4-6.]  The Blum report reflects what Mr. Blum will testify to at trial, such live testimony will certainly be admissible, and Mr. Blum has provided a sworn declaration that at trial he can

and will testify to all of the opinions set out in his reports, such that the Court at summary

judgment may consider his reports.  [*See* Blum Aff. ¶ 3; Plaintiffs' Further Response to ¶ 61.]

## XI.   ADDITIONAL FACTS RELEVANT TO DEFENDANT'S AFFIRMATIVE DEFENSE OF DAMAGES OFFSETS

214.   In *NCUA. v. RBS*, NCUA alleged the "Offering Documents contained untrue

statements of material fact or omitted to state material facts *in violation of Sections 11 and

12(a)(2) of the Securities Act of 1933* ('Securities Act'), 15 U.S.C. §§ 77k, 77*l*(a)(2) ('Section

11' and 'Section 12(a)(2),' respectively), and Article 5 of the Kansas Uniform Securities Act,

Kan. Stat. Ann. § 17-12a509."  [Duffy Ex. 3 (Second Am. Compl. ¶ 3).]

HSBC's Response:  Undisputed that NCUA's complaint against RBS contains the quoted

language.

215.   NCUA alleged that RBS's conduct violated Section 11, as follows:  (1) "[a]t the

time the registration statement became effective, it (including the prospectus and any prospectus

supplements) contained untrue statements and omitted facts that were necessary to make the

statements made not misleading"; (2) "[t]he untrue statements and omitted facts were material

because a reasonably prudent investor deciding whether to purchase the Certificates would have

viewed them as important and as substantially altering the total mix of information available";

(3) "U.S. Central purchased the certificates pursuant to and traceable to the defective

Registration Statement"; and (4) "[a]t the time U.S. Central purchased the Certificates, it did not

know of the untrue statements and omissions contained in the registration statement."  [Duffy

Ex. 3 (Second Am. Compl. ¶¶ 391-94).]

HSBC's Response:  Undisputed that NCUA's complaint against RBS contains the quoted

language.

Dated: August 10, 2021                          Respectfully submitted,

                                                /s/ George A. Borden
                                                George A. Borden
                                                Kevin M. Hodges (*pro hac vice*)
                                                Andrew W. Rudge (*pro hac vice*)
                                                Edward C. Reddington (*pro hac vice*)
                                                Noah M. Weiss (*pro hac vice*)
                                                Lauren H. Uhlig (*pro hac vice*)
                                                Matthew B. Underwood (*pro hac vice*)
                                                WILLIAMS & CONNOLLY LLP
                                                725 Twelfth Street, N.W.
                                                Washington, DC 20005
                                                Telephone: (202) 434-5000
                                                Facsimile: (202) 434-5029
                                                gborden@wc.com
                                                khodges@wc.com
                                                arudge@wc.com
                                                ereddington@wc.com
                                                nweiss@wc.com
                                                luhlig@wc.com
                                                munderwood@wc.com

                                                *Counsel for HSBC Bank USA, N.A.*

Dated: August 24, 2021

George A. Zelcs
John A. Libra
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
stillery@koreintillery.com

Of Counsel:
Jeffrey A. Zick
Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
jzick@ncua.gov

Respectfully submitted,

/s/ *Scott K. Attaway*
David C. Frederick
Scott K. Attaway
Matthew M. Duffy
Ana Nikolic
Catherine M. Redlingshafer
Travis G. Edwards
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
dfrederick@kelloghansen.com
sattaway@kelloghansen.com
mduffy@kelloghansen.com
apaul@kelloghansen.com
credlingshafer@kelloghansen.com
tedwards@kelloghansen.com

*Attorneys for the National Credit Union*
*Administration Board, as Liquidating Agent, and*
*Graeme W. Bush, as Separate Trustee*